## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

JULIAN FERGUSON, Individually and On Behalf of All Others Similarly Situated,

     Plaintiff,

   v.

OPPENHEIMERFUNDS, INC.,
OPPENHEIMER INTEGRITY FUNDS,
OPPENHEIMER CORE BOND FUND,
WILLIAM L. ARMSTRONG,
JOHN V. MURPHY,
BRIAN W. WIXTED,
ROBERT G. AVIS,
GEORGE C. BOWEN,
EDWARD L. CAMERON,
JON S. FOSSEL,
SAM FREEDMAN,
BEVERLY L. HAMILTON,
ROBERT J. MALONE,
F. WILLIAM MARSHALL, JR., and
OPPENHEIMERFUNDS DISTRIBUTOR, INC.,

     Defendants.

---

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## FEDERAL SECURITIES LAWS

### JURY TRIAL DEMANDED

---

### NATURE OF THE ACTION

     1.     This is a class action on behalf of all persons and entities who purchased shares of the Oppenheimer Core Bond Fund (the "Fund") on or after April 27, 2007 (the "Class Period"), and who were damaged thereby. Plaintiff sues under the Securities Act of 1933 (the "Securities Act") and the Investment Company Act of 1940 (the "ICA") in connection with the Fund's April 27, 2007 and April 29, 2008 offerings (the "Offerings").

2.      The Fund was organized as a series of the Oppenheimer Integrity Funds, a Massachusetts business trust, founded in April 1982.  The Trust is an open-end, diversified management investment company.  At all relevant times, the Fund was managed by OppenheimerFunds. The Fund offers five classes of shares.

3.      According to the Fund's April 27, 2007 and April 29, 2008 Registration Statements on Form N-1A, Prospectuses and Statements of Additional Information filed with the Securities and Exchange Commission (collectively the "Prospectuses"), the Fund seeks "total return," or "income earned on the Fund's investments, plus capital appreciation, if any, which generally arises from decreases in interest rates, improving credit fundamentals for a particular sector or security, and managing pre-payment risks associated with mortgage-related securities as well as other techniques."  The Fund claimed that it would strive toward this objective by investing primarily in investment-grade bonds and United States government securities.

4.      Moreover, the Fund promoted itself as appropriate for, and was offered by, college savings plans, known as 529 plans, in Illinois, Oregon, Texas, Maine and New Mexico. Additionally, the Fund described itself as being designed "to be a long-term investment" and appropriate as "a part of a retirement plan portfolio."

5.      In direct conflict with the Fund's stated investment objective, and without notifying investors, the Fund altered its investment strategy and began to assume substantially greater levels of risk than those implicated by the fund's stated objectives and policies.  The Fund dramatically increased its use of derivative instruments and purchases of highly volatile mortgage-related securities.

6.      The Fund further increased its risk profile, in violation of its stated investment objectives and policies, by significantly increasing its leverage up to 180% of net assets.  The

2

Fund borrowed money using the Fund's assets as collateral and then used the proceeds to pursue high risk derivative transactions. The use of leverage greatly increased the Fund's potential loss by exposing it to the risk of loss on its new investments in addition to loss associated with its existing asset bases.

7. Moreover, the Fund's use of off-balance-sheet vehicles to create leverage helped to conceal from investors the Fund's full exposure to risky derivatives. Specifically, the Fund engaged in total return swaps. A total return swap is a financial contract between parties to exchange cash flows in the future based on the performance of a specified security or group of securities. In the midst of the severe downturn in the residential real estate market in 2007 and 2008, the Fund entered into swaps related to commercial real estate, speculating that the commercial real estate market would rally and not suffer the same fate as the residential market. The risky venture caused the Fund to report substantial declines in its portfolio value as the market for commercial real estate property massively declined in the Fall of 2008.

8. The Fund concurrently increased its sales of credit default swaps, including selling credit default swaps tied to companies on the brink of collapse like American International Group ("AIG") and Lehman Brothers Holdings Inc. ("Lehman"). Credit default swaps are insurance contracts that insure against default on debt and equity securities such as corporate bonds. In a credit default swap, two parties enter into a private contract whereby the buyer of the protection agrees to pay the seller premiums over a set period of time which is typically four or five years. In exchange, the seller agrees to pay the buyer in the event a particular credit crisis occurs such as a default on the underlying securities.

