# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. **09-cv-1186-JLK-KMT**

JULIAN FERGUSON, Individually and on Behalf of all Others Similarly Situated,

      Plaintiff,

v.

OPPENHEIMERFUNDS, INC., et al.,

      Defendants.

---

## CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ....................................................................................................1

    A.    Claims of the Securities Class...................................................................1

    B.    The Staggering Losses ...............................................................................4

    C.    Plaintiff's Claims ......................................................................................5

II.    JURISDICTION AND VENUE ............................................................................5

III.    PARTIES ...............................................................................................................6

    A.    Lead Plaintiff ............................................................................................6

    B.    Defendants .................................................................................................6

        1.    The Corporate Defendants .............................................................6

        2.    The Individual Defendants..............................................................7

        3.    Control Allegations........................................................................8

IV.    FACTUAL ALLEGATIONS ................................................................................9

    A.    Introduction to the Fund............................................................................9

    B.    The Relevant Registration Statements and SEC-Filed Prospectus Materials for the Fund ..........................................................................................................9

    C.    The Misstatements of Material Fact and Material Omissions Contained in the Fund's Registration Statements and SEC-Filed Prospectus Materials .......................10

    D.    The Material Misrepresentations and Omissions by Defendants ...............................16

        1.    The Fund made overconcentrated investments on mortgage-related bonds....17

        2.    The Fund became highly leveraged due to speculative, undisclosed off-balance sheet bets on derivative instruments known as total-return swaps and credit-default swaps. ...........................................................................18

        3.    Fund managers recognized that they were exceeding risk limit parameters and secretly redefined maximum risk levels.................................................24

        4.    The Fund's omissions and misrepresentations were material.........................25

    E.    Defendants' Misconduct Causes Huge Losses and Analysts Confirm That Defendants Had Not Disclosed the True Risks of the Fund ........................................26

V.    CLASS ACTION ALLEGATIONS .......................................................................31

COUNT I  VIOLATIONS OF SECTION 11 OF THE 1933 ACT AGAINST ALL
          DEFENDANTS ON BEHALF OF THE SECURITIES CLASS ............................................33

COUNT II  VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT AGAINST ALL
          DEFENDANTS ON BEHALF OF THE SECURITIES CLASS ............................................34

COUNT III  VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST THE CONTROL
          GROUP DEFENDANTS ON BEHALF OF THE SECURITIES CLASS ............................35

PRAYER FOR RELIEF ..............................................................................................................36

JURY DEMAND ........................................................................................................................37

Lead Plaintiff C. Phillip Pattison, on behalf of himself and all others similarly situated for this Consolidated Class Action Complaint, alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by and through his undersigned Counsel, which included, *inter alia*, review of Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles, an analysis by an industry expert, and other publicly available materials.

## I.   INTRODUCTION

1.      Lead Plaintiff brings this action against members of the Oppenheimer Funds family on behalf of persons who bought shares in the Oppenheimer Core Bond Fund (the "Fund").  The Fund sold five classes of shares, A, B, C, N, and Y, under the NASDAQ ticker symbols OPIGX, OIGBX, OPBCX, OPBNX, and OPBYX.

2.      Lead Plaintiff alleges that Defendants OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc., Oppenheimer Integrity Funds, and the Fund's Trustees violated the federal securities laws in registering, marketing and selling the Fund as a broadly diversified portfolio of investment grade corporate and government bonds designed to seek total return and reduce share price volatility.  The Fund was substantially more risky than represented because it took huge gambles on mortgage-backed securities and speculative derivatives that caused the Fund to crash.  Those risks were not disclosed to investors.

3.      Lead Plaintiff seeks to certify a "Securities Class" as defined below.  (*See* ¶91 *infra*.)  This complaint uses "Relevant Time Period" to refer to the time period April 30, 2007 to December 31, 2008.  The claims of the Securities Class are summarized below.

**A.      Claims of the Securities Class**

4.      The Registration Statements, Prospectuses, and Statements of Additional Information dated April 30, 2007 and April 29, 2008, as well as other prospectus materials such as notes, circulars, and other written communications, made fundamental and material representations to investors that the Fund was diversified and did not take any undue risks.  By way of example, these representations included statements that:

- The Fund "invests at least 80% of its net assets (plus borrowings for investment purposes) in investment grade debt securities."

- The Fund "focuses mainly on U.S. government securities and investment-grade debt securities."

- "The portfolio managers' overall strategy is to build a broadly diversified portfolio of corporate and government bonds."  (Emphasis added.)

- The portfolio managers look for "[b]road portfolio diversification to help reduce the volatility of the Fund's share price."  (Emphasis added.)

- "The Fund is designed for investors seeking total return from a fund that invests primarily in investment-grade securities . . . ."

- "The Fund will not invest more than 15% of its net assets in illiquid or restricted securities."

- "The Fund cannot borrow money in excess of 33 1/3% of the value of its total assets."

- "The Fund is intended as a long-term investment, not a short-term trading vehicle, and may be appropriate for a part of an investor's retirement plan portfolio."

- "The Fund cannot concentrate its investments (that means it cannot invest 25% or more of its total assets) in any one industry."

5.     The foregoing representations, as with other representations made by Defendants to the Securities Class, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, or omitted material facts required to be stated therein for the following reasons:

- The Fund did not invest mainly in U.S. government securities and investment-grade debt securities or a broadly diversified portfolio designed to help reduce the volatility of the Fund's share price.  Instead, it became a hedge fund-like investment fund that took extreme risks in a search for speculative, large returns.

- The Fund, among other things, engaged in undisclosed, off-balance sheet credit default swaps and other high-risk derivative instruments with Wall Street firms, promising to pay and insure those Wall Street firms if they lost money as a result of defaults in corporate bonds, CDX indices, ABX indices, and CMBX indices. The magnitude and risky nature of these high-risk bets were never disclosed to shareholders, especially in the heavy concentrations utilized.

- The Fund also failed to disclose the material levels of leverage within the portfolio that resulted from these excessive derivative bets. The total leverage factor reached more than 2.9 times the value of Fund assets by the end of 2008. Indeed, one of the Fund's managers admitted that the Fund got "greedy." This greed exposed the Fund to risks that were never disclosed to investors and were materially inconsistent with the Fund's stated investment objectives.

- The Fund made substantial, undisclosed bets on volatile mortgage-backed securities at a time when that market was severely distressed, and did not seek to avoid such undue risk or use derivatives to try to manage the risk. To the contrary, the Fund invested in these speculative devices in a huge gamble that backfired, multiplying losses.

- The Fund materially exceeded express limitations which prohibited the Fund from (i) investing more than 25% of total assets in any one industry; and (ii) borrowing money in excess of 33 1/3% of the value of total assets.

- The Fund also had inadequate internal controls to prevent Defendants from taking excessive risk. Indeed, the Fund managers ignored the warnings of their own risk managers when the Fund exceeded risk control parameters in April 2008. Moreover, rather than adjust its risk downward, the Fund changed its controls to permit the assumption of even greater risk. After receiving these warnings from its own risk managers, the Fund managers decided that they would, in their own

- 3 -

words, place "<u>big bets</u>" with investors' money – speculative bets that they knew

would exceed the Fund's risk controls.

