**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Civil Action No. **09-cv-1186-JLK-KMT**

**IN RE:  CORE BOND FUND**

---

**OPPENHEIMER DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND**

---

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ............................................................ iv

TABLE OF EXHIBITS ................................................................... x

TABLE OF APPENDICIES ............................................................ xii

PRELIMINARY STATEMENT ........................................................ 1

BACKGROUND ............................................................................ 3

I.       CORE BOND FUND ............................................................ 3

         A.       Core Bond Fund's Objective And Investments ........................................ 3

         B.       The Breadth Of The Manager's Discretion ............................................. 4

II.      UNPRECEDENTED MARKET CONDITIONS CAUSED THE FUND'S
         LOSSES ................................................................................ 6

III.     OVERVIEW OF PLAINTIFF'S CLAIMS. ........................................................ 10

ARGUMENT ................................................................................ 11

I.       PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF
         LIMITATIONS ...................................................................... 11

         A.       Claims Under The Securities Act Must Be Brought Within
                  One Year After A Plaintiff Is On Notice Of The Claims ........................ 12

         B.       Plaintiff Was On Notice Of His Claims By February 27, 2008
                  At The Latest ...................................................................... 14

         C.       Plaintiff Was On Notice Of All Material Facts Regarding
                  The Fund's Investments In MBS .................................................... 15

                  1.       The Fund Disclosed That It Invested In MBS And
                           Explained The Risks Associated With MBS ........................... 15

                  2.       The Fund Disclosed The Magnitude Of Its MBS Investments.... 17

         D.       Plaintiff Was On Notice Of All Material Facts Regarding The Fund's
                  Transactions In Swaps .............................................................. 19

                  1.       The Fund Disclosed That It Would Use Swaps For
                           "Speculative Purposes." ................................................ 19

                  2.       The Fund Disclosed The Risks Associated With Swaps ............. 21

                  3.       The Fund Disclosed The Magnitude Of Its Swap Transactions. . 23

i

**TABLE OF CONTENTS**
(continued)

E.     In Light Of The Fund's Disclosures, Plaintiff's Claims Are Barred As A Matter Of Law ................................................. 25

II.     PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTIONS 11 AND 12(A)(2) BECAUSE HE HAS FAILED TO ALLEGE A MATERIAL MISREPRESENTATION ........................................ 27

A.     Plaintiff Does Not State A Claim Regarding The Fund's Investment Strategy. .................................................................. 28

    1.     The Investment Strategy Was Not False...................................... 29

    2.     The Investment Strategy Is Not Materially Misleading In Light Of The Fund's Numerous Other Disclosures................. 30

    3.     Plaintiff's Claims Regarding The Investment Strategy Are Claims For Alleged Mismanagement, Not Misrepresentation .... 33

B.     None of the Other Alleged Misstatements Was Materially Misleading .. 36

    1.     Plaintiff Does Not State A Claim Regarding The Fund's Holdings Of Investment Grade Securities ................................... 36

    2.     Plaintiff Does Not State A Claim Regarding The Fund's Borrowing Policy ........................................................................ 37

    3.     The Statement That The Fund May Be Appropriate As Part Of A Retirement Portfolio Is Not Misleading............................... 38

    4.     Plaintiff Does Not State A Claim Regarding The Fund's Industry Concentration Policy ..................................................... 40

    5.     Plaintiff's Allegations About "Inadequate Internal Controls" Fail To State A Claim ................................................................. 41

III.     PLAINTIFF LACKS STANDING TO ASSERT THAT THE FUND'S 2008 REGISTRATION STATEMENT WAS MISLEADING.................................... 42

IV.     PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE THE ALLEGED MISREPRESENTATIONS DID NOT CAUSE PLAINTIFF'S CLAIMED LOSSES ................................................................................ 44

V.     PLAINTIFF'S SECTION 12 CLAIMS SHOULD BE DISMISSED BECAUSE HE FAILS TO ALLEGE THAT OFI OR ANY INDIVIDUAL DEFENDANT WAS A "SELLER" OF FUND SECURITIES ........................... 45

VI.     PLAINTIFF'S SECTION 15 CLAIMS SHOULD BE DISMISSED. ................ 45

**TABLE OF CONTENTS**
(continued)

**Page**

CONCLUSION.............................................................................................................. 46

# TABLE OF AUTHORITIES

Page

## CASES

APA Excelsior III L.P. v. Premiere Techs., Inc.,
  476 F.3d 1261 (11th Cir. 2007) ..............................................................43

Albert Fadem Trust v. Am. Elec. Power Co.,
  334 F. Supp. 2d 985 (S.D. Ohio 2004) ...................................................42

In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.,
  No. 95-0330, 1996 WL 551732 (S.D.N.Y. Sept. 27, 1996) .................................31

Andropolis v. Red Robin Gourmet Burgers, Inc.,
  505 F. Supp. 2d 662 (D. Colo. 2007)..............................................34, 41

Anixter v. Home-Stake Prod. Co.,
  977 F.2d 1549 (10th Cir. 1992) ....................................................13, 26

Brown v. Hartshorne Pub. Sch. Dist.,
  926 F.2d 959 (10th Cir. 1991) ..............................................................11

Brumbaugh v. Princeton Partners,
  985 F.2d 157 (4th Cir. 1993) ................................................................25

In re Cable & Wireless, PLC Sec. Litig.,
  321 F. Supp. 2d 749 (E.D. Va. 2004) ....................................................34

Ciresi v. Citigroup,
  782 F. Supp. 819 (S.D.N.Y. 1991)........................................................36

In re Citigroup, Inc. Sec. Litig.,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004)...................................................35

In re Citigroup S'holder Derivative Litig.,
  964 A.2d 106 (Del. Ch. 2009)..............................................................35

DeBruyne v. Equitable Life Assurance Soc'y of the United States,
  920 F.2d 457 (7th Cir. 1990) ..........................................................14, 25

DeBenedictis v. Merrill Lynch & Co.,
  492 F.3d 209 (3d Cir. 2007)..................................................................14

**TABLE OF AUTHORITIES**
(continued)

Page

Dodds v. Cigna Sec., Inc.,
     12 F.3d 346 (2d Cir. 1993)........................................................................25

In re Donald J. Trump Casino Sec. Litig. - Taj Mahal Litig.,
     7 F.3d 357 (3d Cir. 1993) .........................................................................34

Donovan v. Am. Skandia Life Assurance Corp.,
     96 Fed. Appx. 779 (2d Cir. 2004)............................................................40

Dreiling v. Am. Exp. Co.,
     458 F.3d 942 (9th Cir. 2006) ......................................................................3

Eckstein v. Balcor Film Investors,
     8 F.3d 1121 (7th Cir. 1993) ......................................................................13

In re Exabyte Corp. Sec. Litig.,
     823 F. Supp. 866 (D. Colo. 1993)............................................................27

In re FBR Inc. Sec. Litig.,
     544 F. Supp. 2d 346 (S.D.N.Y. 2008).....................................................41

Flinn Found. v. Petro-Lewis Corp.,
     No. 84-2413, 1985 WL 358 (D. Colo. 1985)...........................................12

Friedlob v.  Trs. of the Alpine Mut. Fund Trust,
     905 F. Supp. 843 (D. Colo. 1995)............................................................14

Grossman v. Novell, Inc.,
     120 F.3d 1112 (10th Cir. 1997) ..........................................................32, 37

Grubka v. WebAccess Int'l, Inc.,
     445 F. Supp. 2d 1259 (D. Colo. 2006).................................................13, 14

Hien v. Freedom from Religion Found., Inc.,
     551 U.S. 587 (2007)..................................................................................42

Holtzman v. Proctor, Cook & Co.,
     528 F. Supp. 9 (D. Mass. 1981) ...............................................................25

v

**TABLE OF AUTHORITIES**
(continued)

Page

J & R Mktg., SEP v. Gen. Motors Corp.,
　　549 F.3d 384 (6th Cir. 2008) ..........................................................................21, 33

Joseph v. Wiles,
　　223 F.3d 1155 (10th Cir. 2000) ..............................................................42

Koke v. Stifel, Nicolaus & Co.,
　　620 F.2d 1340 (8th Cir. 1980) ..............................................................25

Landy v. Mitchell Petroleum Tech. Corp.,
　　734 F. Supp. 608 (S.D.N.Y. 1990)..........................................................26

Lapidus v. Hecht,
　　No. 98-3130, 2002 WL 1034042 (N.D. Cal. May 17, 2002)................................38

Lewis v. Casey,
　　518 U.S. 343 (1996)..............................................................................43

Manasfi v. Malone,
　　No. 06-00280, 2007 WL 891871 (D. Colo. Mar. 22, 2007) ..................................14

Naye v. Boyd,
　　No. C83-771R, 1986 WL 198 (W.D. Wash. Oct. 20, 1986)..................................34

Noble Asset Mgmt. v. Allos Therapeutics, Inc.,
　　No. 04-cv-1030, 2005 WL 4161977 (D. Colo. Oct. 20, 2005)..............................27

Pinter v. Dahl,
　　486 U.S. 622, 641-47 (1988) ..................................................................45

Piper Acceptance Corp. v. Slaughter,
　　600 F. Supp. 169 (D. Colo. 1985)...........................................................12

Podany v. Robertson Stephens, Inc.,
　　318 F. Supp. 2d 146 (S.D.N.Y. 2004)......................................................30

vi

**TABLE OF AUTHORITIES**
(continued)

Page

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,
    --- F. Supp. 2d ---, No. 08-10446, 2009 WL 3149775
    (D. Mass. Sept. 30, 2009) .......................................................................................43

In re Qwest Commc'ns Int'l, Inc.,
    396 F. Supp. 2d 1178 (D. Colo. 2004).....................................................................42

Rubke v. Capitol Bancorp LTD,
    551 F.3d 1156 (9th Cir. 2009) .................................................................................30

In re SCOR Holding (Switz.) AG Litig.,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008).....................................................................13

Santa Fe Indus. v. Green,
    430 U.S. 462 (1977)..................................................................................................34

In re Salomon Analyst Level 3 Litig.,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005).....................................................................30

In re Semgroup Energy Partners, L.P., Sec. Litig.,
    No. 08-1989, 2009 WL 3713524 (N.D. Okla. Nov. 4, 2009)...................................3

Sheppard v. TCW/DW Term Trust 2000,
    938 F. Supp. 171 (S.D.N.Y. 1996)..........................................................................27

Snyder v. Newhard, Cook & Co.,
    764 F. Supp. 612 (D. Colo. 1991)...........................................................................26

Sterlin v. Biomune Sys.,
    154 F.3d 1191 (10th Cir. 1998) ........................................................................12, 13

In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.,
    941 F. Supp. 326 (S.D.N.Y. 1996)..........................................................................31

Tabankin v. Kemper Short-Term Global Income Fund,
    No. 93-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994) ..........................................32

Tabankin v. Kemper Short-Term Global Income Fund,
    No. 93-5231, 1994 WL 319185 (N.D. Ill. June 23, 1994).......................................32

**TABLE OF AUTHORITIES**
(continued)

Page

Tal v. Hogan,
    453 F.3d 1244 (10th Cir. 2006) ...............................................................3

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007)..................................................................................3

Va. Bankshares, Inc. v. Sandberg,
    501 U.S. 1083 (1991)..............................................................................30

In re Wash. Mut., Inc. Sec., Derivatives & ERISA Litig.,
    259 F.R.D. 490 (W.D. Wash. 2009) .......................................................43

Young v. Gen. Motors Inv. Mgmt. Corp.,
    550 F. Supp. 2d 416 (S.D.N.Y. 2008)....................................................26

Zobrist v. Coal-X, Inc.,
    708 F.2d 1511 (10th Cir. 1983) .............................................................14

**FEDERAL STATUTES**

15 U.S.C. § 77.................................................................................................12, 27

15 U.S.C. § 80.........................................................................................................29

