**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Civil Action No. **09-cv-1186-JLK-KMT**

**IN RE:  CORE BOND FUND**

---

**DEFENDANTS INDEPENDENT TRUSTEES' AND
THE OPPENHEIMER INTEGRITY FUNDS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND**

---

**K&L GATES LLP**
Peter G. Rush
Jeffrey T. Petersen
Sara E. Fletcher

70 West Madison Street
Chicago, Illinois  60602
Telephone.  (312) 372-1121
Facsimile:  (312) 827-8000

**DAVIS GRAHAM & STUBBS LLP**
Dale R. Harris

1550 Seventeenth Street
Denver, Colorado  80202
Telephone:  (303) 892-9400
Facsimile:  (303) 893-1379

*Attorneys for Defendants William L. Armstrong,
Robert G. Avis, George C. Bowen, Edward L.
Cameron, Jon S. Fossel, Sam Freedman, Beverly L.
Hamilton, Robert J. Malone and F. William
Marshall and the Oppenheimer Integrity Funds*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND .................................................................................................................... 2

I.      Overview of Mutual Funds ......................................................................................... 2

II.     Relationship Between the Integrity Funds and the Core Bond Fund ........................... 4

III.    Overview of Plaintiff's Complaint ............................................................................. 5

ARGUMENT ........................................................................................................................ 6

I.      Standards for Rule 12(b)(6) Motion to Dismiss ......................................................... 6

II.     The Section 12(a)(2) Claim Against the Independent Trustees and the Integrity
        Funds Should be Dismissed For Failing to Allege Those Defendants Sold or
        Offered to Sell any Shares of the Core Bond Fund ..................................................... 7

III.    The Complaint Fails to Adequately Allege a Section 15 Claim Against the
        Independent Trustees or the Integrity Funds ............................................................ 12

        A.      The Complaint Does Not Allege an Underlying Securities Act Violation ....... 13

        B.      The Complaint Fails to Set Forth the Independent Trustees' or the
                Integrity Funds' Control Over a Purported Violator of Sections 11 or
                12(a)(2) ........................................................................................................ 13

IV.     Plaintiff Cannot State a Misrepresentation Claim For Disclosed Investments
        That Sustained Losses .............................................................................................. 16

        A.      The Complaint's Claims of Corporate Mismanagement Are Not
                Actionable Under The Securities Law ........................................................... 17

        B.      The Fund Disclosed the Precise Risks Now Challenged ................................. 19

        C.      The Manager's Investment Strategy Was Well-Known ................................... 23

## TABLE OF AUTHORITIES

### Cases

*Adams v. Kinder-Morgan, Inc.* 340 F.3d 1083 (10th Cir. 2003) .................................................. 14

*Allison v. Bank One-Denver*, No. 91-1422, 1994 WL 637403 (D. Colo. Jan. 7, 1994) ................ 7

*Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662 (D. Colo. 2007) ............. 17

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ........................ 6, 7, 10, 11

*Brodsky v. Yahoo!, Inc.*, 592 F. Supp. 2d 1192, 1207-08 (N.D. Cal. 2008) .................................. 13

*Byers v. Intuit, Inc.*, No. 07-4753, 2009 WL 948651 (E.D. Pa. March 18, 2009) ........................ 21

*Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569 (S.D.N.Y. 2001) ........................... 11

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976) ................ 16

*eSoft, Inc. v. Astaro Corp.*, No. 06-00441, 2006 U.S. Dist. LEXIS 52336, at *2 (D. Colo. July 31, 2006) ........................................................................................................................ 6

*Fagin v. Day*, No. 07-00426, 2007 WL 2990620 (D. Colo. Oct. 11, 2007) ................................ 10

*Gotham Holdings, L.P. v. Health Grades, Inc.*, 534 F. Supp. 2d 442 (S.D.N.Y. 2008) ................ 7

*Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 (M.D. Fla. 2008) ......................................... 7

*Griffin v. PaineWebber, Inc.*, 84 F. Supp. 2d 508 (S.D.N.Y. 2000) .............................................. 14

*Harrison v. Rubenstein*, No. 02-9356, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) ................... 18

*Hinerfeld v. United Auto Group*, No. 97-3533, 1998 WL 397852 (S.D.N.Y. July 15, 1998) .................................................................................................................................... 18

*In re Alliance Equip. Lease Program Sec. Litig.*, No. 98-2150, 2002 WL 34451621 (S.D. Cal. 2002) .................................................................................................................... 8

*In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004) ...................................... 23

*In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009) ..................... 19

*In re Craftmatic Sec. Litig.*, 890 F.2d 628 ........................................................................... 17, 18

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) ................................................ 24

*In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080 (C.D. Cal. 2003) ........................ 8, 10

*In re Regal Communications Corp. Sec. Litig.*, No. 94-179, 1996 WL 411654 (E.D. Pa. 1996) ................................................................................................................ 16

*In re Ross Sys. Litig.*, No. 94-0017, 1994 WL 583114 (N.D. Cal. July 21, 1994) ...................... 15

*In re Sonus Networks Sec. Litig.*, No 04-10294, 2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006) .......................................................................................................... 11

*Iqbal v. Hasty*, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) .................................. 6, 7, 10, 11, 14, 16

*Jackson v. Johns*, 714 F. Supp. 1126 (D. Colo. 1989) .................................................... 10

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998) ........................ 11, 12, 13, 14, 15

*Nelson v. Nat'l Republic Bank of Chicago*, No. 80-6401, 1984 WL 2424 (N.D. Ill. April 17, 1984) ........................................................................................................... 14

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) .................................... 18

*Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir. 1981) ...................................... 17

*Pinter v. Dahl*, 486 U.S. 622, 642, 647, 108 S. Ct. 2063, 100 L. Ed. 2d 658, 679, 682 (1988) ............................................................................................................ 7, 8, 9, 11

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) .................................... 8, 9, 10

*Santa Fe v. Green*, 430 U.S. 462, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977) .............................. 16

*Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213 (D. Colo. 1998) ................................... 10

*SEC v. Selden*, 632 F. Supp. 2d 91, 99 (D. Mass. 2009) .................................................. 8

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ............................................... 24

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ...................................... 8, 10, 11, 12

*Smile Care Dental Grp. v. Delta Dental Plan*, 88 F.3d 780 (9th Cir. 1996) ................................. 6

*Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261 (D. Utah 2002) .......................................... 10

## Statutes

15 U.S.C. § 77k ............................................................................................................. 5

15 U.S.C. § 77l(a)(2) ..................................................................................................... 5, 7

15 U.S.C. § 77o .......................................................................................................... 6, 12

15 U.S.C. § 78u-4(b) ........................................................................................................ 7

15 U.S.C. § 80a-15(a) ............................................................................................................. 3

15 U.S.C. § 80a-15(a)(2)......................................................................................................... 3

15 U.S.C. § 80a-15(c) ............................................................................................................. 3

15 U.S.C. § 80a-2(a)(19)...................................................................................................... 4, 15

**Other Authorities**

Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*,
        MORNINGSTAR, Dec.17, 2008 ................................................................................ 17, 23

Lee Gremillion, *A Purely American Invention:  The U.S. Open-End Mutual Fund
        Industry* (2001)................................................................................................................ 4

Miriam Sjoblom, *We've lost confidence in Oppenheimer Core Bond Fund*,
        MORNINGSTAR, Dec.17, 2008 ........................................................................................ 17

Victoria E. Schonfeld and Thomas M. J. Kerwin, *Organization of a Mutual Fund*, 49
        Bus. Law. 107 (1993)........................................................................................................ 3

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................... 6

Defendants, William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone and F. William Marshall (collectively, the "Independent Trustees") and Oppenheimer Integrity Funds (the "Integrity Funds") hereby move to dismiss the Consolidated Class Action Complaint and Jury Demand[1] and submit the following memorandum in support of their Motion. [2]

### PRELIMINARY STATEMENT

Plaintiff seeks to hold Defendants liable for violating the securities laws because the Core Bond Fund's portfolio holdings performed poorly in a market the Complaint acknowledges was "dysfunctional". But the federal securities laws provide no insurance against investment losses, and Defendants made no secret of either the Core Bond Fund's portfolio positions or the investment direction pursued by its Manager. As a consequence, rather than pleading (as required) claims of misrepresentation and omission, the Complaint instead pleads claims of corporate mismanagement not actionable under the federal securities laws.

Plaintiff's effort to hold the Independent Trustees liable for violations of Sections 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") fails for additional reasons. The Complaint fails to include a single non-conclusory allegation any of the Independent Trustees participated in the sale or solicitation for sale of any shares of the Core Bond Fund or controlled any of the challenged investment decisions.

---

[1]     Plaintiff's Consolidated Class Action Complaint and Jury Demand shall hereinafter be referred to as "CCAC" or "Complaint."

[2]     Defendants incorporate herein by reference the Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand filed by their Co-Defendants, OppenheimerFunds, Inc., the OppenheimerFunds Distributor, Inc., John Murphy and Brian Wixted (collectively, the "Oppenheimer Defendants"). The Independent Trustees and the Integrity Funds, in the interests of efficiency, have endeavored to avoid repeating the points and authorities set forth by the Oppenheimer Defendants, which provides separate grounds for dismissing Plaintiff's claims. The Motions of all Defendants are intended to be read together.

Plaintiff's effort to hold the Integrity Funds liable for violations of Section 12(a)(2) and possibly Section 15 of the Securities Act likewise fails. The sole non-conclusory factual allegation asserted against the Integrity Funds in the Complaint is that it was the registrant for the Core Bond Fund's offerings. Such meager allegations provide no predicate for violations of the Securities Act. As with the Independent Trustees, the Complaint fails to include a single non-conclusory allegation the Integrity Funds sold or solicited the sale of any shares of the Core Bond Fund. Due to Plaintiff's ambiguous and conclusory pleading, the Complaint is entirely unclear as to whether Plaintiff asserts a Section 15 claim against the Integrity Funds. To the extent Plaintiff intends to do so, he fails to allege the requisite element of control over any other named Defendant.

Plaintiff's claims must also fail because the Complaint does not allege Defendants misrepresented or omitted a material fact in violation of Sections 11 or 12(a)(2) of the Securities Act. The Core Bond Fund's investments -- including the type, reference entity, magnitude, and value of each instrument, as well as the supporting rationale for those investment decisions -- were disclosed in great detail to the public. These disclosures reveal that during the relevant time period, contrary to Plaintiff's claim the Core Bond Fund was stockpiling risky investments, the Core Bond Fund's Manager actually increased the investments in more highly rated securities.

## BACKGROUND

### I.    Overview of Mutual Funds

Mutual funds provide a means for investors to invest in pools of securities. Mutual funds provide various advantages to their shareholders, including diversification of investments, professional money management, and economies of scale on brokerage and other services. *See* Victoria E. Schonfeld and Thomas M. J. Kerwin, *Organization of a Mutual Fund*, 49 Bus. Law.

107 (1993) ("*Organization of a Mutual Fund*"). Unlike stocks in a publicly-traded company, mutual fund shares do not trade on a public exchange. Shares are priced daily based upon the net asset value of the securities held by the fund. *Id.* at 112-13.

A mutual fund generally has few or no employees. Rather, a mutual fund contracts with third parties for all its services. The cast of characters relevant to the management and governance of mutual funds includes investment advisers (or managers), distributors, and directors/trustees.

The investment adviser manages and invests the fund's assets pursuant to an advisory contract with the fund. Section 15 of the Investment Company Act of 1940 ("ICA") requires, *inter alia,* that the advisory agreement be approved initially by a majority of the fund's outstanding voting securities and by a majority of the directors who are not parties to such agreement or "interested persons" of any such party. *See* 15 U.S.C. § 80a-15(a), (c). Section 15 also sets forth procedures for the renewal of the advisory agreement. *Id.* at § 80a-15(a)(2). The terms of the advisory agreement, including the compensation to be received by the adviser, are set forth in the fund's Prospectus and Statement of Additional Information.

Most mutual funds additionally enter into a contract with a distributor, or principal underwriter, to purchase and distribute the fund's shares to the public. *See Organization of a Mutual Fund*, 49 Bus. Law. at 132. A fund's distributor is often affiliated with the fund's investment adviser. *Id.* A distributor may distribute shares through its own representatives or through other agents, such as brokers. If a fund's shares are sold through brokers, the distributor generally will enter into selling agreements with each brokerage firm, detailing the responsibilities of the broker in selling the fund's shares to investors and in executing

transactions in the fund's shares. *See* Lee Gremillion, *A Purely American Invention: The U.S. Open-End Mutual Fund Industry*, 133-34 (2001) ("*Mutual Fund Industry*").

