**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Judge John L. Kane**


Civil Action No. **09-cv-1186-JLK-KMT**


**IN RE: CORE BOND FUND**

---

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

---

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... iii

I.    INTRODUCTION ....................................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................ 3

       A.   The Fund and Its Stated Investment Strategy. ...................................................3

       B.   The Fund Abandons Its Stated Investment Strategies and Dramatically Enhances
             Its Risk Profile. ................................................................................................3

             1.   The Fund's Excessive Investments in Total-Return Swaps. ................................. 4

             2.   The Fund's Excessive Investments in Credit-Default Swaps. ............................... 4

             3.   The Fund's Excessive Investments in Risky Mortgage-Backed Securities. ........... 5

       C.   The Fund Exacerbates Its Enhanced Risk Exposure Through Leveraging......................6

       D.   The Fund Lacked Internal Controls Over Risk Management. .........................................7

       E.   The Fund's Massive Losses. ..........................................................................................8

       F.   Defendants' Inadequate Disclosures. ..............................................................................9

III.  ARGUMENT ................................................................................................................ 10

       A.   Pleading Standards. .......................................................................................................10

       B.   Plaintiff Alleges Material Misstatements and Omissions Under Sections 11 and
             12(a)(2)..........................................................................................................................11

             1.   The Offering Documents Were Not Accompanied By Meaningful Risk
                  Disclosures. .......................................................................................................... 13

             2.   Defendants' Statements About the Fund's Investment Strategies and
                  Policies Were Materially Misleading................................................................... 25

             3.   Lead Plaintiff's Allegations Show that Reasonable Investors Actually *Were*
                  Misled................................................................................................................... 31

             4.   Lead Plaintiff's Claims Do Not Sound in Corporate Mismanagement................. 32

       5.    Lead Plaintiff's Allegations About the Fund's Inadequate Internal Controls Are Sufficient to State a Claim for Violations of Sections 11 and 12. ................ 34

    C.    Defendants Are Liable Under Section 12(a)(2) as "Sellers." ........................................36

    D.    Defendants Are Liable Under Section 15 as "Control Persons."...................................39

    E.    Lead Plaintiff Has No Duty To Plead Loss Causation And Defendants Cannot Establish Negative Causation..........................................................................................42

    F.    The Statute of Limitations Does Not Preclude Lead Plaintiff's Claims ......................46

    G.    Standing is More Appropriately Addressed at Class Certification ...............................49

IV.  CONCLUSION.............................................................................................................. 50

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004)......................................................................................43

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003)................................................................................39

*Akerman v. Oryx Commc'ns*,
   609 F. Supp. 363 (S.D.N.Y. Sept. 18, 1984)...........................................................46

*In re Alstom SA Secs. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005).....................................................................41

*In re Am. Business Fin. Servs., Inc. Sec. Litig.*,
   2007 U.S. Dist. LEXIS 932 (E.D. Pa. Jan. 9, 2007) ...............................................35

*In re Am. Continental Corp./Lincoln Sav. and Loan Sec. Litig.*,
   794 F. Supp. 1424 (D. Ariz. 1992)......................................................................49 50

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662, 675 (D. Colo. 2007) ..............................................................33

*Anixter v. Home-Stake Prod. Co.*,
   977 F.2d 1549 (10th Cir. 1992)................................................................................48

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .............................................................11

*Ballan v. Wilfred Am. Educ. Corp.*,
   720 F. Supp. 241 (E.D.N.Y. 1989) .........................................................................35

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).................................................................................................12

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................11

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008)....................................................................................16

iii

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2nd Cir. 2001).................................................................45

*Batwin v. Occam Networks, Inc.*,
2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) ........................40

*California Public Employees' Retirement Sys. v. Chubb Corp.*,
2002 WL 33934282 (D. N.J. June. 26, 2002) ........................................48

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009) ..................................................... *passim*

*In re Convergent Techs. Sec. Litig.*,
108 F.R.D. 328 (N.D. Cal. 1985) ...........................................................42

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*,
2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ...................................17, 25

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882(C.D. Cal. Jul. 21, 2005) ..........................................50

*DeBruyne v. Equitable Life Assurance Soc'y*,
920 F.2d 457 (7th Cir. 1990)...........................................................48, 49

*Eckstein v. Balcor Film Investors*,
8 F.3d 1121 (7th Cir.1993)......................................................................16

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
305 F. Supp. 2d 658 (E.D. Tex. 2004) ..............................................38, 39

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
2004 WL 405886 (S.D. Tex. Feb. 25, 2004) .........................................50

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008).................................................35, 36

*Garcia v. Eidal Int'l Corp.*,
808 F.2d 717 (10th Cir. 1986)................................................................10

*In re Giant Interactive Group, Inc. Sec. Litig.*,
643 F. Supp. 2d 562 (S.D.N.Y. 2009)...............................................17, 43

*In re Global Crossing, Ltd. Sec. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003)....................................................49

*Goldman v. Belden,*
     754 F.2d 1059 (2d Cir. 1985)..................................................................12, 13

*Grossman v. Novell, Inc.,*
     120 F.3d 1112 (10th Cir. 1997)........................................................14, 25, 29

*Gustafson v. Alloyd Co., Inc.,*
     513 U.S. 561, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995) .........................12

*Herman & MacLean v. Huddleston,*
     459 U.S. 375 (1983) ................................................................................11

*Hevesi v. Citigroup Inc.,*
     366 F.3d 70 (2d Cir. 2004)......................................................................50

*Holtzman v. Proctor, Co.,*
     528 F. Supp. 9 (D. Mass. 1981) ..............................................................19

*Howard v. Everex Sys., Inc.,,*
     228 F.3d 1057 (9th Cir. 2000)...........................................................41, 42

*Kaplan v. Rose,*
     49 F.3d 1363 (9th Cir. 1994)...................................................................41

*Koke v. Stifel, Nicolaus & Co.,*
     620 F.2d 1344 (8th Cir. 1908)..................................................................19

*Krouner v. The American Heritage Fund, Inc.,*
     1996 U.S. Dist. LEXIS 9783 (S.D.N.Y. July 15, 1996) ...................21, 31

*In re LDK Solar Sec. Litig.,,*
     2008 U.S. Dist. LEXIS 80717 (N.D. Cal. Sept. 24, 2008) ................40, 41

*Lentell v. Merrill Lynch & Co. Inc.,*
     396 F.3d 161 (2d Cir. 2005).....................................................................45

*Maher v.  Durango Metals, Inc.,*
     144 F.3d 1302 (10th Cir. 1998)..........................................................37, 42

*McMahon & Co. v. Wherehouse Entm't, Inc.,*
     900 F.2d 576 (2d Cir. 1990).....................................................................26

*Mellette v. Branch,*
     2009 WL 651142 (D. Colo. Mar. 12, 2009) ...........................................49

*In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.,*
   289 F. Supp. 2d 429 (S.D.N.Y. 2003) ............................................................45, 46

*In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.,*
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ....................................................................43

*Miller v. Thane Int'l, Inc.,*
   519 F.3d 879 (9th Cir. 2008) ..................................................................................12

*In re Nat'l Golf Props., Inc. Sec. Litig.,*
   2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ......................................................37

*N.J. v. Sprint Corp.,*
   314 F. Supp. 2d 1119 (D. Kan. 2004) ....................................................................41

*Olcott v. Delaware Flood Co.,*
   76 F.3d 1538 (10th Cir. 1996) ................................................................................50

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) ....................................................................42

*Pinter v. Dahl,*
   486 U.S. 622 (1988) ...............................................................................................37

*Piper Acceptance Corp. v. Slaughter*
   600 F. Supp. 169 (D. Colo. 1985) ..........................................................................48

*In re Qwest Commc'ns Intern., Inc. Sec. Litig.,*
   387 F. Supp. 2d 1130 (D. Colo. 2005) ..............................................................40, 45

*In re Real Estate Assoc. Ltd. P'ship Litig.,*
   223 F. Supp. 2d 1109 (C.D. Cal. 2002) ..................................................................21

*In re Rent-Way Secs. Litig.,*
   209 F. Supp. 2d 493 (W.D. Pa. 2002) ....................................................................41

*Rodney v. KPMG Peat Marwick,*
   143 F.3d 1140 (8th Cir. 1998) ..........................................................................18, 31

*In re Salomon Smith Barney Mutual Fund Fees Litig.,*
   441 F. Supp. 2d 579 (S.D.N.Y. Jul. 26, 2006) ......................................................44

*Santa Fe Indus., Inc. v. Green,*
   430 U.S. 462 (1977) ......................................................................................33, 34, 35

*Schaffer v. Evolving Sys., Inc.*,
   29 F. Supp. 2d 1213 (D. Colo. 1998) ...................................................................40

*Schwartz v. Celestial Seasonings*,
   124 F.3d 1246 (10th Cir. 1997).................................................................12, 13

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992).........................................................................36

*SEC v. Mozilo*,
   2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ...........................................21, 49

*SEC v. Wolfson*,
   539 F.3d 1249 (10th Cir. 2008).........................................................................12

*Siemers v. Wells Fargo & Co.*,
   2006 WL 2355411 (N.D. Cal. Aug. 14, 2006)...........................................41, 44

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009)........................................................................18

*In re Sirrom Capital Corp. Secs. Litig.*,
   84 F. Supp. 2d 933 (M.D. Tenn. 1999) ..........................................................39

*Sterlin v. Biomune Sys.*,
   154 F.3d 1191 (10th Cir. 1998).......................................................................49

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)...........................................................................12

*Tabankin v. Kemper Short-Term Global Income Fund*,
   1994 WL 30541 (N.D. Ill. Feb. 1, 1994) .......................................................32

*In re TCW/DW North Am. Gov't Income Trust Sec. Litig.*,
   1997 U.S. Dist. LEXIS 18485 (S.D.N.Y. Nov. 20, 1997) ...........................19, 23, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................11

*TSC Indus. v. Northway*,
   426 U.S. 438 (1976).......................................................................................13

*In re Tyco Int'l, Ltd.*,
   2004 WL 2348315 (D.N.H. Oct. 14, 2004) .....................................................34

*Warman v. Overland Data*,
    1998 WL 110018 (S.D. Cal. Feb. 20, 1998) ..................................................39

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996).......................................................................40

*White v. Heartland High-Yield Municipal Bond Fund*,
    237 F. Supp. 2d 982 (E.D. Wis. 2002)...............................................16, 31

*In re Williams Sec. Litig.*,
    558 F.3d 1130 (10th Cir. 2009)................................................................48

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. May 19, 2003) .....................................50

*Yuan v. Bayard Drilling Techs., Inc.*,
    96 F. Supp. 2d 1259 (W.D. Okla. 1999) ..........................................12, 13

## RULES AND STATUTES

Fed. R. Civ. P. 8(a) ............................................................................................12

Fed. R. Civ. P. 12(b)(6).....................................................................................11

15 U.S.C. § 77(l)..........................................................................................13, 45

15 U.S.C. § 77(k) ...............................................................................................45

15 U.S.C. § 77(m)........................................................................................49, 50

15 U.S.C.§ 77(o) ................................................................................................41

17 C.F.R. § 230.405...........................................................................................44

Lead Plaintiff, Dr. C. Phillip Pattison, respectfully submits this memorandum of law in opposition to the motions to dismiss filed by defendants: (i) OppenheimerFunds, Inc. ("OFI"), OppenheimerFunds Distributor, Inc. ("OFDI"), John V. Murphy, and Brian W. Wixted (collectively, the "Oppenheimer Defendants");[1] and (ii) William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone, F. William Marshall, Jr. (collectively, the "Trustee Defendants"), and Oppenheimer Integrity Funds ("OIF") (all defendants collectively referred to as "Defendants").[2]

## I.     INTRODUCTION

On December 17, 2008, a *Morningstar* article entitled "Oppenheimer Bond Funds Missed the Forest Fire for the Trees," summarized this case as follows:

> I'm sorry to be glib, but this strains credulity.  Here's a news flash, Oppenheimer:  If your funds are going to use instruments that involve this much portfolio complexity, you have a duty to translate and simplify what that means for shareholders.  Not doing so is patently unacceptable and comes awfully close to dishonesty by omission.

