**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Civil Action No. 09-cv-01186-JLK-KMT

**IN RE:  CORE BOND FUND**

---

**OPPENHEIMER DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE
CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND**

---

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

I.    Plaintiff Wrongly Suggests That The Fund Portrayed Itself As Having "Minimal Risk Exposure" ............................................................................. 2

II.   Plaintiff's Claims Are Time-Barred ............................................................ 6

      A.    Reasonable Investors Could Easily Determine The "Magnitude" Of The Fund's MBS Investments And Swap Transactions ................................ 7

      B.    Morningstar's After-The-Fact Repudiation Of Its Former Views Is Irrelevant To What A "Reasonable Investor" Would Have Known About the Fund ................................................................................ 10

            1.    The Morningstar Articles Say Nothing About The Fund's MBS Investments ......................................................................... 10

            2.    The Morningstar Articles Confirm That A Reasonable Investor Who Read The Fund's Disclosures Would Have Known About The "Magnitude" Of The Fund's Swap Investments .................. 11

      C.    The Statute Of Limitations Issues Should Be Decided Now ................... 11

III.  Plaintiff Fails To Allege A Material Misrepresentation Or Omission ............. 12

      A.    The Fund Had No Duty To Calculate And Disclose Its "Overall Leverage Position" ............................................................... 13

            1.    No Statute, Rule, Or Case Requires The Fund to Calculate And Disclose Its "Overall Leverage Position" ................................. 13

            2.    Disclosure of the Fund's "Overall Leverage Position" Was Not Necessary To Prevent Other Disclosures From Being Misleading ......... 14

            3.    The Cases Plaintiff Cites Are Easily Distinguishable ................. 15

            4.    The Disclosure Regime Plaintiff Demands Is Unworkable ............. 15

      B.    Plaintiff Fails To State A Claim About The Fund's MBS Investments ............. 16

            1.    Plaintiff's New Allegations About The Liquidity Risks Of MBS Fail to State a Claim ......................................................... 16

            2.    The Fund's Concentration Policy Was Not Materially Misleading ......... 17

      C.    Plaintiff Fails To Allege A Violation Of The Fund's Policy On Investment Grade Securities ............................................................... 18

# TABLE OF CONTENTS

D.      Plaintiff Fails To State A Claim About The Fund's Internal Controls ................ 19

E.      The Fund Disclosed Its Investments In Companies That Were Financially Troubled .......................................................................................................... 20

IV.    Plaintiff's Claims Should Be Dismissed Because The Fund's NAV Decline Did Not "Result From" The Alleged Misrepresentations And Omissions ............................ 22

V.     Plaintiff Lacks Standing To Assert That The Fund's 2008 Registration Statement Was Materially Misleading ................................................................................................ 22

VI.    Plaintiff's Section 12 Allegations Fail To State A Claim ................................................ 23

VII.   Plaintiff's Section 15 Allegations Fail To State A Claim ................................................ 24

VIII.  Request for Oral Argument ............................................................................................... 24

CONCLUSION ............................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

Cᴀꜱᴇꜱ

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009)..................................................................................................18, 21

*Benzon v. Morgan Stanley Distribs., Inc,*
  420 F. 3d 598(6th Cir. 2005) .....................................................................................5

*In re Cirrus Logic Sec. Litig.,*
  946 F. Supp. 1446 (N.D. Cal. 1996) ..................................................................19

*DeBruyne v. Equitable Life Assurance Soc'y of the United States,*
  920 F.2d 457 (7th Cir. 1990) ...............................................................................12

*In re Exabyte Corp. Sec. Litig.,*
  823 F. Supp. 866 (D. Colo. 1993) (Kane, J.) ..................................................20

*Gallagher v. Abbott Labs.,*
  269 F.3d 806 (7th Cir. 2001) ..............................................................................15

*Glazer v. Formica Corp.,*
  964 F.2d 149 (2d Cir. 1992)................................................................................13

*Green v. Haskell County Bd. of Comm'rs,*
  568 F.3d 784 (10th Cir. 2009) ...........................................................................22

*Grossman v. Novell,*
  120 F.3d 1112 (10th Cir. 1998) ...................................................................13, 17

*Jojola v. Chavez,*
  55 F.3d 488 (10th Cir. 1995) ..............................................................................16

*Lewis v. Casey*
  518 U.S. 343 (1996).............................................................................................22

*McDonald v. Kinder-Morgan, Inc.,*
  287 F.3d 992 (10th Cir. 2002) ...........................................................................20

*Olkey v. Hyperion 199 Term Trust, Inc.,*
  98 F.3d 2 (2d Cir. 1996)......................................................................................20

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ...................................................................................................13

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    658 F. Supp. 2d 299 (D. Mass. 2009) .....................................................................................23

*In re RAC Mortgage Inv. Corp. Sec. Litig.*,
    765 F. Supp. 860 (D. Md. 1991) ................................................................................................5

*In re Real Estate Associtates Ltd. P'ship Litig.*,
    223 F. Supp. 2d 1109 (C.D. Cal. 2003) .....................................................................................8

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) .....................................................................................23

*SEC v. Mozilo*
    No. 09-3994, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ......................................................8

*Steinberg v. PRT Group, Inc.*,
    88 F. Supp. 2d 294 (S.D.N.Y. 2000) .........................................................................................5

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*,
    No. 95-0167, 1997 U.S. Dist. LEXIS 18485 (S.D.N.Y. Nov. 20, 1997) ...........................16, 17

*United States v. McVeigh*,
    106 F.3d 325 (10th Cir. 1997) .................................................................................................22

*White v. Heartland High-Yield Mun. Bond Fund*,
    237 F. Supp. 2d 982 (E.D. Wis. 2002) ......................................................................................6

## PRELIMINARY STATEMENT

In their Motion to Dismiss the Consolidated Class Action Complaint filed in this action ("Motion to Dismiss" or "MTD"), the Oppenheimer Defendants demonstrated that Plaintiff's claims about the "magnitude" of the Oppenheimer Core Bond Fund's (the "Fund's") investments in mortgage-backed securities ("MBS") and swaps are (1) time-barred, and (2) claims of mismanagement, rather than of misrepresentation cognizable under the securities laws.  In his brief, Plaintiff does not seriously dispute that the Fund disclosed all of the facts relating to its investments, which put him on inquiry notice of his claims more than one year before this lawsuit began.  Nor does he dispute that the Fund disclosed the risks that he claims later materialized and caused the Fund's losses.  Plaintiff nonetheless attempts to breathe life into his time-barred mismanagement claims by recasting the Fund as one that billed itself as a "minimal risk exposure" investment and covertly hid the "magnitude of the risks" created by its disclosed MBS investments and swap transactions.  Unable to cite actual facts to support this theory, Plaintiff is relegated to trumpeting the after-the-fact opinion of a Wall Street analyst at *Morningstar* that a reasonable investor could not have discovered the true risks of the Fund.