9. Credit default swaps can be sold by either the buyer or the seller. These types of financial instruments can be used by the buyer of the instrument as a hedge against credit risk. A

hedge is an investment that is made to reduce or offset the risk associated with another investment. As for the seller of the instrument, these types of transactions create a certain amount of credit risk which the seller is willing to assume in exchange for the steady stream of payments. By entering into derivative and hedging transactions involving companies facing severe credit and liquidity problems, the Fund assumed extremely high levels of risk which its investment manager failed to offset and which was concealed from investors.

10.     In the wake of the collapse of the subprime mortgage market, the credit default swap market began to show signs of distress by summer 2007 and into the fall. By early 2008, the market for credit default swaps had declined significantly. Despite the risks associated with these types of investments, the Fund not only continued selling swaps in 2007 and 2008, but also increased its use of them until September 2008 when AIG and Lehman collapsed.

11.     After Bear Stearns Companies ("Bear Stearns") collapsed in mid-March 2008, rumors began circulating that Lehman faced a similar cash crunch and many Wall Street observers believed Lehman would be the next investment bank to fail after Bear Stearns. The concerns and speculations regarding Lehman persisted right up until the company filed for bankruptcy in September 2008.

12.     Likewise, AIG began to report serious problems with its own credit default swaps in February 2008, writing down billions of dollars in its credit default swap portfolio and posting the first loss in the Company's 89-year history. AIG continued reporting substantial losses and write downs due in significant part to its credit default swaps until it was rescued by the Government in September 2008.

13.     Despite all the questions and concerns regarding Lehman and AIG as well as credit default swaps themselves, the Fund engaged in selling credit default swaps on Lehman and

AIG paper through September 2008.  These investments were in direct contrast to the Fund's stated objectives.

14.     Both of these types of swaps (total return swaps and credit default swaps) were extraordinarily risky.  In the end, the swaps exposed the Fund to catastrophic losses.

15.     Furthermore, the Fund took on excessive risk by purchasing large amounts of commercial mortgage-backed securities ("CMBSs").  In the beginning of 2008, the Fund purchased substantial stakes in mortgage-related bonds tied to commercial real estate despite the massive deterioration in the subprime market and the overall softening of the real estate market in 2007. Angelo Manioudakis ("Manioudakis"), Senior Vice President and head of the Core Plus team that managed the Fund, said that CMBSs accounted for 10% of the Fund's market value as of January 2008.

16.     By July 2008, the Fund had shed 3.7% of its value.  This drop placed the Fund behind 80% of its category rivals.  Equally, by July the Fund had increased its exposure to nonagency mortgage bonds (commercial and residential) to just over 30% of the Fund's total assets.

17.     The fact that the Fund had increased its exposure by engaging in highly speculative and risky transactions in the hopes of higher returns was not disclosed in the Fund's Prospectuses.  This left investors unaware of these additional risk exposures.  Due to defendants' positive, but false, statements, investors purchased and/or continued to hold shares in the Fund.

18.     The true facts which were omitted from the Prospectuses or were known by the defendants but concealed from the investing public during the Class Period were as follows:

> (a)     The Fund was no longer adhering to its objective but rather, in an effort to achieve greater yields, was pursuing riskier instruments;

(b)     The extent of the Fund's liquidity risk due to the illiquid nature of a large

portion of the Fund's portfolios was omitted;

(c)     The extent of the Fund's risk exposure to derivatives and other high risk

instruments was concealed; and

(d)     The extent of the Fund's leverage exposure was misstated.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of

the 1933 Act and §13(a) of the 1940 Act.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1331, §22 of the 1933 Act and §44 of the 1940 Act.

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because many of

the acts and practices complained of herein occurred in substantial part in this District.

22.     In connection with the acts alleged in this complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, telephone communications and the facilities of the national securities

exchanges.

## PARTIES

23.     Plaintiff Julian Ferguson acquired shares of the Fund during the Class Period as

set forth in the accompanying certification, and has been damaged thereby.