6.     After the fund's losses were disclosed, financial commentators were outraged by

the utter lack of adequate disclosures and material omissions by Defendants.  As one

Morningstar commentator noted:

> I'm sorry to be glib, but this strains credulity.  Here's a news flash, Oppenheimer:  If your funds are going to use instruments that involve this much portfolio complexity, <u>you have a duty to translate and simplify what that means for your shareholders</u>.  <u>Not doing so is patently unacceptable and comes awfully close to dishonesty by omission</u>.
>
> * * *
>
> The only thing worse than levering up a portfolio with 180% market exposure, though, <u>is doing it quietly</u>.  I'd like to be wrong about this, but <u>I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way</u>.  The word itself doesn't seem to be linked to any of the funds' strategies anywhere I've searched on Oppenheimer's Web site or in any of the supporting shareholder or marketing materials that we've seen.  Terminology aside, none of the portfolio descriptors provides enough information to estimate those market exposures, much less know that they're not typical, 100 cents in, 100 cents invested.  <u>There's just no indication whatsoever that anything is unusual about any of the funds that employ this kind of leveraged exposure</u>.
>
> * * *
>
> When the market for both bonds and the derivatives became increasingly illiquid as the credit crisis unfolded, the funds got slammed.  <u>Not only did the managers fail to appreciate the risks they were taking, but Oppenheimer also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary</u>.

(Emphasis added.)

## B.     The Staggering Losses

7.     The Fund's assets as of June 30, 2008 were over $2.3 billion.  By December 31,

2008, however, Fund assets dropped to just over $1.4 billion, and then to $1.1 billion on June 30,

2009, <u>a more than $1.2 billon drop in 12 months' time</u>.   The Fund's performance was 31

percentage points worse than the typical intermediate-term bond fund.  Indeed, the Fund's

benchmark index – the Barclay's Capital Aggregate Bond Index – actually rose 5.24% in 2008, as reflected in the following graph from *Morningstar*:

Growth of $10,000

<span style="color:blue">Oppenheimer Core Bond A</span>   <span style="color:orange">Intermediate-Term Bond</span>   <span style="color:green">BarCap US Agg Bond TR USD</span>



8.      The Fund's losses were a direct result of the realization of the misrepresented and/or undisclosed risks.

**C.      Plaintiff's Claims**

9.      Lead Plaintiff brings claims under and pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act") (15 U.S.C. §§ 77k, 77l and 77o).

## II.      JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action under § 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. §§ 1331.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Defendants do business and/or reside in this District.  Further, many of the acts giving rise to the violations of law complained of herein occurred in this District, including manager meetings and the preparation and dissemination to shareholders of the Registration Statements and Prospectuses. The Fund has its Principal Executive Offices in this District at 6803 South Tucson Way, Centennial, Colorado.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.     PARTIES

**A.     Lead Plaintiff**

13.     Lead Plaintiff C. Phillip Pattison purchased and owned shares of the Fund during the Relevant Time Period pursuant to or traceable to a registration statement and prospectus at issue in this complaint and has been damaged thereby.

14.     In its September 25, 2009 Order, the Court appointed Dr. Pattison Lead Plaintiff pursuant to 15 U.S.C. § 77z-1(a)(3)(B).

**B.     Defendants**

15.     The Defendants are all affiliated with each other and conduct business under the umbrella of the "Oppenheimer" name, which is one of the largest asset management organizations in the United States.

**1.     The Corporate Defendants**

16.     Defendant OppenheimerFunds, Inc. (or the "Manager") is the manager and investment advisor of the Fund and chooses the Fund's investments and handles its day-to-day business.  It is a holding company that engaged in securities brokerage, banking services and related financial services through its subsidiaries.  OppenheimerFunds, Inc. is headquartered at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008.  The Manager carries out its duties, subject to the policies established by the Fund's Board of Trustees, under an investment advisory agreement.  As compensation for its services, OppenheimerFunds, Inc. receives a management fee.

17.     Defendant OppenheimerFunds Distributor, Inc. (or the "Distributor"), located at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008, is a subsidiary of the Manager and was, during the Relevant Time Period, the principal underwriter

and distributor for shares of the Fund, was the trust agent for the purpose of the continuous public offering of the Fund's shares, and helped draft and disseminate the offering documents.

18.     Defendant Oppenheimer Integrity Funds is an open-end management investment company registered under the Investment Company Act of 1940 and was the Registrant for the Fund's offerings.

### 2.     The Individual Defendants

19.     Defendant William L. Armstrong is Chairman of the Board of Trustees and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

20.     Defendant Robert G. Avis was a Trustee and signed or authorized the signing of the April 30, 2007 Registration Statement.

21.     Defendant George C. Bowen is a Trustee and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

22.     Defendant Edward L. Cameron is a Trustee and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

23.     Defendant Jon S. Fossel is a Trustee and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

24.     Defendant Sam Freedman is a Trustee and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

25.     Defendant Beverly L. Hamilton is a Trustee and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

26.     Defendant Robert J. Malone is a Trustee and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

27.     Defendant F. William Marshall, Jr., is a Trustee and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

28.     Defendant John V. Murphy is President and Principal Executive Officer of the Fund and a Trustee and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

29.     Defendant Brian W. Wixted is Treasurer and Principal Financial and Accounting Officer of the Fund and signed or authorized the signing of the April 30, 2007 and April 29, 2008 Registration Statements.

30.     The persons identified above in ¶¶ 19-29 are collectively referred to as the "Individual Defendants."

### 3.     Control Allegations

31.     The Manager, the Distributor, and the Individual Defendants, directly or indirectly, control the Fund, both individually and collectively.

32.     Defendant OppenheimerFunds, Inc. controlled the Fund as the manager and investment advisor of the Fund and by virtue of choosing the Fund's investments and handling its day-to-day business.  OppenheimerFunds, Inc. also controlled the Distributor, its subsidiary.

33.     OppenheimerFunds Distributor, Inc. controlled the Fund by being the principal underwriter and distributor for shares of the Fund, the trust agent for the purpose of the continuous public offering of the Fund's shares, and by helping draft and disseminate the offering documents.

34.     Defendant Oppenheimer Integrity Funds is an open-end management investment company registered under the Investment Company Act of 1940 and was the Registrant for the Fund's offering.

35.     The Individual Defendants controlled the Fund by virtue of their officer or trustee positions.  As the Statements of Additional Information dated April 30, 2007 and April 29, 2008 admit, the Fund "is governed by a Board of Trustees, which is responsible for protecting the interests of shareholders under Massachusetts law.  The Trustees meet periodically throughout the year to oversee the Fund's activities, review its performance, and review the actions of the Manager."  In addition to being Trustees, Individual Defendants John Murphy and Brian Wixted

also controlled the Fund in their capacities as President and Principal Executive Officer of the Fund and Treasurer and Principal Financial and Accounting Officer of the Fund, respectively.

## IV.   **FACTUAL ALLEGATIONS**

### A.   **Introduction to the Fund**

36.     The Oppenheimer Core Bond Fund (the "Fund") is an open-ended, fixed income mutual fund managed and marketed by Defendant Oppenheimer Funds.  The Fund sold five classes of shares, A, B, C, N, and Y, under the NASDAQ ticker symbols OPIGX, OIGBX, OPBCX, OPBNX, and OPBYX

37.     Defendants represented the Fund as a broadly diversified portfolio of investment grade corporate and government bonds designed to seek total return and reduce share price volatility and portrayed the Fund as an appropriate part of a retirement plan portfolio.

38.     The Fund was marketed to the investing public through other brokerage firms such as Wachovia, Merrill Lynch, Citigroup Global Markets, Bank of America Securities, ING, and UBS.

### B.   **The Relevant Registration Statements and SEC-Filed Prospectus Materials for the Fund**

39.     Defendants filed nearly identical Registration Statements and Prospectuses on an annual basis throughout the Relevant Time Period in connection with the continuous offerings of the Fund's shares.  The Fund's shares were issued to investors pursuant to the following series of Registration Statements filed with the SEC and made effective during the Relevant Time Period (collectively referred to as the "Registration Statements"):

- Registration Statement filed pursuant to Form N-1A on April 30, 2007; and

- Registration Statement filed pursuant to Form N-1A on April 29, 2008.