**MISCELLANEOUS**

J. William Hicks, International Dimensions of U.S. Securities Laws § 5:50 ....................29

Lingling Wei and Serena Ng, Treasurys Gain and Bonds Feel Pain—Spreads
    Hit Record On Corporate Debt; CMBS Prices Dive,
    Wall Street Journal (Nov. 21, 2008) ........................................................9

Improving Descriptions of Risk by Mutual Funds and Other Investment Companies,
    60 Fed. Reg. 17172 (Apr. 4, 1995) ..........................................................6

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Registration Form Used by Open-End Mgmt. Inv. Cos.*; *Guidelines*,
    SEC Release Nos. 33-6479, IC-13436 (Aug. 12, 1983) .......................................40

## TABLE OF EXHIBITS

**Exhibit**

March 2007 Core Bond Fund Form N-Q........................................................................ A

April 2007 Core Bond Fund Prospectus ......................................................................B

April 2007 Core Bond Fund Statement of Additional Information...................................C

May 2007 Core Bond Fund Statement of Additional Information .................................. D

June 2007 Core Bond Fund Semi-Annual Report ...........................................................E

September 2007 Core Bond Fund Form N-Q ................................................................. F

December 2007 Core Bond Fund Annual Report........................................................... G

March 2008 Core Bond Fund Form N-Q........................................................................ H

April 2008 Core Bond Fund Prospectus ........................................................................I

April 2008 Core Bond Fund Statement of Additional Information...................................J

June 2008 Core Bond Fund Semi-Annual Report .......................................................... K

September 2008 Core Bond Fund Form N-Q .................................................................L

*Morningstar's Take* (July 3, 2006) .............................................................................M

*Morningstar's Take* (Dec. 1, 2006)............................................................................. N

*Morningstar's Take* (Apr. 29, 2007)........................................................................... O

*Morningstar's Take* (Sept. 26, 2007)...........................................................................P

## TABLE OF EXHIBITS
(continued)

**Page**

Total Return Swap Chart ................................................................. Q

Credit Default Swap Chart................................................................R

Net Notional Value Chart ................................................................ S

## TABLE OF APPENDICIES

**Appendix**

Portions of Fund Disclosures that Relate to the Fund Manager's Discretion……...................... A-1

Portions of Fund Disclosures that Relate to Mortgage-Backed Securities and Their Risks....... A-2

Portions of Fund Disclosures that Relate to Derivatives Generally and Their Risks ................. A-3

Portions of Fund Disclosures that Relate to Credit Default Swaps and Their Risks.................. A-4

Portions of Fund Disclosures that Relate to Total Return Swaps and Their Risks.................... A-5

Portions of Fund Disclosures that Relate to Leverage............................................................. A-6

Portions of Fund Disclosures that Relate to the Fund's Intention to Invest 80% of Its
Assets in Investment-Grade Securities ........................................................................ A-7

Portions of Fund Disclosures that Relate to the General Risks of Investing in the Fund........... A-8

Defendants OppenheimerFunds, Inc. ("OFI" or the "Manager"), OppenheimerFunds Distributor, Inc. ("OFDI"), John V. Murphy, and Brian W. Wixted  (collectively, the "Oppenheimer Defendants") respectfully move this Court for an Order dismissing with prejudice the Consolidated Class Action Complaint and Jury Demand ("Complaint" or "CCAC").

## PRELIMINARY STATEMENT

Plaintiff C. Phillip Pattison ("Plaintiff") alleges that Defendants made material misrepresentations regarding the investment portfolio of Oppenheimer Core Bond Fund ("Core Bond Fund" or the "Fund").  Specifically, Plaintiff brings claims under Sections 11, 12 and 15 of the Securities Act of 1933, alleging that the Fund's registration statements were rendered misleading by the Fund's significant investments in mortgage-backed securities ("MBS") and use of derivative instruments, including swaps.  Plaintiff's claims fail as a matter of law, because they are time-barred and because they fail to allege either an actionable misrepresentation under the Securities Act or the loss causation required under the plain language of that statute.[1]

As an initial matter, Plaintiff's claims are time-barred under the Securities Act's one-year statute of limitations.  Under established Tenth Circuit precedent, investors cannot take a "wait and see" approach before deciding to file suit.  Rather, they must file suit within one year of being put on notice that they may have a claim, even if that is well before they suffer any losses.  Plaintiff purchased Fund shares in June 2007.  By that time, the Fund had already publicly

---

[1]     The Oppenheimer Defendants have moved to dismiss the Consolidated Class Action Complaint filed with respect to Oppenheimer Champion Income Fund (the "Champion Fund Motion to Dismiss").  Rather than repeat arguments made in that Motion, the Oppenheimer Defendants refer below to certain portions of the Champion Fund Motion to Dismiss and incorporate them into this brief.

disclosed that it was investing in MBS and swaps and had made extensive risk disclosures regarding those securities.  By February 27, 2008 – the date the Fund disseminated its 2007 Annual Report – the Fund specifically informed investors that its portfolio had already grown to include over $1.8 *billion* in MBS and swap transactions with a notional value of over $1.1 *billion*.  Indeed, Plaintiff cites this very disclosure to support his allegation that the Fund invested in "too many" MBS and swaps.  Thus, even if Plaintiff could sue under the Securities Act because the Fund had "too many" MBS or swaps (which he cannot), then he should have brought his claims within one year of February 27, 2008.  But he did not.  Instead, he waited to raise any complaint until many months after the market collapsed in the fall of 2008.  Accordingly, his claim is untimely as a matter of law.

Even if they were timely, Plaintiff's claims should nonetheless be dismissed because they have no merit – his Complaint does not allege a material misrepresentation of fact.  Plaintiff's conclusory assertion that the Fund's investments in MBS and swaps were made "unbeknownst" to investors is demonstrably false.  The Fund always disclosed its intent to invest in MBS and swaps and described in extensive detail the material risks associated with those investments.  Equally important, the Fund disclosed on a quarterly basis its entire investment portfolio, *i.e.*, the Fund publicly disclosed every single MBS and every single swap transaction every three months.  In light of these disclosures, no investor could have been misled into thinking the Fund's investments would not include MBS or swaps, or that such investments did not include significant risks.

Stripped of Plaintiff's attempt at artful pleading, it is apparent that his real complaint is not about the Fund's disclosures.  Instead, his complaint is that OFI, the Fund's Manager, made

2

investment decisions that turned out badly in the face of the greatest market collapse since the

Great Depression.  Specifically, with the benefit of hindsight, Plaintiff complains that the

Manager should have foreseen the market collapse of 2008 and adjusted its strategy so that he

might have avoided the losses that crisis inflicted on the Fund.  Whatever claim this might be, it

is not a disclosure claim that gives Plaintiff any right to damages under the Securities Act.  For

these reasons and those discussed below, the Oppenheimer Defendants respectfully submit that

Plaintiff's Complaint should be dismissed with prejudice.

## BACKGROUND

I.   **CORE BOND FUND.**

   A.   **Core Bond Fund's Objective And Investments.**

   The Core Bond Fund's investment objective was to seek "total return by investing mainly

in debt instruments."  *See, e.g.*, April 2007 Prospectus at 3.[2]  Consistent with this objective, the

Fund disclosed that, under normal market conditions, it would invest "at least 80% of its net

assets (plus borrowings for investment purposes) in investment grade debt securities."  *Id.*  These

investment-grade debt securities could include:  (1) corporate bonds; (2) government bonds –

including mortgage-related U.S. government securities and collateralized mortgage obligations

---

[2]      All of the Fund's prospectuses, SAIs, Annual and Semi-Annual Reports, and Form N-Qs
for the period April 30, 2007 – December 31, 2008 are attached to this motion as Exhibits
A – L.  This Court may, of course, take judicial notice of the contents of these documents
because they were referred to in the Complaint or filed with the SEC.  *See Tellabs, Inc. v.
Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Tal v. Hogan*, 453 F.3d 1244,
1265 n.24 (10th Cir. 2006); *In re Semgroup Energy Partners, L.P., Sec. Litig.*, No. 08-
1989, 2009 WL 3713524, at *1-2 (N.D. Okla. Nov. 4, 2009); *see also Dreiling v. Am.
Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (explaining that courts "may consider
documents referred to in the complaint or any matter subject to judicial notice, such as
SEC filings"); *see, e.g.*, CCAC ¶¶ 39-41 (identifying the Fund's registration statements
and SEC-filed prospectus materials).

("CMOs"); and (3) mortgage-related securities (including CMOs) issued by private issuers.  *Id.*  Thus, the Fund prominently disclosed that it would invest both in government-related MBS ("Agency MBS") and privately-issued MBS ("Non-Agency MBS").  There is no allegation that the Fund did not invest at least 80% of its net assets in investment-grade debt securities.

The Fund also disclosed that it could invest in junk bonds and swaps.  Specifically, it could invest "up to 20% of its assets in high-yield debt securities that are below investment grade (commonly referred to as 'junk bonds')" and could "use derivative instruments, primarily futures, *swaps*, CMOs and 'structured' notes for speculative purposes (to seek higher investment returns) or for hedging purposes (to manage investment risks)."  *Id.* (emphasis added).  There is no allegation that the Fund exceeded this limit.

The "Fund's portfolio holdings [were] included in semi-annual and annual reports that [were] distributed to shareholders of the Fund within 60 days after the close of the period for which such report [was] being made."  *Id.* at 18 (hereafter, the "Statement of Investments").  In addition, the Fund filed a Statement of Investments with the SEC for each of the two quarters not covered by the Annual and Semiannual Reports.  *Id.*  Thus, the complete "portfolio holdings of the Fund [were] made publicly available no later than 60 days after the close of each of the Fund's fiscal quarters."  *Id.*

### B.     The Breadth Of The Manager's Discretion.

The Manager's "overall strategy [was] to build a broadly diversified portfolio of corporate and government bonds."  *E.g.*, April 2007 Prospectus at 4 (the "Investment Strategy").  Consistent with the Investment Strategy, the Manager had wide discretion, within certain stated parameters, to select investments for the Fund.  *See* Appendix A-1 (collecting portions of Fund

disclosures that relate to the Fund Manager's discretion).[3]  As the Fund explained:  "The allocation of the Fund's portfolio among the different types of investments [would] vary over time based upon the evaluation of economic and market trends."  *Id.* at 11.  The Fund's disclosures identified a number of investing strategies available to the Manager, including investments in MBS and swaps.  *Id*. at 11-15; May 2007 Statement of Additional Information (hereafter, "SAI") at 2-31.  However, the Manager had broad discretion to select and employ its preferred investment strategies from the list of available possibilities:

> The composition of the Fund's portfolio and the techniques and strategies that the Manager may use in selecting portfolio securities will vary over time.  The Fund is not required to use all of the investment techniques and strategies described below in seeking its goal.  It may use some of the special investment techniques and strategies at some times or not at all.

May 2007 SAI at 2.

These and other similar disclosures made clear to investors that the success of the Fund, and the investment risks presented by the portfolio of Fund assets, would be primarily dependent upon the exercise of professional investment judgment by the portfolio managers.  *See, e.g.*, April 2007 Prospectus at 4 (explaining that investors faced "the risk that poor security selection by the Manager will cause the Fund to underperform other funds having similar objectives").  Investors were also informed of a number of specific restrictions on that discretion that also served to define risk boundaries for the Fund.  These restrictions included:

- The Fund must be "diversified" within the meaning of the Investment Company Act of 1940 ("ICA").  That meant that the

---

[3]     The Fund repeated its relevant disclosures throughout the class period.  The body of this brief provides one citation for each quote.  The Fund's extensive disclosures are collected in Appendices A-1 to A-8, which are organized by topic and disclosure document.

Fund could not buy securities issued or guaranteed by any one issuer if more than 5% of its total assets would be invested in securities of that issuer or if it would own more than 10% of that issuer's voting securities. This restriction applied to 75% of the Fund's total assets, but did not apply to investments in securities issued by the U.S. government or any of its agencies or instrumentalities. *See* May 2007 SAI at 32.