A mutual fund's board of directors (or trustees) supervises the fund's business operations. A mutual fund's board consists of both "interested" and "non-interested" (or independent) directors/trustees.[3] The directors/trustees of a mutual fund are responsible for approving and monitoring the advisory agreement. The directors/trustees are also responsible for reviewing arrangements between a fund and its distributors and other service providers.

## II.     Relationship Between the Integrity Funds and the Core Bond Fund

In the instant case, non-Defendant Core Bond Fund is a series of Defendant Oppenheimer Integrity Funds, an open-ended, diversified management investment company. (April 30, 2007 Statement of Information ("SAI") at 37 (selected portions[4] attached to the Declaration of Peter G. Rush ("Rush Declaration") as Exhibit A); April 29, 2008 SAI at 37 (selected portions attached to Rush Declaration as Exhibit B). Oppenheimer Integrity Funds was established in 1982. *(Id.)* The Core Bond Fund was reorganized from a closed-end investment company into a series of the Oppenheimer Integrity Funds on April 15, 1988. *(Id.)*

## III.    Overview of Plaintiff's Complaint

The Complaint was filed on October 12, 2009 by Plaintiff C. Phillip Pattison ("Plaintiff"), an investor who alleges he purchased shares in the Core Bond Fund in June, 2007.

---

[3]     The ICA defines an "interested person" of an investment company to include, among other people: (1) any affiliated person of an investment company or any immediate family member of any such person; and (2) any interested person of the company's investment adviser or principal underwriter. *See* 15 U.S.C. § 80a-2(a)(19).

[4]     The Oppenheimer Defendants have attached complete versions of the relevant filings with the Securities and Exchange Commission ("SEC") to their Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand. Because these documents are voluminous, in the interests of efficiency, the Independent Trustees and the Integrity Funds have attached only the pages of the filings that they specifically refer to in this Motion.

(CCAC ¶ 13, Certification of Dr. C. Phillip Pattison at Ex. A (attached to Declaration of Alan I. Ellman in Support of the Motion of Dr. C. Phillip Pattison for Appointment as Lead Plaintiff and Approval of Selection of Counsel at Ex. A, Docket No. 57)).  It pleads three counts and names as Defendants, *inter alia*, individuals alleged to be trustees of the Core Bond Fund.  The Complaint also names the Integrity Funds as a Defendant, claiming it was the registrant for the Core Bond Fund's offerings.   (CCAC ¶ 18).    Although the Integrity Funds is the named registrant Defendant, the Complaint identifies the mutual fund as the Core Bond Fund.[5]  The Core Bond Fund is not named as a defendant, although the Complaint alleges the Independent Trustees "controlled" the Core Bond Fund as opposed to the Integrity Funds, which leads to a host of confusing and improper allegations discussed in detail below.

Conspicuously absent from the Complaint is any contention the Independent Trustees or the Integrity Funds engaged in securities fraud.  Rather, the Complaint turns entirely on alleged, technical disclosure shortcomings.  Count I purports to assert a claim under Section 11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants for allegedly false and misleading statements in Form N-1A Registration Statements which were filed with the SEC on April 30, 2007 and April 29, 2008 (the "Registration Statements").

Count II purports to assert a claim under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against all Defendants as "sellers" for allegedly false and misleading statements in Prospectuses filed on the same dates and incorporated into each concurrent Registration Statement (the "Prospectuses").    The Registration Statements, Prospectuses, Statement of Additional Information, Management Commentaries and Annual Reports, Management

---

[5]     The Complaint abbreviates the Core Bond Fund as "the Fund." (CCAC ¶¶ 1, 36).

Commentaries and Semi-Annual Reports, and Form N-Q Quarterly Schedules shall be referred to collectively as the "Disclosures."

Count III purports to state a claim for violation of Section 15 of the Securities Act, 15 U.S.C. § 77o, against unidentified "Control Group Defendants" for purported control liability for the alleged misstatements in the Disclosures.

## ARGUMENT

### I.    Standards for Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for two reasons:   (1) lack of cognizable legal theory; or (2) pleading of insufficient facts under a cognizable theory.  *Smile Care Dental Grp. v. Delta Dental Plan*, 88 F.3d 780, 783 (9th Cir. 1996).  In considering a motion to dismiss under Rule 12(b)(6), a court must presume only that the well-pleaded *facts* set forth in a complaint are true.  The Court thus need not credit legal conclusions or unsupported conclusions of fact.  *eSoft, Inc. v. Astaro Corp.*, No. 06-00441, 2006 U.S. Dist. LEXIS 52336, at *2 (D. Colo. July 31, 2006); *Iqbal v. Hasty*, 129 S. Ct. 1937, 1949-50, 173 L.Ed.2d 868, 884 (2009).

To survive a motion to dismiss, the "[f]actual allegations [of a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, 940 (2007).  The Complaint must show entitlement to relief is plausible, not merely that there might exist some set of facts consistent with the allegations of the complaint that would entitle the plaintiff to relief.  *Twombly*, 127 S. Ct. at 1965-66; *see also Iqbal*, 129 S. Ct. at 1950 (applying the *Twombly* standard to all civil actions and stating "only a complaint that states a plausible claim for relief survives a motion to dismiss").

The *Twombly* standard has been applied to assess the sufficiency of claims pleaded under Sections 11 and 12(a)(2) of the Securities Act.  *See, e.g. Grand Lodge of Pa. v. Peters*, 550 F.

- 6 -

Supp. 2d 1363, 1376 n.78 (M.D. Fla. 2008) (applying *Twombly* to Section 11 claim and quoting

it for the proposition a complaint cannot avoid dismissal on the "possibility that a plaintiff might

later establish some 'set of [undisclosed] facts' to support recovery"); *Gotham Holdings, L.P. v.

Health Grades, Inc.*, 534 F. Supp. 2d 442, 444 (S.D.N.Y. 2008) (citing *Twombly* on motion to

dismiss Section 12(a)(2) claim).

The Complaint fails to set forth any allegations establishing a plausible right to relief on

either the Section 12(a)(2) or Section 15 claims.   The paucity of allegations on necessary

elements for both these claims mandates they be dismissed.