Notwithstanding Defendants' 70 pages of combined briefing and 1,125 pages of exhibits, this is a very simple case.  The Defendants, throughout the Relevant Time Period,[3] represented the Oppenheimer Core Bond Fund (the "Fund") as a vehicle that would (i) invest "at least 80% of its net assets" in investment-grade debt securities, (ii) focus primarily on "U.S. government securities and investment-grade debt securities," and (iii) seek a "broadly diversified portfolio" of investments to "help reduce the volatility" of the Funds share price.   Defendants'

---

[1] The Oppenheimer Defendants filed a memorandum of law in support of their motion to dismiss on December 3, 2009 [Dkt. No. 78], referred to herein as "Oppenheimer Br."

[2] The Trustee Defendants and OIF filed a memorandum of law in support of their motion to dismiss on December 3, 2009 [Dkt. No. 79], referred to herein as "Trustees' Br."

[3] April 30, 2007 to December 31, 2008.  CCAC ¶ 91.

representations, touting these attributes, led investors to believe that the Core Bond Fund was a safe, stable investment that involved minimal risk exposure. Instead of adhering to these principles, however, Defendants proceeded to transform the Fund into a *de facto* hedge fund[4] through complex, highly-leveraged, off-balance sheet derivative transactions that dramatically enhanced the Core Bond Fund's risk exposure. Defendants' wrongful manipulation of the Fund ultimately caused investors to suffer extraordinary losses totaling hundreds of millions, if not billions, of dollars when the enhanced, yet undisclosed, risks materialized. Indeed, Defendant OFI already has settled lawsuits with the states of Oregon, New Mexico, and Illinois for well-over $150 million based on allegations substantially similar to those set forth in this action.[5]

Faced with these simple facts, the Defendants attack Lead Plaintiff's claims by attempting to radically alter the pleading requirements under Rule 8(a) and purport to rewrite the standards for establishing a *prima facie* case under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"). In doing so, Defendants repeatedly cite securities fraud cases brought under the Securities Exchange Act of 1934 (the "Exchange Act") and seemingly insist that Lead Plaintiff meet the pleading standards set forth under Rule 9(b). Defendants' arguments are without merit and should be rejected. Lead Plaintiff's Consolidated Class Action Complaint ("Complaint" or "CCAC") more than adequately states claims under the Securities Act.

---

[4] A hedge fund is a flexible investment fund for large investors (usually a $1 million minimum investment) that uses high-risk techniques (not allowed for mutual funds) such as short-selling and heavy leveraging. *See* http://www.thefreedictionary.com/hedge+fund (last visited on January 18, 2010).

[5] Defendant OFI is actively involved in settlement discussions with numerous other states including Maine, Nebraska, and Texas.

## II.     STATEMENT OF FACTS

### A.     The Fund and Its Stated Investment Strategy.

In accordance with the name "Core" Bond Fund, Defendants, throughout the Relevant Time Period, actively marketed and sold the Fund as a "broadly diversified portfolio of investment-grade corporate and government bonds designed to seek total return and reduce share price volatility." CCAC ¶ 2.  In order to ensure diversification and minimize risk, the Fund represented that it: (i) would not concentrate more than 25% of its investments in a "single industry;" and (ii) would not "borrow" more than one-third (33 1/3%) of total assets.  CCAC ¶¶ 46-47.  Prior to 2007, it appears that the Fund adhered to its stated investment strategy and policies.

The Fund, first offered in 1988, has five classes of shares outstanding.  CCAC ¶ 1.  The term "core," when used to describe a mutual fund, refers to a foundational or "prime" investment in a certain class of asset (*i.e.*, bonds) that provides significant diversification within that class. CCAC ¶ 43.  Moreover, according to the *Morningstar Guide to Mutual Funds: Five Star Strategies for Success*, core funds "tend to be reliable year in and year out," and although they will not usually deliver "eye-popping gains," they are not "likely to be terrible, either," providing a "portfolio with a solid foundation."  CCAC ¶ 43.

### B.     The Fund Abandons Its Stated Investment Strategies and Dramatically Enhances Its Risk Profile.

In 2007 and 2008, however, and without adequate disclosure to its investors, the Fund altered its investment policies and began significantly increasing its positions in highly leveraged, illiquid, off-balance sheet derivatives in the hopes of achieving higher returns.  CCAC ¶ 50.  In effect, the Fund became a *de facto* hedge fund by investing heavily in "extraordinarily

risky" mortgage-backed securities, credit-default swaps, and total-return swaps. *Id*. By investing in these risky securities, the Fund violated its fundamental principles and numerous direct representations in its Offering Documents[6] concerning Fund concentration and borrowing. *e.g.* CCAC ¶¶ 5, 49

### 1.     The Fund's Excessive Investments in Total-Return Swaps.

Total-return swaps are speculative, highly illiquid, and complex agreements between parties to exchange cash flows in the future based on how a set of securities or a particular index performs.  CCAC ¶ 57.  During the Relevant Time Period, the Fund dramatically increased the volume of its total-return swap transactions and exposed its investors to vastly increased, but undisclosed risk.  *Id*.  For example, in the first quarter of 2007, the Fund's total-return swap transactions amounted to about $15,000 but reached a high during the Relevant Time Period of nearly $8 million during the same quarter in 2008.  CCAC ¶ 58.  Indeed, during the last four quarters of the Relevant Time Period, the Fund's total-return swap transactions averaged nearly $7 million per quarter, or a nearly 50,000% increase over the first quarter of 2007.  *Id*.

### 2.     The Fund's Excessive Investments in Credit-Default Swaps.

Credit-default swaps are essentially insurance contracts that insure against the default on debt securities such as corporate bonds.  CCAC ¶ 60.  In a credit default swap, two parties enter into a private contract whereby the buyer of the protection agrees to pay the seller premiums over a set period of time.  *Id*.  In exchange, the seller agrees to pay the buyer in the event a particular pre-defined credit event occurs, such as a default on the underlying security.  *Id*.

---

[6] "Offering Documents" refers to the Fund's Registration Statements, Prospectus Materials, Statements of Additional Information, and Annual Reports referenced in paragraphs 39 through 41 in the Complaint.

As with total-return swaps, the Fund significantly increased the volume of its credit-default swap transactions during the Relevant Time Period, but not as a buyer of credit protection to hedge existing holdings, but as a seller, essentially writing insurance on corporate bonds in search of higher investment returns. CCAC ¶¶ 61, 64. For example, in the first quarter of 2007, the Fund's credit-default swap transactions amounted to about $100 million and reached a high during the Relevant Time Period of nearly $900 million (a roughly 900% increase), during the second quarter of 2008. *Id.* Indeed, during the last six quarters of the Relevant Time Period, the Fund's credit-default swap transactions averaged well-over $650 million per quarter, or a 650% increase over the first quarter of 2007. *Id.* As the seller in these transactions, the Fund dramatically enhanced its risk exposure to its corporate bond holdings, thereby doubling or tripling its exposure to the credit-worthiness of those issuers. CCAC ¶ 62. In other words, if the issuer of one of its bond holdings went into default, not only would the Fund lose the value of the bonds it currently held, it would also be responsible for making payments to other holders of those same bonds who had purchased the credit protection sold by the Fund. *Id.*

### 3. The Fund's Excessive Investments in Risky Mortgage-Backed Securities.

Mortgage-backed securities are bonds backed by pools of mortgage loans that can be riskier than most other fixed income assets due to their complex structure and multiple risk sources, including not only interest rate risk but also prepayment risk, default risk, and liquidity risk. CCAC ¶ 51. Despite the overall crisis in the real estate market that began in 2007 and accelerated in 2008, the Fund's positions in mortgage-backed securities during the Relevant Time Period amounted to more than 50% of its net assets, including 64.2% on the last day of the Relevant Time Period. CCAC ¶¶ 52, 54. Particularly, its investments in commercial mortgage-

backed securities significantly increased when the market was suffering a significant widening of spreads, peaking at 39% of its net assets for the period ending June 30, 2008.  CCAC ¶¶ 54, 57. These concentrations in mortgage-backed securities exceeded the Fund's limitation of investing no more than 25% of its assets in any one industry.  CCAC ¶ 56.

In addition to increasing its concentrations in commercial mortgage-backed securities, the Fund invested heavily in total-return swaps tied to commercial real estate indices.  CCAC ¶ 57. This, in effect, "doubled-down" the Fund's investments in the commercial real estate sector.  *Id*. Therefore, any downturn in the commercial real estate market (which eventually materialized) would exponentially impact the Fund through its heavy investment in this sector.  This enhanced risk was not disclosed.

### C.    The Fund Exacerbates Its Enhanced Risk Exposure Through Leveraging.

In addition to amplifying the Fund's risk exposure to particular markets through the use of various swap transactions, the swap transactions themselves exacerbated this enhanced undisclosed risk through leveraging the Fund's assets.  CCAC ¶ 66.  "Leverage" refers to the utilization of "borrowed" money.  *Id*.  The use of leverage can increase returns when values rise but also exacerbate losses when values decline.  *Id*.  Here, by investing heavily in various swap transactions, the Fund was effectively insuring the performance of billions of dollars in risky derivative securities that the Fund did not own, in direct violation of its 33 1/3% borrowing limit.

The staggering magnitude of this leverage is demonstrated by comparing leverage values to the value of the Fund's total net assets under management.  CCAC ¶ 68.  For example, in

December 2007, when the Fund had $2.1 billion in assets, the net notional value[7] of leverage was just over $1 billion.  *Id*.  By December 2008, however, the net notional value of leverage was almost $2 billion, greatly exceeding net Fund assets of $1.474 billion and adding numerous layers of undisclosed risk.  *Id*.  In other words, in December 2008, when Fund assets totaled about $1.5 billion, the Fund was not permitted to borrow more than $500 million (or 33 1/3% of $1.5 billion), yet this borrowing cap was exceeded by $1.5 billion.

The Fund's leverage position not only violated the Fund's stated investment strategy of "a broadly diversified portfolio of corporate and government bonds managed to reduce share price volatility," but also the Fund's specific representation that it would not "borrow" more than one-third of the value of its net assets.  CCAC ¶¶ 69-70.  Indeed, at least one Fund manager admitted that the Fund became "greedy" through its use of leverage to make bets on the riskiest derivatives available.  CCAC ¶¶ 71-72.

### D.      The Fund Lacked Internal Controls Over Risk Management.

The Fund had inadequate internal controls to monitor the extreme risks that the Fund managers were taking, but even the Fund's meager controls indicated that the managers were assuming excessive risk in violation of the Fund's strategies and guidelines.  CCAC ¶ 74.  In April 2008, the Fund's internal risk profile indicated that it was positioned to achieve inordinately high excess returns compared to its benchmark, the Barclay's Capital Aggregate Bond Index.  CCAC ¶ 75.  The so-called "Core Plus" strategy that was used to manage the Fund set an *ex ante* target for excess return over the benchmark of between 100 to 125 basis points, or 1 percent to 1.25%.  *Id*.  As early as April 1, 2008, however, the composition of the Fund was

---

[7] "Notional value" means the total value of a leveraged position's exposure.

such that prospective excess return over the benchmark was already forecast to be 1,058 basis points or 10.58%, well in excess of the Fund's own internal guidelines, and an extraordinary level of risk and deviation from the benchmark index. *Id*. Of course, Defendants never disclosed that the Fund was taking enormous risks in an effort to generate additional returns of almost 10 times the excess return it represented to investors. *Id*.