These arguments fail for four reasons:

- Rather than describe itself as having "minimal risk exposure," the Fund told investors that it would routinely invest in MBS and engage in swap transactions and that these investments entailed unique risks that could cause the Fund's share price to decline.

- The Fund fulfilled its duty to inform investors of the relevant risks by explaining in detail the risks of MBS and swaps and regularly disclosing all of its investments in these securities in its Statements of Investments.  Contrary to Plaintiff's suggestion, the Fund had no duty to go further and attempt to characterize, opine about, or quantify these disclosed risks.

- The Fund's Statements of Investments also put Plaintiff on inquiry notice of the "magnitude" of the Fund's MBS investments and swap transactions, the precise facts on which he bases his claims.  No expert analysis of these documents is necessary to determine the percentage of the Fund's assets invested in MBS (a number the Fund itself reported) or the total notional amount of the Fund's swap investments (a number that can be determined through simple addition).

- The *Morningstar* article Plaintiff cites makes clear that the author did not read the Fund's disclosures until *after* the market collapsed.  Once he did so, however, the author discovered the very risks that Plaintiff claims the Fund concealed.  Thus, the *Morningstar* article does not support Plaintiff's argument that the Fund's disclosures both failed to put him on notice of his claims and failed to adequately warn investors about the Fund's risks.

Plaintiff's remaining arguments fail as well:  (1) his remaining disclosure allegations fail to state a claim; (2) he suffered no compensable damages under the plain language of the Securities Act; and (3) he lacks standing to assert that the Fund's 2008 registration statement was materially misleading.

In short, this case is ripe for dismissal now.  There are no factual disputes and the Fund's disclosures, when analyzed in light of the applicable legal principles, did not contain any misrepresentations or omissions of material fact.  For all of these reasons, Plaintiff's claims should be dismissed with prejudice.[1]

## I.      Plaintiff Wrongly Suggests That The Fund Portrayed Itself As Having "Minimal Risk Exposure"

Plaintiff suggests that the Fund touted itself as having "minimal risk exposure," and that, as a result, investors were misled about the "magnitude" of the risks created by the Fund's MBS investments and swap transactions.  Plaintiff's Opposition to Defendants' Motion to Dismiss

---

[1]      In his brief, Plaintiff repeats numerous arguments that are made in the opposition brief in the Champion Fund case.  Rather than repeat the Oppenheimer Defendants' responses to these arguments, this brief cites to and incorporates by reference relevant portions of the Oppenheimer Defendants' reply brief in the Champion Fund case.

("Pl. Br.") at 2.  But Plaintiff's characterization of the Fund's disclosures is simply wrong.

When read in full, the Fund's disclosures made clear that the Fund invested a substantial

percentage of its assets in MBS and swaps, and that these securities entailed significant risks that

could cause the Fund to lose money.  In his own brief, Plaintiff concedes (or does not dispute)

that:

- The Fund told investors that the Manager had discretion to invest the Fund's assets in MBS and to engage in swap transactions;

- The Fund disclosed the risks inherent in its swaps transactions, including that swaps could add leverage to the Fund's portfolio;

- The Fund disclosed all of its investments – including its swaps transactions and MBS investments – on a quarterly basis in Statements of Investments that were sent to shareholders and/or filed with the SEC; and

- *All* of the factual allegations in the Complaint are pulled directly from the Fund's contemporaneous disclosures.

Plaintiff cannot dispute these points.  In just the first few pages of its prospectus, the

Fund clearly disclosed that:  (1) MBS would be one of the main building blocks of its portfolio;

(2) the Fund's Manager had wide discretion to enter into swap transactions for speculative

purposes; and (3) these investments had significant risks.  Specifically, an investor who merely

opened the front cover of the Fund's prospectus would have seen a prominent disclosure

explaining that MBS were one of the Fund's three primary investments:

> **WHAT DOES THE FUND MAINLY INVEST IN?**  As a non-fundamental policy . . . , under normal market conditions, the Fund invests at least 80% of its net assets (plus borrowings for investment purposes) in investment grade debt securities.  Those investment-grade debt securities can include:
> - domestic and foreign corporate debt obligations,
> - domestic and foreign government bonds, including U.S. government securities, and

- ***mortgage-related securities (including collateralized mortgage obligations ("CMOs")) issued by private issuers.***

April 2007 Prospectus at 3 (second emphasis added).  On the very same page, the Fund told investors it "can also use derivative instruments, primarily futures, ***swaps, CMOs*** and 'structured notes,' for ***speculative purposes (to seek higher investment returns)***."  *Id.* (emphasis added). . And it explained that "[t]here is no set allocation of the Fund's assets among the classes of securities the Fund buys[.]"  *Id.*

Over the next two pages of the prospectus, the Fund explained that its debt securities, including its MBS, were exposed to credit risk, interest rate risks, and prepayment risks.  These are precisely the risks of MBS that Plaintiff suggests later materialized and caused the Fund to lose money.  *See* Consolidated Class Action Complaint ("CCAC") ¶¶ 53-54 (referring to interest rate risks and credit risks).  Plaintiff does not contend that any of these disclosures were affirmatively misleading or that they failed to capture the types of risk to which the Fund was exposed, including those that led to the decline of its NAV in 2008.