24.     Defendant OppenheimerFunds is one of the largest asset management companies

in the United States.  OppenheimerFunds offers products and services to individuals,

corporations and institutions, including mutual funds, separately managed accounts, investment

management for institutions, hedge fund products, qualified retirement plans and subadvisory

investment-management services.  OppenheimerFunds acts as the Fund's manager and is

primarily responsible for selecting the Fund's investments and handling its day-to-day

operations.

25.      Defendant Oppenheimer Integrity Funds (the "Trust") is an open-end,

management investment company registered under the 1940 Act.  The Trust was the Registrant

for the Fund's Offerings.

26.      Defendant Core Bond Fund is a mutual fund and a series of Oppenheimer

Integrity Funds.   The Core Bond Fund and its trustees are responsible for ensuring that the Fund

complies with its stated objectives.  The Core Bond Fund offers five classes of shares.  The

Fund's classes are as follows:

> Core Bond Fund Class A
> Core Bond Fund Class B
> Core Bond Fund Class C
> Core Bond Fund Class N
> Core Bond Fund Class Y

27.      Defendant William L. Armstrong ("Armstrong") is, and at all relevant times was,

Chairman of the Board of Trustees for the Fund. Defendant Armstrong signed or authorized the

signing of the 2007 and 2008 N-1A Registration Statements.

28.      Defendant John V. Murphy ("Murphy") is, and at all relevant times was,

President, Principle Executive Officer and trustee of the Fund.  Defendant Murphy signed or

authorized the signing of the 2007 and 2008 N-1A Registration Statements.

29.      Defendant Brian W. Wixted ("Wixted") is, and at all relevant times was,

Treasurer and Principal Financial & Accounting Officer of the Fund.  Defendant Wixted signed

or authorized the signing of the 2007 and 2008 N-1A Registration Statements.

30.     Defendant Robert G. Avis ("Avis") was at all relevant times, a trustee of the Fund.  Defendant Avis signed or authorized the signing of the 2007 N-1A Registration Statement.

31.     Defendant George C. Bowen ("Bowen") is, and at all relevant times was, a trustee of the Fund.  Defendant Bowen signed or authorized the signing of the 2007 and 2008 N-1A Registration Statements.

32.     Defendant Edward L. Cameron ("Cameron") is, and at all relevant times was, a trustee of the Fund.  Defendant Cameron signed or authorized the signing of the 2007 and 2008 N-1A Registration Statements.

33.     Defendant Jon S. Fossel ("Fossel") is, and at all relevant times was, a trustee of the Fund.  Defendant Fossel signed or authorized the signing of the 2007 and 2008 N-1A Registration Statements.

34.     Defendant Sam Freedman ("Freedman") is, and at all relevant times was, a trustee of the Fund.  Defendant Freedman signed or authorized the signing of the 2007 and 2008 N-1A Registration Statements.

35.     Defendant Beverly L. Hamilton ("Hamilton") is, and at all relevant times was, a trustee of the Fund.  Defendant Hamilton signed or authorized the signing of the 2007 and 2008 N-1A Registration Statements.

36.     Defendant Robert J. Malone ("Malone") is, and at all relevant times was, a trustee of the Fund.  Defendant Malone signed or authorized the signing of the 2007 and 2008 N-1A Registration Statements.

37.     Defendant F. William Marshall, Jr. ("Marshall") is, and at all relevant times was, a trustee of the Fund.  Defendant Marshall signed or authorized the signing of the 2007 and 2008 N-1A Registration Statements.