40.     The Fund was marketed and sold to investors pursuant to the following series of Prospectuses:

- Prospectus dated April 30, 2007 (the "2007 Prospectus"); and

- Prospectus dated April 29, 2008 (the "2008 Prospectus").

41.     These Prospectuses also explicitly incorporated by reference a Statement of Additional Information ("SAI") and the Fund's Annual Report for that year, each of which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations.  These SAIs include the following:

- Statement of Additional Information dated April 30, 2007; and

- Statement of Additional Information dated April 29, 2008.

42.     Each of the foregoing documents was materially false and misleading or omitted to state other facts necessary to make the statements not misleading, or omitted material facts required to be stated as described below.

**C.     The Misstatements of Material Fact and Material Omissions Contained in the Fund's Registration Statements and SEC-Filed Prospectus Materials**

43.     The word "core" in association with mutual funds refers to a foundational or "prime" investment in a certain asset class that provides significant diversification within that class.  As the MORNINGSTAR GUIDE TO MUTUAL FUNDS:  FIVE-STAR STRATEGIES FOR SUCCESS explains, core funds "tend to be reliable year in and year out":

> Core funds won't usually deliver eye-popping gains over short periods, but they aren't likely to be terrible, either.  That makes them easier to stick with during rough times, and they'll help shore up your portfolio when your other funds are struggling.  In short, they will provide your portfolio with a solid foundation.  [*Id.* at 169.]

44.     So, for example, in the fixed income context, "core" is commonly used to refer to an investor's primary or "core" holdings of typical outstanding bonds.  Thus, a "core" bond fund is commonly comprised of well-diversified portfolio of investment grade bonds and is designed to provide primary exposure to fixed income investments with low-to-moderate risk.  To the extent that an investor also seeks fixed income investments of shorter or longer maturity, or seeks higher yields, the investor will typically look for other fixed income investment opportunities beyond his or her "core" bond fund to satisfy these other objectives.  However, a "core" bond fund is a diversified fixed income investment with relatively low-risk and with neither "eye-popping gains or losses."  This is precisely how Defendants' represented the Fund to investors.

45.   From the April 30, 2007 Registration Statement and Prospectus onward throughout the entire Relevant Time Period, Defendants issued and offered for sale shares of the Fund.  Defendants continuously filed nearly identical Registration Statements and Prospectuses throughout the Relevant Time Period and continued to offer and sell the Fund's newly issued securities.

46.   The Registration Statements, Prospectuses, and SAIs used throughout the Relevant Time Period to register and offer the Fund to Lead Plaintiff and the Class contained untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading.  While the Prospectuses issued during the Relevant Time Period were not perfectly identical, they did contain many of the same materially untrue statements and were rendered materially misleading by the same omissions.  These include the following statements:

a.   From the **April 30, 2007** Prospectus:

WHAT IS THE FUND'S INVESTMENT OBJECTIVE?
The Fund seeks total return by investing mainly in debt instruments.

WHAT DOES THE FUND MAINLY INVEST IN?  As a non-fundamental policy (which will not be changed without providing 60 days' notice to Fund shareholders), under normal market conditions, the Fund invests at least 80% of its net assets (plus borrowings for investment purposes) in investment grade debt securities.  Those investment-grade debt securities can include:

- domestic and foreign corporate debt obligations,
- domestic and foreign government bonds, including U.S. government securities, and
- mortgage-related securities (including collateralized mortgage obligations ("CMOs") issued by private insurers.

In general, these debt securities are referred to as "bonds." The Fund's investments in U.S. government securities include securities issued or guaranteed by the U.S. government or its agencies or federally-chartered corporate entities referred to as "instrumentalities."  These include mortgage-related U.S. government securities and CMOs.  The Fund can invest in money market instruments and other debt obligations.  The fund can invest up to 20% of its total assets in high-yield debt securities that are below investment-grade (commonly referred to as "junk bonds").

The Fund can also use derivative instruments, primarily futures, swaps, CMOs and "structured" notes, for speculative

- 11 -

purposes (to seek higher investment returns) or for hedging purposes (to manage investment risks).  These investments are more fully explained in "About the Fund's Investments", below.

There is no set allocation of the Fund's assets among the classes of securities the Fund buys, but the Fund focuses mainly on U.S. government securities and investment-grade debt securities. However, if market conditions change, the Fund's portfolio managers might change the relative allocation of the Fund's assets.

The Fund seeks to maintain an average effective portfolio duration (discussed In "About the Fund's Investments", below) of three to six years (measured on a dollar-weighted basis) to try to reduce the volatility of the value of its securities portfolio.  The Fund has no limitations on the range of maturities of the debt securities in which it can invest and therefore may hold bonds with short-, medium- or long-term maturities.  Because of market events and interest rate changes, the duration of the portfolio might not meet that target at all times.  The Fund's investment manager, OppenheimerFunds, Inc. (the "Manager") will attempt to maintain the overall weighted average credit quality of the portfolio at a rating of "A-" (or equivalent) or higher from any nationally recognized credit rating organization.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL?  In selecting securities for the Fund, the Fund's portfolio managers analyze the overall investment opportunities and risks in different sectors of the debt securities markets by focusing on business cycle analysis and relative values between the corporate and government sectors.  The portfolio managers' overall strategy is to build a broadly diversified portfolio of corporate and government bonds.  The portfolio managers currently focus on the factors below (which may vary in particular cases and may change over time), looking for:

- Debt securities in market sectors that offer attractive relative value,
- Investment-grade securities that offer more income than U.S. treasury obligations with a good balance of risk and return,
- High income potential from different types of corporate and government securities, and
- Broad portfolio diversification to help reduce the volatility of the Fund's share price.

The portfolio managers monitor individual issuers for changes in the factors above and these changes may trigger a decision to sell a security.  Generally, the "total return" sought by the Fund consists of income earned on the Fund's investments, plus capital appreciation, if any, which generally arises form decreases in interest rates, improving credit fundamentals for a particular sector or security, and managing pre-payment risks associated with mortgage-related securities, as well as other techniques.

WHO IS THE FUND DESIGNED FOR?  <u>The Fund is designed for investors seeking total return from a fund that invests primarily in investment-grade debt securities</u> but which can also hold high-yield, below investment grade debt securities.  Those investors should be willing to assume the credit risks of a fund that typically invests a significant amount of its assets in corporate-debt securities, and the changes in share prices that can occur when interest rates change.  <u>The Fund is intended as a long-term investment, not a short-term trading vehicle, and may be appropriate for a part of an investor's retirement plan portfolio.</u>  The Fund is not a complete investment program.

\*          \*          \*

Illiquid and Restricted Securities.  Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price.  Restricted securities may have terms that limit their resale to other investors or may require registration under applicable securities laws before they may be sold publicly.  <u>The Fund will not invest more than 15% of its net assets in illiquid or restricted securities.</u>  Certain restricted securities that are eligible for resale to qualified institutional purchasers may not be subject to that limit.  The Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity.

(Emphasis added.)

b.      The **April 29, 2008** Prospectus contained disclosures very similar to the

2007 Prospectus:

WHAT IS THE FUND'S INVESTMENT OBJECTIVE?  The Fund seeks total return by investing mainly in debt instruments.

WHAT DOES THE FUND MAINLY INVEST IN?  As a non-fundamental policy (which will not be changed without providing 60 days' notice to Fund shareholders), under normal market conditions, the Fund invests at least <u>80% of its net assets (plus borrowings for investment purposes) in investment grade debt securities</u>.  Those investment-grade debt securities can include:

- domestic and foreign corporate debt obligations,
- domestic and foreign government bonds, including U.S. government securities, and
- mortgage-related securities (including collateralized mortgage obligations ("CMOs") issued by private insurers.