- The Fund could borrow money only from a bank or an affiliated investment company, and could not borrow in excess of 33 1/3% of its total assets. *Id.*

- The Fund could not invest more than 25% of its total assets in any one industry, as defined by the Fund. *Id.*

- The Fund would not invest more than 15% of its net assets in illiquid or restricted securities. *Id.* at 15.

Plaintiff pleads no facts showing that any of these limitations were violated. And it is these prospective constraints – not an after-the-fact assessment that certain securities were too risky – that set the limit on the types of securities that the Fund could hold.[4]

## II.   UNPRECEDENTED MARKET CONDITIONS CAUSED THE FUND'S LOSSES.

Operating within the broad discretion granted to the Fund's portfolio managers, the Fund generated positive total returns for many years prior to the worldwide panic of 2008. Specifically, a Class A Fund share (without a sales charge) returned 4.9% in 2004; 2.35% in 2005; 4.48% in 2006; and 4.49% in 2007.

---

[4]     Neither the Investment Company Act nor SEC regulations require a mutual fund to attempt to quantify the amount of risk in its portfolio. Indeed, in 1995 the SEC requested public comment on whether it should require mutual funds to include quantitative risk measures in their disclosures. *See Improving Descriptions of Risk by Mutual Funds and Other Investment Companies*, 60 Fed. Reg. 17172 (Apr. 4, 1995). After numerous commentators explained that no one number could capture the riskiness of a fund, the SEC abandoned the effort.

As the Fund's disclosures have made plain, the Fund's investment managers did not foresee the financial meltdown that would ravage the Fund and undermine the value of its extensive investments in MBS.  To the contrary, the Fund's managers believed that their strategy, including investments in derivatives, was sound in light of market conditions – and described to investors why.  In June 2007, for instance, the Fund's managers explained to investors that

> Mortgage-backed securities . . . appear to offer ample return for the levels of risk they currently present.  Therefore, we have increased our level of mortgage spread risk based on our belief that the return expectations for this sector are currently favorable relative to other highly rated fixed-income assets. . . .
>
> Similarly, we believe commercial mortgage-backed securities (CMBS) continue to offer attractive return potential at currently favorable price levels.  Recent spread widening in this sector has driven valuations down, making these securities even more appealing on a risk-adjusted basis.  As such, we've added to this allocation at what we believe to be an opportune time to do so.

Management Commentaries and 2007 Semiannual Report at 9; *see also* Management Commentaries and 2007 Annual Report at 7 (explaining that the Fund had "increased [its] exposure" to MBS).  The managers repeated their optimistic views about MBS in 2008.  In June 2008, the Fund's managers informed investors that they did "not anticipate a severe recession" despite recent turmoil in the economy.  Management Commentaries and 2008 Semiannual Report at 7.  They explained that, based on their "outlook," the Fund had increased its "overall exposure to the residential mortgage market . . . at a time when these securities are, in our opinion, priced cheaply" relative to their value.  *Id.* (adding that "the area of non-agency residential MBS . . . currently offers attractive yield and favorable total return potential").

7

As discussed in more detail in the Champion Fund Motion to Dismiss at Part III.B., the Fund's managers' expectations regarding the financial markets were not borne out.  In the fall of 2008 the worldwide economy experienced an unprecedented downturn.  Many investors became unwilling to invest in anything other than the safest of investments, liquidity dried up, and panic ruled the day.  As a result of these unexpected market events, the Fund's disclosed portfolio holdings did not perform as expected.  Plaintiff alleges that the Fund experienced a 35.8% drop in net asset value.  *See* CCAC ¶ 83.

The Fund explained the reasons for its losses.  Its investments declined in value as many investors shunned all securities other than Treasury securities:

> During [2008], financial markets in general experienced extreme volatility and steep declines.  In particular, the fixed income markets were subject to high volatility, price declines, and lack of liquidity, as were the fixed-income securities and derivatives instruments based on such securities in which the Fund invested.  In the continuing mortgage crisis and ensuing global economic downturn, investors generally shunned perceived risk, regardless of a security's credit quality or underlying fundamentals.  These problems created a disparity between security prices and investment fundamentals as to those securities and, as a result, most non-Treasury fixed-income securities, or "spread products," suffered declines.

Management Commentaries and 2008 Annual Report at 6.

These market forces had a dramatic effect on credit spreads, *i.e.*, the difference between the yields on Treasury securities and other, riskier securities.  As the Fund explained, there is an "inverse relationship between [the] price and yield" of bonds.  May 2007 SAI at 3.  Thus, increased investor demand for Treasury securities drove their prices up and pushed down their yields.  Conversely, the dramatic decline in demand for non-Treasury securities drove their prices down and pushed up their yields, creating a dramatic and unanticipated increase (or

"widening") of credit spreads.  Unfortunately, the Fund had significant holdings of investments whose performance depended upon an anticipated decrease (or "narrowing") of credit spreads – including the Fund's total return swap investments.  The value of these investments plummeted. As the Fund explained:  "There was an unprecedented and unanticipated widening of credit spreads of mortgage-backed securities over Treasury securities, which . . . had a negative impact on the Fund's positions in total return swaps in the CMBS sector."  *See* Management Commentaries and 2008 Annual Report at 6-7; *accord, e.g.*, Lingling Wei and Serena Ng, *Treasurys Gain, and Bonds Feel Pain --- Spreads Hit Record On Corporate Debt; CMBS Prices Dive*, Wall Street Journal, Nov. 21, 2008, at C1 ("Credit markets were at crisis levels, as investors flocked to U.S. Treasurys while prices of commercial real-estate bonds and corporate debt tumbled to lows.").

Finally, as a result of investor panic and the liquidity crisis, funds like Core Bond Fund were unable to sell their securities except at deeply discounted values.  As the Fund explained: "liquidity virtually disappeared in the CMBS market, severely limiting the Fund's ability to scale back or hedge away portfolio holdings that detracted from performance."  *Id.* at 7; *see also id.* at 11 ("liquidity virtually disappeared as the markets in mortgage-related instruments effectively shut down").  As a result, the Fund was forced to sell securities at the worst time since the Great Depression.[5]

---

[5]      Plaintiff makes much of Morningstar's after-the-fact coverage of the Fund's decline.  *See* CCAC ¶¶ 88-90.  He does not, however, discuss Morningstar's praise for the Fund in the years preceding the unprecedented market shifts that led to his losses.  In late 2006, Morningstar stated, "We like Oppenheimer Core Bond."  Reginald Laing, *Morningstar's Take* (July 3, 2006), attached as Exhibit M.  Morningstar called the portfolio managers, led by Angelo Manioudakis, "skilled and experienced managers," and attributed the Fund's success since 2002 to the portfolio managers' arrival.  Among other things,

### III.    OVERVIEW OF PLAINTIFF'S CLAIMS.

Plaintiff purports to bring this case in his own right and on behalf of "all persons or entities who acquired shares of the Fund traceable to a false and misleading Registration Statement and Prospectus for the Fund and who were damaged thereby."  CCAC ¶ 91.  The putative class period is April 30, 2007 to December 31, 2008.  *Id.*  Plaintiff names as defendants: (1) the Manager; (2) OFDI, a subsidiary of the Manager and the distributor for the Fund; (3) Oppenheimer Integrity Funds, the registrant for the Fund's offerings; (4)  John V. Murphy, President and Principal Executive Officer of the Fund and a Fund Trustee; (5) Brian W. Wixted, Treasurer and Principal Financial and Accounting Officer of the Fund; and (6) all of the remaining Fund Trustees (Murphy, Wixted, and the Fund Trustees are hereafter the "Individual Defendants").  *See* CCAC ¶¶ 16-29.

Plaintiff's overarching theory is that, "unbeknownst to investors," the Fund invested in too many MBS and swaps and that those investments were inconsistent with the Manager's stated strategy of building a diversified portfolio of corporate and government bonds.  CCAC ¶ 49-50; *see also id.* ¶¶ 5, 53, 55, 59, 65, 69.  Plaintiff alleges that, in light of the Fund's investments, the Fund's registration statements were materially false and misleading, and violated Sections 11 and 12(a)(2) of the Securities Act of 1993.   He also alleges that certain

---

Morningstar noted that the managers' "execution has been superior to that of many peers."  Scott Berry, *Morningstar's Take* (Dec. 1, 2006), attached as Exhibit N.  In April of 2007, Morningstar noted that the Fund had "outpaced the returns of 90% of intermediate-term bond funds" during "Manioudakis' tenure."  Reginald Laing, *Morningstar's Take* (Apr. 29, 2007), attached as Exhibit O.  And in September 2007, Morningstar touted the Fund, telling investors that "Core Bond's case remain[ed] strong."  It attributed the Fund's success to the "managers' willingness to chart their own course, which they do quite capably."  Miriam Sjoblom, *Morningstar's Take* (Sept. 26, 2007), attached as Exhibit P.

defendants are liable under Section 15 of the Securities Act because they allegedly "controlled"

another defendant who allegedly violated Section 11 or Section 12(a)(2).[6]  These claims are

time-barred and flatly inconsistent with the Fund's disclosures.  Moreover, Plaintiff's claimed

losses were not caused by any alleged misrepresentation.  Accordingly, for these reasons,

Plaintiff's Complaint should be dismissed with prejudice.

## ARGUMENT

## I.    PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiff's claims fail, first, because they are barred by the Securities Act's one-year

statute of limitations.  As discussed below, Plaintiff was on notice of all of the facts underlying

his claims, at the latest, by February 27, 2008, the date the Fund publicly disseminated its 2007

Annual Report and thereby informed investors that it had already invested over $1.8 *billion* in

MBS and had entered into swap transactions with a notional value of over $1.1 *billion*.  Because

the first action involving the Fund was not filed until April 2009, Plaintiff's claims are time

barred.[7]

---

[6]     It is unclear whether Plaintiff has sued all defendants or just certain defendants under
Section 15.  *Compare* CCAC at p. 35 (stating that the Section 15 claim is brought against
undefined "Control Group Defendants"); *id.* ¶ 116 (referring to all defendants); *id.* ¶¶
117-18 (referring only to the Individual Defendants); *id.* ¶ 31 (alleging that OFI, OFDI
and the Individual Defendants control the Fund); *id.* ¶ 34 (purporting to make "control
allegations" against Oppenheimer Integrity Funds).

[7]     On April 22, 2009, a putative class action regarding the Fund was filed in this district.
*Smith v. OppenheimerFunds, Inc., et al.*, No. 09-cv-929 (D. Colo. filed Apr. 22, 2009).
While Plaintiff attempts to use the filing of *Smith* as the date on which this action was
commenced, *see* CCAC ¶ 106, that case was voluntarily dismissed on May 29, 2009.
Consequently, the *Smith* action does not toll the statute of limitations here.  *Brown v.
Hartshorne Pub. Sch. Dist.*, 926 F.2d 959, 961 (10th Cir. 1991) ("a voluntary dismissal
without prejudice leaves the parties as though the action had never been brought").
Plaintiff's claims fail, however, regardless of whether the statute of limitations is assessed

## A.  Claims Under The Securities Act Must Be Brought Within One Year After A Plaintiff Is On Notice Of The Claims.

Section 13 of the Securities Act affirmatively prohibits actions brought under Sections 11 and 12(a)(2) of the Securities Act "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."[8]  *See* 15 U.S.C. § 77m; *see also Piper Acceptance Corp. v. Slaughter*, 600 F. Supp. 169, 172 (D. Colo. 1985) (Kane, J.).  In applying this standard, the Tenth Circuit has held that inquiry notice triggers an investor's duty to exercise reasonable diligence; the one-year limitations period begins to run on the date that an investor, in the exercise of that diligence, should have discovered the facts underlying his claim.  *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998).