**II.**    **The Section 12(a)(2) Claim Against the Independent Trustees
and the Integrity Funds Should be Dismissed For Failing to Allege
Those Defendants Sold or Offered to Sell any Shares of the Core Bond Fund**

A Section 12(a)(2) claim may only be asserted against the "seller" of the security.   15

U.S.C. § 77l(a)(2).   The Supreme Court has interpreted "seller" to mean the "owner who passed

title," as well as "the person who successfully solicits the purchase, motivated at least in part by

a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486

U.S. 622, 642, 647, 108 S. Ct. 2063, 100 L. Ed. 2d 658, 679, 682 (1988).[6]   To qualify as a

"solicitor," a person must, at a minimum, **directly communicate with and actively solicit the**

**buyer.**   *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *Shaw v. Digital*

*Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996) (*superseded on other grounds by statute,*

Private Sec. Litig. Reform Act, 15 U.S.C. § 78u-4(b)(1)-(2), *as recognized in SEC v. Selden*, 632

F. Supp. 2d 91, 99 (D. Mass. 2009)); *In re Alliance Equip. Lease Program Sec. Litig.*, No. 98-

---

[6]     Although *Pinter* addressed the meaning of "seller" under Section 12(a)(1), the courts
have concluded the same definition applies to Section 12(a)(2). *Allison v. Bank One-Denver*,
No. 91-1422, 1994 WL 637403, at *3 (D. Colo. Jan. 7, 1994).

2150, 2002 WL 34451621, at *7-8 (S.D. Cal. 2002). Liability under Section 12(a)(2) does not extend to "collateral participants." *Rosenzweig*, 332 F.3d at 871 (*citing Pinter*, 486 U.S. at 650).

Plaintiff's Section 12(a)(2) claim should be dismissed because he has not pleaded facts giving rise to a plausible claim any Independent Trustee or the Integrity Funds was a "seller" within the meaning of Section 12. First, the Complaint does not allege any of the Independent Trustees or the Integrity Funds "passed title" to any securities. *See, e.g., In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1100 (C.D. Cal. 2003) (dismissing Section 12(a)(2) claim where defendants did not pass title to the security). Instead, the Core Bond Fund's disclosures make clear shares can be purchased only: (1) through brokers, dealers, or financial institutions that have selling agreements with OppenheimerFunds Distributor, Inc; or (2) under certain circumstances, through OppenheimerFunds Distributor, Inc. (April 30, 2007 Prospectus at 21 (selected portions attached to Rush Declaration as Exhibit C); April 29, 2008 Prospectus at 21 (selected portions attached to Rush Declaration as Exhibit D)). No disclosures state the Independent Trustees or the Integrity Funds passed title to investors. (*See also* OppenheimerFunds, Inc. Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand filed in *In re: Oppenheimer Champion Fund Securities Class Action* at Argument Section II.B, n.3. Plaintiff makes no allegations, nor could he, indicating the Independent Trustees ever passed title to investors.

Nor does Plaintiff allege facts demonstrating any Independent Trustee or the Integrity Funds "solicited purchases of the Fund's shares." Instead, the Complaint affirmatively alleges, "[t]he Fund was marketed to the investing public through other brokerage firms such as Wachovia, Merrill Lynch, Citigroup Global Markets, Bank of America Securities, ING, and UBS." (CCAC at ¶ 38).

Plaintiff attempts to assert the Independent Trustees solicited sales of the Fund's shares through the generic allegations that: (1) the Trustees signed the Registration Statements (CCAC ¶¶ 19-27); and (2) "the Individual Defendants governed the Fund, including all communications, and thereby solicited purchases of the Fund's shares to serve their own financial interests." (CCAC ¶ 109d).

With regard to the first allegation, the weight of authority provides simply signing a registration statement fails to amount to soliciting the purchase of securities to serve the financial interests of either the trustee or security owner. The Supreme Court rejected this type of expansive view at the outset in *Pinter*, stating that "seller" status arises from a "defendant's relationship with the plaintiff-purchaser." 486 U.S. at 651. The Supreme Court also emphasized the distinct statutory language for Sections 11 and 12(a)(2): although Section 11 expressly applies to "collateral participants" such as persons who "sign" a registration statement, "[t]here are no similar provisions in § 12, and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions." *Id.* at 650, n.26.

Subsequent decisions have confirmed that one can only be a "seller" based on contractual privity with the purchaser or direct involvement in the solicitation of a purchaser's investment, but not through merely signing a registration statement or prospectus. *See, e.g. Rosenzweig*, 332 F.3d at 871 (dismissing Section 12(a)(2) claim based solely on individual defendants signing the registration statement); *Shaw*, 82 F.3d at 1216 (dismissing Section 12 claim containing allegations of active participation in creation of prospectus and registration statement); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d at 1101 (dismissing claims against defendants

where "their only alleged acts were serving on the Board of Directors and signing the Prospectus and Registration Statement.")[7]

The second set of allegations -- that the Independent Trustees were solicitors because they "governed" the Core Bond Fund and thereby solicited purchases of shares -- constitute no more than "[t]hreadbare recitals of the elements of [the] cause of action, supported by mere conclusory statements . . . ." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). There is nothing in the Complaint suggesting any of the Independent Trustees "directly communicate[d] with the buyer[s]" of shares. *Rosenzweig*, 332 F.3d at 871. As a result, the claim against the Independent Trustees must fail. *See Shaw*, 82 F. 3d at 1216 (rejecting use of conclusory "solicitation" label as a legal term of art); *see also Iqbal*, 129 S. Ct. at 1949. Indeed, if Plaintiff's allegations here proved sufficient, then every trustee of every Fund (and every board member of every corporation) would be liable as a seller. Section 12(a)(2) is not so broad. *See Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261, 1269 (D. Utah 2002) (Section 12(a)(2) claim dismissed for failure to allege "direct and active participation in the solicitation" and "facts that support the conclusion that the individual defendants solicited the purchases and were motivated by a desire to serve their own financial interests") (citations omitted); *In re Sonus Networks Sec. Litig.*, No 04-10294, 2006 U.S. Dist. LEXIS 28272, at *34-38 (D. Mass. May 10, 2006)

---

[7]    The Independent Trustees acknowledge *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1223 (D. Colo. 1998), where the court held plaintiffs adequately stated a claim under Section 12(a)(2) by alleging the individual defendants "solicited" the sale of stock, "motivated 'at least in part by a desire to serve [their] own financial interests,'" and signed the registration statement. This Court is not bound to follow *Schaffer*, however. *See Fagin v. Day*, No. 07-00426, 2007 WL 2990620, at * 1 (D. Colo. Oct. 11, 2007) (one district court in Colorado is not bound to follow other Colorado district court decisions); *Jackson v. Johns*, 714 F. Supp. 1126, 1130 (D. Colo. 1989) (same). Nor should the Court follow *Schaffer*, which neglected to consider the Supreme Court's discussion in *Pinter* of the disparity between the language of Section 11 and Section 12(a)(2). The far better rule, and the rule this Court should follow, is that privity or direct involvement in solicitation is required, as opposed to the mere signing of a registration statement.