Instead, in an effort to give the Fund leeway to ratchet-up its already extraordinary risk exposure, the Fund simply changed the metric it used to calculate risk. CCAC ¶ 78. Under the Fund's historical metric, as of April 8, 2008, the Fund's investments placed it 21% over its risk budget. CCAC ¶ 77. Upon instituting the new metric, however, the Fund's same investments placed it 31% below the risk budget. CCAC ¶ 78. Moreover, instead of the Fund's internal risk controls being used to curtail risk, Defendants used the controls to further enhance the Fund's risk profile once prior risk limits had been met. Needless to say, Defendants never disclosed to investors that the Fund had abandoned its historical metric used to assess risk in order to further enhance the Fund's risk exposure. *Id*.

E.     **The Fund's Massive Losses.**

Defendants' misstatements and omissions concerning the Fund's true objective and strategy resulted in hundreds-of-millions of investor dollars pouring into the Fund, but these same misrepresentations ultimately resulted in investors suffering staggering losses in net asset value. CCAC ¶¶ 81-82. In 2008, the Fund experienced a 35.8% drop in net asset value. CCAC ¶ 83. The magnitude of this drop was not the result of a downtrend in the market, but a direct result of the materialization of the risks that were not disclosed by Defendants through their misstatements and omissions of material fact. CCAC ¶ 84. For context, the Fund's performance

was 31% worse than the typical intermediate-term bond fund.  CCAC ¶ 85.  Indeed, the Fund's

benchmark index actually rose 5.24% in 2008.  *Id*.

**F.      Defendants' Inadequate Disclosures.**

The Fund's investment decisions were dramatically at odds with Defendants'

representations that the Fund was a broadly diversified portfolio of investment-grade corporate

and government bonds designed to seek total return and reduce share price volatility.  CCAC ¶

79.  Although Defendants made boilerplate disclosures about the risk and volatility of derivative

transactions, such disclosures were wholly inadequate to completely and properly inform

investors of the greatly enhanced risk the Fund undertook.  CCAC ¶ 80.  Indeed, many of the

riskiest investments were off-balance sheet transactions for which the true risk, especially as

compounded by leverage, could not be ascertained by ordinary investors.  CCAC ¶ 72.

The inadequacy of the Fund's risk disclosures to investors is evidenced by the numerous

reports from *Morningstar* (the preeminent mutual fund reporting company in the U.S.) analysts

that followed the Fund:

> [I]t's unacceptable that [Oppenheimer] hasn't ***more clearly communicated
> the fund's exposure to various sectors and risks in shareholder reports
> and web commentary***.

CCAC ¶ 88 (December 17, 2008) (emphasis added);

> By the end of March, the Core portfolio carried around $400 million in
> securities exceeding its (then) $2.2 billion in net assets via transactions
> that were effectively akin to margin borrowing.  It also had roughly $800
> million in long exposure to corporate credit via default swaps … and
> around $600 million in total return swap exposure to a volatile slice of
> Barclays' AAA rated CMBS index …. Core Bond's credit exposure to
> those various markets totaled more than 180% of net assets on a dollar
> basis.

Because most of the additional market exposure came from off-balance-sheet derivatives, ***the funds' portfolios didn't look highly leveraged***.

The only thing worse than leveraging up a portfolio with 180% market exposure, though, ***is doing it quietly***. … ***I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way*** … none of the portfolio descriptors provides enough information to estimate those market exposures, much less know that they're not typical, 100 cents in, 100 cents invested. ***There's just no indication whatsoever that anything is unusual about any of the funds that employ this kind of leveraged exposure***. ***And it was never brought up by Oppenheimer managers in any of their recent Morningstar analyst interviews***.

CCAC ¶ 89 (December 17, 2008) (emphasis added);

In 2008, … Core Bond declined 36%, primarily because the bond funds took on plenty of risk. Specifically, the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect on the funds. When the market for both bonds and the derivatives became increasingly illiquid as the credit crisis unfolded, the funds got slammed. ***Not only did the managers fail to appreciate the risks they were taking, but Oppenheimer also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary***.

CCAC ¶ 90 (February 5, 2009) (emphasis added).

## III.   ARGUMENT

### A.   Pleading Standards.

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the pleadings should be liberally construed, all well-pleaded factual allegations must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Garcia v. Eidal Int'l Corp.*, 808 F.2d 717, 719 (10th Cir. 1986). The court also "must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

A court may not dismiss the complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell*, 550 U.S. at 570).

Securities Act claims that are grounded in negligence are subject only to the liberal notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (Rule 8 applies to Sections 11 and 12(a)(2) claims that are not grounded in fraud).

Taking Lead Plaintiff's allegations as true and drawing all reasonable inferences in his favor, the Complaint sets forth a plausible claim to relief. Accordingly, Lead Plaintiff has satisfied the pleading requirements of Rule 8(a) and Defendants' motions to dismiss should be denied.

### B.  Plaintiff Alleges Material Misstatements and Omissions Under Sections 11 and 12(a)(2).

"When alleging a violation of Section 11, a plaintiff who 'purchased a security issued pursuant to a registration statement . . . need only show a material misstatement or omission to establish [a] prima facie case." *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1251 (10th Cir. 1997) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983) (footnote omitted)). Similarly, Section 12(a)(2) provides a cause of action to a purchaser of a security against one who offers or sells a security "by means of a prospectus or

11

oral communication" for misrepresentations or omissions of a material fact.  15 U.S.C. § 77l; *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995).  Both Sections 11 and 12(a)(2) provide for absolute liability, even for innocent misstatements. *Schwartz*, 124 F.3d at 1251 (Section 11 liability "is virtually absolute"); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("Section 12(a)(2) is a virtually absolute liability provision").

"A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information significant when making an investment decision."  *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); *Yuan v. Bayard Drilling Techs., Inc.*, 96 F. Supp. 2d 1259, 1266 (W.D. Okla. 1999) ("A misrepresentation of a fact is material under sections 11 and 12(a)(2) when an investor would attach importance to it in making an investment decision.").

The materiality of a misrepresentation is a mixed question of law and fact that under most circumstances should be determined by the trier of fact.  *TSC Indus. v. Northway*, 426 U.S. 438, 450 (1976) ("The issue of materiality may be characterized as a mixed question of law and fact. …  The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.").  "[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Goldman v. Belden*, 754

F.2d 1059, 1067 (2d Cir. 1985).   When determining whether a statement is material, courts should "adopt[] the perspective of an investor on the date the registration statement containing the prospectus at issue became effective."   *Yuan*, 96 F. Supp. 2d at 1266 (internal quotations and citations omitted).

For the reasons that follow, the Fund's failure to disclose the magnitude of the portfolio's risk profile created by the Fund's enormous investments in mortgage-backed securities and swap transactions, as well as its violations of its stated investment strategies and multiple false representations that the Fund's primary objective would not involve "undue risk," would be material to a reasonable investor's decision to purchase shares in the Fund.   Accordingly, Defendants' motions to dismiss Lead Plaintiff's Sections 11 and 12(a)(2) claims should be denied.

**1.     The Offering Documents Were Not Accompanied By Meaningful Risk Disclosures.[8]**

In moving to dismiss Lead Plaintiff's claims, Defendants do nothing more than erect a "strawman" to challenge the essence of Lead Plaintiff's allegations that Defendants failed to disclose the enhanced risks created by the Fund's investments in mortgage-backed securities, credit default swaps, and total return swaps in violation of various investment policies of the Fund.   In doing so, Defendants argue that the Fund's disclosure materials are replete with lists of the Fund's investments in mortgage-backed securities and swap transactions, which would have alerted a reasonable investor to the risk profile of the Fund's portfolio.   This strawman argument

---

[8] The Oppenheimer Defendants' begin their brief by arguing that Plaintiff's claims are barred by the statute of limitations, but because this assertion is inextricably tied to Defendants' purported disclosures, Plaintiff will first address the inadequacy of those disclosures.   The statute of limitation argument is addressed in Section III.F., *infra*.

must fail.  Defendants ignore the essential allegations of Lead Plaintiff's claims *that Defendants failed to disclose the enormously enhanced risk that was created as a result of the sheer volume of the Fund's investments in mortgage-backed securities and swaps* – not the plain and simple fact that the Fund's portfolio contained these types of investments.

> **(a)    Defendants' disclosures concerning credit default and total return swaps were inadequate and failed to alert investors to the heightened risk exposure of the fund due to leverage.**

A risk disclosure is insufficient to support a motion to dismiss where the disclosure does not specifically relate to the plaintiff's claims.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997) (not every risk disclosure will be sufficient to immunize statements relating to the disclosures; rather, 'the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions … which the plaintiffs challenge.'").

Defendants identify several statements that they argue sufficiently warned investors of the risks associated with its swap transactions.  *See* Oppenheimer Br., Appendices A-3, A-4, A-5, and A-6.[9]   For example, Defendants rely on disclosures about derivatives generally (Oppenheimer Br. at 21) and statements that explain what credit default and total-return swaps are and the difference between buying and selling credit protection (Oppenheimer Br. at 19-21). Defendants also argue that the following disclosures were sufficiently specific to warn investors of the risky nature of those investments:

> Credit default swaps are subject to counterparty credit risk (if the counterparty fails to meet its obligations). They are subject to the risk that

---

[9] The Trustee Defendants and OIF incorporate by reference Section I of the memorandum of law filed by the Oppenheimer Defendants regarding disclosure of the nature, magnitude and risks of the Fund's investments.  Trustees' Br. at 19.  For simplicity, Plaintiff will cite only to the memorandum of law filed by the Oppenheimer Defendants on this issue.

the Fund will not properly assess the cost of the instrument. If the Fund is selling credit protection, there is a risk that a credit event will occur and that the Fund will have to pay par value on defaulted bonds. If the Fund is buying credit protection, there is a risk that no credit event will occur and the Fund will receive no benefit for the premium paid.

*** 

The primary risks associated with total return swaps are credit risks (if the counterparty fails to meet its obligations) and market risk (if there is no liquid market for the agreement or unfavorable changes occur in the reference asset).

Oppenheimer Br. at 21-22.

With respect to the leveraging effect of swaps, Defendants note that several Offering Documents state the following:

INVESTMENTS WITH OFF BALANCE SHEET RISK. The Fund enters into financial instrument transactions (such as swaps, futures, options and other derivatives) that *may* have off-balance sheet market risk. Off-balance sheet market risk exists when the maximum potential loss on a particular financial instrument is greater than the value of such financial instrument, as reflected in the Fund's Statement of Assets and Liabilities ….

Oppenheimer Br. at 23. Similarly, the April 2008 Prospectus states:

Derivatives also present the risk of leverage. Leverage exists when an investor achieves the right to a return on a total investment amount that exceeds the cash amount the investor contributed in making the investment. The Fund's use of certain economically leveraged derivatives can result in a loss substantially greater than the amount invested in the derivative itself. Certain derivatives have the potential for unlimited loss, regardless of the size of the initial investment. When the Fund uses derivatives for leverage, a shareholder's investment in the Fund will tend to be more volatile, resulting in larger gains or losses in response to the fluctuating prices of the Fund's investments ….

April 2008 Prospectus at 6.