In the same section, under the bold-faced heading "**RISKS OF USING DERIVATIVE INVESTMENTS,**" the Fund explained the risks of derivatives this way:

> If the issuer of the derivative does not pay the amount due, ***the Fund can lose money on the investment***.  Also, the underlying security or investment on which the derivative is based, and the derivative itself, might not perform the way the Manager expected it to perform.  If that happens, ***the Fund's share prices could decline*** and ***the Fund could get less income than expected***, or its hedge might be unsuccessful.  ***Some derivatives may be illiquid***, making it difficult to value them or sell them at an acceptable price.  The Fund has limits on the amount of certain types of derivatives it can hold.  However, ***using derivatives can cause the Fund to lose money on its investments and/or increase the volatility of its share prices.***

April 2007 Prospectus at 6 (emphasis added).  Thus, the first six pages of the Fund's prospectus plainly told investors that the Fund did not involve "minimal risk exposure," but rather purchased MBS and used derivatives, and that these types of investments carried risks.

Moreover, the Fund explained that derivatives such as swaps present the "***risk of leverage***."  As Plaintiff admits, the Fund's disclosures explained that the Fund's use of "***economically leveraged derivatives can result in a loss substantially greater than the amount invested in the derivative itself***" and that "***[c]ertain derivatives have the potential for unlimited loss, regardless of the size of the initial investment***."  Pl. Br. at 17; April 2008 Prospectus at 6 (emphasis added).[2]

The Fund also explained the precise risks of swaps that, according to Plaintiff, later materialized and caused the Fund to lose money.  For example, the main risk of selling protection through credit default swaps is that the Fund could be required to pay the par value of the underlying bond.  *See* CCAC ¶ 60.  The Fund disclosed this risk in clear, plain English:  "If the Fund is selling credit protection, there is a risk that a credit event will occur and that the Fund will have to pay par value on defaulted bonds."  *E.g.*, April 2007 Prospectus at 17.

Similarly, the principal risk of total return swaps is that the Fund's manager will be wrong about how the reference asset or index underlying the swap will perform.  Indeed, Plaintiff alleges that risk materialized when a commercial mortgage-backed securities index that

---

[2]     Plaintiff complains that certain of the Fund's disclosures about the leveraging effects of swaps contain the word "may."  *See* Pl. Br. at 15.  In light of the totality of the Fund's disclosures about swaps, Plaintiff's complaint amounts to nothing more than mere quibbling about semantics.  *See* Champion Reply Br. at Part I.B. (citing *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598 (6th Cir. 2005); *In re RAC Mortgage Inv. Corp. Secs. Litig.*, 765 F. Supp. 860 (D. Md. 1991); *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000)).

the Fund's manager believed would "rally in 2008" later performed poorly.  CCAC ¶ 57.  Once again, however, the Fund disclosed this *precise* risk by explaining that total return swaps could cause the Fund to lose money if "unfavorable changes occur in the reference asset."  June 2007 Semiannual Report at 55.[3]

In sum, when read as a whole, the Fund's disclosures facially told investors that the Fund would regularly invest in MBS and engage in swap transactions for speculative purposes; warned investors of the unique risks of MBS and swaps; and detailed the specific risks of MBS and swaps that Plaintiff claimed materialized and caused the Fund's losses.  Plaintiff's argument that the Fund lulled investors to sleep by portraying itself as having "minimal risk exposure" is simply not true.

## II.      Plaintiff's Claims Are Time-Barred

The central allegation of the Complaint is that the "magnitude" of the Fund's MBS investments and swap transactions were inconsistent with the Fund's stated investment policies. CCAC ¶¶ 53, 59, 65, 69.  As the Oppenheimer Defendants explained in detail in their Motion to Dismiss, Plaintiff's claims are time-barred because any investor who read the Fund's disclosures would have known about the purportedly inappropriate "magnitude" of these investments more than one year before this suit was filed.  *See* MTD at 15-26.

---

[3]      These crisp, specific disclosures easily distinguish this case from *White v. Heartland High-Yield Municipal Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002), the lone case Plaintiff cites to support the claim that the Fund's disclosures were "boilerplate."  *See* Pl. Br. at 17.  The Court in *White* held that general disclosures about the "greater risks" and "limited liquidity" of junk bonds were not sufficiently tailored to warn investors of the risk that a fund was violating its valuation policies.  *Id.* at 986.  Here, by contrast, the Fund's disclosures describe precisely those risks that Plaintiff claims materialized and caused the Fund's losses.

Plaintiff tries to save his time-barred claims by arguing that (1) reasonable investors cannot be expected to add (Pl. Br. at 19); (2) a *Morningstar* analyst purportedly did not discover the alleged misstatements until December 2008, so no reasonable investor would have discovered them before that date (*id.* at 47-48); and (3) despite the fact that the Court may take judicial notice of the Fund's disclosures now, it should wait until summary judgment to decide whether Plaintiff's claims are timely (*id.* at 48-49).  All of these arguments are meritless.

### A.   Reasonable Investors Could Easily Determine The "Magnitude" Of The Fund's MBS Investments And Swap Transactions

The Fund made clear that it could invest in MBS and swaps and that such investments carried risks; thus, Fund investors went in knowing that such risks went along with the shares they were buying.  Moreover, the Fund disclosed the precise extent of its MBS holdings every quarter in its Statements of Investments.  Thus, any investor could have learned the "magnitude" of the Fund's MBS investments by simply looking at the Statements of Investments.  *See* MTD at 17-19.  Plaintiff does not, and cannot, argue that the magnitude of the Fund's MBS transactions was difficult to calculate or required expert assistance.

The Fund also disclosed each of its swap transactions and its notional amount every quarter.  *See* MTD at 24.  Thus, any investor who was interested in determining the precise extent of the Fund's exposure to swaps could have easily determined the "magnitude" of the Fund's swap transactions (and the "leverage" the swaps purportedly created) by simply adding up the notional amounts.  *See id.*  As the Oppenheimer Defendants' citations to *Koke* and *Holtzman* made clear, courts routinely hold that investors are on notice of their claims when "simple arithmetic" like this would alert them to the facts underlying their claims.  *Id.* at 24-25.