38.     The defendants referenced above in ¶¶27-37 are referred to herein as the "Individual Defendants."

39.     Defendant OppenheimerFunds Distributor, Inc. (the "Distributor") acted as the distributor of the Fund and is an affiliate of OppenheimerFunds. The Distributor acted as an underwriter in the sale of the Fund in connection with the Offerings, helping to draft and disseminate the offering documents.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the Fund traceable to the false and misleading Prospectuses for the Offerings, or purchased or held the shares during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and trustees of the OppenheimerFunds, the Fund or any of the other defendants, and at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable. The Fund's shares were actively traded in an efficient market.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class with thousands of outstanding shares.  Record owners and other members of the

Class may be identified from records maintained by the OppenheimerFunds or its transfer agent and may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1933 Act was violated by defendants' acts as alleged herein;

(b)     whether the 1940 Act was violated by defendants' acts as alleged herein;

(c)     whether statements made by defendants to the investing public in the Prospectus misrepresented material facts about the business, operations and management of the OppenheimerFunds or the Fund; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

46.    On April 27, 2007, the Fund filed with the SEC a Registration Statement on Form N-1A, a Prospectus and Statement of Additional Information (collectively the "April 2007 Prospectus").  The April 2007 Prospectus emphasized that "the Fund is intended as a long-term investment… and may be appropriate for a part of an investor's retirement plan portfolio."

47.    The April 2007 Prospectus was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

48.    The April 2007 Prospectus represented the following about the Fund's business and operations:

ABOUT THE FUND

The Fund's Investment Objective and Principal Investment Strategies

WHAT ARE THE FUND'S INVESTMENT OBJECTIVES?  The Fund seeks total return by investing mainly in debt instruments.

WHAT DOES THE FUND MAINLY INVEST IN?  As a non-fundamental policy (which will not be changed without providing 60 days' notice to Fund shareholders), under normal market conditions, the Fund invests at least 80% of its net assets (plus borrowings for investment purposes) in investment grade debt securities.  Those investment-grade debt securities can include:

- domestic and foreign corporate debt obligations,
- domestic and foreign government bonds, including U.S. government securities, and

- mortgage-related securities (including collateralized mortgage obligations ("CMOs")) issued by private issuers. The Fund can also use derivative instruments, including futures, swaps, CMOs and "structured" notes, to seek higher investment returns or to manage investment risks. These investments are more fully explained in "About the Fund's Investments", below:

There is no set allocation of the Fund's assets among the classes of securities the Fund buys, but the Fund focuses mainly on U.S. government securities and investment-grade debt securities. However, if market conditions change, the Fund's portfolio managers might change the relative allocation of the Fund's assets.

The Fund seeks to maintain an average effective portfolio duration (discussed in "About the Fund's Investments", below) of three to six years (measured on a dollar-weighted basis) to try to reduce the volatility of the value of its securities portfolio. The Fund has no limitations on the range of maturities of the debt securities in which it can invest and therefore may hold bonds with short, medium or long-term maturities. Because of market events and interest rate changes, the duration of the portfolio might not meet that target at all times. The Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), will attempt to maintain the overall weighted average credit quality of the portfolio at a rating of "A-" (or equivalent) or higher from any nationally recognized credit rating organization.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL? In selecting securities for the Fund, the Fund's portfolio managers analyze the overall investment opportunities and risks in different sectors of the debt securities markets by focusing on business cycle analysis and relative values between the corporate and government sectors. The portfolio managers' overall strategy is to build a broadly diversified portfolio of corporate and government bonds. The portfolio managers currently focus on the factors below (which may vary in particular cases and may change over time), looking for:

- Debt securities in market sectors that offer attractive relative value,
- Investment-grade securities that offer more income than U.S. treasury obligations with a good balance of risk and return,
- High income potential from different types of corporate and government securities, and
- Broad portfolio diversification to help reduce the volatility of the Fund's share prices.

The portfolio managers monitor individual issuers for changes in the factors above and these changes may trigger a decision to sell a security. Generally, the "total

return" sought by the Fund consists of income earned on the Fund's investments, plus capital appreciation, if any, which generally arises from decreases in interest rates, improving credit fundamentals for a particular sector or security, and managing pre-payment risks associated with mortgage-related securities, as well as other techniques.

WHO IS THE FUND DESIGNED FOR? The Fund is designed for investors seeking total return from a fund that invests primarily in investment-grade debt securities but which can also hold high-yield, below investment grade debt securities. Those investors should be willing to assume the credit risks of a fund that typically invests a significant amount of its assets in corporate-debt securities, and the changes in share prices that can occur when interest rates change. The Fund is intended as a long-term investment, not a short-term trading vehicle, and may be appropriate for a part of an investor's retirement plan portfolio. The Fund is not a complete investment program.