In general, these debt securities are referred to as "bonds." The Fund's investments in U.S. government securities include securities issued or guaranteed by the U.S. government or its agencies or federally-chartered corporate entities referred to as "instrumentalities."  These include mortgage-related U.S. government securities and CMOs.  The Fund can invest in money

market instruments and other debt obligations.  The fund can invest up to 20% of its total assets in high-yield debt securities that are below investment-grade (commonly referred to as "junk bonds").

The Fund can also use derivative instruments, including futures, swaps, CMOs and "structured" notes, to seek higher investment returns or to manage investment risks.  These investments are more fully explained in "About the Fund's Investments", below.

There is no set allocation of the Fund's assets among the classes of securities the Fund buys, but the Fund focuses mainly on U.S. government securities and investment-grade debt securities. However, if market conditions change, the Fund's portfolio managers might change the relative allocation of the Fund's assets.

The Fund seeks to maintain an average effective portfolio duration (discussed In "About the Fund's Investments", below) of three to six years (measured on a dollar-weighted basis) to try to reduce the volatility of the value of its securities portfolio.  The Fund has no limitations on the range of maturities of the debt securities in which it can invest and therefore may hold bonds with short-, medium- or long-term maturities.  Because of market events and interest rate changes, the duration of the portfolio might not meet that target at all times.  The Fund's investment manager, OppenheimerFunds, Inc. (the "Manager") will attempt to maintain the overall weighted average credit quality of the portfolio at a rating of "A-" (or equivalent) or higher from any nationally recognized credit rating organization.

**HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL?**  In selecting securities for the Fund, the Fund's portfolio managers analyze the overall investment opportunities and risks in different sectors of the debt securities markets by focusing on business cycle analysis and relative values between the corporate and government sectors.  The portfolio managers' overall strategy is to build a broadly diversified portfolio of corporate and government bonds.  The portfolio managers currently focus on the factors below (which may vary in particular cases and may change over time), looking for:

- Debt securities in market sectors that offer attractive relative value,
- Investment-grade securities that offer more income than U.S. treasury obligations with a good balance of risk and return,
- High income potential from different types of corporate and government securities, and
- Broad portfolio diversification to help reduce the volatility of the Fund's share price.

The portfolio managers monitor individual issuers for changes in the factors above and these changes may trigger a decision to sell a security.  Generally, the "total return" sought by the Fund consists of income earned on the Fund's investments, plus capital appreciation, if any, which generally arises form decreases in interest rates, improving credit fundamentals for a particular sector or security, and managing pre-payment risks associated with mortgage-related securities, as well as other techniques.

**WHO IS THE FUND DESIGNED FOR?**  The Fund is designed for investors seeking total return from a fund that invests primarily in investment-grade debt securities but which can also hold high-yield, below investment grade debt securities.  Those investors should be willing to assume the credit risks of a fund that typically invests a significant amount of its assets in corporate-debt securities, and the changes in share prices that can occur when interest rates change.  The Fund is intended as a long-term investment, not a short-term trading vehicle, and may be appropriate for a part of an investor's retirement plan portfolio. The Fund is not a complete investment program.

*       *       *

**Illiquid and Restricted Securities.**  Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price.  Restricted securities may have terms that limit their resale to other investors or may require registration under applicable securities laws before they may be sold publicly.  The Fund will not invest more than 15% of its net assets in illiquid or restricted securities.  Certain restricted securities that are eligible for resale to qualified institutional purchasers may not be subject to that limit.  The Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity.

(Emphasis added.)

47.    Both the April 30, 2007 and the April 29, 2008 SAIs represented that the Fund

would not concentrate more than 25% of its investments in a single industry and would not

borrow more than 33 1/3% of the value of its total assets:

The Fund cannot concentrate its investments (that means it cannot invest 25% or more of its total assets) in any one industry.

The Fund cannot borrow money in excess of 33 1/3% of the value of its total assets.  The Fund may borrow only from banks and/or affiliated investment companies.  With respect to this fundamental policy, the Fund can borrow only if it maintains a 300% ratio of assets to borrowings at all times in the manner set forth in the Investment Company Act.

48.     The foregoing representations were false and/or materially misleading for the reasons stated in ¶¶ 49-80.

**D.     The Material Misrepresentations and Omissions by Defendants**

49.     The true material facts, or material facts omitted which were necessary to make the statements made not misleading, or omitted material facts required to be stated therein, were:

a.     The Fund was not adhering to its objectives of investing in a broadly diversified portfolio of mainly U.S. government securities and investment-grade debt securities designed to help reduce the volatility of the Fund's share price;

b.     The Fund took on an undisclosed, material amount of leverage risk in violation of the 33 1/3% limitation due to the Fund's investments in off-balance sheet derivatives;

c.     The Fund failed to disclose, and indeed concealed, the magnitude of the risk presented by its exposure to these off-balance sheet derivative investments;

d.     Due to the Fund's investment in highly leveraged, undisclosed off-balance sheet derivatives, illiquid investments and overconcentration, the Fund was not an appropriate part of an investor's retirement plan portfolio;

e.     The Fund's investment strategies were not focused on achieving broad portfolio diversification and as a result, did not function as a means to reduce the volatility of the Fund's share price;

f.     The Fund had invested more than 15% of net assets in illiquid or restricted securities;

g.     The Fund had invested more than 25% of net assets in any one industry;

h.     The Fund's internal controls were inadequate to prevent Defendants from taking excessive risk.

50.     Throughout 2007 and 2008, and unbeknownst to investors, the Fund altered its investment policies and began significantly increasing its investments in highly leveraged, off-balance sheet derivatives in the hopes of seeking higher returns.  In doing so, the Fund

dramatically increased its reliance on volatile mortgage-backed securities and risky derivative instruments in violation of its investment policies.  Unknown to investors due to defendants' misrepresentation and/or omissions, the Fund became a *de facto* hedge fund, investing heavily in extraordinarily risky off-balance sheet derivatives.  These actions eventually caused investors to suffer more than a billion dollars in damages.

**1.    The Fund made overconcentrated investments on mortgage-related bonds.**

51.    Mortgage-backed securities are bonds backed by pools of mortgage loans. Mortgage-based securities are riskier than most other fixed income assets due to their complex structure and multiple risk sources, including not only interest rate risk but also prepayment risk, default risk, and liquidity risk.

52.    Throughout 2007 and 2008, positions in agency mortgage-based securities exceeded more than half of the Fund's assets as follows:

| 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 | 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|---|---|---|---|
| 62.0% | 62.9% | 56.6% | 55.5% | 59.1% | 53.3% | 59.6% | 64.2% |

53.    These concentrations of mortgage-based securities in the portfolio made the Fund's share price more volatile and the Fund much more susceptible to changes in interest rates and fixed income market dislocations.  These concentrations were inconsistent with representations that the Fund was a broadly diversified portfolio of corporate and government bonds managed to reduce share price volatility.

54.    The Fund magnified this risk by, in effect, doubling down on falling mortgage-related bonds in 2007 and 2008.  During this time period, the Fund purchased substantial stakes in mortgage-based securities tied to commercial real estate – referred to as commercial mortgage-backed securities – despite the massive deterioration in the residential mortgage market and the overall crisis in the real estate market that began in 2007 and accelerated in 2008. Angelo Manioudakis, Senior Vice President and head of the team that managed the Fund, reported that commercial mortgage-backed securities accounted for 10% of the Fund's market value as of January 2008.  But by that time, the Fund's exposure to commercial mortgage-backed

securities already exceeded 29% of Fund assets and would continue to grow, reaching a zenith of almost 39% by June 30, 2008, as reflected in the following table:

| 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 | 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|---|---|---|---|
| 8.3% | 6.8% | 10.4% | 29.7% | 32.6% | 38.9% | 18.1% | 18.5% |

55.     These investments were inconsistent with representations, contained in its Registration Statements and Prospectuses, that the Fund was a broadly diversified portfolio of corporate and government bonds managed to reduce share price volatility.