Inquiry notice is triggered by facts sufficient "to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale [of the security]."  *Id.* at 1196 (internal brackets and citations omitted).  A disclosure document need not "discuss each and every aspect" of the alleged misstatement; rather, inquiry notice is triggered whenever the disclosure "alert[s] a reasonable investor to the possibility" of

---

from the April 2009 filing date for *Smith* or from May 22, 2009, the date the instant action was commenced.

[8]  A plaintiff must affirmatively plead compliance with the statute of limitations.  *Piper Acceptance Corp. v. Slaughter*, 600 F. Supp. 169, 172 (D. Colo. 1985) (Kane, J.); *see also Flinn Found. v. Petro-Lewis Corp.*, No. 84-2413, 1985 WL 358, at *3 (D. Colo. Nov. 8, 1985) (Carrigan, J.).  As the Court explained in *Flinn*, "[m]ere conclusory allegations will not suffice.  Plaintiffs must allege with particularity the *facts* on which they rely to avoid this statute of limitations."  *Flinn*, 1985 WL 358, at *3.  Here, Plaintiff does not even attempt to plead *facts* establishing compliance with the statute of limitations.  *See* CCAC ¶ 106.

such misstatement.  *Sterlin*, 154 F.3d at 1204; *see also Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1267 (D. Colo. 2006).  The facts necessary to trigger inquiry notice are lower for Securities Act claims than for claims under the Securities Exchange Act of 1934.  *See In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 580-81 (S.D.N.Y. 2008) (recognizing a distinction between the inquiry notice standard for a Securities Act claim, which requires notice of a misstatement, and the higher inquiry notice standard for an Exchange Act claim, which "demands notice not just of a misstatement, but of a fraudulent misstatement").

The purpose of the securities laws "is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."  *Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1552 (10th Cir. 1992) (quotation marks omitted).  Thus, as the Tenth Circuit has explained, the statute of limitations may begin to run before the plaintiff's shares decline in value:

> We recognize in securities fraud cases the cause of action may accrue at a separate and distinct time from when the plaintiff/investor is injured. That is, a material misrepresentation may far precede plaintiff's injury. Nevertheless, an aggrieved investor must bring an action once he discovers or should have discovered the fraud.

*Id*. at 1551-52; *see also Sterlin*, 154 F.3d at 1202 ("purpose behind commencing the one-year limitations period upon inquiry notice is to discourage investors from adopting a wait-and-see approach"); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1128 (7th Cir. 1993) ("Investors must bring their claims as soon as they become aware of misrepresentations or omissions, instead of waiting while avoidable damages accrue.").

Mutual fund investors are presumed to have full knowledge of all information contained within the Fund's disclosures.  As the Seventh Circuit has explained:  "plaintiffs cannot avoid the

statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice." *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 466 n.18 (7th Cir. 1990). Thus, for purposes of the statute of limitations, "investors are presumed to have read prospectuses, quarterly reports, and other information related to their investments." *Debenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 216 (3d Cir. 2007); *see also Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1518 (10th Cir. 1983) ("Thus, it is our view that knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents.").

Courts grant motions to dismiss where the facts showing that the statute of limitations has run are apparent from the face of the complaint or from documents properly considered on such a motion. *See, e.g., Grubka*, 445 F. Supp. 2d at 1267 (Babcock, J.) (dismissing '33 and '34 Act claims on 12(b)(6) motion); *Friedlob v. Trs. of the Alpine Mut. Fund Trust*, 905 F. Supp. 843, 854 (D. Colo. 1995) (Nottingham, J.) (dismissing '33 Act claims pursuant to statute of limitations); *Manasfi v. Malone*, No. 06-00280, 2007 WL 891871, at *2 (D. Colo. Mar. 22, 2007) (Miller, J.) (dismissing '34 Act claims pursuant to statute of limitations).

### B.     Plaintiff Was On Notice Of His Claims By February 27, 2008 At The Latest.

Plaintiff's theory is that "[t]hroughout 2007 and 2008, unbeknownst to investors, the Fund altered its investment policies and began significantly increasing its investments in highly leveraged, off-balance sheet derivatives in the hopes of seeking higher returns." CCAC ¶ 50. Plaintiff alleges – on the basis of the Fund's own disclosures – that because of the size of the MBS and swap investments:  the Manager's stated strategy to build a broadly diversified portfolio of corporate and government bonds was rendered false and misleading; the Fund

violated its stated limitation on borrowing; the Fund lacked adequate internal controls; and the Fund violated its limitation on investments within a single industry. *See* CCAC ¶¶ 55, 56, 65, 69, 70.

For the reasons discussed below, Plaintiff's Complaint should be dismissed in its entirety because Plaintiff was on notice of the facts underlying each of his claims, at the latest, by February 27, 2008, the date the Fund disseminated its 2007 Annual Report. By that date, the Fund had disclosed: (1) that it would invest in MBS and swaps; (2) the risks associated with these investments; (3) that it had invested more than $1.8 billion in MBS and had invested in swaps with a notional value of over $1.1 billion; and (4) that MBS comprised over 85% of its portfolio. Thus, even if large investments in MBS and swaps could give rise to the claims Plaintiff alleges, those claims arose no later than February 2008.[9] Because Plaintiff was on inquiry notice of the facts underlying his claims more than one year before any case involving the Fund was filed, his claims are barred by the statute of limitations.

    **C.**    **Plaintiff Was On Notice Of All Material Facts Regarding The Fund's Investments In MBS.**

        **1.**    **The Fund Disclosed That It Invested In MBS And Explained The Risks Associated With MBS.**

There can be no dispute that the Fund disclosed its intention to invest in MBS. As an initial matter, the Fund explained MBS to investors. *See, e.g.*, May 2007 SAI at 5 ("Mortgage-related securities are a form of derivative investment collateralized by pools of commercial or residential mortgages. Pools of mortgage loans are assembled as securities for sale to investors

---

[9]    Moreover, by alleging that the purported class period begins in April 2007, Plaintiff's Complaint itself is necessarily predicated on the theory that the Fund's holdings gave rise to claims long *before* he bought his shares.

by government agencies or entities or by private issuers."); *see also* Appendix A-2 (collecting portions of Fund disclosures that relate to mortgage-backed securities and their risks).  The Fund also prominently stated that its investments could include "mortgage-related U.S. government securities and CMOs" and "mortgage related securities (including collateralized mortgage obligations ('CMOs') issued by private issuers)."  April 2007 Prospectus at 3.  Thus, investors knew that the Fund could invest in both Agency and Non-Agency MBS.

The Fund also disclosed the key risks associated with MBS.  It disclosed that "the values of mortgage-related securities may be affected by changes in the market's perception of the creditworthiness of the entity issuing the securities or guaranteeing them."  May 2007 SAI at 6. It also explained the interest and prepayment risks applicable to MBS:

> The prices and yields of CMOs are determined, in part, by assumptions about the cash flows from the payments of the underlying mortgages.  Changes in interest rates may cause the rate of expected prepayments of those mortgages to change.  In general, prepayments increase when general interest rates fall and decrease when interest rates rise.
>
> If *prepayments of mortgages underlying a CMO occur faster than expected when interest rates fall, the market value and yield of the CMO could be reduced*.  Additionally, the Fund might have to reinvest the prepayment proceeds in other securities paying interest at lower rates, which could reduce the Fund's yield.
>
> *When interest rates rise rapidly, and if prepayments occur more slowly than expected, a short- or medium-term CMO can in effect become a long-term security, subject to greater fluctuations in value*.  These are the prepayment risks described above and can make the prices of CMOs very volatile when interest rates change. The prices of longer-term debt securities tend to fluctuate more than those of shorter-term debt securities.  *That volatility will affect the Fund's share price*.

*Id.* at 8 (emphases added).  Plaintiff does not take issue with these – or any of the Fund's numerous other – risk disclosures regarding MBS; nor does he identify any undisclosed risk that materialized and caused his alleged losses.

**2.     The Fund Disclosed The Magnitude Of Its MBS Investments.**

The Fund disclosed the precise extent of its MBS holdings every quarter in its Statements of Investments.[10]  As an initial matter, the Statements of Investments detailed each of the Fund's MBS investments, including the principal amount and current value of each investment.[11]  The Fund also prominently disclosed the total value of the Fund's investments in MBS.   For instance, the Fund's Annual Report, filed February 27, 2008, provides that the value of the Fund's MBS investments was $1,838,370,147.  *See* December 2007 Annual Report at 33.  Similar figures appear in each and every Statement of Investments.

The Fund also disclosed the percentage of its assets that were invested in MBS and broke down that percentage for the amount of Agency MBS and Non-Agency MBS.  In fact, Plaintiff

---

[10]     *See* (1) March 31, 2007 Form N-Q, filed May 29, 2007, at 2 (Exhibit A); (2) June 30, 2007 Semiannual Report, filed Aug. 28, 2007, at 18 (Exhibit E); (3) September 30, 2007 Form N-Q, filed Nov. 27, 2007, at 2 (Exhibit F); (4) December 31, 2007 Annual Report, filed Feb. 27, 2008, at 24 (Exhibit G); (5) March 31, 2008 Form N-Q, filed May 30, 2008, at 2 (Exhibit H); (6) June 30, 2008 Semiannual Report, filed Aug. 27, 2008, at F2 (Exhibit K); and (7) September 30, 2008 Form N-Q, filed Nov. 25, 2008, at 2 (Exhibit L).

[11]     For example, the chart below illustrates how the Fund disclosed that it had purchased a Non-Agency Commercial MBS with a value as of December 31, 2007 of $1.149 million:

| MORTGAGE-BACKED OBLIGATIONS | Principal Amount | Value |
|---|---|---|
| Citigroup Mortgage Loan Trust, Inc. 2006-WF1, Asset-Backed Pass-Through Certificates, Series 2006-WF1, Cl. A2B, 5.536%, 3/1/36 | 1,150,000 | 1,149,759 |

*See* December 2007 Annual Report at 30.

used these very disclosures in an attempt to show that the Fund had invested too heavily in MBS.

Specifically, in Paragraph 52 of the Complaint, Plaintiff created a chart showing the percentage

of the Fund's investments in Agency MBS:

| 3/31/07 | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 |
|---------|---------|---------|----------|---------|---------|---------|----------|
| 62% | 62.9% | 56.6% | 55.5% | 59.1% | 53.3% | 59.6% | 64.2% |

CCAC ¶ 52.  Plaintiff also created a chart regarding the Fund's investments in commercial MBS,

one type of Non-Agency MBS:

| 3/31/07 | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 |
|---------|---------|---------|----------|---------|---------|---------|----------|
| 8.3% | 6.8% | 10.4% | 29.7% | 32.6% | 38.9% | 18.1% | 18.5% |

*Id.* ¶ 54.[12]

Plaintiff fails, however, to inform the Court that these figures were taken directly from

the Fund's own disclosures.  Indeed, Plaintiff populated his table with percentages taken *directly*

from the Fund's Statements of Investments.  For example, the 55.5% figure reflecting the Fund's

investment in Agency MBS as of December 31, 2007 was taken directly from the Fund's Annual

Report.  *See* December 2007 Annual Report at 24.  The Non-Agency figure of 29.7% is set forth

just a few pages later in the same Annual Report.  *Id.* at 29.  (The combined figure of 85.2% is

also disclosed.  *Id.* at 24.)

---

[12]    The chart in Paragraph 54 of the Complaint contains three typographical errors.  In copying the amount of commercial MBS owned by the Fund as of 12/31/07, 3/31/08, and 6/30/08, Plaintiff mistakenly utilized the percentage of the Fund's investments in all types of Non-Agency MBS, and not merely the percentage of commercial MBS.  The percentage of the Fund's investments in all Non-Agency MBS and commercial MBS were both disclosed by the Fund.

In light of these contemporaneous disclosures, Plaintiff's claims are clearly time-barred. By December 31, 2007, the Fund had already invested over $1.8 billion in MBS, *i.e.*, over 85% of the value of its portfolio.  The Annual Report disclosing these figures was distributed to shareholders on February 27, 2008.  Thus, if Plaintiff truly believed that the Fund's actual investments in MBS deviated from its disclosed strategy, he had all the information needed to form that view by February 27, 2008.