(dismissing Section 12(a)(2) claim containing mere conclusory allegations concerning defendants' participation in the creation and distribution of prospectuses and registration statements without factual allegations pertaining to defendants' solicitation efforts); *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 580 (S.D.N.Y. 2001) (Section 12(a)(2) claim dismissed for failure to allege defendant "undertook any activities designed to solicit the sale" of securities).

This same reasoning renders the Section 12(a)(2) claim defective for failing to allege any facts demonstrating any Independent Trustee was motivated by a desire to serve his or her own financial interests or those of the security owner. *See Pinter*, 486 U.S. at 647; *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998). The naked allegation the Independent Trustees must have solicited purchases of the Fund's shares out of some unidentified financial interest does nothing to establish the necessary factual predicate for this Count. *See Shaw*, 82 F.3d at 1216.

Plaintiff attempts to assert the Integrity Funds solicited sales of Core Bond Fund shares through the generic allegation that "[a]s the registrant of the Fund, Defendant Oppenheimer Integrity Funds solicited purchases of the Fund's shares to serve its own financial interests." (CCAC ¶ 109c). Like Plaintiff's allegations against the Independent Trustees, this allegation constitutes no more than "threadbare recitals of the elements of [the] cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 555). There is nothing in the Complaint suggesting the Integrity Funds "directly communicate[d] with the buyer[s]" of Core Bond Fund shares. *Shaw*, at 82 F.3d at 1216 (where the complaint does not demonstrate that an issuer passed title, "bald and factually unsupported allegation that the issues . . . . 'solicited' the plaintiffs' securities purchases" is not sufficient). As a result of the

failure to provide adequate factual allegations, the claim against the Integrity Funds, too, must fail.

Because the Complaint fails to establish the Independent Trustees and the Integrity Funds are "sellers" of the Core Bond Fund's shares under the applicable statutory language and overwhelming case law, the Court should dismiss the Section 12(a)(2) Count as to the Independent Trustees and the Integrity Funds.

**III.    The Complaint Fails to Adequately Allege a Section 15
Claim Against the Independent Trustees or the Integrity Funds**

Plaintiff's Section 15 claim against the Independent Trustees and possibly the Integrity Funds must be dismissed for failing to allege the necessary prerequisites. Section 15 provides a person who "controls any person liable under [Sections 11 or 12] . . . shall also be liable jointly and severally *with and to the same extent* as such controlled person. . . " 15 U.S.C. § 77o (emphasis added);[8] *see also Maher*, 144 F.3d at 1304-05 (under Section 15 "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable *with* the primary violator.") (emphasis added).

To state a *prima facie* case of control person liability, Plaintiff "must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher*, 144 F.3d at 1305. Because the Complaint fails to establish either predicate, the Count should be dismissed.

**A.    The Complaint Does Not Allege an Underlying Securities Act Violation**

Control person liability cannot be established without proper allegations of a primary violation under Sections 11 or 12. *See Maher*, 144 F.3d at 1305; *Cooperman v. Individual, Inc.*,

---

[8]     That is, unless the control person was reasonably without knowledge of the basis for the controlled person's liability. 15 U.S.C. § 77o.

171 F.3d 43, 52 (1st Cir. 1991) (control person claim dismissed where plaintiffs failed to properly allege underlying violation); *Brodsky v. Yahoo!, Inc.*, 592 F. Supp. 2d 1192, 1207-08 (N.D. Cal. 2008) (same).  As set forth in the Oppenheimer Defendants' Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand and in sections II and IV of this Motion, Plaintiff has failed to properly allege the requisite underlying violation.  Dismissal of the Section 15 claim is therefore required.

**B.    The Complaint Fails to Set Forth the Independent Trustees' or the Integrity Funds' Control Over a Purported Violator of Sections 11 or 12(a)(2)**

To plead adequately one had "control" over a primary violator of the securities laws, plaintiff must demonstrate defendant had "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *See Maher*, 144 F.3d at 1305 (*citing* 17 C.F.R. § 230.405).  Dismissal of the complaint is appropriate where "a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Id.* at 1306 (affirming dismissal of Section 15 claim where plaintiff failed to plead facts sufficient to demonstrate "control" over any primary violator).

The Complaint contains no particularized allegations to demonstrate any "control" by the Independent Trustees or the Integrity Funds over any alleged primary violator.  In fact, it is difficult, if not impossible, to discern in this Count just which Defendants are being sued and over whom they allegedly exercised control in the first instance.  The title to Count III states it is being brought against the "Control Group Defendants," which implies the Count involves a subset of all Defendants. (CCAC p. 35).  The term "Control Group," however, is never defined in the Complaint.  The Complaint then alleges each of the Defendants was a control person of the Core Bond Fund (which is not a named as a defendant in the Complaint), the Manager, or the

Distributor, without specifying which Defendant assertedly controlled which entity. (CCAC ¶ 117).