Defendants contend that these disclosures, as well as the notional amounts of the individual swap transactions, fully disclosed the risks of swaps and their leveraging effect, and

15

that they could create off-balance sheet risk.   Oppenheimer Br. at 21-25, 38.   Defendants'
argument, which tellingly fails to cite relevant legal authority, should be rejected for several
reasons.

First, these risk disclosures are simply generic statements that are not sufficiently tailored
to inform Fund investors of the aggregate risk exposure of the Fund.   Indeed, they are no more
than boilerplate descriptions that are inadequate to support a motion to dismiss.   *See White v.
Heartland High-Yield Municipal Bond Fund*, 237 F. Supp. 2d  982, 986 (E.D. Wis. 2002)
("boilerplate language which warns generally that 'junk bonds' involve greater risks and limited
liquidity … are inadequate to support a motion to dismiss").

Second, a table that itemizes the notional amounts of individual swap transactions and a
general disclosure that those transactions *may* have off-balance sheet risk does not warn
investors that those investments did in fact have off-balance sheet risk at the time of the
offerings, and that these risks negated representations that the Fund was a "broadly diversified
portfolio of investment-grade corporate and government bonds designed to seek total return and
reduce share price volatility."   Once a defendant chooses to disclose a risk, it assumes a duty to
disclose all material information about that risk, including whether the risk has come to fruition.
*See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009) (reversing district
court's dismissal of Complaint where defendant's disclosure about the risks of product liability
claims did not disclose that the risk "may already have come to fruition."); *Berson v. Applied
Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ("once defendants chose to tout the company's
backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that
backlog consisted of"); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A

16

prospectus stating a risk that such thing could happen is a far cry from one stating that this had happened.  The former does not put an investor on notice of the latter.").   While the Fund disclosed that the maximum potential loss on a particular financial instrument *could be greater* than the value of that financial instrument as a result of a swap transaction, the Fund failed to disclose that, at the time of the offerings, the risk already had come to fruition, *i.e.* the Fund was already heavily leveraged up to more than two times the total value of its net assets.  CCAC ¶ 68.  As *Morningstar* reported on December 17, 2008, "I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way."  CCAC ¶ 89.

Third, "warnings of specific risks … do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the ***magnitude*** of the risks described."  *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99-12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001) (emphasis added); *Rodney v. KPMG Peat Marwick*, 143 F.3d 1140, 1145 (8th Cir. 1998) (defendant's cautionary statement fails to alert investors to the heightened extension risk posed by inverse floating collateralized mortgage obligations); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009) (motion to dismiss Sections 11 and 12(a)(2) claims denied where defendants disclosed the effect of gold farming generally but failed to disclose the scope and impact of its gold farming).  Defendants' disclosure that "leveraged derivatives can result in a loss substantially greater than the amount invested in the derivative itself" and "[w]hen the Fund uses derivatives for leverage, a shareholder's investment in the Fund will tend to be more volatile, resulting in larger … losses" did not warn investors of the ***magnitude*** of the Fund's overall leverage position (i.e. the total dollar amount of

potential losses compared to the Fund's total net assets), which at the time of the offerings far exceeded the dollar value of the total net assets of the Fund.  *See* CCAC ¶ 68.

Lead Plaintiff specifically alleges that the "***magnitude*** and risky nature of these high-risk [credit default swaps and other high-risk derivative instruments] were never disclosed to shareholders" (CCAC ¶¶ 5) and the Fund "failed to disclose the ***material levels of leverage*** within the portfolio that resulted from these excessive derivative bets."  CCAC ¶¶ 67-68.

A reasonable investor in a "core" bond fund with purportedly relatively low risk would have considered significant to their investment decision the fact that the Fund's derivative securities were leveraged to an amount in excess of the net value of the Fund's assets, and thus the potential for the Fund to suffer a financial loss that far exceeded its net worth.  *See In re TCW/DW North American Government Income Trust Sec. Litig.*, No. 95-0167, 1997 U.S. Dist. LEXIS 18485, at *19 (S.D.N.Y. Nov. 20, 1997) ("while the prospectus's disclosures, understood together, clearly and accurately depict the type of risk borne by the Fund, a reasonable investor could find both that the prospectus failed to disclose the extent of the risk and that this failure significantly altered the total mix of information available.").

Finally, a determination of the magnitude of the Fund's leverage would require expert analysis – an analysis that a typical investor would be unable to perform.  As alleged, the Fund's net leverage position was calculated by an industry expert (CCAC ¶¶ 67-68).  Such a calculation is not one "that most investors would be able to perform based on a review of the Fund's SEC filings." CCAC ¶ 58 n.1.  Defendants' assertion that the Fund's leverage position can be determined through "simple mathematics" (Oppenheimer Br. at 38 n.18) is manifestly unreasonable.  Defendants fail to cite any relevant legal authority.  Although Defendants earlier

in their brief rely upon *Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1344 (8th Cir. 1980), and *Holtzman v. Proctor, Co.*, 528 F. Supp. 9 (D. Mass. 1981) to support their argument that an investor could determine the total notional value of the Fund's swap transactions by simply adding together each individual transaction, those cases are inapplicable here. Plaintiffs' claims in both of those cases were brought against their brokerage firms and essentially based on breach of contract. *Koke*, 620 F.2d 1344; *Holtzman*, 528 F. Supp. 9. Additionally, in those cases, the court found that plaintiffs' account statements and confirmation slips of their purchases and sales disclosed that their investments were sold at a loss. *Koke*, 620 F.2d at 1344; *Holtzman*, 528 F. Supp. at 14. Here, the Fund's net leverage position, and thus the aggregate risk of loss by investing in the Fund, require an understanding and use of specific mathematical formulas.

In support of their argument, Defendants instead attach a chart that shows how the "net notional" value of the Fund's leverage position is calculated. *See* Oppenheimer Ex. S. When viewed in context with the general nature of Defendants' risk disclosures, Defendants' chart demonstrates the complexity of performing such an analysis – a practical impossibility for most investors. Neither the analysis illustrated by Defendants' chart, nor the "net notional" value of the Fund's leverage position are disclosed in any of the Fund's Offering Documents. *See* CCAC ¶ 67. Likewise, the "net leverage" multiplier is not disclosed in the Offering Documents. *See* CCAC ¶ 68. Defendants note that the "net notional value" is "[c]alculated as the sum of the notional values of swaps plus the market value of futures bought by the Fund minus the market value of futures sold by the Fund." Oppenheimer Ex. S. Although Defendants interestingly do not submit a chart that shows how "net leverage" is calculated, net leverage is equal to "the market value of long positions less the market value of short positions divided by net asset

value." CCAC ¶ 68 n.2. These complex formulas were not disclosed, and the Fund's investors were given no guidance on how to determine the net notional value of leverage or net leverage. Defendants' argument erroneously assumes that an average investor not only has a fundamental understanding of futures, but is familiar with these specific mathematical equations and how they evaluate risk. As *Morningstar*, a sophisticated mutual fund analyst, so aptly summarized:

> How is it possible that a shareholder can go to its Web site, see that Core bond is down nearly 40% … and yet find no information to use to figure out why, much less an actual explanation?
>
> \* \* \*
>
> If your funds are going to use instruments that involve this much portfolio complexity, you have a duty to translate and simplify what that means for your shareholders. Not doing so is patently unacceptable and comes awfully close to dishonesty by omission.

CCAC ¶ 6, 89.

If a Fund investor must perform such a difficult analysis of data to gain an understanding of the true risk of his investment, Defendants' disclosures are necessarily insufficient to render the alleged misstatements immaterial. *See SEC v. Mozilo*, No. 09-3994, 2009 WL 3807124, at *10 (C.D. Cal. Nov. 3, 2009) (denying defendants' motion to dismiss where an investor would have to "decipher complex raw data to understand that [defendants'] prime category included borrowers with FICO scores below 620); *In re Real Estate Assoc. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1109, 1132 (C.D. Cal. 2002) ("the complexity of the REIT transaction and the length of the Solicitations meant that the calculations and conclusions set forth in the Solicitations were comprehensible only to those with a high level of expertise and familiarity with the REIT transaction.").

Defendants contend that the sum of the notional values of the Fund's individual swap transactions, which were disclosed every quarter, revealed to investors the magnitude of its swap transactions. Defendants' assertion, however, mischaracterizes Lead Plaintiff's allegations as a failure to disclose the Fund's actual transactions in swaps and ignores the multiplying effect that the Fund's swap transactions had on the net leverage of the portfolio resulting in vastly enhanced and undisclosed risk, which, as discussed above, cannot be determined by any ordinary investor. Although an investor may have been aware that the Fund invested in swaps, the additional layers of risk such investments added to the Fund's portfolio would have been material to an investor. *See Krouner v. The American Heritage Fund, Inc.*, No. 94-7213, 1996 U.S. Dist. LEXIS 9783, at *7 (S.D.N.Y. July 15, 1996) (denying motion to dismiss Section 11 claim where "there is a substantial likelihood that a reasonable investor in the Fund would find that the Fund's excessive investment in illiquid securities to be a material fact, notwithstanding the knowledge that the Fund regularly invests in that type of security"). And, of course, Defendants never explained to investors how the swap transactions vitiated representations that the Fund was a "broadly diversified portfolio of investment-grade corporate and government bonds designed to seek total return and reduce share price volatility." CCAC ¶ 37.

The Fund further increased its already heightened risk in swap transactions by selling protections on issuers of bonds already owned by the Fund that were in severe financial crisis, such as AIG, Merrill Lynch, Washington Mutual, Lehman Brothers, Tribune Citigroup, General Motors, and Ford, several of which were on the verge of bankruptcy. CCAC ¶¶ 62-63. Defendants again attempt to mischaracterize Lead Plaintiff's allegations by arguing that these transactions were disclosed. Oppenheimer Br. at 22. Defendants do not, and cannot, however,

argue that the Fund disclosed the increased risks associated with bonds issued by these severely troubled financial companies, because it did not.

> **(b)     Defendants' disclosures concerning mortgage-backed securities were inadequate and failed to alert fund investors to the resulting heightened risk exposure.**

Throughout the Relevant Time Period, the Fund invested heavily in mortgage-backed securities.  CCAC ¶ 52.  Particularly, the Fund's investments in commercial mortgage-backed securities at a time when the market was severely distressed and had suffered a significant widening of spreads, grew significantly and reached nearly 39% of the Fund's assets by June 2008.  CCAC  ¶¶ 54, 57.  The complex structure and multiple risk sources of the Fund's concentrated investments in mortgage-backed securities made the Fund's investments far riskier than its other fixed income assets.  CCAC ¶¶ 51-55.  As one court duly noted, "[m]ortgage-backed securities have become increasingly complicated financial products, and now include among their number several mortgage derivative securities … [such as] the CMO [("Collateralized Mortgage Obligation")].  *TCW/DW North American*, 1997 U.S. Dist. LEXIS 18485, at *9-*10.  Collateralized mortgage obligations, which represent interests in pools of residential or commercial mortgages, were one type of mortgage-backed security in which the Fund invested.  *See e.g.* April 2007 Prospectus; CCAC ¶ 46.

In attempting to show that the Fund disclosed all material facts regarding its complicated investments in mortgage-backed securities, Defendants identify, as they do for the Fund's swap transactions, general disclosures explaining what mortgage-backed securities are and the Fund's intention to invest in mortgage-backed securities and collateralized mortgage obligations.  Oppenheimer Br. at 15-16.  Defendants additionally identify disclosures about interest and

prepayment risk applicable to mortgage-backed securities to show that the specific risks to mortgage-backed securities were disclosed.  Oppenheimer Br. at 16; Oppenheimer Appendix A-2.  Like the Fund's swap disclosures, its mortgage-backed securities disclosures consisted of nothing more than generic boilerplate language.