Plaintiff does not and cannot distinguish *Koke* and *Holtzman*. Instead, he makes three statements that are either irrelevant or wrong. *First*, Plaintiff notes that the cases were brought against brokerage firms. But Plaintiff does not even attempt to explain why the identity of the defendant is relevant to when a reasonable investor is on notice of his claims. *Second*, he says the cases were "essentially based on breach of contract." This is simply not true. Rather, both *Koke* and *Holtzman* involved federal securities fraud claims in which an investor, just like Plaintiff here, claimed that his actual investments were riskier than he requested. *Third*, Plaintiff asserts that calculating the "magnitude" of the Fund's swap transactions and the leverage they create involves "specific mathematical formulas." Pl. Br. at 19. But the only math that might be required is simple addition. A reasonable investor does not need an expert to help him add. The truth is that not even addition is necessary; simply reading the list without any calculation at all would put an investor on notice that derivatives – and their attendant risks, including leverage – played a material role in the Fund's portfolio and strategy.[4]

Plaintiff tries to cover up this simple fact by a bootstrapping "straw man" argument. He posits a "magnitude" of risk disclosure obligation unsupported by any precedent or regulation. He then asserts that expert analysis is needed to calculate the "net notional" value of the Fund's

---

[4]      The cases Plaintiff cites on this issue are easily distinguishable. In *SEC v. Mozilo*, No. 09-3994, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009), the relevant numerical disclosures were included in different documents filed by different issuers, *i.e.*, the documents that contained the relevant information were not sent to the investors or even issued by the company in which they invested. That is why the court concluded that the information was not "readily available" to the issuer's investors. *See id.* at *10. And in *In re Real Estate Associates Ltd. Partnership Litigation*, 223 F. Supp. 2d 1109 (C.D. Cal. 2003), the court concluded that the calculations necessary to understand the disclosure were not calculations that "could easily be made" and were not "obvious to anyone conversant in basic mathematics." *Id.* at 1132. Here, by contrast, "basic mathematics" is all that is required.

leverage because such calculation requires an investor to understand and take account of futures. Pl. Br. at 19.  Plaintiff's argument fails for two reasons.

*First*, Plaintiff's Complaint is based on the allegation that the Fund's MBS investments and swap transactions were excessive.  *See, e.g.*, CCAC ¶¶ 52, 54, 55, 58, 64, 65 (including charts listing the MBS holdings and the notional amounts of the Fund's swaps and calling these totals "inconsistent" with the Fund's disclosures).  As discussed above, any investor could determine the amount of the MBS holdings by simply looking at the Fund's Statements of Investments.  Just as clearly, any investor would know by mere reading that the notional amount of the swaps was quite large and could determine the Fund's total exposure to swaps by simply adding up the notional amounts listed in the Fund's Statements of Investments.  Thus, knowledge of futures or even awareness of the term "net notional leverage" is not required to determine the magnitude of the Fund's exposure to MBS or swaps.

*Second*, Plaintiff believes that his net notional value calculation shows "the potential for the Fund to suffer a financial loss that far exceeded its net worth," because the notional value of the Fund's swaps exceeded its total net assets. Pl. Br. at 18.  In fact, as Paragraph 68 of Plaintiff's own Complaint demonstrates, this conclusion is not true for most periods during the putative class period.  *See* CCAC ¶ 68 (alleging that Fund had $2.1 billion in assets and $1 billion in leverage as of December 2007).  But even if it were true, an investor would not need to calculate the precise figures Plaintiff's "expert" calculated to reach this conclusion.  Rather, an investor would only need to add the notional value of the Fund's swap investments and compare it to the value of the Fund's total net assets, a figure that is reported in the Fund's Statements of Investments.  *See* Champion Reply Br. at Part I.C.3.  No sophisticated analysis or "expert" help

is needed to compare these numbers and determine whether the notional value of the Fund's swaps is bigger than the value of its net assets.  And, of course, the Fund did not suffer a loss greater than the value of its net assets or anything close to it.

Significantly, Plaintiff does not allege that anything new was learned about the Fund after February 2008.  He does not identify any new facts that first came to light after that time and purportedly put him on notice, other than the decline in his shares due to market forces.  The reality is that Plaintiff's theory is one shaped entirely by hindsight and by the unreasonable expectation that the Fund should have characterized its holdings to better predict the future.  The law does not require funds to make predictions and Plaintiff avers no facts suggesting that this Fund should have done so.

### B.   *Morningstar's* After-The-Fact Repudiation Of Its Former Views Is Irrelevant To What A "Reasonable Investor" Would Have Known About the Fund

Rather than focus on the language of the disclosures themselves, Plaintiff attempts to deal with his fatal statute of limitations problem by relying on after-the-fact commentary by *Morningstar*.  When the articles are read in full, however, it is clear that they: (1) say nothing at all about MBS; and (2) actually *support* the conclusion that a reasonable investor who read the Fund's disclosures would have known about the allegedly inappropriate "magnitude" of the Fund's swap transactions.

### 1.   The *Morningstar* Articles Say Nothing About The Fund's MBS Investments

Plaintiff alleges that the Fund's "concentrations of mortgage-backed securities" were "inconsistent" with the Fund's stated investment policies.  CCAC ¶¶ 53, 56.  But the chart he includes in his Complaint shows that the Fund maintained essentially the same "concentrations"

of MBS throughout the entire class period, which extends more than one year before this case was filed.  *Id.* ¶ 52.  Plaintiff does not and cannot deny that the MBS concentration figures in the Complaint were taken directly from the Fund's Statement of Investments.  *See* MTD at 18.  Thus, anyone who read the Fund's disclosures would have known the "concentrations" of the Fund's MBS investments, and, if they were concerned about them, could have sold their shares or filed a lawsuit more than one year before this case began.  Nothing in the *Morningstar* articles suggests that any information about the Fund's MBS holdings was unavailable to investors.  *See* CCAC ¶¶ 88-90.  Accordingly, the *Morningstar* articles do not save Plaintiff's MBS claims.

> 2.  The *Morningstar* Articles Confirm That A Reasonable Investor Who Read The Fund's Disclosures Would Have Known About The "Magnitude" Of The Fund's Swap Investments

*Morningstar*'s articles cannot resuscitate Plaintiff's time-barred swap claims either.  In Plaintiff's view, these articles free him from the obligation to explain how a reasonable investor *who actually read the disclosures* would not have been on notice of the facts underlying his claims.  But Plaintiff is wrong because the *Morningstar* article admits that the author was not fooled; rather, he simply did not read the Fund's disclosures until late 2008.  *See* Champion Reply Br. at Part IV.  Because the author discovered the "magnitude" of the Fund's exposure to swaps as soon as he sat down and read the Fund's disclosures, the article actually *supports* the Oppenheimer Defendants' argument that Plaintiff was on inquiry notice of his claims more than one year before this lawsuit began.