49.     The April 2007 Prospectus stated that the Fund's "[f]undamental policies cannot be changed without the approval of a majority of the Fund's outstanding voting shares.  The Fund's investment objective is a fundamental policy."

50.     Consistent with the Fund's investment objective of seeking total return, the April 2007 Prospectus represented that:

The Manager tries to reduce risks by carefully researching securities before they are purchased. The Fund attempts to reduce its exposure to market risks by diversifying its investments, that is, by not holding a substantial amount of securities of any one issuer and by not investing too great a percentage of the Fund's assets in any one company. Also, the Fund does not concentrate 25% or more of its investments in any one industry.

51.     While acknowledging some risks associated with investing in the Fund, the April 2007 Prospectus emphasized the conservative nature of the Fund: "the Fund's emphasis on investment-grade securities may make its share prices less volatile than high-yield bond funds or funds that focus on foreign bonds."

52.     On April 29, 2008, the Fund filed with the SEC a Registration Statement on Form N-1A, a Prospectus and Statement of Additional Information (collectively the "April 2008

Prospectus"). The April 2008 Prospectus contained substantially similar statements concerning the Fund's objectives and principal investment strategies as contained in the April 2007 Prospectus.

53.     The Prospectuses were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. The true facts which were misstated in or omitted from the Prospectuses included that:

(a)     The Fund was no longer adhering to its objective but rather, in an effort to achieve greater yields, was pursuing riskier instruments;

(b)     The extent of the Fund's liquidity risk due to the illiquid nature of a large portion of the Fund's portfolios was omitted;

(c)     The extent of the Fund's risk exposure to derivatives and other high risk instruments was omitted; and

(d)     The extent of the Fund's leverage exposure was omitted.

54.     On December 12, 2008, Senior Vice President of OppenheimerFunds, Manioudakis, who headed the Core Plus team, resigned from his position. During the relevant period, the Core Plus team managed more than $16 billion in individual investor fund assets, including the Fund.

55.     For the year ended December 16, 2008, the Fund had lost a staggering 37.6%, which was 31 percentage points worse than its typical intermediate-term bond rival's loss.

56.     On December 17, 2008, Morningstar declared that "[w]e've lost confidence in Oppenheimer Core Bond."  The article stated, in pertinent part:

> In the past, we were optimistic that the managers' conviction in the fund's high-quality mortgage holdings would eventually pay off, but we've become increasingly concerned about the magnitude of their bets.  In particular, the team's liberal use of swaps to gain exposure to corporates and CMBS has made matters far worse.  The market for CMBS total-return swaps, for example, seized up in the wake of September's financial sector upheaval.  Meanwhile, those CMBS swaps, the corporate swaps, and the fund's other holdings added up to credit market exposure well beyond the dollar value of the fund's net assets, amplifying the impact of losses on the overall outcome.

> The managers have since replaced many CMBS contracts with bonds, but its upsetting that they didn't anticipate the dangers of the fund's derivative positions in this dysfunctional market.  And it's unacceptable that the firm hasn't more clearly communicated the fund's exposure to various sectors and risks in shareholder reports and web commentary.

57.     Also on December 17, 2008, Morningstar released an article entitled "Oppenheimer Bond Funds Missed the Forest Fire for the Trees" detailing the significant problems at the Core Bond Fund. [1]

> What's been going on with Oppenheimer's bond funds has been so unbelievable that, well, we didn't believe it. We'll get back to that in a minute.

> *   *   *

> Even with 2008's ugly market, we don't need any benchmarks to know that neither [the Core Bond Fund nor the Champion Income Fund] are anywhere near the market averages.

> **Bad Markets, Bad Returns**

> At first blush, the cause seems logical enough. Manioudakis and his team tried to keep powder dry in mid-2007, figuring that good opportunities were going to present themselves. By January 2008, the team had begun packing some of that powder, building positions in four key areas that they felt had become exceedingly cheap. That included AAA rated commercial mortgage-backed securities, nonagency prime (jumbo) mortgages, AA and A rated financial-sector

---

[1] All emphasis in this article is original.

corporate bonds, and very short-maturity high-yield corporates. As we all know by now, the market only got worse and became more illiquid through the course of the year. Each of those areas has been pummeled mercilessly.