56.     The concentrations in mortgage-based securities also violated the representation that the Fund would not invest more than 25% of its assets in any one industry.

**2.     The Fund became highly leveraged due to speculative, undisclosed off-balance sheet bets on derivative instruments known as total-return swaps and credit-default swaps.**

57.     Unbeknownst to investors, the Fund invested heavily in highly illiquid total-return swaps. Total-return swaps are speculative and complex agreements between parties to exchange cash flows in the future based on how a set of securities or a particular index performs. Fund managers increased their bet on commercial mortgage-backed securities and, therefore risk, by entering into total-return swaps on commercial real estate indices. This was a speculative bet that the commercial mortgage-backed securities market, which had suffered a significant widening of spreads (that is, the difference in yields between commercial mortgage-backed securities and similar term government bonds), would rally in 2008, causing spreads to narrow and generating large returns for the Fund. Thus, not content to increase the Fund's exposure to the commercial real estate market through increasing concentration of traditional commercial mortgage-backed securities investments, the Fund managers essentially "doubled-down" its investment in this sector through total-return swaps.

58.     Based on preliminary data, an industry expert retained by Counsel has calculated the "net notional" value of the Fund's total-return swaps transactions in the table set forth in this paragraph ("notional" refers to the value of the underlying assets or liabilities represented by the

derivative).[1]  As shown, the Fund's total-return swap transactions steadily increased throughout 2007, peaking in the first quarter of 2008 at just under $800 million.

| 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 | 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|---|---|---|---|
| $14,870 | $60,950,000 | $209,585,000 | $429,901,000 | $798,406,000 | $713,110,000 | $681,990,000 | $587,920,000 |

59.    The magnitude of these total-return swap transactions and the nature of the risk associated with these investments violated the Fund's objectives and representations that it was a broadly diversified portfolio of corporate and government bonds managed to reduce share price volatility and was appropriate as a part of a retirement portfolio.

60.    The Fund managers' gambling of Fund assets also grew exponentially through transactions known as credit-default swaps.  Credit-default swaps are essentially insurance contracts that insure against the default on debt securities such as corporate bonds.  In a credit default swap, two parties enter into a private contract whereby the buyer of the protection agrees to pay the seller premiums over a set period of time, which is typically four or five years.  In exchange, the seller agrees to pay the buyer in the event a particular pre-defined credit event occurs, such as a default on the underlying security.  A credit-default swap thus functions as an insurance policy:  the buyer can use the swap to hedge an existing position in a particular security, and the seller receives a regular insurance premium in the hope of not having to pay an insurance "claim."

61.    The Fund entered into a significant number of credit-default swaps, but not as a buyer of credit protection to hedge existing holdings, but as a seller, essentially writing insurance on corporate bonds.  This further leveraged the Fund because the Fund was in the position to realize the full impact of price declines in the bonds it was insuring, even though it did not actually own those bonds.

---

[1] Many of the calculations presented in this complaint were performed by an industry expert retained by Counsel and are not calculations that most investors would be able to perform based on a review of the Fund's SEC filings.  In addition, the calculations presented may be refined once Defendants produce all of the transaction data for the Fund.

62.     And the Fund not only engaged in undisclosed, off-balance sheet selling of protection on corporate bonds, it sometimes actually sold protection on the issuers of bonds that the Fund already owned in its portfolio, thereby doubling or tripling its exposure to the credit-worthiness of those issuers.  For example, as of June 30, 2008, the Fund held bonds issued by AIG, Merrill Lynch, Washington Mutual, Lehman Brothers, Tribune, Citigroup, General Motors, and Ford.  At the time, each of these companies was in a severe financial crisis, with several of them on the verge of bankruptcy.  Nonetheless, the Fund was selling credit-default swap protection on the bonds of these very same issuers.  In other words, if the issuer went into default on its bonds (as Lehman Brothers did), not only would the Fund lose the value of the bonds of Lehman Brothers that it currently held, it would also be responsible for making payments to other holders of those same bonds who had purchased the credit protection sold by the Fund.  By selling credit protection on these issuers, the managers were gambling that no credit events requiring a payment would occur in these issuers prior to the expiration dates of the swaps.  But by doing so, the managers gambled Fund assets through risk on the bonds themselves <u>and</u> on the credit-default swaps.

63.     The speculative nature of the Fund managers' decisions is also highlighted by a consideration of the then-concurrent market events.  At the time the Fund entered these transactions, the troubles at AIG, Washington Mutual, Lehman Brothers, Merrill Lynch, Citigroup, Tribune, General Motors, and Ford were known to the Defendants, <u>meaning that the Fund made highly risky bets on these investments</u>.  Indeed, in the wake of the collapse of the subprime mortgage market, the credit-default swap market began to show signs of distress by Summer 2007.  But despite the risks associated with these types of investments, the Fund continued selling swaps throughout 2007 and 2008 and increased its use of them until the third quarter of 2008 when AIG and Lehman collapsed.  The Fund's losses on selling credit-default swaps were massive.

64.     Based on preliminary data, an industry expert retained by Counsel has calculated the "net notional" value of the Fund's credit-default swap sale transactions in the table below.

As with the total-return swaps transactions, the Fund's credit-default swap transactions increased throughout 2007; they topped out at $884 million in June 2008.

| 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 | 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|---|---|---|---|
| $104,205,000 | $295,665,000 | $528,030,000 | $693,725,000 | $850,905,000 | $884,550,000 | $554,955,000 | $461,308,000 |

65.     The magnitude of these credit-default swap transactions was inconsistent with representations that the Fund was a broadly diversified portfolio of corporate and government bonds managed to reduce share price volatility.

66.     The total-return swap and credit-default swap derivatives utilized by the Fund, in addition to interest rate swaps, added a tremendous amount of leverage to the Fund and allowed the Fund to bet on more securities than it actually held in the portfolio.  "Leverage" refers to the utilization of "borrowed" money.  The use of leverage can increase returns when values rise but also exacerbate losses when values decline.  It thus has a two-edged effect:  leverage allows a fund to participate in the gains and losses on a pool of assets that is greater than the amount of dollars actually invested in the fund.  Any gains on those extra assets flow directly to the shareholders, but any losses come directly out of the investors' capital.  Simply put, leverage amplifies risk, and it was the realization of this undisclosed risk that was a contributing cause to the Fund's loss of value.

67.     The Fund's undisclosed leverage position – constructed through total-return swaps, credit-default swaps, and interest rate swap transactions – was extreme.  An industry expert retained by Counsel has calculated the "net notional" value of the Fund's swap transactions as follows:

| 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 | 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|---|---|---|---|
| $65,303,573 | $385,924,937 | $777,968,906 | $1,012,601,578 | $1,321,761,203 | $1,214,168,623 | $794,596,093 | $1,980,052,109 |

Leverage thus increased dramatically throughout 2007 to over a billion dollars at the end of the year, reaching nearly $2 billion by the end of 2008.