### D.   Plaintiff Was On Notice Of All Material Facts Regarding The Fund's Transactions In Swaps.

#### 1.   The Fund Disclosed That It Would Use Swaps For "Speculative Purposes."

Plaintiff claims that "[u]nbeknownst to investors, the Fund invested heavily in highly illiquid total return swaps," CCAC ¶ 57, and "gambl[ed] . . . Fund assets . . . through transactions known as credit default swaps."  *Id.* ¶ 60.  The Fund's public filings refute Plaintiff's claim that the Fund's investments were not disclosed and demonstrate that Plaintiff was on notice of his claim more than one year before any suit was filed.

As an initial matter, the Fund disclosed that it can "*use derivative instruments*, primarily futures, *swaps*, CMOs and 'structured' notes, for speculative purposes (to seek higher investment returns) or for hedging purposes (to manage investment risks)."  April 2007 Prospectus at 3 (emphases added); *see also* Appendix A-3 (collecting portions of Fund disclosures that relate to derivatives generally and their risks).  The Fund also explained credit default swaps and total return swaps to investors.  With regard to credit default swaps, the Fund explained that credit default swaps are, as Plaintiff alleges, "essentially insurance contracts that ensure against the default on debt securities such as corporate bonds."  CCAC ¶ 60.  Specifically, the Fund stated

that a credit default swap "enables an investor to buy or sell protection against a credit event, such as an issuer's failure to make timely payments of interest or principal, bankruptcy or restructuring."  April 2007 Prospectus at 16-17; *see also* Appendix A-4 (collecting portions of Fund disclosures that relate to credit default swaps and their risks).  The Fund then explained the difference between buying and selling credit protection via a credit default swap, making clear that sellers of credit protection can be liable for paying the par amount of the defaulted bonds:

> If the Fund buys credit protection using a credit default swap, the Fund will make fixed payments to the counterparty.  If a credit event occurs, the Fund will deliver the defaulted bonds underlying the swap and the swap counterparty will pay the par amount of the bonds.  If the Fund sells credit protection using a credit default swap, the Fund will receive fixed payments from the counterparty. If a credit event occurs, the Fund will pay the par amount of the defaulted bonds underlying the swap and the swap counterparty will deliver the bonds.

April 2007 Prospectus at 17.

The Fund also explained total return swaps.  The June 2007 Semiannual Report disclosed that a total return swap is simply an arrangement whereby two parties exchange the returns on two different sets of assets (or indices).  The Fund also explained that the returns may be based upon hypothetical, *i.e.*, "notional," investments in the underlying assets or indices:

> A total return swap is an agreement under which a set of future cash flows is exchanged between two counterparties.  One cash flow stream will typically be based on a reference interest rate or index and the other on the total return of a reference asset such as a security, a basket of securities, or an index. . . . Payments under the swap are based on an agreed upon principal amount but since this principal amount is not exchanged, it represents neither an asset nor a liability to either counterparty, and is referred to as notional.

June 2007 Semiannual Report at 55; *see also* Appendix A-5 (collecting portions of Fund disclosures that relate to total return swaps and their risks).  In light of these disclosures, Plaintiff was on notice that the Fund could use swaps to enhance the Fund's income.

### 2.    The Fund Disclosed The Risks Associated With Swaps.

The Fund also explained the key risks associated with credit default swaps and total return swaps.  First, it explained that swaps are a type of derivative and the risks associated with derivatives:

> If the issuer does not pay the amount due, the Fund can lose money on the instrument.  Also*, the underlying security or investment on which the derivative is based, and the derivative itself, may not perform the way the Manager expected it to perform*.  If that happens, the Fund's share prices could fall and the Fund could get less income than expected, or its hedge might be unsuccessful. *Some derivatives may be illiquid, making it difficult to value or to sell them at an acceptable price*.

April 2007 Prospectus at 6 (emphases added); *see also id.* at 14 ("Markets underlying securities and indices may move in a direction not anticipated by the Manager.  Interest rate and stock market changes . . . may also influence the performance of derivatives."); Appendix A-3 (derivatives disclosures).

Second, it explained the specific risks of both credit default swaps and total return swaps.  With regard to credit default swaps, the Fund warned investors in its April 2007 Prospectus that:

> *Credit default swaps are subject to counterparty credit risk* (if the counterparty fails to meet its obligations*).  They are subject to the risk that the Fund will not properly assess the cost of the instrument*.  *If the Fund is selling credit protection, there is a risk that a credit event will occur and that the Fund will have to pay par value on defaulted bonds*.  If the Fund is buying credit protection, there is a risk that no credit event will occur and the Fund will receive no benefit for the premium paid.

April 2007 Prospectus at 17 (emphases added); *see also* May 2007 SAI at 134 (if the Fund sells credit protection, the Fund would be required to make payment to the buyer of credit protection equal to "the notional amount" of the defaulted bond). Thus, the Fund disclosed prior to December 2007 the very risks about which Plaintiff now complains. *See* CCAC ¶ 62 (alleging that, as a result of credit default swaps, the Fund would be "responsible for making payments to other holders of those same bonds who had purchased the credit protection sold by the Fund").[13]

Similarly, the Fund alerted investors to the key risks of total return swaps. In its June 2007 Semiannual Report, the Fund explained:

> The *primary risks associated with total return swaps are credit risks* (if the counterparty fails to meet its obligations) *and market risk (if there is no liquid market for the agreement or unfavorable changes occur in the reference asset)*.

June 2007 Semiannual Report at 55 (emphases added). Once again, the Fund disclosed the very risks about which Plaintiff complains. *See* CCAC ¶ 57 (alleging that total return swaps exposed the Fund to the risk that interest rates on commercial MBS would not decrease compared with the rates on Treasury securities).

---

[13]   In a graphic demonstration of the hindsight nature of his claims, Plaintiff points out that the Fund had sold credit protection via credit default swaps on bonds issued by AIG, Citigroup, Ford, General Motors, Lehman Brothers, Merrill Lynch, Tribune, and Washington Mutual. *See* CCAC ¶ 62. But Plaintiff does not allege that any of these transactions were undisclosed and therefore has not even tried to state a claim related to them. This is for good reason; no such disclosure-based allegations could be made. The Fund specifically and continually disclosed its exposure to these companies well before 2008. *See, e.g.*, June 30, 2007 Semiannual Report at 54 (disclosing that the Fund sold credit protection on General Motors, Ford, Tribune); September 2007 N-Q at 19-21 (disclosing that the Fund sold credit protection on AIG, Citigroup, Ford, General Motors, Lehman Brothers, Merrill Lynch, Tribune, Washington Mutual); December 2007 Annual Report at 38-40 (disclosing that the Fund sold credit protection on Citigroup, Ford, General Motors, Lehman Brothers, Merrill Lynch, Tribune, Washington Mutual).

While ignoring these risk disclosures completely, Plaintiff falsely contends that the Fund failed to disclose the leveraging effects of swaps. *See, e.g.*, CCAC ¶¶ 66-67. In the May 2007 SAI, the Fund disclosed, in a section entitled "Investments with Off Balance Sheet Risk," that the "Fund enters into financial instrument transactions (*such as swaps* . . . and other derivatives) that *may have off balance sheet market risk*." May 2007 SAI at 127 (emphases added); *see also* Appendix A-6 (collecting portions of Fund disclosures that relate to leverage). The Fund explained that "[o]ff-balance sheet market risk exists when the maximum potential loss on a particular financial instrument is greater than the value of such financial instrument, as reflected in the Fund's Statement of Assets and Liabilities." *Id.* Again, this is the very type of risk that Plaintiff complains about. *See, e.g.*, CCAC ¶ 68.

In light of these disclosures, Plaintiff was on notice more than one year before this case was filed that swaps had risks, including off-balance sheet risk.

### 3. The Fund Disclosed The Magnitude Of Its Swap Transactions.

As with MBS, the Fund disclosed the magnitude of its swap transactions every quarter. Specifically, on a quarterly basis the Fund's Statements of Investments disclosed detailed information about each of the Fund's total return swaps and credit default swaps.[14] Thus, any investor who looked at the Fund's disclosures could see precisely how many swaps the Fund had entered into and could easily calculate the total notional value of the swaps. As a result of these disclosures, any investor who was concerned that the magnitude of the Fund's swap transactions

---

[14]   *See* (1) March 2007 N-Q at 17 (Exhibit A); (2) June 2007 Semiannual Report at 52 (Exhibit E); (3) September 2007 N-Q at 15 (Exhibit F); (4) December 2007 Annual Report at 37 (Exhibit G); (5) March 2008 N-Q at 17 (Exhibit H); (6) June 2008 Semiannual Report at F19 (Exhibit K); and (7) September 2008 N-Q at 19 (Exhibit L).

meant that it was not "diversified" had the necessary information to come to that judgment and immediately redeem his shares (or file a lawsuit) if he so chose.

Plaintiff's Complaint itself makes the point.  For instance, Plaintiff created a chart reflecting the notional value of the Fund's investments in total return swaps:

| 3/31/07 | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 |
|---------|---------|---------|----------|---------|---------|---------|----------|
| $14,870 | $60,950,000 | $209,585,000 | $429,901,000 | $798,406,000 | $713,110,000 | $681,990,000 | $587,920,000 |

CCAC ¶ 58.  He also created a chart regarding the notional value of the Fund's credit default swap investments:

| 3/31/07 | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 |
|---------|---------|---------|----------|---------|---------|---------|----------|
| $104,205,000 | $295,665,000 | $528,030,000 | $693,725,000 | $850,905,000 | $884,550,000 | $554,955,000 | $461,308,000 |

*Id.* ¶ 64.

These charts are drawn directly from the Fund's public disclosures, which demonstrate that the notional value of the Fund's total return swaps and credit default swaps had surpassed $1.1 billion by December 2007.  Accordingly, Plaintiff was on notice of his claims by the time these figures were publicly disclosed and disseminated to investors in February 2008.

Plaintiff alleges that the charts in the Complaint were created with the help of an "industry expert," with the apparent implication that this information was unavailable – hidden – from investors.  Any such implication is untenable.  Lay investors could readily replicate these charts, which Plaintiff paid experts to tabulate, by simply reading the disclosure documents and engaging in elementary arithmetic.  Specifically, to duplicate the "industry expert" figures on the swap charts, an investor would merely need to add together the disclosed notional values for the Fund's total return swaps and sell-side credit default swaps.  *See* Total Return Swap Chart,

attached as Exhibit Q; Credit Default Swap Chart, attached as Exhibit R; *see also Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1344 (8th Cir. 1980) (statute begins running when investor could have learned of claim through "simple comparison and examination" of account statements and "simple arithmetic"); *Holtzman v. Proctor, Cook & Co.*, 528 F. Supp. 9, 14 (D. Mass. 1981) ("The confirmation slips and the monthly account statements sent to the plaintiffs should have alerted reasonable persons to the possibility that their accounts were not being managed as they had anticipated."). Thus, Plaintiff cannot avoid the statute of limitations by claiming that the Fund failed to disclose the extent of its swaps transactions.

### E. In Light Of The Fund's Disclosures, Plaintiff's Claims Are Barred As A Matter Of Law.

In light of the Fund's extensive disclosures, Plaintiff's claims are barred as a matter of law. *DeBruyne v. Equitable Life* is directly on point. In that case, the plaintiffs claimed that the fund had misrepresented itself as a "balanced fund," because it had not invested enough in debt securities. The Seventh Circuit held that the claims were time-barred because the plaintiffs "selectively ignore[d] Equitable's continued and open disclosures as to the percentage composition of the Balanced Fund." The court explained that, if the plaintiffs truly believed that the fund should have been investing in substantially more debt securities, then "basic logic leads us to the conclusion that an investor reading with reasonable care would have been suspicious, if not enraged, when Equitable openly stated prior to November 30, 1987, that the Balanced Fund was made up of [a very small amount of debt securities]." *DeBruyne*, 920 F.2d at 466-67; *see also Dodds v. Cigna Sec., Inc.,* 12 F.3d 346 (2d Cir. 1993) (dismissing complaint and holding that the statute of limitations began to run when investor received prospectus describing the investments as being risky and illiquid); *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 163

(4th Cir. 1993) ("when a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims"); *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 (S.D.N.Y. 2008) (dismissing complaint and holding that the statute of limitations began to run when investor received prospectus disclosing the allegedly imprudent investments); *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608, 617 (S.D.N.Y. 1990) (finding inquiry notice of claims based solely on offering documents).