As to the Independent Trustees, the Complaint fails to in any way specify how the Trustees could have controlled any of the Defendant entities, instead merely reciting the Trustees attained control simply by virtue of their positions as trustees and by unspecified "direct and/or indirect business and/or personal relationships" with other (unidentified) parties. (CCAC ¶ 117). The failure to specify the basis for the Independent Trustees' purported exercise of control is fatal to the Section 15 claim. *See Maher*, 144 F.3d at 1306; *see also Iqbal*, 129 S. Ct. at 1949 (mere conclusory allegations without factual support are insufficient to establish a claim for relief).[9]

Furthermore, attempting to establish the Independent Trustees' control over another Defendant merely by pointing to their positions as trustees proves unavailing. *See, e.g. Adams v. Kinder-Morgan, Inc.* 340 F.3d 1083, 1106 (10th Cir. 2003) ("The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person" and "the district court was correct to

---

[9] Moreover, Plaintiff alleges only that the Independent Trustees controlled "the Fund." (CCAC ¶¶ 31, 35). As previously noted, references to "the Fund" in the Complaint are shorthand for the Core Bond Fund, a non-party to this lawsuit. There is no allegation the Independent Trustees controlled the Integrity Funds, the named Defendant. To the extent Plaintiff's control allegations focus on the Independent Trustees' asserted control over the Core Bond Fund, those allegations provide no basis for Section 15 liability because the Core Bond Fund has not been named as a defendant. *See Nelson v. Nat'l Republic Bank of Chicago*, No. 80-6401, 1984 WL 2424, at *8 (N.D. Ill. April 17, 1984) ("[U]nder § 15, no action against the directors of either McCormick or Domicile can be maintained, since neither McCormick or Domicile are parties to this suit, and thus could not be found liable under Section 77k or 77l."); *Griffin v. PaineWebber, Inc.*, 84 F. Supp. 2d 508, 516 (S.D.N.Y. 2000) (similar). If Plaintiff belatedly contends the purported "control" is actually over the Integrity Funds, no factual allegations have been provided to support such claim.

dismiss the claim of control person liability . . . ."); *In re Ross Sys. Litig.*, No. 94-0017, 1994 WL

583114, at *5 (N.D. Cal. July 21, 1994) ("courts in this District have required plaintiffs to plead

more than the status of an outside director in order to survive a motion to dismiss control person

claims.")[10]   Similarly, citation to a "personal relationship" with a purported (and unidentified)

"controlled person" is insufficient to set forth a Section 15 claim. *See Maher*, 144 F.3d at 1306

(allegation that a sibling was an officer of primary violator insufficient to confer control person

status).

Indeed, the "Independent Trustees" are just what their title implies -- separate and

independent from the Manager and Distributor. There is no allegation -- nor could there be -- the

Independent Trustees are on the Board of the Defendant Manager or the Defendant Distributor.

Likewise, there is no factual allegation tending to show how any of the Independent Trustees

could have asserted control over either the Manager or the Distributor. Indeed, the ICA prohibits

conferring independent trustee status on an "interested person," which is defined to include any

"affiliated person" of the investment adviser or principal underwriter. 15 U.S.C. § 80a-2(a)(19).

The lack of any "control" relationship could hardly be more clear.

The failure of the Complaint to properly plead any of the predicates for Section 15

liability as to the Independent Trustees subjects that Count to dismissal.

As to the Integrity Funds, while on pages 8-9 of the Complaint Plaintiff purports to set

forth "control allegations," the *only* allegation directed towards the Integrity Funds is that the

Integrity Funds is a management investment company registered under the ICA and was the

registrant for the Core Bond Fund's offerings (CCAC ¶ 34). The Integrity Funds is even

excluded from the generic, improper allegation at the outset of the Complaint that the Manager,

---

[10]   The control person provisions at Section 15 and Section 20(a) of the Securities Exchange
Act of 1934 are interpreted in the same way. *Maher*, 144 F.3d at 1305 n.7.

Distributor and Individual Defendants controlled the non-party Core Bond Fund. (CCAC ¶ 31). The lone allegation of the Complaint -- which does not specify what entity the Integrity Funds purportedly controlled or how it may have done so -- is clearly insufficient to set forth a plausible right to relief. *Iqbal*, 129 S. Ct. at 1949-50. To the extent Plaintiff attempts to allege the Integrity Funds exercised control over *itself* as a primary violator, such attempt must fail. *See In re Regal Communications Corp. Sec. Litig.*, No. 94-179, 1996 WL 411654, at *4 (E.D. Pa. 1996) ("A person cannot be both the controller and the controlled.")

IV.    **Plaintiff Cannot State a Misrepresentation Claim For Disclosed Investments That Sustained Losses**

Sections 11 and 12(a)(2) base liability on the misrepresentation or omission of material facts. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209, 96 S. Ct. 1375, 1388, 47 L. Ed. 2d 668 (1976). Here, no disclosure deficiencies exist. Instead, the Core Bond Fund's disclosures painstakingly described its investments, the level of its investment, the particular types of securities and the risks of each of those investments. The comprehensive nature of the disclosures reveal Plaintiff's true criticism is that the Core Bond Fund's announced investment strategy proved unsuccessful.

For more than 30 years, the Securities Act has provided no basis to challenge the internal management of a corporation. *Santa Fe v. Green*, 430 U.S. 462, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977). The securities laws "did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Id.* at 479 (internal quotations and citation omitted). The prohibition against corporate mismanagement claims extends equally to Sections 11 and 12(a)(2) claims. *See, e.g., In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 638 n.14 (3d Cir. 1989) ("the holding and reasoning [of *Santa Fe*] apply equally to claims arising under § 11(a) and § 12(2).") A "plaintiff may not 'bootstrap' a claim for internal corporate

mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682-83 (D. Colo. 2007) (no actionable securities claim for alleged non-disclosure of inadequacy of financial reporting controls because "[a]t base, this allegation is of mismanagement"). Stated differently, "if the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981) (*quotations and citation omitted*).

A. **The Complaint's Claims of Corporate Mismanagement Are Not Actionable Under The Securities Law**

Plaintiff's dominant allegations challenge -- with the benefit of hindsight -- investment decisions made in a "dysfunctional market" that admittedly "sailed off into unchartered mania." (*See* Miriam Sjoblom, *We've lost confidence in Oppenheimer Core Bond Fund*, MORNINGSTAR, Dec.17, 2008, attached to Rush Declaration as Exhibit E; Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec.17, 2008, attached to Rush Declaration as Exhibit F). For example, the Complaint alleges:

- The Fund "took huge gambles on mortgage-backed securities and speculative derivatives that caused the Fund to crash." (CCAC ¶ 2);

- The Fund "became a hedge fund-like investment fund that took extreme risks in search for speculative, large returns." (CCAC ¶ 5);

- "[T]he Fund invested in these speculative devices in a huge gamble that backfired, multiplying losses." (CCAC ¶ 5);