Absent from the Fund's disclosures are specific risk disclosures related to the inherent illiquidity of mortgage-backed securities and the collateralized mortgage obligations market. Defendants instead identify generic disclosures that warn: "[s]ome derivatives may be illiquid, making it difficult to value or to sell them at an acceptable price;" (*e.g.* April 2007 Prospectus at 6); "[c]ertain derivative investments held by the Fund may be illiquid" (April 2007 Prospectus at 14); and "Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price" (*e.g.* April 2007 Prospectus at 16).  The court in *TCW/DW North American*, found disclosures like these insufficient to sustain a motion to dismiss.  1997 U.S. Dist. LEXIS 18485, at *27.  In *TCW/DW North American*, the fund's prospectus disclosed that it would invest at least 65% of the total assets in investment-grade fixed-income securities, a substantial portion of which were mortgage-backed securities.  *Id.* at *8.  Lead Plaintiff alleged that defendants' failure to disclose the inherent illiquidity of the market for collateralized mortgage obligations was material information to an investor.  *Id.* at *27.  The court held that defendants' illiquidity disclosure "makes a general observation about all securities in the Fund, because it neither specifically refers to, or even suggests reference to, CMOs." *Id.*  The court denied defendants' motion to dismiss plaintiffs' Securities Act claims, refusing to conclude that this omission was immaterial

as a matter of law because a reasonable investor may find illiquidity risks particular to the collateralized mortgage obligations market to be material information. *Id.* at *28.

Like the defendants' disclosures in *TCW/DW North American*, the Fund's disclosures here concerning illiquidity are too general and do not specifically relate to mortgage-backed securities. Because the illiquidity risks specific to mortgage-backed securities and the collateralized mortgage obligations market would be information material to a reasonable investor's decision to purchase shares in the Fund, Defendants' motions to dismiss on this ground should be denied. *TCW/DW North American*, 1997 U.S. Dist. LEXIS 18485, at *28.

The Fund's exposure to the riskier nature of mortgage-backed securities was further multiplied through Defendants' use of speculative total-return swap transactions on commercial real estate indices, which effectively "double-downed" its investments in commercial mortgage-backed securities. CCAC ¶ 57. As discussed, *supra*, although Lead Plaintiff may have been aware that the Fund invested in mortgage-backed securities and swaps, Defendants' disclosures did not alert investors to the magnitude of this leveraging effect and thus the aggregate risk profile to which Lead Plaintiff was exposed.

**(c)     Defendants are not protected by the "Bespeaks Caution" Doctrine.**

Defendants appear to invoke the bespeaks caution doctrine. Oppenheimer Br. at 16, 21-22. The bespeaks caution doctrine applies only to affirmative, forward-looking statements. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir. 1997). It cannot be applied to shield defendants from liability for statements about "present factual conditions." *Grossman*, 120 F.3d at 1123. Here, the alleged false and misleading statements concern the investment strategies and practices of the Fund employed *at the time* plaintiffs purchased shares in the Fund. For example,

24

the Offering Documents stated that "the Fund invests at least 80% of its net assets … in investment-grade debt securities" and the Fund would not "concentrate its investments (that means it cannot invest 25% or more of its total assets) in any one industry." CCAC ¶¶ 46-47. The bespeaks caution doctrine is inapplicable to statements about the Fund's current investment strategies such as these. *Credit Suisse*, 2001 WL 300733, at *5 (bespeaks caution doctrine does not apply where the complaint "challenges the disclosures in the Prospectus relating to the nature of [defendant's] business and [defendant's] business strategies in place at the time the Prospectus became effective.").

> ## 2. Defendants' Statements About the Fund's Investment Strategies and Policies Were Materially Misleading.

Defendants' contention that the representation of the Manager's "overall strategy [] to build a broadly diversified portfolio of corporate and government bonds" is not actionable as a "broad investment goal" (Oppenheimer Br. at 28-33) is meritless. Defendants incorrectly attempt to isolate the Fund's overall strategy and ignore the statement taken together in context with the Fund's other investment strategies and representations.[10]

The central inquiry in determining whether a statement is materially misleading is "whether defendant's representations, *taken together and in context*, would have [misled] a reasonable investor" about the nature of the investment. *McMahon & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). When viewed in context, Defendants' statements made

---

[10] Defendants also argue that the Fund's use of the term "diversification" is not misleading because the Fund incorporates the definition and policies about diversification set forth in the Investment Company Act. Oppenheimer Br. at 29. Defendants' argument mischaracterizes Plaintiff's allegations, which do not allege that the Fund's definition of the term "diversification" was misleading.

distinct claims about the current posture of the Fund and present methods being employed to achieve results.  For example, the Fund's other investment strategies and policies include the following:

- the Fund "invests at least 80% of its net assets (plus borrowings for investment purposes) in investment-grade debt securities" and only "up to 20% of its total assets in high-yield debt securities that are below investment-grade (commonly referred to as 'junk bonds');"

- The Fund "focuses mainly on U.S. government securities and investment-grade debt securities;"

- "[t]he Fund  will not invest more than 15% of its net assets in illiquid or restricted securities;"[11]

- "[t]he Fund cannot borrow money in excess of 33 1/3% of the value of its total assets;" and

- [t]he Fund cannot concentrate its investments (that means it cannot invest 25% or more of its total assets) in any one industry."

CCAC ¶¶ 4, 46-47.

These strategies portrayed operating rules for the Fund that were much more than a mere statement that is so "general and vague" as to be devoid of any meaning that a reasonable investor could factor into investment decisions.  Rather, these statements represented an avowed inherent quality of the Fund - that it was a safe vehicle that did not take undue risks.  CCAC ¶ 4. Consistent with these representations, the name of the Fund, the "Oppenheimer *Core* Bond Fund," also indicated to investors that the Fund is designed as a primary investment vehicle with low-to-moderate risk that "will provide your portfolio with a solid foundation."  CCAC ¶¶ 43-44. Accordingly, Defendants specifically marketed the Fund to risk-averse investors, representing

---

[11] Defendants do not contest Plaintiff's claim that they failed to adhere to the Fund's restriction to not " invest more than 15% of its net assets in illiquid or restricted securities."  *See* CCAC ¶¶ 4, 46a, 49f.  Accordingly, Defendants' motions to dismiss as to that statement should be denied.

that "[t]he Fund is designed for investors seeking total return from a fund that invests primarily in investment-grade debt securities . . . .", and "[the Fund is intended as a long-term investment, not a short-term trading vehicle, and may be appropriate for a part of an investor's retirement plan portfolio."   CCAC ¶¶ 4, 46.   Thus, when viewed in their full context, Defendants' representations presented to investors the false picture that the Fund was structured as a conservative and stable investment.

Throughout the Relevant Time Period, the Fund was far more risky than investors were led to believe, because Defendants heavily invested in mortgage-backed securities and speculative derivatives like credit default swaps and total-return swaps, but failed to disclose the exponentially heightened risk these investments added to the Fund's overall risk profile.   CCAC ¶¶ 2, 5.   These investment practices were inconsistent with and in violation of the Fund's representations and stated investment strategies that portrayed the Fund as a relatively low-risk fund.   CCAC ¶¶ 5, 49a, 50, 59, 69, 70.   Lead Plaintiff alleges that the Fund's investments in these speculative derivatives (1) were not primarily in U.S. government securities and investment-grade debt securities, particularly its investments in mortgage-backed securities at a time when that market was severely distressed; (2) exceeded the Fund's limitation on borrowing 33 1/3% of the value of total assets (CCAC ¶¶ 5, 49, 70); and (3) exceeded the Fund's limitation on investing more than 25% of total assets in any one industry by investing more than half of the Fund's total assets in mortgage-backed securities, and up to nearly 39% of the Fund's total assets in commercial mortgage-backed securities (CCAC ¶¶ 5, 49, 52-56).

Defendants argue that because mortgage-backed securities are a type of security rather than a defined industry, it did not violate its rule against investing 25% or more of its assets in

one industry.  Oppenheimer Br. at 40.  While Defendants are correct that mortgage-backed securities are a type of security, they fail to observe that the Fund's mortgage-backed securities investments exclusively dealt with the "Real Estate" industry – an industry classification that Defendants *do* recognize.  *See* April 2007 SAI, Appendix B at 33.  In fact, the Fund recognized this distinction, stating that "[t]he Fund cannot invest in real estate or real estate mortgage loans. However, the Fund can purchase and sell securities issued or secured by companies that invest in or deal in real estate or interests in real estate."  April 2007 SAI at 33; May 2007 SAI at 32; April 2008 SAI at 32.  In any event, this debate points up factual considerations that are not appropriate to decide on a motion to dismiss.

Defendants also argue that the Fund's swap investments did not violate the 33 1/3% borrowing restriction because that policy was limited to bank borrowing and did not specifically refer to the borrowing inherent in leverage.  Defendants' argument, however, only points out further violations of this policy – that the Fund's borrowing effect created by the Fund's swap transactions were from non-banks.  Moreover, Defendants' position that the Fund's borrowing through leverage—which escalated to as much as 133% over the Fund's total assets during the Relevant Time Period—did not violate the represented 33 1/3% cap on borrowing because the borrowing was from non-banks, is disingenuous in the extreme.  CCAC ¶ 68.

Further, Defendants impermissibly attempt to hold Lead Plaintiff to the particularized pleading standard of Rule 9(b) by arguing that Lead Plaintiff failed to allege facts showing how the statement that the Fund "invests at least 80% of its net assets … in investment-grade debt securities" was false.  Oppenheimer Br. at 36-37.  Defendants mistakenly rely on *Grossman*, 120 F.3d 1112.  The plaintiffs in *Grossman* asserted claims of *fraud* under the Exchange Act and the

court, accordingly, held plaintiffs to the pleading standards of Rule 9(b). *Grossman*, 120 F.3d at 1115, 1118. In holding that the complaint failed to allege facts showing that defendant's statements were false, the court specifically recognized that "*Fed.R.Civ.P. 9(b) requires* that to state a claim for securities fraud, '[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.* at 1124 (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)) (emphasis added). Here, Lead Plaintiff's claims are not based in fraud, nor do Defendants even attempt to argue that they sound in fraud triggering the heightened requirements of Rule 9(b). Therefore, Lead Plaintiff's claims are subject to only the notice pleading requirements of Rule 8(a), with which Lead Plaintiff complies.

In sum, Defendants' severe departure from its investment strategies in search of high-risk, high-returns is supported by objective evidence and is manifestly material. During the Relevant Time Period, the Fund's risk profile far exceeded both its own internal risk guidelines and the benchmark index. CCAC ¶¶ 75-78. As the Complaint states:

> The so-called "Core Plus" strategy that was used to manage the Fund set an *ex ante* target for excess return over the benchmark of between 100 to 125 basis points, or 1 percent to 1.25 percent. However, internal documents indicate that as early as April 1, 2008, the composition of the Fund was such that prospective excess return over the benchmark was already forecast to be 1,058 basis points or 10.58%, well in excess of the Fund's own internal guideline, and an extraordinary level of risk and deviation from the benchmark index. An excess return of this size, and the risk required to achieve it, was totally inappropriate for a fund labeled as a diversified "core" bond fund. Moreover, Defendants never disclosed that the Fund was taking enormous risks in an effort to generate additional returns of almost 10 times the excess return it represented to investors.

CCAC ¶ 75;

> The following week, on April 8, 2008, the Fund's internal risk profile documents again confirm that the managers had exceeded the Fund's risk budget. According to the documents, it had expended over 121% of its

risk budget based on the metric used the previous week.  Indeed, in Mr. Dachille's presentation to the Oregon Board, he stated that a tracking error of 200 basis points for the Fund, which would be a fully expended risk budget of 100%, was a "hard maximum."  Nonetheless, on April 8, 2008, the tracking error was 242 basis points, a 21% overage in the risk budget.