## C.   The Statute Of Limitations Issues Should Be Decided Now

Plaintiff's final argument is that the Court should ignore the statute of limitations issue until summary judgment.  *See* Pl. Br. at 48.  This is so, Plaintiff says, because the statute of

limitations "often" requires a "fact intensive inquiry." *Id.* But Plaintiff does not explain why deciding the statute of limitations issue in *this case* requires further discovery or point to any belatedly disclosed facts that are central to his claims.

Courts can and should dismiss cases on limitations grounds if it is clear from the allegations and judicially noticeable facts that the claims are time-barred. *See, e.g.*, MTD at 14 (collecting cases). Plaintiff's claims fit that mold because, as discussed above, the facts he uses to support his allegations are taken from the very disclosure documents that he claims are misleading. No further factual discovery can alter that result.[5]

## III.    Plaintiff Fails To Allege A Material Misrepresentation Or Omission

The Fund's disclosures not only bar Plaintiff's claims on statute of limitations grounds; they also refute them on the merits. Plaintiff tries in vain to manufacture various misrepresentation claims by arguing that:  (1) the Fund had a duty to calculate and disclose its "overall leverage position"; (2) the Fund failed to disclose the liquidity risks of MBS, and its MBS investments violated the Fund's policies on industry concentration; (3) unidentified Fund investments violated the Fund's policy on investment grade securities; (4) the Fund had a duty to disclose a change to an internal "risk metric"; and (5) the Fund failed to disclose the "enhanced

---

[5]     Plaintiff claims that the Court should not rely on *DeBruyne v. Equitable Life Assurance Society of the United States*, 920 F.2d 457 (7th Cir. 1990), because that case involved a motion for summary judgment, rather than a motion to dismiss.  Pl. Br. at 48-49. However, the Seventh Circuit based its decision on the fund's statement of investments, *i.e.*, documents which this Court may judicially notice right now. *See* MTD at 3 n.2. Thus, because *DeBruyne* held that the statute of limitations barred the plaintiffs' claims based upon the same type of information that is before the Court here, that case is fully applicable to the Oppenheimer Defendants' present motion.

risks" created by its exposure to financially troubled companies.  All of these claims fail as a matter of law.

### A.     The Fund Had No Duty To Calculate And Disclose Its "Overall Leverage Position"

Plaintiff admits that the Fund warned investors that: (1) swaps "can result in a loss substantially greater than the amount invested" in the swap itself; and (2) when the Fund uses swaps, "a shareholder's investment in the Fund will tend to be more volatile, resulting in larger . . . losses."  Pl. Br. at 17.  Nevertheless, Plaintiff claims that the Fund's disclosures were misleading because they "did not warn investors of the magnitude of the Fund's overall leverage position (i.e. the total dollar amount of potential losses compared to the Fund's total net assets)[.]"  *Id.* at 17-18.  In other words, the Fund's disclosures are misleading, Plaintiff says, because they purportedly failed to calculate and disclose the Fund's "overall leverage position".

An omission is actionable, however, only if the issuer had a duty to disclose the omitted fact.  *See, e.g., Grossman v. Novell*, 120 F.3d 1112, 1121 (10th Cir. 1998); *Glazer v. Formica Corp.*, 964 F.2d 149, 156-57 (2d Cir. 1992).  A duty to disclose arises *only* if:  (1) a rule or regulation requires disclosure of the omitted fact; or (2) disclosure of the omitted fact is necessary to prevent other disclosures from being misleading.  *E.g., Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).  Neither of these requirements is met here, and the cases Plaintiff cites do not suggest otherwise.

### 1.     No Statute, Rule, Or Case Requires The Fund to Calculate And Disclose Its "Overall Leverage Position"

To begin with, Plaintiff fails to point to any statute, rule, regulation, or Form N-1A instruction that requires a mutual fund to calculate its "overall leverage position" in order to

better describe risk and disclose it to investors.  Plaintiff's failure is not surprising because the SEC has twice considered but ultimately *refused* to require mutual funds to disclose numerical or quantitative measures of risk.  *See* Champion Reply Br. at Part I.C.2.   Moreover, case law makes clear that the Fund had no duty to characterize, opine about, or quantify disclosed risks.  *See id.* In short, no legal requirement obligated the Fund to calculate and disclose its overall leverage position.

           2.      <u>Disclosure of the Fund's "Overall Leverage Position" Was Not Necessary To Prevent Other Disclosures From Being Misleading</u>

Moreover, Plaintiff cannot point to any disclosure that was rendered misleading by the Fund's failure to calculate and disclose its "overall leverage position".  With a studied lack of clarity, the Complaint and Plaintiff's brief suggest three possibilities for such a disclosure.  None of them comes close.

*First*, Plaintiff repeatedly refers to the Fund's statement that it would invest in a "broadly diversified portfolio."  *E.g.*, CCAC ¶¶ 46, 49, 53, 55, 59, 69; Pl. Br. at 21.  After receipt of the Motion to Dismiss, however, Plaintiff was forced to concede that the Fund's use of the term "diversified" was not misleading.  *See* Pl. Br. at 25 n.10.

*Second*, without citing any legal authority, Plaintiff asserts that the Fund's swap investments violated the Fund's limit on bank borrowing.  *See* Pl. Br. at 28.  Swaps, however, do not involve "borrowing" from a bank or anyone else.  Thus, the Fund's borrowing limitation does not apply to them.  *See* Champion Reply Br. at Part II.

*Lastly*, Plaintiff falls back on the conclusory contention that the Fund's disclosures, as a whole, somehow portrayed the Fund as having "minimal risk exposure."  Pl. Br. at 2, 26.  For the reasons explained above, this claim fails because it simply is not true – the Fund's disclosures,

taken as a whole, told investors that a significant percentage of its assets were invested in MBS and swaps, and warned investors that these securities had unique risks that could cause the Fund to lose money.  *See supra* Part I.