Something just didn't add up for us, though. In January, Manioudakis told Morningstar that CMBS consumed 10% of the Core Bond Fund's "absolute market value." But as badly as the sector performed--The Barclays (nee Lehman) CMBS Index fell 27.4%--that alone couldn't possibly explain the portfolio's overall loss of nearly 39% as of Monday. Ditto for the other sectors, even though they lost a lot, as well.

**Not 10 ... This One Goes to 11**

We had some suspicions about the portfolios' exposures, which weren't confirmed for us by Oppenheimer until now. It turns out that when Manioudakis and the crew decided that the four areas they identified were undervalued, they *really* decided.

By the end of March, the Core portfolio carried around $400 million in securities exceeding its (then) $2.2 billion in net assets via transactions that were effectively akin to margin borrowing. It also had roughly $800 million in long exposure to corporate credit via default swaps—including American International Group (AIG), Lehman Brothers, Wachovia (WB), Washington Mutual, and Bear Stearns--and around $600 million in total return swap exposure to a volatile slice of Barclays' AAA rated CMBS index, all of which by normal reporting convention were *not* included on the fund's balance sheet and thus not in its net assets. By the end of September, just before the Treasury Department's Troubled Asset Relief Program proposal and right around the time the market sailed off into uncharted mania, Core Bond's credit exposure to those various markets totaled more than 180% of net assets on a dollar basis. In other words, *for every dollar of shareholder capital in the fund, it was exposed to the credit-driven movement of more than $1.80 worth of securities.*

\* \* \*

…there is just no getting around the fact that the extra layers of market exposure were piled *high*.

**I'm Sorry, I Couldn't Hear That. Would You Speak Up?**

Left there, things would have been plenty bad enough. But they weren't. Because most of the additional market exposure came from off-balance-sheet derivatives, the funds' portfolios didn't *look* highly leveraged. And while they may have been only somewhat leveraged in what we might call a conventional accounting sense-- by borrowing money against your net assets and investing it--they were heavily

16

leveraged as mutual funds go, in an *economic* sense. …And because the managers were careful to control interest-rate risk, in part through futures and swaps, and in part by taking on only credit exposure with their off-balance-sheet derivatives, they may not have really *thought* of their funds as heavily leveraged.

To the degree it existed, that thinking was erroneous, and it's very disappointing that the team didn't internalize just how much risk it was taking. …[The Fund manager] failed to model or plan for the possibility of severe downturns and thus for how they could turn the equivalent of a discarded cigarette into a raging inferno.

The only thing worse than levering up a portfolio with 180% market exposure, though, is doing it quietly. I'd like to be wrong about this, but I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way. The word itself doesn't seem to be linked to any of the funds' strategies anywhere I've searched on Oppenheimer's Web site or in any of the supporting shareholder or marketing materials that we've seen. Terminology aside, none of the portfolio descriptors provides enough information to estimate those market exposures, much less know that they're not typical, 100 cents in, 100 cents invested. There's just no indication whatsoever that anything is unusual about any of the funds that employ this kind of leveraged exposure. And it was never brought up by Oppenheimer managers in any of their recent Morningstar analyst interviews.

\* \* \*

How is it possible that a shareholder can go to its Web site, see that Core Bond is down nearly 40%, or 80% in the case of Champion Income, and yet find no information to use to *figure out why*, much less an actual *explanation*?

\* \* \*

I'm sorry to be glib, but this strains credulity. Here's a news flash, Oppenheimer: If your funds are going to use instruments that involve this much portfolio complexity, you have a duty to translate and simplify what that means for your shareholders. Not doing so is patently unacceptable and comes awfully close to dishonesty by omission. While most of your competitors haven't taken on anywhere near this much risk, many use similar portfolio techniques and are just as guilty of these omissions. I can think of numerous ways this can all happen without intent, but we're way past the honeymoon period now that these tools have been around for quite a while. It's time for this to stop all around.