68.     The staggering magnitude of this leverage is highlighted by comparing leverage values to the value of total net assets under management.  For example, in December 2007, when the Fund had $2.1 billion in assets, the net notional value of leverage was just over $1 billion.  By December 2008, the net notional value of leverage was almost $2 billion, greatly *exceeding* net Fund assets of $1.474 billion.  In other words, as of the end of December 2008, the approximate $1.4 billion Fund was exposed to the performance of an ***additional $1.9 billion*** in assets ***that it did not actually own***.  An industry expert retained by Counsel has calculated the Fund's net leverage[2] during the Relevant Time Period as follows:

| 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 | 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|----------|----------|----------|----------|----------|----------|----------|----------|
| 1.2483   | 1.4349   | 1.4939   | 1.5620   | 1.7673   | 1.6885   | 1.6725   | 2.3267   |

69.     The magnitude of this leverage violated the Fund's objectives and representations that it was a broadly diversified portfolio of corporate and government bonds managed to reduce share price volatility and was appropriate as a part of a retirement portfolio.

70.     Thus, Fund managers used off-balance sheet derivative transactions as vehicles to make the Fund highly-leveraged in order to make speculative bets on particular sectors in the bond market.  These excessively leveraged and speculative bets significantly altered the risk profile of the Fund in derogation of the Fund's investment objectives.  Furthermore, the leverage values reported in the table above also violated the representation that the Fund would not borrow more than 33 1/3% of the value of its total assets.

71.     Fund mangers have privately admitted that they became "greedy" with their betting.  Kevin Dachille, an investment director of Defendant OppenheimerFunds, Inc. who works with fixed income teams articulating their investment policy, strategy and performance to existing and prospective institutional clients, explained the Fund's strategy during a private presentation to the Oregon 529 College Savings Board in October 2008:

> MR. DACHILLE: …  Now, this is a trying time, because every time we bought something, it went down in price.  And we'd buy it again, and it would go down in price.  And we'd buy it again, and

---

[2] "Net leverage" is the market value of long positions less the market value of short positions divided by net asset value.

it would go down in price.  <u>To the point where right at the eve of
the Bear Stearns episode in mid-March, we were, for all intents
and purposes, all in</u>.  Ninety-five percent of our risk budget was –
we still have 95 percent of our risk budget, so the last six months
we have not added to aggregate risk, but rather just held our
position or stayed the course.

MR. EDWARDS:  So why would you keep buying?....

MR. DACHILLE:  Valuations got more attractive. . . .  <u>And so we
were getting greedy.  That's how we – when the value increases –
we back up the truck</u>.

MR. EDWARDS:  Well, let me ask you, is this abnormal?  Has the
fund done this before where you've kept the steady buying spree –

MR. DACHILLE:  Never like this.

MR. EDWARDS:  – and took a risk budget –

MR. DACHILLE:  Never like this.

MR. EDWARDS:  – up like that?

MR. DACHILLE:  No.  We've never gotten close to our
maximum.

(Emphasis added.)

72.     Thus, the Fund got "greedy" and took massive bets on some of the riskiest

derivatives available.  These risks were "<u>off-balance sheet</u>" and not adequately disclosed to

investors; the use of these derivatives was only generally disclosed in cursory boiler-plate

fashion when these risks eventually materialized and contributed to the Fund's losses.

73.     Moreover, the risks of the Fund made it much more similar to a hedge fund than

the "core" diversified, intermediate-bond fund it was portrayed to clients to be in Prospectuses

and other marketing material and sales pitches.  Unfortunately for Fund investors, the "house of

cards" that the Fund managers built upon commercial mortgage-backed securities, credit-default

swaps, total-return swaps and other speculative, off-balance sheet derivatives came crashing

down.  The commercial mortgage-backed securities market continued to decline precipitously in

2008, accelerating at breath taking speed in the latter half.  As a result, the Fund experienced

substantial declines in its portfolio value as a result of the leverage in these speculative

derivatives.

3.   **Fund managers recognized that they were exceeding risk limit parameters and secretly redefined maximum risk levels.**

74.   The Fund had inadequate internal controls to manage the extreme risks that the Fund managers were taking.  But even the Fund's meager controls indicated that the managers were assuming excessive risk.

75.   In April 2008, the Fund's internal risk profile indicated that it was positioned to achieve inordinately high excess returns compared to its benchmark.  The so-called "Core Plus" strategy that was used to manage the Fund set an *ex ante* target for excess return over the benchmark of between 100 to 125 basis points, or 1 percent to 1.25 percent.  However, internal documents indicate that as early as April 1, 2008, the composition of the Fund was such that prospective excess return over the benchmark was already forecast to be 1,058 basis points or 10.58%, well in excess of the Fund's own internal guideline, and an extraordinary level of risk and deviation from the benchmark index.  An excess return of this size, and the risk required to achieve it, was totally inappropriate for a fund labeled as a diversified "core" bond fund.  Moreover, Defendants never disclosed that the Fund was taking enormous risks in an effort to generate additional returns of almost 10 times the excess return it represented to investors.

76.   OppenheimerFunds, Inc.'s Director of Risk Management, Navin Sharma, was responsible for monitoring risk and preventing Fund managers from taking too much risk or exceeding internal risk management guidelines.  On April 1, 2008, Mr. Sharma informed Ben Gord, a portfolio manager who helped manage the Fund, that the team had been exceeding the "pre-set limits" contained in the firm's risk models.  In response to this warning, Mr. Gord told his team that it "was obvious from the start" that Mr. Sharma did not "understand[] why he's been asked to do what he does."  Rather than heed this warning, Mr. Gord informed Sharma that "<u>maybe the guidelines have actually done their job, that we're taking big bets and now he knows about it</u>[.]"  (Emphasis added.)

77.   The following week, on April 8, 2008, the Fund's internal risk profile documents again confirm that the managers had exceeded the Fund's risk budget.  According to the documents, it had expended over 121% of its risk budget based on the metric used the previous

week.  Indeed, in Mr. Dachille's presentation to the Oregon Board, he stated that a tracking error of 200 basis points for the Fund, which would be a fully expended risk budget of 100%, was a "hard maximum."  Nonetheless, on April 8, 2008, the tracking error was 242 basis points, a 21% overage in the risk budget.

78.     Despite the stated warnings of its risk managers, the Fund continued to make bets throughout 2008 that were even bigger than the "big bets" it made in April that caused the Fund to exceed its risk controls.  Unwilling to lower the risk profile to the required internal parameters, and hoping to achieve outsized returns, the Fund changed the metric used to calculate the amount of risk budget remaining.  Using a new metric starting in April 2008, the Fund's internal documents showed a risk budget <u>remaining</u> of 31% – a sharp change from the 21% overage.  This more favorable metric would be used by the Fund for the rest of 2008 in calculating the risk budget remaining, and the previous metric was disregarded.  Defendants failed to disclose to investors that it had abandoned its old metric used to assess risk.

**4.     The Fund's omissions and misrepresentations were material.**

79.     Defendants' investment decisions were dramatically at odds with Defendants' representations that the Fund was a broadly diversified portfolio of investment grade corporate and government bonds designed to seek total return and reduce share price volatility.  Defendants' actions were also dramatically at odds with Defendants' representations that the Fund was as an appropriate part of a college savings or retirement plan portfolio.

80.     A reasonable investor would have viewed these undisclosed facts, severally and jointly, as having materially altered the total mix of information available to him or her.  Moreover, a reasonable investor would understand that the facts described herein, but never disclosed, would cause the Fund to undertake a materially increased investment risk during the Relevant Time Period because the Fund was investing in securities that were materially more risky than disclosed.

E.      **Defendants' Misconduct Causes Huge Losses and Analysts Confirm That Defendants Had Not Disclosed the True Risks of the Fund**

81.     Due to Defendants' positive, but misleading or untrue statements, and the omissions described above, hundreds-of-millions of dollars poured into the Fund.