Here, as in *DeBruyne*, the Fund's Statements of Investments disclosed the exact nature of its investments more than one year before the Plaintiff filed suit. Thus, as in *DeBruyne*, if Plaintiff truly believed that investments in MBS and swaps impermissibly made the Fund "hedge fund-like," CCAC ¶¶ 5, 62, then "basic logic" leads to the conclusion that Plaintiff "would have been suspicious, if not enraged, when [the Fund] openly stated" that, as of December 2007, it had invested more than $1.8 billion in MBS – over 85% of the value of its assets – and had invested in swaps with a notional value of over $1.1 billion.

Plaintiff is not, in the words of the Tenth Circuit, an "innocent investor" who took action as soon as he became aware of the alleged misrepresentation. *Anixter*, 977 F.2d at 1552. Rather, Plaintiff "wait[ed] to see how his investment turn[ed] out before he decide[d] to invoke the provisions of the Act." *Id.* Or, as this Court has put it, he chose to "sit on [his] hands and wait." *Snyder v. Newhard, Cook & Co.*, 764 F. Supp. 612, 619 (D. Colo. 1991) (Kane, J.). In so doing, he has filed his Complaint more than one year after he was on notice of the very facts that underlie his claims. Accordingly, Plaintiff's claims are untimely as a matter of law.

II.     **PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTIONS 11 AND 12(A)(2) BECAUSE HE HAS FAILED TO ALLEGE A MATERIAL MISREPRESENTATION.**

Plaintiff purports to state claims under Sections 11 and 12(a)(2) of the Securities Act.  By their own terms, Sections 11 and 12 are violated only where the defendants have misstated a "material *fact*."  15 U.S.C. §§ 77k(a), 77*l*(a)(2) (emphasis added).  Thus, these Sections do not impose on Funds (or other issuers) the duty to predict future market events or to assess the likelihood of future recessions.  *See, e.g.*, *In re Exabyte Corp. Sec. Litig.*, 823 F. Supp. 866, 871-72 (D. Colo. 1993) (Kane, J.) (rejecting plaintiffs' assertion that defendants had a duty to disclose the effect of "general economic conditions" and dismissing Section 10(b) claim).  To the contrary, issuers are obligated only to make accurate factual representations about their own operations.  *Id.*  Accordingly, when "a plaintiff complains that a defendant failed to disclose a material fact necessary to make its statement not misleading, the concealed information must be information known to the defendants that is *not otherwise available to the investing public*."  *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. 04-cv-1030, 2005 WL 4161977, at *7 (D. Colo. Oct. 20, 2005) (Matsch, J.) (emphasis added); *see also Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 178 (S.D.N.Y. 1996) ("Failure to predict a rise in interest rates . . . cannot be the basis for alleging misrepresentations or omissions of material facts.").

Here, Plaintiff fails to allege that the Fund made a material misrepresentation of fact about the Fund or its investments.  Accordingly, the Complaint should be dismissed with prejudice.

### A.      Plaintiff Does Not State A Claim Regarding The Fund's Investment Strategy.

The majority of Plaintiff's claims rest on the theory that the Investment Strategy was misleading, *i.e.*, that the Fund misrepresented that the Manager's "overall strategy is to build a broadly diversified portfolio of corporate and government bonds." *See* CCAC ¶¶ 5, 49, 53, 55, 59, 65, 69.  Targeting the term "broadly diversified," Plaintiff contends that the "extreme risks" and "hedge fund-like" investments made by the Fund in MBS and swaps rendered the Investment Strategy misleading. *See id*. In addition to being untimely, Plaintiff's claims fall short for several reasons.

*First*, Plaintiff does not and cannot allege the Fund's Investment Strategy was false, in light of the ICA's statutory definition of the term "diversified." *Second*, to the extent Plaintiff claims that the word "diversified" means something other than the ICA definition, the Investment Strategy could not have misled investors given the Fund's extensive and specific disclosures of its actual investments. Indeed, no investor who read the Fund's detailed disclosures regarding MBS and swaps could have understood the Investment Strategy to mean that the Fund would not invest significantly in those instruments. *Third*, Plaintiff's claims, although styled as nondisclosure claims, are in substance nothing more than claims for mismanagement or breach of fiduciary duty, neither of which states a cause of action under the Securities Act.[15]

---

[15]     Plaintiff devotes considerable attention to allegations purporting to describe, in pejorative terms, the Fund's purported increase in exposure to MBS and swaps in the fall of 2008. CCAC ¶¶ 54, 62-63, 68, 71.  These allegations do not state a claim or add anything of substance to Plaintiff's remaining allegations.  As an initial matter, and as Plaintiff's own charts make clear, the Fund's exposure to credit default swaps and total return swaps had peaked earlier in 2008 and had decreased significantly before the fall of 2008. *See* CCAC ¶¶ 58, 64.  Moreover, even accepting Plaintiff's allegations regarding MBS as

### 1.    The Investment Strategy Was Not False.

First, Plaintiff's claim that the Investment Strategy was misleading fails because the definitions and policies about diversification that governed the Fund's investment strategy were those set forth in the ICA and the Fund's own disclosed investment policy regarding diversification, not the subjective theory of diversification advanced by Plaintiff in hindsight. The ICA requires mutual funds to classify themselves as either "diversified" or "non-diversified."  *See* 15 U.S.C. § 80a-5(b).  A fund is "diversified" if

> it meets each of the following conditions with respect to 75% of the value of the fund's total assets:
>
> (1) of the securities so included, the fund may not have more than 10% of the outstanding voting securities of any one company; and
>
> (2) not more than 5% of the fund's assets may be in the securities of any one company.

J. William Hicks, *International Dimensions of U.S. Securities Laws* § 5:50; 15 U.S.C. § 80a-5(b)(1).  The Fund incorporated this definition into a "fundamental policy" which it consistently disclosed to investors.  *See, e.g.*, May 2007 SAI at 32.[16]

---

true, they are legally irrelevant.  First, Plaintiff has launched a much broader attack on the Fund's MBS investments dating back to April of 2007.  He does not allege that any additional MBS investments in 2008 presented new or different risks than those the Fund had disclosed in connection with its earlier MBS investments.  Second, Plaintiff nowhere alleges that any of these alleged investment decisions violated any of the stated limits on the Manager's discretion or that they were not made in the good faith belief that they were good investments.  Finally, like its earlier investments, all of the Fund's 2008 MBS investments, and their value, were disclosed along with the rest of the Fund's investments on a quarterly basis.

[16]    As it was permitted to do, the Fund disclosed that the "limit does not apply to securities issued by the U.S. Government or any of its agencies or instrumentalities . . . ."  *Id.*  Thus, Agency MBS were expressly removed from the Fund's diversification limitation.

Plaintiff does not – and cannot – allege that the Fund violated either the ICA's definition of "diversified" or its own fundamental policy regarding diversification.  Thus, the Fund's Investment Strategy to build a "broadly diversified portfolio" met the disclosed definition of "diversified" that governed the representation and could not have been misleading to investors.

**2.     The Investment Strategy Is Not Materially Misleading In Light Of The Fund's Numerous Other Disclosures.**

To the extent Plaintiff asserts that the term "broadly diversified" should mean something other than the ICA definition, he still has not stated a claim.  Even putting aside that the Complaint does not offer or even attempt to justify a competing definition of that phrase, Plaintiff's opinion on what constitutes an appropriately diversified portfolio does not give rise to a claim.[17]  More importantly, no investor who read the Investment Strategy in context with the rest of the Fund's disclosures could have understood it to mean that the Fund would not invest in a significant amount of MBS and swaps.

In *In re Alliance North America Government Income Trust, Inc. Securities Litigation*, the fund stated that it "seeks the highest level of current income, consistent with what the Fund's Adviser considers to be prudent investment risk, that is available from a portfolio of debt securities issued or guaranteed by the governments of the United States, Canada, and Mexico

---

[17]     A mere difference in judgment or opinion, absent an allegation that the speaker did not subjectively believe the opinion at the time, cannot create a material misrepresentation of fact.  *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991); *Rubke v. Capitol Bancorp LTD*, 551 F.3d 1156, 1162 (9th Cir. 2009); *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 155 (S.D.N.Y. 2004) ("unlike a statement of fact," an opinion "cannot be false at all unless the speaker is knowingly misstating his truly held opinion"); *see also* Champion Fund Motion to Dismiss at Part I.C.

. . . ." No. 95-0330, 1996 WL 551732, at *4 (S.D.N.Y. Sept. 27, 1996).  The district court held

that this statement was simply too vague to support a claim:

> The investment objective announces the goal of the Fund, rather
> than a promise to investors. The investment objective is not the
> type of statement that a reasonable investor would consider
> important in deciding whether or not to invest. . . . Such general,
> forward looking statements, which make no promise to investors,
> are not actionable under the securities laws.

*Id.*; *see also J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 395-96 (6th Cir. 2008)

(holding that the phrase "significant progress" was too vague to be material when read  in

context of other disclosures); *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp.

326, 338-39 (S.D.N.Y. 1996) (objective of "earn[ing] a high level of current income while

maintaining relatively low volatility of principal" was "general and indefinite," and thus "simply

not the kind of statement which a reasonable investor would consider important in deciding

whether or not to invest").

Like the objectives at issue in these cases, the Investment Strategy – that the Manager's

"overall strategy is to build a broadly diversified portfolio of corporate and government bonds" –

is too general to support a misrepresentation claim built on a plaintiff's view that specific

investments were inconsistent with the strategy.  Rather than constituting a promise, the

Investment Strategy is a broad investment goal that – if somehow unmoored from the bounds of

the ICA definition – provides no guidance to courts or investors to determine objectively if the

goal has been met.  Indeed, Plaintiff's theory would require the Court to determine, with no legal

parameters, what criteria produce a sufficiently diversified portfolio (*e.g.*, the number of issuers,

industries, security types or sizes, etc.) and then determine if the particular level of MBS or

swaps extant on each day of the class period violated those criteria in light of the overall Fund holdings.

Thus, to the extent Plaintiff claims that the Investment Strategy requires something more than the ICA's definition of "diversified," it is simply too general and vague to support the weight of any such inquiry.  Accordingly, Plaintiff's attempt to base a nondisclosure claim on the Fund's alleged failure to maintain a "broadly diversified portfolio" fails as a matter of law.

Equally important, the Investment Strategy could not have misled any investor who read it in context with the remainder of the Fund's registration statement.  *See Grossman v. Novell*, 120 F.3d 1112, 1121 (10th Cir. 1998) (explaining that courts assessing materiality "must consider the context in which the statements were made").  In *Tabankin v. Kemper Short-Term Global Income Fund*, for instance, the fund's investment objective was "to provide as high a level of current income as is consistent with prudent investment management."  No. 93-5231, 1994 WL 30541, at *1 (N.D. Ill. Feb. 1, 1994).  The court concluded that this general statement was not misleading because "other statements in the Prospectus give meaning" to the objective and the plaintiffs' complaint "shows that the Funds pursued the very strategies identified in the Prospectus."  *Id*. at *4.  "It is not tenable," the court explained, "to base a securities fraud claim on a general statement of the Fund's objective when the Prospectus clearly states that there is no assurance that the objective will be achieved, goes on to list specific risks associated with the particular Fund, and the plaintiffs' loss results from those very risks."  *Id*. at *5; *see also Tabankin v. Kemper Short-Term Global Income Fund*, No. 93-5231, 1994 WL 319185, at *2 (N.D. Ill. June 23, 1994) (explaining that because "the investors had the prospectuses which contained explicit risk disclosures . . . they cannot seek to impose liability for the general

32

statements that the investments were 'conservative' and 'prudently managed'"); *J & R Mktg.*, 549 F.3d at 395-96.