- "The Fund's investment strategies were not focused on achieving broad portfolio diversification and as a result, did not function as a means to reduce the volatility of the Fund's share price;" (CCAC ¶ 49e);

- "The Fund's internal controls were inadequate to prevent Defendants from taking excessive risk." (CCAC ¶ 49h);

- "Fund managers increased their bet on commercial mortgage-backed securities and, therefore risk, by entering into total-return swaps on commercial real estate indices. This was a speculative bet that the commercial mortgage-backed securities market, which had suffered a significant widening of spreads . . . would rally in 2008, causing spreads to narrow and generating large returns for the Fund." (CCAC ¶ 57);

- "The speculative nature of the Fund managers' decisions is also highlighted by a consideration of the then-concurrent market events.   At the time the Fund entered these transactions, the troubles at AIG, Washington Mutual, Lehman Brothers, Merrill Lynch, Citigroup, Tribune, General Motors, and Ford were known to the Defendants, meaning that the Fund made highly risky bets on these investments.  Indeed, in the wake of the collapse of the subprime mortgage market, the credit-default swap market began to show signs of distress by Summer 2007." (CCAC ¶ 63)

Hindsight allegations such as these provide no basis for a Securities Act claim as they are "essentially grounded on corporate mismanagement." *In re Craftmatic Sec. Litig.*, 890 F.2d at 638-39; *see also Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 7-9 (2d Cir. 1996) (affirming dismissal of Securities Act claim arising from alleged failure to disclose assumptions behind ultimately unprofitable investment decisions and emphasizing that "[n]ot every bad investment is the product of misrepresentation"); *Harrison v. Rubenstein*, No. 02-9356, 2007 WL 582955, at *13 (S.D.N.Y. Feb. 26, 2007) (dismissing Securities Act claim because allegations of business decisions that turned out to be poor and led to losses are mismanagement claims); *Hinerfeld v. United Auto Group*, No. 97-3533, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (dismissing Securities Act claims because "[t]he failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws").

Second-guessing a manager's risk/reward decision-making was recently identified as an ill-conceived foundation for liability:

> The essence of the business judgment of managers and directors is deciding how the company will evaluate the trade-off between risk and return.  Businesses -- and particularly financial institutions -- make returns

> by taking on risk; a company or investor that is willing to take on more risk can earn a higher return. Thus, in almost any business transaction, the parties go into the deal with the knowledge that, even if they have evaluated the situation correctly, the return could be different than they expected.
>
> It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decision.

*In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009). The Complaint here is subject to this same defect.

### B.   The Fund Disclosed the Precise Risks Now Challenged

Plaintiff's contention the portfolio holdings and investment strategy of the Core Bond Fund were purportedly "undisclosed" is just the type of "bootstrapping" effort rejected by the courts. As the Oppenheimer Defendants painstakingly demonstrate in their brief, the Core Bond Fund's portfolio holdings -- including mortgage-backed securities and derivatives -- were meticulously disclosed multiple times each year. *See* OppenheimerFunds, Inc. Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand at Argument Section I for a full analysis of the disclosures about the nature, magnitude, and risks of the challenged investments.

The Form N-Q Quarterly Schedules and Annual and Semiannual Reports listed the total notional amount of every single mortgage-backed security and swap, the reference entity and the counter-party so that the exact amount of the Fund's potential losses was an open book. For example, the Core Bond Fund Annual Report dated December 31, 2007 and filed on February 27, 2008 disclosed each of its mortgage-backed securities this way:

## Mortgage-Backed Obligations

### Commercial

| | Principal Amount | Value |
|---|---|---|
| Lehman Brothers Commercial Conduit Mortgage Trust, Interest-Only Stripped Mtg.-Backed Security, Series 1998-C1, Cl. IO, 1.434%, 2/18/30 | 4,539,525 | 117,543 |

Oppenheimer Core Bond Fund, *Management Commentaries and Annual Report*, Dec. 31, 2007, at 24-33 (selected portions attached to Rush Declaration as Exhibit G). That Annual Report provided the same type of entry (and hence the same level of detail) for *96* different mortgage-backed securities, a disclosure that ran *10* pages in length. (*Id.*)

When the disclosures detail the very risk that allegedly led to plaintiff's losses, there can be no disclosure action under the Securities Act. *Demaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001). That is precisely the case here, and therefore the Complaint should be dismissed. Indeed, no allegations in the Complaint could possibly control over contradictory statements in the Disclosures. *See, e.g., Byers v. Intuit, Inc.*, No. 07-4753, 2009 WL 948651, at *2 (E.D. Pa. March 18, 2009) ("When allegations in a complaint are contradicted by the materials appended to or referenced in the complaint, 'the documents control and the court need not accept as true the allegations of the complaint.'").

As to the use of derivatives, the Core Bond Fund repeatedly advised investors the managers could purchase derivatives for speculative purposes to achieve higher returns.

> **Derivatives**. The Fund can invest in a variety of derivative investments for speculative (seeking higher returns) or hedging (managing investment risk) purposes.

April 30, 2007 SAI at 20 (Ex. A to Rush Declaration); April 30, 2007 SAI revised as of May 25, 2007 at 20 (selected portions attached to Rush Declaration as Exhibit H); April 29, 2008 SAI at 20 (Exhibit B to Rush Declaration).

For their part, the Core Bond Fund managers made no secret of their investment judgments.  In 2007, the Manager stated:

> Mortgage-backed securities, which lagged over the period, appear to offer ample return for the levels of risk they currently present.  Therefore, we have increased our level of mortgage spread risk based on our belief that the return expectations for this sector are currently favorable relative to other highly rated fixed-income assets.
>
> \*       \*       \*
>
> Similarly, we believe commercial mortgage-backed securities (CMBS) continue to offer attractive return potential at currently favorable price levels.  Recent spread-widening in this sector has driven valuations down, making these securities even more appealing on a risk-adjusted basis.  As such, we've added to this allocation at what we believe to be an opportune time to do so.
>
> \*       \*       \*
>
> We continue to favor higher-quality, longer-term financial names, a focus we've balanced through our concurrent emphasis on shorter-term, lower-quality paper, where we also expect good return potential.  Finally, we aim to further increase our high-yield allocation as appropriate.