CCAC ¶ 77.

Lead Plaintiff also alleges that "the Fund's performance was 31 percentage points worse than the typical intermediate-term bond fund … [and] the Fund's benchmark index – the Barclay's Capital Aggregate Bond Index – actually rose 5.24% in 2008."  CCAC ¶ 85.  The Fund's departures are further supported by the October 2008 statements of Kevin Dachille, an investment director of Defendant OppenheimerFunds, Inc., who, concerning the Fund's aggregate risk of its investments, admitted that "we were getting greedy" and "*never like this*" took a risk budget up.  CCAC ¶ 71 (emphasis added).

Thus, when viewed in context, Defendants' departure from the Fund's stated strategies and policies would be material to a reasonable investor.  *See Rodney v. KPMG Peat Marwick*, 143 F.3d 1140 (8th Cir. 1998) (rejecting district court's characterization of the fund's policy on borrowing and illiquid securities as "general statements trumped by the Fund's more specific investment disclosures" and holding that a violation of the fund's stated policies would create an enhanced risk that is material to a reasonable investor); *White*, 237 F. Supp. 2d 982 (denying defendant's motion to dismiss Section 11 claims where plaintiff alleged noncompliance with the Fund's stated objective and investment policy to invest no more than 15% of its net assets in illiquid securities); *Krouner*, 1996 U.S. Dist. LEXIS 9783 (same).[12]

---

[12] Defendants' reliance on *Tabankin v. Kemper Short-Term Global Income Fund*, No. 93-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994), is misplaced.  The court in *Tabankin* granted
*(continued … )*

### 3. Lead Plaintiff's Allegations Show that Reasonable Investors Actually *Were* Misled.

Lead Plaintiff here goes well beyond the Rule 8(a) pleading requirement by demonstrating that not only *would* a reasonable investor be misled about the nature of the investment, but that a sophisticated mutual fund analyst – *Morningstar* – *was* misled.  CCAC ¶¶ 6, 89-90.  On two separate occasions, *Morningstar* reported on the misleading nature of the Fund's disclosures.  On December 17, 2008, it noted:

> The only thing worse than levering up a portfolio with 180% market exposure, though, *is doing it quietly*.  I'd like to be wrong about this, but I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way.  The word itself doesn't seem to be linked to any of the funds' strategies anywhere I've searched on Oppenheimer's Web site or in any of the supporting shareholder or marketing materials that we've seen.  Terminology aside, none of the portfolio descriptors provides enough information to estimate those market exposures, much less know that they're not typical, 100 cents in, 100 cents invested.  *There's just no indication whatsoever that anything is unusual about any of the funds that employ this kind of leveraged exposure*.  And it was never brought up by Oppenheimer managers in any of their recent Morningstar analyst interviews.

> \*       \*       \*

> How is it possible that a shareholder can go to its Web site, see that Core Bond is down nearly 40%, or 80% in the case of Champion Income, and yet find no information to use to *figure out why*, much less an actual *explanation*?

CCAC ¶ 89 (emphasis added).  Later, on February 5, 2009, Morningstar reported that "the managers bought complex, off-balance sheet swap contracts that created a leveraging effect on

---

*( ... continued)*

defendants' motion to dismiss because the plaintiffs' complaint showed "that the Funds pursued the very strategies identified in the Prospectus."  *Id*. at \*4.  Unlike the plaintiffs in *Tabankin*, Plaintiff here clearly alleges that the Defendants' actual investment practices were inconsistent with the strategies identified in the Offering Documents, truly creating undisclosed enhanced risks.

the funds" and that "Oppenheimer did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary." CCAC ¶ 90.  Lead Plaintiff's allegations thus clearly meet the pleading standard required under Rule 8(a).

### 4.   Lead Plaintiff's Claims Do Not Sound in Corporate Mismanagement.

Defendants attempt to distort Lead Plaintiff's allegations as complaining of corporate mismanagement.  Oppenheimer Br. at 33-36; Trustees' Br. at 17-19.  Defendants rely on the Supreme Court's decision in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), which held that allegations of mere mismanagement are not actionable under the federal securities laws. *Id.* at 478-79.  However, Defendants neglect to recognize that *Santa Fe* does not preclude a claim "based on a material nondisclosure or misrepresentation simply because the undisclosed facts involved might also support a breach of fiduciary duty claim."  *Lane v. Page*, 581 F. Supp. 2d 1094, 1106 (D.N.M. Sept. 24, 2008) (quoting *Kas v. Financial General Bankshares, Inc.*, 796 F.2d 508, 512 (D.C. Cir. 1986)).  As the court in *Lane* noted, "*Santa Fe* itself declares that 'the existence of a particular state-law remedy is not dispositive of the question whether Congress meant to provide a similar federal remedy' under section 10(b)."  *Id.* (quoting *Kas*, 796 F.2d at 512 (quoting *Santa Fe*, 430 U.S. at 478)).  In other words, a claim that meets the necessary elements in federal law will not be impermissible just because the claim also may assert a state law claim.  *Lane*, 581 F. Supp. 2d at 1113-14.

Defendants mischaracterize Lead Plaintiff's allegations as complaining about Defendants' decision to invest improperly in risky mortgage-related securities and swap

transactions.[13]   Even though Defendants may have mismanaged the Fund, Lead Plaintiff's allegations go much further than this management decision – Lead Plaintiff alleges that Defendants failed to disclose the aggregate risk profile of the Fund and the extent to which it was exposed to risky mortgage-backed securities and swap transactions.   *See* CCAC ¶¶ 2, 5, 6, 49, 75.   For the reasons discussed in Section III.B., Lead Plaintiff has sufficiently pled the necessary elements of his Securities Act claims which therefore are not precluded by *Santa Fe*.   *Lane*, 581 F. Supp. 2d at 1113 (rejecting defendants' argument that *Santa Fe* precludes plaintiff's claims where plaintiff's allegations also met the elements of Section 14(a) of the Exchange Act in addition to possible violations of state-law claims for corporate malfeasance).

Moreover, the value of the undisclosed risks of the Fund would be material to an investor for reasons other than mismanagement.   Lead Plaintiff's claims thus are based on the concealment of this information concerning mismanagement, rather than the underlying mismanagement itself.   *In re Tyco Int'l, Ltd.*, No. 02-1335, 2004 WL 2348315, at *3-*4 (D.N.H. Oct. 14, 2004) (rejecting defendants' assertion that *Santa Fe* precludes any claim on a failure to disclose corporate misconduct and holding that plaintiffs' claims are based on concealment of material information concerning corporate misconduct).

---

[13] Defendants cite *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662 (D. Colo. 2007) to assert that Plaintiffs here are merely "bootstrapping" claims of mismanagement to their Securities Act claims.  Oppenheimer Br. at 34, 41.  Again, Defendants rely on a decision that analyzed the sufficiency of the plaintiff's claims under Rule 9(b).  *Andropolis*, 505 F. Supp. 2d at 675.

     **5.**     **Lead Plaintiff's Allegations About the Fund's Inadequate Internal Controls Are Sufficient to State a Claim for Violations of Sections 11 and 12.**

During the Relevant Time Period, the excessive risk the Fund assumed was flagged internally by its own internal risk controls. CCAC ¶ 74. In managing risk, the Fund set an *ex ante* target for excess return over the benchmark between 1% and 1.25%. CCAC ¶ 75. As a result of the Fund's risky investments, the Fund internally forecasted as early as April 1, 2008 that the prospective excess return would deviate from the benchmark by 10.58% - far in excess of its own guideline. *Id*. Rather than disclose the excessive risks forecasted internally, Defendants instead abandoned its old risk metrics and secretly adopted new ones that permitted their high-risk high-return strategy. CCAC ¶ 25.

Defendants' arguments that allegations of inadequate controls do not state a claim under the securities laws and did not make any part of the Offering Documents misleading (Oppenheimer Br. at 41-42) mischaracterize the heart of Lead Plaintiff's allegations (once again) and incorrectly rely on the case law that they cite in support thereof. Initially, Lead Plaintiff's allegations extend to Defendants' failure to disclose the *extent of risks* identified internally by the Fund's risk metrics -- not its failure to disclose inadequate internal controls specifically. Defendants simply ignore allegations regarding the Fund's internal controls that make this distinction. For example, Lead Plaintiff alleges that: "the Fund's meager controls indicated that the managers were assuming excessive risk" (CCAC ¶ 74); "Defendants never disclosed that the Fund was taking enormous risks in an effort to generate additional returns of almost 10 times the excess return it represented to investors" (CCAC ¶ 75); and "Defendants failed to disclose to investors that it had abandoned its old metric used to assess risk" (CCAC ¶ 78). Surely, the

excessive risks detected by the Fund's own internal controls and the Fund's subsequent abandonment of those controls in favor of ones permitting a significantly higher risk profile would be material to a reasonable investor.

Moreover, allegations of inadequate internal controls may be actionable under the securities laws where plaintiffs allege that defendant made false or misleading statements about the quality of its risk controls. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) (noting that "it is not a violation of the securities laws to simply fail to . . . provide sufficient internal controls or loan management practices" while holding that defendants' statement that 'internal controls not only existed, but were properly centralized, supervised, and managed" could be actionable); *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 245 (E.D.N.Y. 1989) (defendants misled investors by claiming the existence of "additional, elaborate compliance and control steps which [they believed to be] the best procedures in the industry").

Defendants cite *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 352 (S.D.N.Y. 2008), a case brought exclusively under the Exchange Act of 1934, analyzed under the heightened pleading requirements of the PSLRA and Rule 9(b), and thus inapplicable here. Lead Plaintiff's claims of inadequate internal controls here are brought exclusively under the Securities Act, and therefore subject only to the liberal notice pleading requirements of Rule 8(a). *See In re American Business Financial Services, Inc. Sec. Litig.*, No. 05-232, 2007 U.S. Dist. LEXIS 932, at *25-*26 (E.D. Pa. Jan. 9, 2007) (denying motion to dismiss where plaintiffs' allegations of inadequate internal controls met the pleading requirements of Rule 8(a)). Lead Plaintiff's allegations that Defendants failed to disclose that the Fund was performing far in excess of its internal risk metrics meets this standard. Notwithstanding this distinction, the court in *FBR* held

that a brief description of defendants' risk management program could not mislead investors, because it did not provide any qualitative assurances that it was managed properly or used the best procedures in the industry.  544 F. Supp. 2d at 359-60.

Unlike *FBR*, and contrary to Defendants' contention that the Lead Plaintiff's allegations are not linked to any misrepresentation, the Fund's Offering Documents provided investors with qualitative assurances that the Fund manager would "analyze the overall … *risks* in different sectors of the debt securities markets" in order to "reduce the volatility of the Fund's share price" and achieve "a good balance of risk and return."   CCAC ¶¶ 4-5, 46 (emphasis added).   The Fund's secret abandonment of risk controls that flagged the enhanced risk created by the Fund's trading strategy in favor of looser controls that removed the flags is in direct contradiction with the Defendants' assurances that the portfolio's overall risk profile would be properly managed to reduce share price volatility and strike a "good balance of risk and return."   Investors thereby were misled about the risks they would incur by investing in the Fund.

Defendants also attempt to contort Lead Plaintiff's internal control allegations into purported claims of mismanagement.  Oppenheimer Br. at 41-42.  For the reasons discussed in Section III.B.4. above, Defendants argument must be rejected.