### 3. The Cases Plaintiff Cites Are Easily Distinguishable

On pages 17-18 of his brief, Plaintiff cites four cases that, in his view, require an issuer to quantify and disclose the "magnitude" of a disclosed risk.  None of these cases support his position because none of them even suggest, much less hold, that an issuer must quantify a disclosed risk.  In fact, these cases collectively stand only for the unremarkable proposition that issuers and mutual funds must disclose known, hard facts or risks that are inherent in an investment.  *See* Champion Reply Br. at Part I.C.3.  Plaintiff here, as noted above, has yet to point out any hard fact, or any inherent risk in MBS investments or swap transactions, which was not disclosed.

### 4. The Disclosure Regime Plaintiff Demands Is Unworkable

Plaintiff's argument that the Fund had an obligation to calculate and disclose its "overall leverage position" also fails because it requires a system of continuous disclosure that is simply unworkable.  *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("We do not have a system of continuous disclosure.").  The Fund's registration statement must be written in a way that will inform investors about the risks the Fund will likely encounter throughout the year.  It cannot possibly provide the type of real time "overall leverage position" calculations that Plaintiff demands.  Thus, if the Court were to adopt such a regime it would threaten serious confusion in the market.  *See* Champion Reply Br. at Part III.  For this additional reason, Plaintiff's claim fails.

**B.      Plaintiff Fails To State A Claim About The Fund's MBS Investments**

Plaintiff alleges that the Fund's disclosures about MBS were misleading because: (1) they failed to disclose the liquidity risks of MBS (Pl. Br. at 23-24); and (2) the MBS investments violated the Fund's industry-concentration policy (*id*. at 27-28).  Both arguments fail as a matter of law.

1.      <u>Plaintiff's New Allegations About The Liquidity Risks Of MBS Fail to State a Claim</u>

The Complaint does not allege that the Fund failed to disclose the liquidity risks of MBS.  Nevertheless, Plaintiff's brief asserts that the Fund failed to disclose this risk.  Pl. Br. at 24-25.  This argument fails for at least three reasons:

*First*, it was not pleaded in the Complaint.  As the Tenth Circuit has explained, "in determining whether to grant a motion to dismiss, the district court . . . [is] limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint."  *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995).  Here, there is not a single allegation in the Complaint that the Fund failed to disclose the liquidity risks of MBS.

*Second*, Plaintiff does not allege any facts suggesting that the risk existed and was material.  Instead, he simply cites a case in which a court concluded, in a different context with respect to a different fund, that the liquidity of the mortgage-backed securities market *might* be material.  *See* Pl. Br. at 23-24 (discussing *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, No. 95-0167, 1997 U.S. Dist. LEXIS 18485 (S.D.N.Y. Nov. 20, 1997)).  That is plainly insufficient to plead materiality under any pleading standard.

*Lastly*, the Fund in fact disclosed the liquidity risks of MBS.  Specifically, the Fund repeatedly disclosed that "derivatives" can be illiquid (*e.g.*, April 2007 Prospectus at 6, 14), and

it told investors that MBS "are a form of derivative investment" (April 2007 SAI at 5).  Thus, the lone authority cited by Plaintiff, *In re TCW/DW*, is easily distinguishable because the fund in that case did not even mention liquidity risks; instead, the fund there attempted to rely on disclosures about its general valuation policy.  *See In re TCW/DW*, 1997 U.S. Dist. LEXIS 18485, at *27.

2.    <u>The Fund's Concentration Policy Was Not Materially Misleading</u>

Plaintiff also alleges the Fund's concentration policy was misleading because the Fund invested more than 25% of its assets in MBS.  This argument is meritless because, as Plaintiff admits, MBS is a type of security, not an "industry".  Pl. Br. at 28.  Nevertheless, Plaintiff attempts to argue that a reasonable investor would have been misled into believing that MBS fell within the Fund's "Real Estate" industry classification, and thus would have assumed that the Fund would not have invested more than 25% of its net assets in MBS.  This argument fails too.

No one who read the industry classifications *in context* would have believed that MBS fell within the Real Estate industry classification.  The Fund's Statements of Investments disclosed precisely which of its investments fell within its Real Estate industry classification.  But the Fund never included MBS in that category.  *See*, *e.g.*, May 2007 SAI at 110 (identifying 1.5% of assets as Real Estate investments and listing the particular investments).  Moreover, the Fund explicitly disclosed the percentage of its investments that actually were in MBS and that percentage never fell below 64% during the class period.  MTD at 33.  Thus, when read in context, which it must be, *see Grossman*, 120 F.3d at 1121, the Fund's reference to a Real Estate

industry classification could not have misled investors into believing that the Fund would not invest more than 25% of its assets in MBS.[6]

### C.   Plaintiff Fails To Allege A Violation Of The Fund's Policy On Investment Grade Securities

Plaintiff next argues that the Fund's investments in unidentified "speculative derivatives," and, in particular, its investments in unidentified "mortgage-backed securities" violated the Fund's stated policy of investing "at least 80% of its net assets (plus borrowing for investment purposes) in investment-grade securities." Pl. Br. at 27. But as the Oppenheimer Defendants explained in their Motion to Dismiss, the Fund regularly disclosed the weighted rankings of its portfolio. These disclosures confirm that at all times during the class period the Fund did in fact invest 80% or more of its assets in investment grade securities. *See, e.g.,* December 2007 Annual Report at 10; MTD at 37. Thus, the allegation is belied by the very disclosure documents Plaintiff cites.

Plaintiff does not deny this. Instead, he simply asserts that under Federal Rule of Civil Procedure 8(a), his bald belief is enough to state a claim. *See* Pl. Br. at 28-29. Plaintiff is plainly wrong. Under *Twombly* and *Iqbal*, Plaintiff must plead a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). To meet this standard, Plaintiff must allege a "plausible" ground for believing that more than 20% of the Fund's assets were not investment grade as defined by the Fund. But he does not. He does not identify any particular securities – or group of securities – that allegedly were below investment grade and does not allege that there

---

[6]     Plaintiff also incorrectly suggests that there is a factual dispute on this issue that must await summary judgment. Pl. Br. at 28. When read in context, the Fund's disclosures make clear to investors that MBS are not in the Real Estate industry. No amount of discovery can change that fact.

was anything wrong with how the Fund (or, more accurately, the independent ratings agencies) classified the Fund's investments.  Absent such allegations, the Oppenheimer Defendants and the Court are left to guess about why Plaintiff thinks this policy was violated.  Because Plaintiff does not plead a single fact to show that his naked conclusion is plausible, this claim should be dismissed.