\* \* \*

**...** it seems that Manioudakis and his crew were overly focused on trees that appeared to be incredible bargains. They backed up all of their trucks and even used a few of their neighbors'. Sadly, it seems that they couldn't see that the forest was on fire.

58.     On February 5, 2009, *Morningstar* again reported on the Fund in an article

entitled "Fund Companies Falling Short on Stewardship." The article provided in part:

If you step back and think about it, it's not hard to be a good steward of capital. Mutual funds simply have to care for fundholders' capital the same way they'd want their own money to be run: with sensible strategies, fair prices, and reasonable, straightforward explanations as to why things go well – and not so well.

Some funds – those that receive As for corporate culture as part of Morningstar's Stewardship Grades for funds, for example – seem to have an easy time putting shareholders first. But other firms have apparently lost sight of their mission. What follows are examples of recent fund moves that are disrespectful to the shareholders they're serving.

\*   \*   \*

**Hypocrisy Stings Oppenheimer**

In May 2006, John Murphy, president of OppenheimerFunds, gave the welcoming remarks to the annual ICI General Membership Meeting. . . The theme was "Creating Shareholder Value" and two of his suggestions were a) "Offering competitive investment returns at an appropriate level of risk," and b) "Supplying clear, concise, and relevant information and tools that investors need to make informed investment decisions."

We wish Murphy had followed his own advice. In 2008, Oppenheimer Champion Income lost a nearly inconceivable 78% and sibling Core Bond declined 36%, primarily because the bond funds took on plenty of risk.  Specifically, the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect on the funds. When the market for both bonds and the derivatives became increasingly illiquid as the credit crisis unfolded, the funds got slammed.  Not only did the managers fail to appreciate the risks they were taking, but Oppenheimer also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary. Longtime fixed-income head Jerry Webman has stepped in to try and right the ship at both offerings, but the damage has already been done.

**COUNT I**
**Violations of §11 of the 1933 Act**
**Against All Defendants**

59.     Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.  Plaintiff does not allege that the Individual Defendants or the other defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

60.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

61.     The Prospectuses were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

62.     The Trust is the registrant for the Offerings.  The defendants named herein were responsible for the contents and dissemination of the Prospectuses.

63.     As issuer of the shares, the Trust is strictly liable to Plaintiff and the Class for the misstatements and omissions.

64.     Each of the defendants was responsible for the contents and dissemination of the Prospectuses but none of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectuses were true, without omissions of any material facts and were not misleading.

65.     By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

66.     Plaintiff acquired Fund shares pursuant or traceable to the Prospectuses for the Offerings.

67.     Plaintiff and the Class have sustained damages. The value of the Fund's shares has declined subsequent to and due to defendants' violations.

68.     At the time of their purchases of the Fund's shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

**COUNT II**
**Violations of §12(a)(2) of the 1933 Act Against**
**Defendants OppenheimerFunds, the Trust, the Fund and the Distributor**

69.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

70.     This Count is brought pursuant to §12(a)(2) of the 1933 Act on behalf of the Class, against defendants OppenheimerFunds, the Trust, the Fund and the Distributor.

71.     This Count does not sound in fraud.  Plaintiff does not allege that the defendants had scienter or fraudulent intent, which are not elements of this claim.

72.     These defendants were sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to the Prospectuses.

73.     The Prospectuses contained untrue statements of material facts, omitted to state

other facts necessary to make the statements made not misleading, and omitted to state material

facts required to be stated therein.  The actions of solicitation of the defendants named in this

claim included participating in the preparation of the false and misleading Prospectuses and

participating in marketing the Fund to investors.

74.     These defendants owed to the purchasers of the Fund's shares, including Plaintiff

and other Class members, the duty to make a reasonable and diligent investigation of the

statements contained in the Prospectuses, to ensure that such statements were true and that there

was no omission to state a material fact required to be stated in order to make the statements

contained therein not misleading.  Defendants, in the exercise of reasonable care, should have

known of the misstatements and omissions contained in the offering materials as set forth above.

75.     Plaintiff and other members of the Class purchased or otherwise acquired shares

of the Fund pursuant to and/or traceable to the defective Prospectuses.