82.     But Defendants' misrepresented and omitted practices ultimately triggered staggering losses in net asset value as reflected in the following graph:



83.     By December 31, 2008, the Fund experienced a <u>35.8% percent</u> drop in net asset value.

84.     The magnitude of this drop was not the result of a downtrend in the market but a direct result of Defendants' misstatements and omissions of material fact.  In other words, Defendants' violations of the federal securities laws caused the net asset value of the Fund to plummet.

85.     For context, the Fund's performance was 31 percentage points worse than the typical intermediate-term bond fund.  Indeed, the Fund's benchmark index – the Barclay's Capital Aggregate Bond Index – actually rose 5.24% in 2008, as reflected in the following graph from *Morningstar*:

Growth of $10,000

<span style="color:blue">Oppenheimer Core Bond A</span>   <span style="color:orange">Intermediate-Term Bond</span>   <span style="color:green">BarCap US Agg Bond TR USD</span>



86.     By June 2008, the Fund's assets reached over $2.3 billion but dropped to under $1.2 billion just 12 months later as reflected in the following table:

| Date | Net Assets |
|------|------------|
| 6/30/09 | 1,139,994,343 |
| 12/31/08 | 1,474,534,382 |
| 6/30/08 | 2,372,111,590 |
| 12/31/07 | 2,156,872,980 |
| 6/30/07 | 1,726,395,895 |
| 12/31/06 | 1,429,225,494 |
| 6/30/06 | 1,157,792,013 |
| 12/31/05 | 930,324,471 |
| 6/30/05 | 764,120,698 |
| 12/31/05 | 641,116,000 |

87.     On December 12, 2008, Manioudakis, who headed the Fund's management team, resigned from his position.  During the relevant period, his team managed more than $16 billion in individual investor fund assets, including the Fund.

88.     On December 17, 2008, Morningstar declared that "[w]e've lost confidence in Oppenheimer Core Bond."  The article commented on the lack of adequate disclosure to investors stated, in pertinent part:

> In the past, we were optimistic that the managers' conviction in the
> fund's high-quality mortgage holdings would eventually pay off,

- 27 -

but we've become increasingly concerned about the magnitude of their bets.  In particular, the team's liberal use of swaps to gain exposure to corporates and CMBS has made matters far worse.  The market for CMBS total-return swaps, for example, seized up in the wake of September's financial sector upheaval.  Meanwhile, those CMBS swaps, the corporate swaps, and the fund's other holdings added up to credit market exposure well beyond the dollar value of the fund's net assets, amplifying the impact of losses on the overall outcome.

The managers have since replaced many CMBS contracts with bonds, but its upsetting that they didn't anticipate the dangers of the fund's derivative positions in this dysfunctional market.  And it's unacceptable that the firm hasn't more clearly communicated the fund's exposure to various sectors and risks in shareholder reports and web commentary.

89.     Also on December 17, 2008, *Morningstar* released an article entitled "Oppenheimer Bond Funds Missed the Forest Fire for the Trees" detailing the significant problems at the Core Bond Fund <u>and the lack of full disclosure</u>.[3]

What's been going on with Oppenheimer's bond funds has been so unbelievable that, well, we didn't believe it.  We'll get back to that in a minute.

* * *

Even with 2008's ugly market, we don't need any benchmarks to know that neither [the Core Bond Fund nor the Champion Income Fund] are anywhere near the market averages.

**Bad Markets, Bad Returns**

At first blush, the cause seems logical enough.  Manioudakis and his team tried to keep powder dry in mid-2007, figuring that good opportunities were going to present themselves.  By January 2008, the team had begun packing some of that powder, building positions in four key areas that they felt had become exceedingly cheap.  That included AAA rated commercial mortgage-backed securities, nonagency prime (jumbo) mortgages, AA and A rated financial-sector corporate bonds, and very short-maturity high-yield corporates.  As we all know by now, the market only got worse and became more illiquid through the course of the year.  Each of those areas has been pummeled mercilessly.

Something just didn't add up for us, though. In January, Manioudakis told Morningstar that CMBS consumed 10% of the Core Bond Fund's "absolute market value."  But as badly as the sector performed – The Barclays (nee Lehman) CMBS Index fell 27.4% – that alone couldn't possibly explain the portfolio's overall

---

[3] All italicized emphasis in this article is original; underline emphasis is added.

loss of nearly 39% as of Monday.  Ditto for the other sectors, even though they lost a lot, as well.

**Not 10 ... This One Goes to 11**

We had some suspicions about the portfolios' exposures, which weren't confirmed for us by Oppenheimer until now.  It turns out that when Manioudakis and the crew decided that the four areas they identified were undervalued, they *really* decided.

By the end of March, the Core portfolio carried around $400 million in securities exceeding its (then) $2.2 billion in net assets via transactions that were effectively akin to margin borrowing.  It also had roughly $800 million in long exposure to corporate credit via default swaps – including American International Group (AIG), Lehman Brothers, Wachovia (WB), Washington Mutual, and Bear Stearns – and around $600 million in total return swap exposure to a volatile slice of Barclays' AAA rated CMBS index, all of which by normal reporting convention were not included on the fund's balance sheet and thus not in its net assets.  By the end of September, just before the Treasury Department's Troubled Asset Relief Program proposal and right around the time the market sailed off into uncharted mania, Core Bond's credit exposure to those various markets totaled more than 180% of net assets on a dollar basis.  In other words, *for every dollar of shareholder capital in the fund, it was exposed to the credit-driven movement of more than $1.80 worth of securities.*

* * *

… there is just no getting around the fact that the extra layers of market exposure were piled *high*.

**I'm Sorry, I Couldn't Hear That.  Would You Speak Up?**

Left there, things would have been plenty bad enough.  But they weren't.  Because most of the additional market exposure came from off-balance-sheet derivatives, the funds' portfolios didn't *look* highly leveraged.  And while they may have been only somewhat leveraged in what we might call a conventional accounting sense – by borrowing money against your net assets and investing it – they were heavily leveraged as mutual funds go, in an *economic sense*….  And because the managers were careful to control interest-rate risk, in part through futures and swaps, and in part by taking on only credit exposure with their off-balance-sheet derivatives, they may not have really *thought* of their funds as heavily leveraged.

To the degree it existed, that thinking was erroneous, and it's very disappointing that the team didn't internalize just how much risk it was taking….  [The Fund manager] failed to model or plan for the possibility of severe downturns and thus for how they could turn the equivalent of a discarded cigarette into a raging inferno.

The only thing worse than levering up a portfolio with 180% market exposure, though, is doing it quietly. I'd like to be wrong about this, but I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way. The word itself doesn't seem to be linked to any of the funds' strategies anywhere I've searched on Oppenheimer's Web site or in any of the supporting shareholder or marketing materials that we've seen. Terminology aside, none of the portfolio descriptors provides enough information to estimate those market exposures, much less know that they're not typical, 100 cents in, 100 cents invested. There's just no indication whatsoever that anything is unusual about any of the funds that employ this kind of leveraged exposure. And it was never brought up by Oppenheimer managers in any of their recent Morningstar analyst interviews.

\* \* \*

How is it possible that a shareholder can go to its Web site, see that Core Bond is down nearly 40%, or 80% in the case of Champion Income, and yet find no information to use to *figure out why*, much less an actual *explanation*?

\* \* \*

I'm sorry to be glib, but this strains credulity. Here's a news flash, Oppenheimer: If your funds are going to use instruments that involve this much portfolio complexity, you have a duty to translate and simplify what that means for your shareholders. Not doing so is patently unacceptable and comes awfully close to dishonesty by omission. While most of your competitors haven't taken on anywhere near this much risk, many use similar portfolio techniques and are just as guilty of these omissions. I can think of numerous ways this can all happen without intent, but we're way past the honeymoon period now that these tools have been around for quite a while. It's time for this to stop all around.