Here, Plaintiff is relying upon a single general statement, *i.e.*, that the Manager's "overall strategy is to build a broadly diversified portfolio of corporate and government bonds," while ignoring the remaining specific disclosures. *E.g.*, CCAC ¶ 4. As in *Tabankin*, however, the Fund's disclosures give meaning to that general statement. For example, as discussed above, the Fund disclosed its significant holdings in MBS. In fact, during the putative class period, it always disclosed that its MBS holdings were at least 64% of its portfolio. *See* May 2007 SAI at 100 (64.0% of portfolio); June 2007 Semiannual Report at 18 (71.2% of portfolio); December 2007 Annual Report at 24 (85.2% of portfolio); June 2008 Semiannual Report at F2 (92.1% of portfolio). The Fund also disclosed its investments in swaps. As noted above, Plaintiff's charts – based entirely on the Fund's own disclosures – demonstrate that the Fund had invested in credit default and total default swaps with a notional value of over $425 million as of June 2007 and over $1.1 billion as of December 2007. *See* CCAC ¶¶ 58, 64.

Thus, no one who read the Investment Strategy in context could have believed that the Fund's "broadly diversified portfolio" would not include significant holdings in MBS or significant exposure to swaps. The Fund made clear that it intended to – and did – invest in hundreds of millions of dollars worth of those securities.

### 3. Plaintiff's Claims Regarding The Investment Strategy Are Claims For Alleged Mismanagement, Not Misrepresentation.

In light of the Fund's extensive disclosures, it is clear that Plaintiff's real complaint is that the Manager made investment decisions that turned out badly. With the benefit of hindsight, he claims that the Manager should have predicted the financial collapse of 2008 and, with that

prescience, chosen different investments. This is at best a claim of mismanagement, not a misrepresentation claim under the federal securities laws.

As the Supreme Court explained in *Santa Fe Industries v. Green*, mismanagement claims are "traditionally relegated to state law." 430 U.S. 462, 478-79 (1977). Indeed, Sections 11 and 12(a)(2) are concerned only with whether disclosures of material facts have been made; they do "not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Id.* at 479 (quotation marks omitted); *see Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007) (Nottingham, J.) ("the Supreme Court held that the federal securities laws were not intended to create a federal remedy for corporate misconduct traditionally left to state regulation").

Thus, it is settled that "the securities laws do not create liability for breaches of fiduciary duty or mismanagement." *In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 376 (3d Cir. 1993); *see also In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004) ("Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback' on the legitimate business decisions, however bad, of company officers"). As this Court explained in *Andropolis*, it is "now [a] clearly established rule that a plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." 505 F. Supp. 2d at 682; *accord, e.g.*, *Naye v. Boyd*, No. C83-771R, 1986 WL 198, at *4 (W.D. Wash. Oct. 20, 1986) (allegations that defendant failed to disclose and "take into account factors which, properly considered, would have led to the establishment of a higher loan loss reserve" do not state a misrepresentation claim).

Allegations that the Fund invested too heavily in MBS and swaps do nothing more than challenge the Manager's investment decisions.  As the Investment Strategy makes clear, it was up to the Manager to develop a strategy to build a broadly diversified portfolio.  The Manager had to operate within its policy regarding diversification, of course, and always did so – Plaintiff does not allege otherwise.  But within the limits of the Fund's own restrictions, the Manager had wide discretion to make investments to pursue the Fund's objective of seeking "total return." *See, e.g.*, April 2007 Prospectus at 3 (there "is no set allocations of the Fund's assets among the classes of securities the Fund buys . . . [and] if market conditions change, the Fund's portfolio managers might change the relative allocation of the Fund's assets").  If investors disagreed with the Manager's investment decisions – which were regularly disclosed – they had the ability to redeem their shares at any time.  But to allow Plaintiff to state a claim now because, in hindsight, he believes the Manager's strategy or investment selections were faulty would invite the exact sort of second-guessing and "review of management practices" that the "securities laws were not designed to provide."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004); *see In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009) ("The essence of the business judgment of managers and directors is deciding how the company will evaluate the trade-off between risk and return. . . . It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decisions.").

Put another way, Plaintiff's theory of the case requires this Court to determine exactly what level of MBS and swaps was "too much" for the Fund.  Zero obviously cannot be the answer, because the Fund always said it could invest in these securities.  Is it ten credit default

swaps?  Twenty?  There obviously is no clear answer, because the question requires a

determination of what was reasonable under the prevailing circumstances in light of the

Manager's expectations regarding future returns.  Such judgments were left to the Fund's

managers; whether they properly exercised their discretion is precisely the sort of judgment call

that is "the hallmark of state fiduciary duty law" and is therefore "not actionable" under the

federal securities laws.  *Ciresi v. Citigroup*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (dismissing

claim that required the court to "distinguish between conduct that is 'reasonable' and

'unreasonable'").

> **B.     None of the Other Alleged Misstatements Was Materially Misleading.**

Beyond claiming that the Investment Strategy was rendered misleading by the magnitude

of the Fund's investments in MBS and swaps, Plaintiff claims that a few of the Fund's other

statements were misleading in light of the Fund's investments.  None of Plaintiff's allegations

states a claim.

> **1.     Plaintiff Does Not State A Claim Regarding The Fund's Holdings Of Investment Grade Securities.**

Plaintiff appears to claim that the Fund misrepresented that, "under normal market

conditions," it "invests at least 80% of its net assets (plus borrowing for investment purposes) in

investment grade debt securities."  CCAC ¶¶ 46(a), 46(b).  Similarly, Plaintiff appears to claim

that the Fund misrepresented that the Manager would "attempt to maintain the overall weighted

average credit quality of the portfolio at a rating of 'A-' (or equivalent) or higher from any

nationally recognized credit rating organization."  *Id*.  Plaintiff's claim fails for two independent

reasons.

First, Plaintiff does not allege that the Fund's investments departed from the investment grade limitation.  Indeed, other than underlining the above statements, *see* CCAC ¶¶ 46(a), 46(b), Plaintiff makes no allegations whatsoever about the average credit quality of the Fund's portfolio, much less assert that any particular Fund investment was not investment grade. Accordingly, any claim regarding these statements fails.  *See Grossman*, 120 F.3d at 1124 (dismissing a securities claim because "nowhere in the complaint are facts alleged showing that anything about these statements is false").

Moreover, even if Plaintiff were to advance such a theory, it would be disproven by the Fund's disclosures.  The Fund told investors that securities rated "Baa" or above by Moody's or "BBB" and above by S&P are considered investment grade.  *See, e.g.*, April 2007 Prospectus at 12; *see also* Appendix A-7 (collecting portions of Fund disclosures that relate to the Fund's intention to invest 80% of its assets in investment-grade securities).  The Fund also disclosed the rankings of its investments, which confirmed that at least 80% of its net assets were investment grade securities and that it always maintained an overall weighted average credit quality of A- or better.  *See, e.g.*, December 2007 Annual Report at 10 (showing ratings of the Fund's investments); *see also* Appendix A-7.  Plaintiff does not take issue with any of these disclosures. Thus, to the extent that Plaintiff complains of a false and misleading statement with respect to the investment grade of the Fund's assets, his claim fails as a matter of law.

**2.      Plaintiff Does Not State A Claim Regarding The Fund's Borrowing Policy.**

In Paragraphs 69-70 of the Complaint, Plaintiff alleges that the "magnitude of leverage" created by the Fund's swap investments violated the Fund's publicly-disclosed borrowing limitation.  This claim fails for two separate reasons.

First, the investment limitation on which Plaintiff relies deals only with *bank borrowing*, not "leverage."  It provides in pertinent part:

> The Fund cannot *borrow money* in excess of 33 1/3% of the value of its total assets.  The Fund *may borrow only from banks and/or affiliated investment companies and only as a temporary measure for extraordinary or emergency purposes.*

May 2007 SAI at 33 (emphases added).  Under its express terms, this disclosure refers to limits on bank borrowing; nothing suggests that it applies to any leveraging effect that might occur from any other type of transaction.  *See Lapidus v. Hecht*, No. 98-3130, 2002 WL 1034042, at *6 (N.D. Cal. May 17, 2002) (holding that "borrowing money" should "be given its "ordinary meaning" and therefore the limitation does not apply to the borrowing associated with short sales).  Thus, Plaintiff alleges no violation of this limitation.

Second, the Fund disclosed that its investments in swaps had a leveraging effect and could create off-balance sheet risk.  *See, e.g.*, May 2007 SAI at 127; April 2008 SAI at 134; *see also* Appendix A-6 (leverage disclosures).  The Fund also disclosed the notional amounts of the swaps – the very information Plaintiff points to and aggregates as evidence of the Fund's leverage.  *See* CCAC ¶¶ 57-58.[18]  In light of these disclosures, no investor could have been misled by the Fund's limitation on bank borrowing.

### 3.    The Statement That The Fund May Be Appropriate As Part Of A Retirement Portfolio Is Not Misleading.

Plaintiff also alleges that, in light of its investments in MBS and swaps, the Fund misstated that it may be "appropriate for a part of an investor's retirement plan portfolio." *See id.*

---

[18]    Plaintiff has created a chart reflecting the Fund's purported leverage position.  As with his other charts, this chart can be replicated through simple mathematics.  *See* Net Notional Value Chart, attached as Exhibit S.

at ¶¶ 46(a), 46(b), 49(d), 79.  To the extent that Plaintiff intends to imply that this phrase

suggested that the Fund is appropriate for *current retirees* who presumably are in need of an

investment which will produce virtually risk-free, short-term returns, any such assertion fails on

its own terms:  no such statement was made.  The statement that was made, that an investment in

the Fund "*may* be appropriate *for part* of an investor's *retirement plan portfolio*," cannot be

reasonably restricted to the portfolio of a current retiree, as opposed to an individual who is

planning for retirement.  Indeed, many investors set up their retirement *plans* decades before

retirement.

Moreover, any argument that the Fund was sold as a product for current retirees – or

indeed for those dependent on a fixed income – is refuted by the rest of the paragraph that he

cites:

> **WHO IS THE FUND DESIGNED FOR?**  The Fund is designed
> for investors seeking total return from a fund that invests primarily
> in investment-grade debt securities.  Those investors should be
> willing to assume the credit risks of a fund that typically invests a
> significant amount of its assets in corporate-debt securities, and the
> changes in share price that can occur when interest rates change.
> The Fund is intended as a long-term investment, not a short-term
> trading vehicle, and may be appropriate for part of an investor's
> retirement plan portfolio.  The Fund is not a complete investment
> program.

April 2007 Prospectus at 4; *see also* Appendix A-8 (collecting portions of Fund disclosures that

relate to the general risks of investing in the Fund).  Thus, the Fund made clear – in the very

paragraph that Plaintiff cites – that investors must be willing to assume "credit risks" and "the

changes in share price that can occur when interest rates change."  The Fund also disclosed that it

is "a long-term investment, not a short-term trading vehicle" and is "not a complete investment

program."  April 2007 Prospectus at 4.  In light of these and the other, extensive risk disclosures

contained in the Fund's public filings, it is plain that the Fund was not represented to be a risk-free investment for current retirees. [19]

### 4. Plaintiff Does Not State A Claim Regarding The Fund's Industry Concentration Policy.

Plaintiff also alleges that the Fund's investments in MBS violated the Fund's industry concentration policy. *See* CCAC ¶ 56. The policy provides that the Fund "cannot invest 25% or more of its total assets" in any one industry. *See* May 2007 SAI at 32. Because the Fund never defined MBS as an industry and, in fact, MBS is a type of security and not an industry, Plaintiff's claim fails.