Oppenheimer Core Bond Fund, *Management Commentaries and Semiannual Report*, June 30, 2007, at 9, *An Interview with Your Fund's Managers* (selected portions attached to Rush Declaration as Exhibit I).

In June of 2008, the Managers again made their investment judgments crystal clear:

> While risks to economic growth remain to the downside, we do not anticipate a severe recession.
>
> \*       \*       \*
>
> Based on our outlook, we have increased our overall exposure to the residential mortgage market.  Spreads are currently at historically wide

> levels, a trend we believe will shift once investors' appetite for
> incremental risk returns. Moreover, we've added to this position at a time
> when these securities are, in our opinion, priced cheaply.
>
> Within our mortgage exposure, we have sold off some of our agency-
> mortgage holdings to fund the purchase of more non-agency residential
> MBS, an area we believe currently offers attractive yield and favorable
> total return potential given the high quality of the securities backing them.
> We are likewise confident that our current focus on short-duration, high-
> yield bonds -- many of which are approaching maturity -- will benefit the
> Fund as these bonds retire. Within our investment-grade credit exposure,
> we expect our emphasis on higher-quality, longer-term financials bonds
> should deliver solid performance . . . .

Oppenheimer Core Bond Fund, *Management Commentaries and Semiannual Report*, June 30,

2008, at 7-8, *An Interview with Your Fund's Managers* (selected portions attached to Rush

Declaration as Exhibit J). Alleging "nothing more than an assertion that [defendants were]

incorrect or unskillful in determining" risk provides no basis for a Securities Act claim. *In re*

*CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004).

Moreover, as explained in detail in the Oppenheimer Defendants Motion to Dismiss the

Consolidated Class Action Complaint and Jury Demand at Section III, because the Fund's

decline plainly resulted from this "unchartered mania" rather than any alleged misrepresentations

or omissions in the Disclosures, Plaintiffs cannot show loss causation, and accordingly are not

entitled to recover damages.

### C.   The Manager's Investment Strategy Was Well-Known

The controlling articles relied upon by the Complaint demonstrate the contemporaneous

conviction with which the managers held their business judgments:

> By January 2008, the team had begun packing some of that powder,
> building positions in four key areas that they felt had become exceedingly
> cheap. That included AAA rated commercial mortgage-backed securities,
> nonagency prime (jumbo) mortgages, AA and A rated financial-sector
> corporate bonds, and very short-maturity high-yield corporates. As we all
> know by now, the market only got worse and became more illiquid
> through the course of the year.

Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec.17, 2008 (Exhibit F to Rush Declaration). As another commentator notes, "[i]n . . . the past, we were optimistic that the managers' conviction in the fund's high-quality mortgagee holdings would eventually pay off." Miriam Sjoblom, *We've lost confidence in Oppenheimer Core Bond Fund*, MORNINGSTAR, Dec.17, 2008 (Exhibit E to Rush Declaration). That commentator (and hence the Complaint) acknowledged that a "dysfunctional market" laid low the Manager's investment strategy. *Id.* Announced investments strategies which failed to succeed when "the market sailed off into unchartered mania" provide no foundation for a Securities Act claim.[11] The wealth of information provided by the Disclosures renders Plaintiff's *post hoc* complaints hollow, and devoid of the facts necessary to pursue a securities claim against the Independent Trustees and the Integrity Funds.

## CONCLUSION

For all the foregoing reasons, defendants William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone, F. William Marshall and the Oppeneheimer Integrity Funds respectfully request that this Court dismiss the Complaint with prejudice.

---

[11]   It is well-settled that the absence of adequate internal controls states no securities violation. *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) ("[I]t is not a violation of the securities laws to simply fail to . . . provide sufficient internal controls.") (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992)).

Dated:   December 3, 2009

Respectfully submitted,

**K&L GATES LLP**

By:  */s/ Peter G. Rush*

Peter G. Rush
Jeffrey T. Petersen
Sara E. Fletcher
70 West Madison Street, Suite 3100
Chicago, IL  60602
Telephone:  (312) 372-1121
Facsimile:  (312) 827-8000
E-Mail:  peter.rush@klgates.com
jeffrey.petersen@klgates.com
sara.fletcher@klgates.com


**DAVIS GRAHAM & STUBBS LLP**

Dale R. Harris
1550 Seventeenth Street, Suite 500
Denver, CO  80202
Telephone:  (303) 892-9400
Facsimile:  (303) 893-1379
E-Mail:  dale.harris@dgslaw.com

*Attorneys for Defendants William L.
Armstrong, Robert G. Avis, George C.
Bowen, Edward L.  Cameron, Jon S. Fossel,
Sam Freedman, Beverly L. Hamilton, Robert
J. Malone and F. William Marshall and the
Oppenheimer Integrity Funds*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of December, 2009, I electronically filed a true and correct copy of the foregoing **DEFENDANTS INDEPENDENT TRUSTEES' AND THE OPPENHEIMER INTEGRITY FUNDS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Peter George Koclanes**
  pkoclanes@shermanhoward.com

- **Aaron Michael Sheanin**
  amv@girardgibbs.com

- **Christina H.C. Sharp**
  chc@girardgibbs.com

- **Gordon W. Netzorg**
  gnetzorg@shermanhoward.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com

- **Regina Ames Sandler**
  ras@girardgibbs.com

- **Stephen D. Bunch**
  dbunch@cohenmilstein.com

- **Steven J. Toll**
  stoll@cohenmilstein.com

- **Charles Walter Lilley**
  clilley@lilleylaw.com

- **Karen Jean Cody-Hopkins**
  kjch@lilleylaw.com

- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com

- **Robert J. Dyer, III**
  bob@dyerberens.com

- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com

- **Daniel Charles Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **Dale R. Harris**
  dale.harris@dgslaw.com,patricia.henson@dgslaw.com

- **Christopher J. Keller**
  ckeller@labaton.com,ejo@labaton.com,aellman@labaton.com,electroniccasefilin
  g@labaton.com

- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,reginald.zeigler@dech
  ert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@de
  chert.com

- **Robert Nolen Miller**
  rmiller@perkinscoie.com

- **Stephanie E. Dunn**
  sdunn@perkinscoie.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com,lisa@shumanlawfirm.com

/s/ Peter G. Rush
Peter G. Rush
K&L GATES LLP
70 W. Madison Street
Suite 3100
Chicago, IL 60602
312.372.1121
peter.rush@klgates.com