## C.    Defendants Are Liable Under Section 12(a)(2) as "Sellers."

Defendants contest the sufficiency of Lead Plaintiff's "seller" allegations with respect to each Defendant, except OppenheimerFunds Distributor, Inc.  Oppenheimer Br. at 45; Trustees Br. at 7-12.  Liability under Section 12(a)(2) "is not limited to the person who passes title to the securities, but extends 'to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'"  *Maher v.*

*Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998) (quoting *Pinter v. Dahl,* 486 U.S. 622 (1988)).[14]

Here, each of the Individual Defendants signed or authorized the signing of the April 30, 2007 and/or April 29, 2008 Registration Statements.   CCAC ¶¶ 19-30.   Allegations that a defendant signed a solicitation document, such as a prospectus or registration statement, are sufficient to show that defendants were "sellers" under Section 12(a)(2).   *In re Sirrom Capital Corp. Secs. Litig.,* 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999) ("Defendants who actually signed the Registration Statements may be said to have solicited the public to purchase the stock."); *In re Nat'l Golf Props., Inc. Sec. Litig.,* No. CV 02-1383, 2003 WL 23018761, at *3 (C.D. Cal. Mar. 19, 2003) (allegations that defendants signed a registration statement on behalf of the issuer, which was also the actual seller, were sufficient to allege active solicitation of purchase of security).   Additionally, Defendants John V. Murphy, as President and Principal Executive Officer, and Brian W. Wixted, as Treasurer and Principal Financial and Accounting Officer, are liable as officers of the Fund.   *Warman v. Overland Data,* No. 97-0833, 1998 WL 110018, at *16-17 (S.D. Cal. Feb. 20, 1998) (allegation that "defendants, as officers, were sellers, offerors and/or solicitors" of sales of shares in IPO was sufficient to state claim under Section 12(a)(2)).

Although these allegations are sufficient to show "seller" liability, Lead Plaintiff's allegations are not limited to signing the Registration Statements and Fund governance, as the Trustee Defendants contend (Trustees' Br. at 9).   Lead Plaintiff additionally alleges that the Trustee Defendants were actively involved in selling the Fund's shares.   For example, Lead

---

[14] The Tenth Circuit has observed that "*Pinter's* definition of a statutory seller under § 12(a)(1) has been applied to § 12(a)(2) as well." *Maher*, 144 F.3d at 1307 n.10.

Plaintiff alleges that: each of the Section 12 Defendants, including the Trustee Defendants, "participated in the process which allowed the offerings to be successfully completed, or . . . participated in the offer or sale of the shares of the Fund" (CCAC ¶ 118); "Defendants issued and offered for sale shares of the Fund" (CCAC ¶ 45); and the Trustee Defendants "'solicited' purchases of the Fund's shares to serve their own financial interests" (CCAC ¶ 109d).  This Court previously has held that allegations like these that, "''at a minimum allege facts' that the defendants 'solicited' the purchase of their … stock," are sufficient to make a prima facie case of Section 12 (a)(2) liability against the defendants.  *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1222-23 (D. Colo. 1998).  Similarly, in *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549-50 (N.D. Cal. 2009), the court held that allegations that defendants signed the registration statement, "actively solicited the sale of the fund's shares," and were involved in marketing the fund sufficiently pled solicitation.

Furthermore, given the fact-sensitive nature of "seller" allegations, any doubts about whether Lead Plaintiff can prove defendant acted as a "seller" are not to be resolved on a motion to dismiss.  *See e.g., Schwab*, 257 F.R.D. at 550 (whether defendants actually solicited plaintiffs' sales is a factual question for the jury); *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 717 (3d Cir. 1996) (reversing district court's dismissal of complaint and holding that allegations that defendants solicited plaintiffs to purchase securities and in doing so were motivated by a desire to serve their own financial interests were not "bare legal conclusions," but were instead "factual allegations" that must be proved at trial) (citation omitted); *In re Elec. Data Sys. Corp. "ERISA" Litig.,* 305 F. Supp. 2d 658, 681 (E.D. Tex. 2004) (holding that plaintiffs' complaint "has

38

certainly given fair notice that Plaintiffs intend to prove Defendants' seller status, and the Court will not resolve this claim under 12(b)(6) on the fact-intensive 'seller' status issue").

For the foregoing reasons, Defendants' contention that Lead Plaintiff's allegations do not amount to a viable Section 12(a)(2) claim should be rejected.

### D.      Defendants Are Liable Under Section 15 as "Control Persons."

Section 15(a) of the Securities Act "imposes joint and several liability upon every person who controls any person liable under Sections 11 or 12." 15 U.S.C. § 77o.   Control-person liability under Section 15(a) requires: (i) a primary violation of the securities laws, and (ii) "control" over the primary violator by the alleged controlling person.   *See, e.g., Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107 (10th Cir. 2003).   The complaint adequately alleges that the Trustee Defendants are "Control Persons" for purposes of Section 15 liability.

At the pleading stage, allegations that individual defendants are the primary violator's senior executives suffice.   *See, e.g., In re Qwest Commc'ns Intern., Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1149 (D. Colo. 2005).   Indeed, courts regularly find that general allegations that individual defendants, by virtue of their executive and managerial positions, had the "power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the" primary violators, are sufficient at the pleadings stage. *Siemers v. Wells Fargo & Co.,* 2006 WL 2355411, at *14 (N.D. Cal. Aug. 14, 2006); *see also In re LDK Solar Sec. Litig.*, 2008 U.S. Dist. LEXIS 80717, at *38 (N.D. Cal. Sept. 24, 2008) (refusing to dismiss control-person claim where complaint alleged that each defendant was a senior manager and undertook typical managerial activities including the signing of the prospectus and financial disclosures) (citing *Siemers*, 2006 WL 2355411, at *14).   Moreover, general allegations such as

these give defendants fair notice of the nature of the claims asserted against them. *Cf, Batwin v. Occam Networks, Inc.,* 2008 U.S. Dist. LEXIS 52365, at *80 (C.D. Cal. July 1, 2008) (plaintiffs' Section 20(a) allegations "place the [venture capital] defendants on adequate notice as to the basis for its claims against them"); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006) ("[n]aked allegations of control, however, will typically suffice to put a defendant on notice of the claims against her").

Here, the Complaint alleges that each Trustee was a control person of the Fund (or the Defendant Oppenheimer entities) by virtue of his or her position as a trustee and/or senior officer of the Fund or the Oppenheimer entities.  The Individual Defendants -- which include the Trustee Defendants -- each had a series of direct or indirect business or personal relationships with other trustees, officers, or major shareholders of the Oppenheimer entities and the Fund.  CCAC ¶ 117. Further, the Trustee Defendants were trustees of OppenheimerFunds Distributor, Inc., the entity that issued the Fund's shares and a critical underlying violator.  See CCAC ¶¶ 17, 33.  These general allegations easily satisfy the foregoing standards.

In addition, the Complaint alleges that the Trustee Defendants culpably participated in the underlying Sections 11 and 12 violations "based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the offerings to be successfully completed, or having participated in the offer or sale of the shares of the Fund."  CCAC ¶ 118.  This type of conduct, standing alone, has been deemed sufficient to indicate "activities typical of managers with the ability to control or influence a corporation."  *See LDK Solar*, 2008 WL 4369987, at *12.  And, courts presume that an outside director and audit committee member who signs an SEC filing has the power to control those

who write the report, within the meaning of Section 20(a). *In re Alstom SA Secs. Litig.,* 406 F. Supp. 2d 433, 488 (S.D.N.Y. 2005); *N.J. v. Sprint Corp.,* 314 F. Supp. 2d 1119, 1144-45 (D. Kan. 2004) (holding that allegation that board members signed SEC filings containing misleading or fraudulent statement raised sufficient inference of control to state claims for control person liability); *see also In re Rent-Way Secs. Litig.,* 209 F. Supp. 2d 493, 524 (W.D. Pa. 2002) (ruling that a complaint was sufficient that alleged, among other indicia of control, that individual defendants "signed one or more statements filed with the SEC that were eventually restated, and . . . had the ability to control the contents of these various statements"). Further, the determination of who is a controlling person is generally an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (quoting *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir. 1994), reversing district court's motion to dismiss claims against CEO, and holding that issue of whether defendant CEO, who was authorized to participate in release of financial statements and signed off on statements as correct, exercised actual power or control over company, was for jury).

Citing *Maher*, 144 F.3d at 1305, the Trustee Defendants assert a stricter pleading standard, arguing that Lead Plaintiffs must plead particular facts showing how each of them exercised actual power or control over Oppenheimer and the Fund. Trustees' Br. at 11-12. *But,* the facts in *Maher* were completely different from those at hand. In *Maher*, the plaintiff alleged that individual defendants were officers or employees of the defendant company, they had access to information relating to the company that was not available to the public, and one defendant

purchased enough stock in the defendant company sufficient to acquire a controlling interest in the defendant company. *Id.* The court in *Maher* noted that the plaintiff had failed to cite any cases where control person liability was found on such a tenuous connection between the alleged control person and the primary violator. *Id.* at 1306. But, as noted above, courts hold that general allegations that individual defendants, by virtue of their executive and managerial positions, had "power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the" primary violators, are sufficient at the pleadings stage. *Siemers,* 2006 WL 2355411, at *14. Lead Plaintiff has alleged these facts.

The Trustee Defendants also claim that by virtue of being "independent" they cannot be deemed to have the requisite control. Trustees' Br. at 13. But they overlook the statutory definition of "control" -- "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. The "power to control or influence" the primary violator is sufficient to establish membership in a corporation's control group. *See, e.g., Howard*, 228 F.3d at 1065; *In re Convergent Techs. Sec. Litig.,* 108 F.R.D. 328, 342 (N.D. Cal. 1985) (control stems from "the power or influence to direct significant aspects of the management of the corporation"). As demonstrated immediately above, reviewing and signing financial statements can lead to control-person liability, even without culpable participation in the violation. *See Howard,* 228 F.3d at 1065-66.

    **E.**    **Lead Plaintiff Has No Duty To Plead Loss Causation And Defendants Cannot Establish Negative Causation**

Loss causation is not an element that must be pled under Sections 11 or 12(a)(2). *See* 15 U.S.C. § 77(k)(a), 15 U.S.C. § 77l; *Schwab*, 257 F.R.D. at 544. While defendants may raise

negative causation as an affirmative defense, numerous courts refuse to dismiss Sections 11 and 12(a)(2) cases at this early stage on the basis of a negative causation. *See e.g., In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("While a defendant may be able to prove this 'negative causation' theory, an affirmative defense may not be used to dismiss a plaintiff's complaint."); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion.").

Notwithstanding the premature nature of Defendants' argument, it fails to overcome the pleadings. A complaint may only be dismissed for want of loss causation if it can be said, as a matter of law, that "it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses." *Giant*, 643 F. Supp. 2d at 572 (quoting *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003)). The court in *Schwab*, 257 F.R.D. 534, 547, where plaintiffs set forth allegations nearly identical to the ones at hand, concluded that loss causation "is not limited to the common 'corrective disclosure-price drop' scenario." *Id.* Instead, the *Schwab* court reasoned, plaintiffs may establish loss causation by alleging that either (1) the misstatement or omissions concealed the risk that materialized and lowered the value of the security, or that (2) the "subject" of the misstatement or omission caused the loss. *Id.* (internal citations omitted). Here, just as in *Schwab*, Lead Plaintiff alleges that Defendants "misrepresented the *scope* of the fund's risks, and the undisclosed risks exacerbated the losses." *Id.* Additionally, the "*subject* of the fraudulent statements caused their

losses-that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses." *Id.* (emphasis in original).