### D.    Plaintiff Fails To State A Claim About The Fund's Internal Controls

Plaintiff concedes that he is not alleging that the Fund failed to "disclose inadequate internal controls."  Pl. Br. at 34.  Instead, he argues that the Fund's disclosures were misleading because they failed to disclose a change in its internal "risk metrics."  *Id.*  This claim fails because the Fund had no duty to disclose a change in *internal* policies that were never previously disclosed to the public.

As discussed above, an issuer has a duty to disclose a fact only if: (1) a rule or statute requires the disclosure; or (2) disclosure is necessary to prevent some other disclosure from being materially misleading.  Plaintiff points to no statute or rule requiring Funds to disclose changes to internal policies, and none exists.  *Cf. In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1459 (N.D. Cal. 1996) ("[T]here is no cause of action under the federal securities laws merely for deviating from an undisclosed internal accounting policy . . . .").  And the only statement that Plaintiff claims was rendered materially misleading was the Fund's general observation that its manager would analyze risks in an effort to reduce volatility and seek "a good balance of risk and return."  Pl. Br. at 36.  But this disclosure says nothing at all about internal controls, nor does it suggest that the Fund will use or maintain any particular internal "risk metrics."  Plaintiff does not assert that the manager did not seek "a good balance of risk and

return" nor that any particular risk metric should have been used for that determination.

Accordingly, disclosing the alleged shift in metrics was not necessary to correct or clarify this statement.  *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002).[7]

> **E.  The Fund Disclosed Its Investments In Companies That Were Financially Troubled**

The Complaint alleges that the Fund "gambled" by selling credit protection on bonds issued by AIG, Merrill Lynch, Washington Mutual, Lehman Brothers, Tribune, Citigroup, General Motors, and Ford.  CCAC ¶ 62.  But Plaintiff does not and cannot dispute that the Fund began entering into these swaps transactions long before the market collapse in the fall of 2008 and disclosed all of these transactions in its Statements of Investments.  *See* Pl. Br. at 21.

Plaintiff nevertheless tries to contrive a disclosure claim by arguing that the Fund failed to disclose "the increased risks associated with bonds issued by these severely troubled financial companies."  Pl. Br. at 22.  Not only is this allegation inappropriate because it is raised for the first time in Plaintiff's brief, but it also lacks merit for two reasons:

*First*, the securities laws require issuers to disclose "firm-specific information," not information that is already public.  *E.g.*, *In re Exabyte Corp. Sec. Litig.*, 823 F. Supp. 866, 872 (D. Colo. 1993) (Kane, J.).  The Fund, of course, has no "inside" information about the companies in which it invests; instead it bases its investment decisions on the same public

---

[7]     Plaintiff also suggests that the Fund must have departed from its stated investment strategies because "the Fund's performance was 31 percentage points worse than the typical intermediate-term bond fund."  Pl. Br. at 30.  But as the Second Circuit has explained, "[i]t is hardly a sound argument . . . to say that some other unspecified income funds performed better.  That is only to say in hindsight that the managers of those funds turned out to be more skillful in their predictions."  *Olkey  v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996).

information that is available to other investors.  So, other than the fact that the Fund sold credit protection on bonds issued by these companies – a fact that was consistently disclosed in the Fund's Statements of Investments – the Fund has no duty to disclose any additional information about these companies or their bonds

*Second*, the disclosure regime Plaintiff asks the Court to adopt is, once again, unworkable and unsupported by law or regulation.  A mutual fund prospectus that included all of this information for each of its investments would easily run into the thousands of pages.  That volume is hardy conducive to the type of concise, informative disclosures that Form N-1A requires.  Updating this type of  disclosure continuously over time (*e.g.*, the risks of investing in General Motors securities, for instance, will certainly change over time) in a disclosure regime built for continuous offerings from an annual prospectus would compound the problem exponentially.  *See* Champion Reply Br. at Part III.  There is no way for a fund to disclose in real time all of the risks associated with each of its investments and this no doubt explains why there is no obligation to do so.[8]

---

[8]    Buried in a footnote of his brief, Plaintiff asserts that "Defendants do not contest Plaintiff's claim that they failed to adhere to the Fund's restriction" to not invest more than 15% of its net assets in illiquid or restricted securities. Pl. Br. at 26 n.11.  This statement is false.  On Page 6 of their Motion to Dismiss, the Oppenheimer Defendants state that Plaintiff has pleaded no facts to support his illiquidity claim.  Plaintiff has done nothing to rectify that fatal flaw.  Apart from direct quotations of the Fund's own disclosures, *see* CCAC ¶¶ 4, 46, the Complaint's only other reference to the Fund's liquidity policy is the bald assertion that it was violated, *see* CCAC ¶ 49(f).  Neither does Plaintiff's brief put any meat on the bare bones of this allegation.  Because this claim is devoid of any context or allegation of fact, it does not state a "plausible" claim for relief and should be dismissed.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Moreover, absent allegations that the illiquidity determination was not believed when made, Plaintiff's claim fails.  *See* Champion Reply Br. at Part V.A.

**IV.    Plaintiff's Claims Should Be Dismissed Because The Fund's NAV Decline Did Not "Result From" The Alleged Misrepresentations And Omissions**

For the reasons explained in the Oppenheimer Defendants' Reply Brief in the Champion Fund case, Plaintiff's claims should also be dismissed because it is clear from the face of the Complaint that he suffered no compensable damages under Sections 11(e) and 12(b).  *See* Champion Reply Br. at Part VII.