76.     By reason of the conduct alleged herein, these defendants violated, and/or

controlled a person who violated, §12(a)(2) of the 1933 Act.  Accordingly, Plaintiff and

members of the Class who hold Fund shares purchased in the Offerings have the right to rescind

and recover the consideration paid for their Fund shares, with interest, and hereby elect to

rescind and tender their Fund shares to the defendants sued herein.  Plaintiff and Class members

who have sold their shares in the Fund are entitled to recessionary damages.

## COUNT III
### Violations of §15 of the 1933 Act
### Against Individual Defendants, the Trust and OppenheimerFunds

77.     Plaintiff repeats and realleges each and every allegation contained above.  For

purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be

construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

78.     This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants, the Trust and OppenheimerFunds.

79.     This Count does not sound in fraud.  Plaintiff does not allege that the Individual Defendants or the other defendants had scienter or fraudulent intent, which are not elements of this claim.

80.     Each of the Individual Defendants was a control person of the Fund by virtue of his or her position as a trustee and/or senior officer of the Fund.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other trustees and/or officers and/or major shareholders of the Fund.

81.     The Trust was a control person of the Fund because the Fund was a series of the Trust and the Trust acted as the registrant for the Fund's Offerings.

82.     Each of the Individual Defendants, the Trust and OppenheimerFunds were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Prospectuses and having otherwise participated in the process which allowed the Offering to be successfully completed.

### COUNT IV
### Violations of §13(a) of the 1940 Act
### Against Defendants OppenheimerFunds, the Trust and the Fund

83.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

84.     This Count is asserted against OppenheimerFunds, the Trust and the Fund for violations of §13(a) of the 1940 Act.

85.     The stated investment objective of the Fund was to seek total return.

86.     OppenheimerFunds and the Fund did not obtain authorization from a majority of the Fund's outstanding voting shareowners prior to deviating from the Fund's investment policy with respect to its objective.  This deviation exposed investors to increased risk.

87.     This deviation ultimately led to losses for the Fund's investors.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissionary measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

Dated:  May 22, 2009                    Respectfully submitted,

                                        SHERMAN & HOWARD L.L.C.


                            By:  s/  *Peter G. Koclanes*
                                 Gordon W. Netzorg (gnetzorg@shermanhoward.com)
                                 Peter G. Koclanes (pkoclanes@shermanhoward.com)
                                 633 17th Street, Suite 3000
                                 Denver, Colorado 80202
                                 Telephone: (303) 297-2700
                                 Facsimile: (303) 298-0940

                                 and

GIRARD GIBBS LLP

Daniel C. Girard (dcg@girardgibbs.com)
Jonathan K. Levine* (jkl@girardgibbs.com)
Aaron M. Shenin* (ams@girardgibbs.com)
Regina A. Sandler* (ras@girardgibbs.com)
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

COUNSEL FOR INDIVIDUAL AND
REPRESENTATIVE PLAINTIFF JULIAN FERGUSON

* Not yet admitted in the District of Colorado.

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF
PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Julian Ferguson, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint against Oppenheimer Core Bond Fund and others prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.

2.      I did not acquire any shares of the Oppenheimer Core Bond Fund at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.    My purchases and sales of shares of the Oppenheimer Core Bond Fund

during the class period are listed in **Attachment A** to this document.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15ᵗʰ day of May, 2009.

Julian Ferguson

2

**ATTACHMENT A**

**JULIAN FERGUSON'S TRANSACTIONS IN
OPPENHEIMER CORE BOND FUND (OPIGX), DURING THE CLASS PERIOD**

| TRADE DATE | AMOUNT INVESTED | PRICE PER SHARE | NUMBER OF SHARES | PURCHASE OR SALE |
|---|---|---|---|---|
| 3/11/08 | $25,831.30 | $9.34 | 2,765.664 | PURCHASE |
| 1/30/09 | $127.41 | $5.79 | 22.005 | PURCHASE |
| 2/27/09 | $122.31 | $5.33 | 22.947 | PURCHASE |
| 3/10/09 | $15,340.42 | $5.17 | 2,967.199 | SALE |