\* \* \*

[I]t seems that Manioudakis and his crew were overly focused on trees that appeared to be incredible bargains. They backed up all of their trucks and even used a few of their neighbors'. Sadly, it seems that they couldn't see that the forest was on fire.

90.    On February 5, 2009, *Morningstar* again reported on the Fund in an article

entitled "Fund Companies Falling Short on Stewardship." The article provided in part:

If you step back and think about it, it's not hard to be a good steward of capital. Mutual funds simply have to care for fundholders' capital the same way they'd want their own money to be run: with sensible strategies, fair prices, and reasonable, straightforward explanations as to why things go well – and not so well.

Some funds – those that receive As for corporate culture as part of Morningstar's Stewardship Grades for funds, for example – seem to have an easy time putting shareholders first.  But other firms have apparently lost sight of their mission.  What follows are examples of recent fund moves that are disrespectful to the shareholders they're serving.

* * *

**Hypocrisy Stings Oppenheimer**

In May 2006, John Murphy, president of OppenheimerFunds, gave the welcoming remarks to the annual ICI General Membership Meeting....  The theme was "Creating Shareholder Value" and two of his suggestions were a) "Offering competitive investment returns at an appropriate level of risk," and b) "Supplying clear, concise, and relevant information and tools that investors need to make informed investment decisions."

We wish Murphy had followed his own advice.  In 2008, Oppenheimer Champion Income lost a nearly inconceivable 78% and sibling Core Bond declined 36%, primarily because the bond funds took on plenty of risk.  Specifically, the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect on the funds.  When the market for both bonds and the derivatives became increasingly illiquid as the credit crisis unfolded, the funds got slammed.  <u>Not only did the managers fail to appreciate the risks they were taking, but Oppenheimer also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary.</u>  Longtime fixed-income head Jerry Webman has stepped in to try and right the ship at both offerings, but the damage has already been done.

(Emphasis added.)

## V.     CLASS ACTION ALLEGATIONS

91.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of the following "Securities Class:"[4]

All persons or entities who acquired shares of the Fund traceable to a false and misleading Registration Statement and Prospectus for the Fund and who were damaged thereby.  The time period for this class is April 30, 2007 to December 31, 2008.

---

[4] Lead Plaintiff reserves the right to modify the proposed class period based on information obtained during discovery.

92.     Excluded from the Class are Defendants, their Officers and Directors, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

93.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands if not tens-of-thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Registrant or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

94.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

95.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

96.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.      whether the 1933 Act was violated by Defendants' acts as alleged;

        b.      whether statements made by Defendants to the investing public in the Registration Statements and Prospectuses misrepresented or omitted material facts; and

        c.      whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

97.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress

individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**VIOLATIONS OF SECTION 11 OF THE 1933 ACT
AGAINST ALL DEFENDANTS ON BEHALF OF THE SECURITIES CLASS**

98.     Lead Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if set forth fully herein, except to the extent any allegations above contain facts which are unnecessary or irrelevant for purposes of stating a claim under Section 11, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the Section 11 Defendants, other than strict liability or negligence.

99.     This Count is brought on behalf of the Securities Class against all Defendants pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k.

100.     The Registration Statements for the Fund contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, or omitted to state material facts required to be stated therein.

101.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

102.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

103.     By reasons of the conduct herein alleged, each Defendant violated, or controlled a person who violated Section 11 of the 1933 Act.

104.     Lead Plaintiff acquired Fund shares pursuant to the Registration Statements.

105.     Lead Plaintiff and the Class have sustained damages.  The value of the Fund shares has declined substantially subsequent to and due to Defendants' violations.

106.     At the time of their purchases of the Fund shares, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts prior to April 2009.  Less

than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which the original complaint in this action was filed in April 2009. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time at which the original complaint in this action was filed in April 2009.

**COUNT II**

**VIOLATIONS OF SECTION 12(a)(2) OF THE 1933 ACT
AGAINST ALL DEFENDANTS ON BEHALF OF THE SECURITIES CLASS**

107.    Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except to the extent any allegations above contain facts which are unnecessary or irrelevant for purposes of stating a claim under Section 12, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the Section 12 Defendants, other than strict liability or negligence.

108.    This Count is brought on behalf of the Securities Class pursuant to Section 12 of the 1933 Act, 15 U.S.C. § 77l.  It is asserted against all Defendants, because they were all participants in the distribution of the Fund's shares.

109.    The Section 12 Defendants "solicited" purchases of the Fund's shares by means of a prospectus or were controlling persons of the Fund or of those who solicited purchases of the Fund's shares.  By way of example, the solicitations were carried out as follows:

a.    As the Manager and investment advisor of the Fund that chose the Fund's investments and handled it day-to-day business, as well as being the parent corporation to the Distributor, Defendant OppenheimerFunds, Inc. solicited purchases of the Fund's shares to serve its own financial interests.

b.    As the Distributor and principal underwriter for shares of the Fund, Defendant OppenheimerFunds Distributor, Inc. solicited purchases of the Fund's shares to serve its own financial interests.

c.    As the registrant of the Fund, Defendant Oppenheimer Integrity Funds solicited purchases of the Fund's shares to serve its own financial interests.

      d.     As the Trustees of the Fund, the Individual Defendants governed the Fund, including all communications, and thereby solicited purchases of the Fund's shares to serve their own financial interests.  The Individual Defendants also solicited purchases by virtue of signing the Registration Statements accompanying the Prospectuses, which are considered solicitation documents.

110.    The Prospectuses contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, which statements and omissions the Section 12 Defendants knew, or in the exercise of reasonable care the Section 12 Defendants would have known, were false or were material facts which were required to be disclosed to avoid the representations which were made from being misleading.

111.    Lead Plaintiff did not know that the representations made in connection with the distribution to him by the Section 12 Defendants regarding the matters described above were untrue and did not know the above described material facts that were not disclosed.

112.    As a result of the matters set forth herein, pursuant to Section 12(a)(2) of the Securities Act, Lead Plaintiff and Class members are entitled to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if they no longer own such shares.

113.    Lead Plaintiff and putative Class members who do not opt out, hereby tender their shares in the Fund.

114.    The Section 12 Defendants are liable to Lead Plaintiff and Class members pursuant to Section 12(a)(2) of the Securities Act, as sellers of the Fund's shares.

## COUNT III

### VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST THE CONTROL GROUP DEFENDANTS ON BEHALF OF THE SECURITIES CLASS

115.    Lead Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if set forth fully herein, except to the extent any allegations above contain facts

which are unnecessary or irrelevant for purposes of stating a claim under Section 15, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the Section 15 Defendants, other than strict liability or negligence.

116.    This Count is brought on behalf of the Securities Class against all Defendants pursuant to Section 15 of the 1933 Act, 15 U.S.C. § 77o.

117.    Each of these Defendants was a control person of the Fund or the Manager or Distributor by virtue of his or her position as a trustee and/or senior officer of the Fund or the Oppenheimer entities.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other trustees and/or officers and/or major shareholders of the Manager and Distributor and the Fund.

118.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12 of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statements and having otherwise participated in the process which allowed the offerings to be successfully completed, or having participated in the offer or sale of the shares of the Fund.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices;

E.      Awarding rescissionary damages; and

F.      Such equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated:  October 13, 2009

**THE SHUMAN LAW FIRM**

   _s/   Kip B. Shuman_
Kip B. Shuman
Rusty Glenn
885 Arapahoe Avenue
Boulder, Colorado  80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
E-Mail: kip@shumanlawfirm.com

*Liaison Counsel for the Class*

**LABATON SUCHAROW LLP**
Christopher J. Keller
Mark S. Arisohn
Alan I. Ellman
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
Sean R. Matt
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Additional Counsel for Plaintiff*