Neither the ICA nor any SEC regulation defines the word "industry." SEC guidance, however, makes clear that a Fund can select its own industry classifications: "In determining industry classifications . . . [a] registrant . . . may select its own industry classifications, but such classifications must be reasonable and should not be so broad that the primary economic characteristics of the companies in a single class are materially different." *Registration Form Used by Open-End Mgmt. Inv. Cos.*; *Guidelines*, SEC Release Nos. 33-6479, IC-13436 (Aug. 12, 1983) at *74.

Nowhere did the Fund designate "MBS" as an industry and Plaintiff does not allege otherwise. Indeed, MBS is not an industry – it is a category of security that captures assets whose value and performance can be influenced by many segments of the economy. Thus,

---

[19]     In addition, the phrase highlighted by Plaintiff says the Fund "*may* be appropriate for part of an investor's retirement plan portfolio." No investor would read such conditional language as a recommendation that the Fund would be appropriate for every retirement plan portfolio. *See, e.g.*, *Donovan v. Am. Skandia Life Assurance Corp.*, 96 Fed. Appx. 779, 781 (2d Cir. 2004).

Plaintiff's claim is analogous to a claim that a Fund violated an industry concentration limit by investing too heavily in equities or corporate bonds.

Moreover, in light of the Fund's Statements of Investments, no investor could have been misled into thinking that MBS had been represented to be an "industry" for purposes of this limitation. The Fund consistently disclosed that it was investing well in excess of 25% of its assets in MBS and revealed who the issuers of the MBS were. Indeed, during the putative class period, the disclosed percentage of the Fund's investments in MBS never fell below 64%. *See supra* Parts I.C.2. & II.A.2. Thus, no investor could have been misled into believing that the Fund's concentration policy meant that it would not invest more than 25% in MBS.

### 5. Plaintiff's Allegations About "Inadequate Internal Controls" Fail To State A Claim.

Paragraph 74 of the Complaint alleges: "The Fund had inadequate internal controls to manage the extreme risks that the Fund managers were taking." To the extent that Plaintiff intends to base a misrepresentation claim on the Fund's allegedly faulty internal risk controls, the claim fails because the Fund had no duty to disclose any allegedly inadequate internal controls. To begin with, an allegation that a Fund has inadequate internal controls does not state a claim under the securities laws. *See, e.g.*, *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008). Moreover, there is no general duty to disclose mismanagement. *See Andropolis*, 505 F. Supp. 2d at 683-84. As discussed above, a plaintiff cannot "bootstrap" an "internal mismanagement claim into a securities action by alleging the disclosure philosophy of the statute obligates Defendants to reveal their managerial deficiencies." *Id.* Here, however, Plaintiff is attempting to do just that. He claims that the Fund lacked sufficient controls over the

risks that the Manager was taking and the Fund had an obligation to disclose that purported

deficiency.  Because there is no duty to disclose alleged mismanagement, Plaintiff's claim fails.

More fundamentally, Plaintiff does not claim that the Fund's purported failure to disclose

allegedly faulty internal controls made any aspect of the registration statement misleading.  The

Fund's Investment Strategy – the primary representation upon which Plaintiff relies – says

nothing whatsoever about internal controls.  Nor does Plaintiff point to any other representation

that discusses the Fund's internal controls.  Accordingly, Plaintiff's internal controls claim fails.

*See*, *e.g.*, *Albert Fadem Trust v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1018-20 (S.D. Ohio

2004) (dismissing claim regarding alleged failure to disclose the "lack of internal controls"

because none of the alleged misstatements discussed internal controls).

## III.   PLAINTIFF LACKS STANDING TO ASSERT THAT THE FUND'S 2008 REGISTRATION STATEMENT WAS MISLEADING.

Plaintiff contends that the Fund's 2007 and 2008 registration statements contained

materially misleading statements of fact.  *E.g.*, CCAC ¶¶ 40-41.  Both Article III of the

Constitution and Section 11 require a plaintiff to trace his purchases to the allegedly defective

registration statement to have standing.  *See Hien v. Freedom from Religion Found., Inc.*, 551

U.S. 587, 598 (2007) (Article III standing requires "personal injury fairly traceable to the

defendant's allegedly unlawful conduct"); *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000)

("purchaser has standing to pursue a claim under section 11 so long as he can prove the securities

he bought were those sold in an offering covered by the false registration statement"); *In re*

*Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1202 (D. Colo. 2004) ("Absent an allegation

that the plaintiffs purchased securities tied to these registration statements, the plaintiffs may not

assert a § 11 claim based on material misstatements in those registration statements.").  Because

Plaintiff purchased Fund shares *only* in June 2007,[20] he lacks standing to assert claims based on the subsequent 2008 registration statement.  *See APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1276 (11th Cir. 2007) ("It is undisputed that if stock is purchased in a prior offering, and before a defective registration statement is issued, then no relief may be had as the pre-registration purchaser falls outside the scope of Section 11."); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, --- F. Supp. 2d ----, No. 08-10446, 2009 WL 3149775, at *4 (D. Mass. Sept. 30, 2009) (dismissing Section 11 and Section 12(a)(2) claims in six of eight mortgage pass-through certificate offerings because named plaintiffs purchased certificates from only two offerings).

That Plaintiff seeks to represent other investors who did purchase pursuant to the 2008 registration statement does not change the standing analysis.  *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing."); *In re Wash. Mut., Inc. Sec., Derivatives & ERISA Litig.*, 259 F.R.D. 490, 504 (W.D. Wash. 2009) (concluding that, because the named plaintiff purchased securities pursuant to the October 2007 Offering Documents only, "the plaintiff class currently has Section 11 standing as to the October 2007 offering only").  Accordingly, all claims based the Fund's 2008 registration statement,

---

[20]    *See* Certification of Dr. C. Phillip Pattison at Ex. A (attached to Declaration of Alan I. Ellman in Support of the Motion of Dr. C. Phillip Pattison for Appointment as Lead Plaintiff and Approval of Selection of Counsel at Ex. A), *Ferguson v. OppenheimerFunds, Inc.*, No. 09-cv-1186 (D. Colo. Aug. 7, 2009) (Docket Entry No. 57-2); Loss Analysis – Dr. C. Phillip Pattison (attached to Declaration of Alan I. Ellman in Support of the Motion of Dr. C. Phillip Pattison for Appointment as Lead Plaintiff and Approval of Selection of Counsel at Ex. B), *Ferguson v. OppenheimerFunds, Inc.*, No. 09-cv-1186 (D. Colo. Aug. 7, 2009) (Docket Entry No. 57-3).

prospectus, and SAI, and any alleged misrepresentations contained therein, should be dismissed for Plaintiff's lack of standing.

## IV.   PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE THE ALLEGED MISREPRESENTATIONS DID NOT CAUSE PLAINTIFF'S CLAIMED LOSSES.

For the reasons discussed in Part III of the Champion Fund Motion to Dismiss, which is incorporated herein, Plaintiff can only recover damages under the Securities Act if such damages are the result of misrepresentations made by the Fund.  But none of the alleged misrepresentations could have caused Plaintiff's losses, even if they were not refuted by the Fund's disclosures.  Representations that the Fund would be diversified or invest mainly in investment grade and government securities, for example, had no impact on the price of the Fund's shares.  In June 2007, the price Plaintiff paid for his shares was not inflated by these or any other of the alleged misrepresentations.  Plaintiff paid the statutorily-defined net asset value for his shares and no more – and does not allege otherwise.  Just as clearly, the decline in value of Plaintiff's shares in the fall of 2008 was not affected in the slightest, let alone caused, by any representations or disclosures by the Fund.  Rather, the value of Plaintiff's shares fell because of market forces that drove down the value of the Fund's investments. Nothing the Fund said, at any point, started that decline or affected its extent – and again, Plaintiff cannot allege otherwise. The Securities Act, for good reasons, does not provide a damage remedy in these circumstances and Plaintiff's claims therefore should be dismissed.  *See* Champion Fund Motion to Dismiss at Part III.

**V.  PLAINTIFF'S SECTION 12 CLAIMS SHOULD BE DISMISSED BECAUSE HE FAILS TO ALLEGE THAT OFI OR ANY INDIVIDUAL DEFENDANT WAS A "SELLER" OF FUND SECURITIES.**

Liability under Section 12(a)(2) is limited to "sellers" of a security.  *See Pinter v. Dahl*, 486 U.S. 622, 641-47 (1988).  For the reasons set forth in Part II of the Motion of Independent Trustees and Oppenheimer Integrity Funds to Dismiss the Consolidated Class Action Complaint, which is incorporated herein, Plaintiff's Section 12 claims against OFI and all of the Individual Defendants should be dismissed because he does not allege that these defendants are "sellers" under Section 12(a)(2).  Plaintiff pleads no facts to support his bald allegations that OFI or the Individual Defendants solicited investor purchases of shares "motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Id.* at 647.  Indeed, Plaintiff does not allege that OFI had any relationship whatsoever with purchasers.  *See id.* at 649-50.  Similarly, Plaintiff does not allege that OFI or the Individual Defendants passed title to any purchasers of Fund shares.  *See id.* at 642.

**VI.  PLAINTIFF'S SECTION 15 CLAIMS SHOULD BE DISMISSED.**

For the reasons set forth in Part III of the Motion of Independent Trustees and Oppenheimer Integrity Funds to Dismiss the Consolidated Class Action Complaint, which is incorporated herein, Plaintiff's Section 15 claims should be dismissed because he has not alleged an underlying violation and has not alleged sufficient allegations of "control."

## CONCLUSION

For the foregoing reasons, the Oppenheimer Defendants respectfully request that the Court dismiss Plaintiff's Complaint with prejudice.

Dated this 3rd day of December, 2009.

Respectfully submitted,

*s/ Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  rmiller@perkinscoie.com

-And-

*s/ William K. Dodds*
William K. Dodds
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Tel:  212.698.3500
Fax:  215.698.3599
Email:  william.dodds@dechert.com

Matthew L. Larrabee
Dechert LLP
One Maritime Plaza
Suite 2300
San Francisco, CA  94111
Tel:  415.262.4500
Fax:  415.262.4555
Email:  matthew.larrabee@dechert.com

Michael S. Doluisio
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104
Tel:  215.994.4000
Fax:  215.994.2222
Email:  michael.doluisio@dechert.com

Attorneys for OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc., John
V. Murphy, and Brian W. Wixted

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of December, 2009, I electronically filed a true and correct copy of the foregoing **OPPENHEIMER DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Stephen D. Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com

- **Karen Jean Cody-Hopkins**
  kjch@lilleylaw.com,rbyers@lilleylaw.com

- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com

- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com,sdunn-efile@perkinscoie.com

- **Robert J. Dyer , III**
  bob@dyerberens.com

- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com

- **Daniel Charles Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **Dale R. Harris**
  dale.harris@dgslaw.com,patricia.henson@dgslaw.com

- **Christopher J. Keller**
  ckeller@labaton.com,electroniccasefiling@labaton.com

- **Peter George Koclanes**

- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,michael.doluisio@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com,amv@girardgibbs.com

- **Charles Walter Lilley**
  clilley@lilleylaw.com

- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com

- **Gordon W. Netzorg**
  gnetzorg@shermanhoward.com,shood@shermanhoward.com,cdias@shermanhoward.com,efiling@shermanhoward.com

- **Peter G. Rush**
  peter.rush@klgates.com,melissa.neubeck@klgates.com

- **Regina Ames Sandler**
  ras@girardgibbs.com,amv@girardgibbs.com

- **Christina H.C. Sharp**
  chc@girardgibbs.com,sfs@girardgibbs.com,amv@girardgibbs.com

- **Aaron Michael Sheanin**
  amv@girardgibbs.com,ams@girardgibbs.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com

- **Steven J. Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com

*s/ Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  rmiller@perkinscoie.com

Attorneys for OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc., John V.
Murphy, and Brian W. Wixted