Conversely, this is not a fee case in which misrepresentations or omissions regarding the use of investment fees had no effect on the net asset value of the mutual fund. *See In re Salomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006) (an easily distinguishable fee case cited by Defendants in which disclosure of the total fees and the allocation of the fees would not affect the mutual fund share value because the fees have no relation to the Fund's investment in the underlying securities). Nor is this a case in which Lead Plaintiff alleges that misrepresentations inflated the price of a security which fell to its true value after the disclosure of the truth. *See In re Qwest Commc'ns Intern., Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1148 (D. Colo. 2005) (upholding claim that defendants' false statements concerning Qwest's financial status was a significant, if not primary, cause of its losses). Instead, Lead Plaintiff's allegations in this case fall directly into the "materialization of risk" approach firmly established by *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 175 (2d Cir. 2005):

> [T]he complaint alleges "facts that support an inference that [Defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.

*Id.*

As discussed in Section III.B., *supra*, despite Defendants' multiple representations that the Fund was a relatively conservative "core" Fund, the Fund abandoned its stated investment policies, significantly increased the number of high-risk investments and leveraged the Fund to an amount in far excess of its net assets, but failed to disclose the magnitude of the risks associated with those investments to investors. Unfortunately, the realization of the magnitude

of these risks came to fruition, causing the Fund's net asset value to crash when the concealed

risks were realized.  By December 31, 2008, the Fund experienced a 35.8% drop in net asset

value.  CCAC ¶ 83.  As of June 30, 2009, the Fund's net assets had declined by more than $1.2

billion from the year before.  CCAC ¶ 7.  As the Second Circuit noted:

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a *zone of risk* that would be perceived as remote or highly unlikely by one believing the fraud, and *the loss ultimately suffered is within that zone*, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 188, n.6 (2d Cir. 2001) (emphasis added)

(holding plaintiffs identified sufficient evidence of loss causation to avoid summary judgment on

claims regarding material omission of quantified risk).

Defendants "restrict the concept of loss causation too narrowly."  *Schwab*, 257 F.R.D. at

546.  Indeed, Defendants go to great lengths to describe the function of mutual funds and the

statute that governs the way in which the value of the mutual fund is calculated, ignoring the

dozens of Securities Act Claims against mutual funds that do in fact survive motions to dismiss.

In essence, Defendants' argue that misstatements and omissions regarding a mutual fund are

inactionable under Federal Securities laws because such misstatements and omissions cannot

inflate the net asset value of the fund.[15]  Oppenheimer Br. at 49-50.  This argument, however,

---

[15] Defendants' reliance on *In re Williams Sec. Litig. – WCG Subclass* is misplaced, simply because the court's analysis focuses on a Section 10(b) claim at the summary judgment phase, concluding that Plaintiff's expert is unreliable, and therefore Plaintiffs failed to present evidence on the issue of loss causation. 558 F.3d 1130, 1143 (10th Cir. 2009).  Similarly, *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.* dismissed plaintiff's suit because plaintiffs failed to plead an actionable misrepresentation, notably finding that mutual funds must indeed disclose

*(continued ... )*

completely ignores the well established "materialization of the risk" aspect of loss causation set forth above.  Moreover, this type of erroneous and overly narrow formulation "would effectively insulate mutual fund companies from claims for a wide range of material misrepresentations regarding fund policies, risks, and investment decisions."  *Schwab*, 257 F.R.D. at 547.  In addition, Defendants cite *Akerman v. Oryx Commc'ns*, 609 F. Supp. 363, 371-72 (S.D.N.Y. Sept. 18, 1984), adjudicated at summary judgment, in support of their argument that disclosures by a mutual fund do not affect the share price.  In *Akerman*, however, Oryx's stock did not drop after the disclosure of earnings, and actually rose above its class period levels.  *Id.* at 370.  The court even noted that the legislative choice of making loss causation an affirmative defense under Section 11(e) "represents a judgment that the risk of any uncertainty as to causality must fall upon defendants in order to insure the full disclosure that is the primary goal of the act," thereby entitling plaintiffs to a "rebuttable presumption that the decline was related to the nondisclosure." *Id.* at 372.

### F.  The Statute of Limitations Does Not Preclude Lead Plaintiff's Claims

Actions for violations of Sections 11 or 12 of the Securities Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.  The Tenth Circuit has held that the statute of limitations begins to run "once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."  *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998).  The standard outlined in *Sterlin* sets forth a

---

*( … continued)*
"investment strategies and risk, mismanagement, organization, capital structure, and distribution arrangements."  289 F. Supp. 2d 429, 434 (S.D.N.Y. 2003).

two-step process in determining when the statute of limitation period begins to run: 1) the date when there existed "sufficient storm warnings" to alert a reasonable person to the possibility that misleading statements or significant omissions had been made; and 2) the period thereafter during which a reasonable investor should have discovered the facts underlying the alleged misstatements or omissions.  *Id.*  As discussed in Section III.B.1, s*upra*, Defendants' disclosures regarding the Fund's investment concentrations, leverage, and overall risk profile were wholly inadequate.

Indeed, even the Fund's independent analysts did not appreciate the full extent of the Fund's risk exposure until it was too late.  *See* Section III.B.3, *supra* (discussing *Morningstar* reports that criticize Defendants for failing to adequately disclose the risks associated with its investments).   If sophisticated analysts, like *Morningstar*, did not pick-up on Defendants' purported "storm warnings," no reasonable investor could be charged with such knowledge.  *See Mozilo*, 2009 WL 3807124, at *10 (finding that it is difficult for a court to determine, as a matter of law, whether purportedly disclosed information was "readily" or "reasonably available" to an investor, particularly when the investor is further required to decipher complex raw data in order to fully understand the purported disclosure).[16]   Therefore, any purported "storm warnings" materialized only after independent analysts challenged the appropriateness of the Fund's

---

[16] Defendants once again attempt to rewrite the pleading standards by asserting that a plaintiff "must affirmatively plead compliance with the statute of limitations."  Oppenheimer Br. at 12, n.8.  Defendants, however, misquote *Piper Acceptance Corp. v. Slaughter*, which held that a plaintiff must "plead affirmatively facts *indicating* compliance with the limitations period."  600 F. Supp. 169, 172 (D. Colo. 1985) (emphasis added).  Here, the Complaint clearly sets forth that even as of December 17, 2008, *Morningstar* analysts recognized that no ordinary investor could have appreciated the enormous amounts of undisclosed leverage and enhanced risk caused by the Fund's investments in mortgage-backed securities and various swap transactions.

investments and corresponding disclosures.  Given that the first analyst report questioning the propriety of the Fund's investments and disclosures was not published until December 17, 2008, the filing of the initial complaint in the instant action, on April 22, 2009, easily satisfies the one-year statute of limitation.  15 U.S.C. § 77m.

Even assuming, *arguendo*, that Defendants could mount a legitimate challenge to the timeliness of this action, any determination of when the statute of limitations began to run is most appropriately made in the context of summary judgment.  *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1549 (10th Cir. 1996)).  This is particularly true with respect to Securities Act claims because the question of when a plaintiff should have known of the alleged violation often requires a fact intensive inquiry that is inappropriate at this early-stage of the proceedings.  *See Mellette v. Branch*, No. 07-cv-02065-WDM-KMT, 2009 WL 651142, at *6 (D. Colo. March 12, 2009); *California Public Employees' Retirement Sys. v. Chubb Corp.*, No. 00-4285(GEB), 2002 WL 33934282, at *25 (D.N.J. Jun. 26, 2002).  Defendants repeatedly cite the Tenth Circuit's "innocent investor" language set forth in *Anixter v. Home-Stake Prod. Co.*, but fail to appreciate the context of that decision.  977 F.2d 1549, 1552 (10th Cir. 1992).  In *Anixter*, the Tenth Circuit remanded the case to the trial court because it could not "say with certainty whether the jury's factual finding" supported, as a matter of law, the jury's conclusion that the statute of limitations had been satisfied.  *Id.* at 1551.  Moreover, even after trial on the merits, the fact-intensive issues surrounding the statute of limitations in securities class actions can remain unresolved.  *Id.* Defendants' reliance on *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457 (7th Cir. 1990), is equally misguided.  In *DeBruyne*, the trial court granted *summary judgment* to defendants based of plaintiffs' failure to comply with the statute of limitations, but only after

plaintiff failed to raise an issue of fact concerning defendants assertions of adequate disclosure. *Id.* at 463-64. Given the already apparent factual dispute concerning the inadequacy of Defendants' disclosures, substantiated by the several *Morningstar* articles cited herein, resolution of this issue is premature, particularly on a motion to dismiss.

### G.   Standing is More Appropriately Addressed at Class Certification

Defendants made false and misleading statements and omissions in the registration statements and prospectuses from which Lead Plaintiff purchased shares, and Lead Plaintiff was damaged thereby. Simply because Lead Plaintiff may have purchased from only one of the two sets of nearly offering documents, that does not warrant dismissal of the claims pursuant to the 2008 registration statements. Faced with a similar issue, the court in *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 422 (S.D.N.Y. 2003), stated:

> The argument that [plaintiff] did not and does not have standing in this lawsuit because it does not have standing to bring claims based on the 2000 and 2001 Offerings blinks reality and requires no further discussion. The [defendants] have not shown that there is any legal bar to a lead plaintiff asking other plaintiffs to join a lawsuit as named plaintiffs in order to represent more broadly the interests of the class at the time of the filing of the consolidated class complaint.

Numerous other courts have reached similar conclusions. *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action."); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003) (finding that the PSLRA does not prevent "Lead Plaintiffs from constructing a consolidated complaint that brings claims on behalf of a number of named parties besides the Lead Plaintiffs themselves"); *In re American Continental Corp./Lincoln Sav. and Loan Sec. Litig.*, 794 F. Supp. 1424, 1461 (D. Ariz. 1992)

("Plaintiffs need not name a representative of the class for each subgroup of securities, where common issues predominate as to all securities.").

Indeed, a Lead Plaintiff "is authorized by statute to bring suit on behalf of the whole class even though it may not have purchased every type of security that others in the class hold, as long as a representative plaintiff with standing to sue on each class or subclass can be designated at class certification time." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2004 WL 405886, at *21 (S.D. Tex. Feb. 25, 2004); *In re DDi Corp. Sec. Litig.*, 2005, WL 3090882, at *6 (C.D. Cal. Jul. 21, 2005) (holding that concerns over whether purchaser of one security should represent purchasers of another security are better addressed at the time of class certification). Given that Defendants' misrepresentations in the 2007 and 2008 Offering Documents were nearly identical, dismissal of Lead Plaintiff's claims based upon lack of standing would be inappropriate at this stage of the litigation.

## IV.   CONCLUSION.

For the foregoing reasons, Defendants' motions to dismiss the Complaint should be denied in their entirety.

Dated:  January 19, 2010                    Respectfully submitted,

**THE SHUMAN LAW FIRM**


   */s/  Kip B. Shuman*
Kip B. Shuman
Rusty Glenn
885 Arapahoe Avenue
Boulder, Colorado  80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
E-Mail: kip@shumanlawfirm.com

*Liaison Counsel for the Class*


**LABATON SUCHAROW LLP**
Mark S. Arisohn
Sidney S. Liebesman
Benjamin D. Bianco
Laura Killian Mummert
Erin H. Rump
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff, Dr. C. Phillip
Pattison, and Lead Counsel for the Class*


**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
Sean R. Matt
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Additional Counsel for Plaintiff*

51

## **Certificate of Service**

I hereby certify that the foregoing was filed with this Court on January 19, 2010 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.


_____s/  Rusty E. Glenn_____
Rusty E. Glenn