**V.     Plaintiff Lacks Standing To Assert That The Fund's 2008 Registration Statement Was Materially Misleading**

Both Article III and established case law require a plaintiff to trace his purchases to an allegedly defective registration statement in order to have standing.  *See* MTD at 42.  Plaintiff concedes that he did not purchase shares pursuant to the Fund's 2008 registration statement.  Thus, he lacks standing to bring any claims for alleged misrepresentations in that document.

In response, Plaintiff suggests that the Court ignore this threshold jurisdictional issue until the class certification stage.  The Tenth Circuit, however, has consistently held the question of standing is a "threshold issue ***in every case*** before a federal court" because it "involves the court's power to entertain the suit."  *Green v. Haskell County Bd. of Comm'rs*, 568 F.3d 784, 792 (10th Cir. 2009) (emphasis added); *see also United States v. McVeigh*, 106 F.3d 325, 334 (10th Cir. 1997).  And as the Supreme Court explained in *Lewis v. Casey*, an action's status as a class action "adds nothing to the question of standing."  518 U.S. 343, 357 (1996).  Thus, Plaintiff's standing to bring claims based on misrepresentations in the 2008 registration statement should be decided now; it should not be put off until class certification and thereby add to the cost and delay of this case.  As the District of Massachusetts recently wrote:

> While plaintiffs maintain that standing is an issue to be resolved at
> the class certification stage, a plaintiff may not avoid the standing

> inquiry merely by styling his suit as a class action.  Here, the named plaintiffs are incompetent to allege an injury caused by the purchase of Certificates that they themselves never purchased.

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303 (D. Mass. 2009) (internal marks and citations omitted); *see also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006).[9]

## VI.    Plaintiff's Section 12 Allegations Fail To State A Claim

Plaintiff begins the discussion of his Section 12(a)(2) claims by recognizing that the Oppenheimer Defendants contest the sufficiency of his "seller" claims with regard to *all defendants* named in this action except OppenheimerFunds Distributor, Inc.  Pl. Br. at 36.  However, in the ensuing pages his brief makes *no* argument whatsoever to support his purported Section 12 claim against OFI, presumably because no plausible allegation can be made that OFI "solicited" the sale of Fund securities.   *See* Pl. Br. 36-39.  As Plaintiff appears to have conceded that OFI was not a statutory "seller," his claims under Section 12 against OFI should be dismissed.

Moreover, for the reasons set forth in Part III.B of the Independent Trustees' and Oppenheimer Integrity Funds' Reply Brief, which is incorporated fully herein, Plaintiff's Section 12(a)(2) claims against OFI and the Individual Defendants fail because Plaintiff has not adequately asserted that they are "sellers" within the meaning of the statute.

---

[9]    Plaintiff cites some contrary class action authority, but those scattered decisions are neither binding on this Court nor consistent with Supreme Court precedent holding that standing is a jurisdictional question that must be decided first, before a court may address the merits of a dispute.

**VII.    Plaintiff's Section 15 Allegations Fail To State A Claim**

For the reasons set forth in Part III.C of the Independent Trustees' and Oppenheimer Integrity Funds' Reply Brief, which is incorporated fully herein, Plaintiff's Section 15 claims against OFI and the Individual Defendants fail because Plaintiff fails to plead a primary violation of Sections 11 or 12, and Plaintiff fails to allege sufficient allegations of control.

**VIII.   Request for Oral Argument**

The Oppenheimer Defendants respectfully request oral argument on their Motion to Dismiss.  Oral argument is warranted in light of the novelty of Plaintiff's theory and the significance of the issues raised.

**CONCLUSION**

For the reasons set forth above and discussed in the Oppenheimer Defendants' initial Motion to Dismiss, Plaintiff's claims should be dismissed with prejudice.

Dated this 17th day of February, 2010.

Respectfully submitted,

s/ *Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  rmiller@perkinscoie.com


s/ *William K. Dodds*
William K. Dodds
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Tel:  212 698 3500
Fax:  215 698 3599
Email:  william.dodds@dechert.com

Matthew Larrabee
Dechert LLP
One Maritime Plaza, Suite 2300
San Francisco, CA 94111
Tel: 415 262 4500
Fax: 415 262 4555
Email: matthew.larrabee@dechert.com

Michael Doluisio
Dechert LLP
2929 Arch Street
Philadelphia, PA 19147
Tel: 215 994 2325
Fax: 215 994 2222
Email: michael.doluisio@dechert.com

Attorneys for Defendants
OppenheimerFunds, Inc., OppenheimerFunds
Distributor, Inc., John V. Murphy, and Brian
W. Wixted

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of February, 2010, I electronically filed a true and correct copy of the foregoing **OPPENHEIMER DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Stephen D. Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com
- **Karen Jean Cody-Hopkins**
  kjch@lilleylaw.com,rbyers@lilleylaw.com
- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com
- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com,sdunn-efile@perkinscoie.com
- **Robert J. Dyer , III**
  bob@dyerberens.com
- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com
- **Daniel Charles Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com
- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com
- **Dale R. Harris**
  dale.harris@dgslaw.com,patricia.henson@dgslaw.com
- **Christopher J. Keller**
  ckeller@labaton.com,electroniccasefiling@labaton.com
- **Peter George Koclanes**
  pkoclanes@shermanhoward.com,cgreen@shermanhoward.com,efiling@sah.com
- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,michael.doluisio@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com
- **Jonathan Krasne Levine**
  jkl@girardgibbs.com,amv@girardgibbs.com
- **Charles Walter Lilley**
  clilley@lilleylaw.com
- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com
- **Gordon W. Netzorg**
  gnetzorg@shermanhoward.com,shood@shermanhoward.com,cdias@shermanhoward.com,efiling@shermanhoward.com

- **Peter G. Rush**
  peter.rush@klgates.com,melissa.neubeck@klgates.com
- **Regina Ames Sandler**
  ras@girardgibbs.com,amv@girardgibbs.com
- **Christina H.C. Sharp**
  chc@girardgibbs.com,sfs@girardgibbs.com,amv@girardgibbs.com
- **Aaron Michael Sheanin**
  amv@girardgibbs.com,ams@girardgibbs.com
- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com
- **Steven J. Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com

*s/ Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  rmiller@perkinscoie.com

Attorneys for Defendants
OppenheimerFunds, Inc., OppenheimerFunds
Distributor, Inc., John V. Murphy, and Brian W.
Wixted