# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge John L. Kane

Civil Action No. 09-cv-1186-JLK-KMT

IN RE:  CORE BOND FUND

---

## DEFENDANTS INDEPENDENT TRUSTEES' AND
## THE OPPENHEIMER INTEGRITY FUNDS' REPLY BRIEF
## IN SUPPORT OF MOTION TO DISMISS
## CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND

---

**K&L GATES LLP**
Peter G. Rush
Jeffrey T. Petersen
Sara E. Fletcher

70 West Madison Street
Chicago, Illinois  60602
Telephone:  (312) 372-1121
Facsimile:  (312) 827-8000

**DAVIS GRAHAM & STUBBS LLP**
Dale R. Harris

1550 Seventeenth Street
Denver, Colorado  80202
Telephone:  (303) 892-9400
Facsimile:  (303) 893-1379

*Attorneys for Defendants William L. Armstrong,*
*Robert G. Avis, George C. Bowen, Edward L.*
*Cameron, Jon S. Fossel, Sam Freedman, Beverly L.*
*Hamilton, Robert J. Malone and F. William*
*Marshall and the Oppenheimer Integrity Funds*

**Table of Contents**

**Page**

I.   Preliminary Statement.................................................................................. 1

II.  Background ................................................................................................. 2

     A.   Common Factual Background ............................................................. 2

III. Argument ................................................................................................... 5

     A.   Plaintiff Has Failed to State a Section 11 or Section 12(a)(2) Claim .................... 5

          1.   Defendants Have No Duty to Quantify Level of Risk For Investors........... 5

          2.   Quantification of Risk is Inherently a Matter of Opinion, Not Fact, Amounting to "Soft Information," Disclosure of Which is Not Required................................................................................ 6

          3.   Plaintiff Seeks to Hold Defendants Liable to Disclose a "Fact" Defendants Did Not Know......................................................... 7

          4.   Plaintiff's Proposed New Disclosure Standard Proves Unworkable ........... 8

          5.   The Fund Disclosed All the Factual Information Required...................... 12

          6.   The Opposition Fails to Support Any Contention the Fund Failed to Invest Its Net Assets in Investment Grade Securities ................................. 14

     B.   Plaintiff Has Failed to Show the Independent Trustees or the Integrity Funds Can be Liable Under Section 12(a)(2) as "Sellers" ................................................ 16

     C.   The Complaint Does Not Allege Any Section 15 Claim Against the Independent Trustees or the Integrity Funds ......................................................... 19

          1.   The Complaint Fails to Allege the Independent Trustees Controlled Any Defendant..................................................................... 19

          2.   The Complaint Does Not Allege an Underlying Securities Act Violation ......................................................................... 22

IV.  Conclusion ................................................................................................ 22

## TABLE OF AUTHORITIES

### Cases

*Albert Fadem Trust v. American Elec. Power Co., Inc.*, 334 F. Supp. 2d 985 (S.D. Ohio 2004) .................................................................................................................... 10

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ......................................... 16, 17, 18, 19, 21, 22

*Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 U.S. Dist. LEXIS 52365(C.D. Cal. July 1, 2008)................................................................................................................ 21

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ....................................... 16, 17, 18, 19, 21

*Brett v. Community Unit School Dist. No. 303*, No. 08 C 3092, 2009 WL 424546 (N.D. Ill. Feb. 18, 2009)................................................................................................... 2, 20

*Cafaro v. HMC*, No. 07-2793, 2008 WL 4224801 (D.N.J. Sept. 8, 2008)............................. 17, 18

*Cooperman v. Individual, Inc.*, 171 F.3d 43 (1st Cir. 1999)......................................... 22

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, 99-120462001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ...................................................................... 8

*Demaria v. Andersen*, 153 F. Supp. 2d 300 (S.D.N.Y. 2001) ....................................... 14

*Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001)....................................... 9

*Graham v. Barriger*, No. 08-9357, 2009 WL 3852461 (S.D.N.Y. Nov. 17, 2009)...................... 21

*In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543 (D.N.J. 1992) .................................. 9

*In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007) ........................ 10, 17, 18

*In re Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009) ........................................ 18, 19

*In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933 (M.D. Tenn. 1999).......................... 18

*In re Sonus Networks Sec. Litig.*, No 04-10294, 2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006)................................................................................................... 19

*In re Thornburg Mortgage, Inc. Sec. Litig.*, No. 07-0815, 2010 WL 378300 (D.N.M. Jan. 27, 2010) ....................................................................................................... 18

*In re Verifone*, 784 F. Supp. 1741 (N.D. Cal. 1992)....................................................... 8

*Kowal v. MCI Communications Corp.*, No. 90-2862, 1992 WL 121378 (D.D.C. May 20, 1992) .................................................................................................................... 6

*Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) .............................. 10

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998)..................................... 18, 21, 22

*Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009)............................................................ 16

*Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) ............................................................................................................................ 7

*Pinter v. Dahl*, 486 U.S. 622 (1988) ..................................................................... 17, 18, 19

*Rosenzweig v. Azurix Corp.*, 332 F. 3d 854 (5th Cir. 2003) ....................................................... 17

*Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 319185 (N.D. Ill. June 23, 1994) ..................................................................................... 9

*Turkmen v. Ashcroft*, 589 F.3d 542 (2d Cir. 2009) ..................................................................... 16

*Yuan v. Bayard Drilling Techs., Inc.*, 96 F. Supp. 2d 1259 (W.D. Okla. 1999) ........................... 10

## Other Authorities

Andrew Gogerty, *Fund Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009.................................................................................................................... 4, 7, 11

Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008 ........................................................................ 7, 11, 12, 15

Miriam Sjoblam, *We've lost confidence in Oppenheimer Core Bond Fund*, MORNINGSTAR, Dec. 17, 2008 ................................................................................ 11, 12

*The American Heritage Dictionary of the English Language*, 3d Ed. (1992) ................................ 3

## Rules

15 U.S.C. §77k............................................................................................................... 9

15 U.S.C. §77k(a) ........................................................................................................... 6

15 U.S.C. §77l(a)(2)....................................................................................................... 6

15 U.S.C. §80a-2(a)(19)................................................................................................ 22

## Regulations

SEC Form N-1A, General Instructions, Part C.1.b..........................................................................5

Defendants, William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone and F. William Marshall (collectively, the "Independent Trustees") and the Oppenheimer Integrity Funds (the "Integrity Funds") hereby submit the following Reply Brief in Support of their Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand.[1]

## I.    Preliminary Statement[2]

Plaintiff was obligated to plead the misstatement or omission of a material fact to support his securities law claims. Neither the Complaint nor Plaintiff's Opposition to Defendants' Motions to Dismiss (the "Opposition") articulates any such material fact. Instead, the Opposition asks this Court to formulate a new disclosure standard, one that requires an issuer to quantify accurately and then disclose an "aggregate risk profile" prognosis for its entire investment portfolio. The securities laws impose no such duty; indeed, the case law and governing regulatory authority state such a disclosure requirement would be inherently unreliable if not dangerous. The Complaint accordingly must be dismissed.

---

[1]    The Consolidated Class Action Complaint and Jury Demand shall hereinafter be referred to as "CCAC" or "Complaint." The Motion to Dismiss of the Independent Trustees and the Integrity Funds shall be referred to as the "Trustees' Motion."

[2]    In the interest of efficiency, the Independent Trustees and the Integrity Funds have sought to avoid repeating the points and authorities of their co-Defendants, OppenheimerFunds, Inc., the OppenheimerFunds Distributor, Inc., John Murphy and Brian Wixted (collectively, the "Oppenheimer Defendants" or "Oppenheimer Def's"), and incorporate herein by reference the Reply Brief in Support of the Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand filed by the Oppenheimer Defendants. (The Independent Trustees, the Integrity Funds and Oppenheimer Defendants shall be referred to collectively as "Defendants.")

## II.     Background

Virtually none of the salient background is disputed.   Either by express admission or

conspicuous silence, Plaintiff concedes the factual predicate established by Defendants in their

opening papers.   *See Brett v. Community Unit School Dist. No. 303*, No. 08 C 3092, 2009 WL

424546, at *5 (N.D. Ill. Feb. 18, 2009) ("Plaintiff has failed to respond to a number of arguments

defendants assert in their motion to dismiss . . . . [B]ecause plaintiff did not respond to these

arguments in defendant's motion, he has waived these claims.")[3]  Plaintiff's multiple concessions

substantially narrow the issues before this Court, as the parties appear to agree to all of the

following background:

### A.     Common Factual Background

Investing in each of the following types of instruments fell squarely within the Core Bond

Fund's[4] express (*i.e.*, "disclosed") investment policy:  credit default swaps ("CDS"), total return

swaps ("TRS"), mortgage-backed securities ("MBS") and collateralized mortgage obligations

("CMO").   (CCAC ¶ 46); (Oppenheimer Def's Motion to Dismiss ("Oppenheimer Def's Br.")

pp. 15-16, 19-21).   The Fund clearly announced (*i.e.*, "disclosed") to investors in advance its

intention to invest in each of these instruments.   (*Id.*)   According to Plaintiff, these instruments

were understood to be "risky" securities.   (CCAC ¶ 2, 5).

---

[3]     *See* Independent Trustees' Reply Brief in Support of Motion to Dismiss Consolidated
Class Action Complaint and Jury Demand ("Trustees' Champion Reply Br.") p. 2 in *In re
Oppenheimer Champion Fund Securities Fraud Class Action*, No. 09-386, for additional
authorities.

[4]     The Complaint abbreviates the Core Bond Fund to "the Fund." (CCAC ¶¶ 1, 36).

In addition to disclosing all the types of investments the Fund would make, both prior to and throughout the putative Class Period, the Fund accurately disclosed the "magnitude" of the investment in each of these instruments including the full notional amount of risk to the Fund with respect to each such investment. (Oppenheimer Def's Br. pp. 17-18, 23-25). The Fund timely disclosed in detail each of its positions in these instruments and every change in the "greatness in size or extent"[5] of the holdings in each position in these instruments. (*Id.*) Neither the Complaint nor the Opposition contends the Fund's investments in CDS, TRS, MBS, or CMO exceeded any disclosed limit imposed upon the investment in these instruments. The Fund also disclosed "the risk and volatility of derivative transactions" (Opposition p. 9), and the Fund specifically disclosed the risks accompanying an investment in each of these instruments. (Oppenheimer Def's Br. pp. 16, 21-23). The Fund explained MBS and the Fund's intention to invest in them. (*Id.* pp. 15-16).

Plaintiff, by virtue of the materials cited in the Complaint and the Opposition's conspicuous silence to the Trustees' Motion's emphasis on the prevailing economic conditions, concedes the conditions confronting the market in the second half of 2008 reached an unprecedented "crisis" level. (Opposition p. 5 (discussing "the overall crisis in the real estate market that began in 2007 and accelerated in 2008 . . . .")). Conditions in the commercial real estate market changed and substantially worsened in the last three quarters of 2008. "[A]ny downturn in the commercial real estate market (which eventually materialized) would exponentially impact the Fund . . . ." (Opposition p. 6). Plaintiff acknowledges the liquidity

---

[5]     "Magnitude" as defined *The American Heritage Dictionary of the English Language* 1082 (3d Ed. 1992) .

3

conditions in the market also changed drastically in 2008. "In 2008, . . . . [w]hen the market for

both bonds and the derivatives became increasingly illiquid as the credit crisis unfolded . . . ."

(Opposition p. 10 (quoting Andrew Gogerty, *Fund Companies Falling Short on Stewardship*,

MORNINGSTAR, Feb. 5, 2009)). Moreover, Plaintiff concedes the Fund Manager understood it

was taking no undue risk. Instead, Plaintiff recognizes that the "Fund managers 'fail[ed] to

appreciate the risks they were taking.'" (Opposition p. 10 (quoting Andrew Gogerty, *Fund*

*Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009)).

The breadth of the common ground leaves scant room for any alleged misstatement or

omission of any material fact. As a consequence, the Opposition struggles to identify a concrete

fact omitted or misstated, thus reducing the essence of the Complaint to the following narrowly-

themed articulation of a purported omission:

- "[T]he essential allegations of Lead Plaintiff's claims *that Defendants failed to disclose the enormously enhanced risk that was created as a result of the sheer volume of the Fund's investments in mortgage-backed securities and swaps* . . . ." (Opposition p. 14 (emphasis in original)).

- "[F]ailure to disclose the magnitude of the portfolio's risk profile created by the Fund's enormous investments in mortgage-backed securities and swap transactions" or the "*magnitude* of the Fund's overall leverage position . . . ." (Opposition pp. 13, 17 (emphasis in original)).

- "[F]ail[ure] to disclose the aggregate risk profile of the Fund and the extent to which it was exposed to risky mortgage-backed securities and swap transactions." (Opposition p. 33).

The frequency with which the Plaintiff falls back on these "magnitude of risk" allegations

makes clear Plaintiff does not criticize any specific disclosure of the risks involved in investing

in these instruments (*e.g.*, CMO, TRS, MBS, CDS), or even the disclosures of actual investments

by specific instrument. Instead, Plaintiff asserts only that the overall portfolio of investments

was such that, in addition to disclosing the risks of each investment, Defendants should have

quantified and disclosed changes in the "aggregate risk profile" over the entire portfolio based on the anticipated market conditions.  That Plaintiff supplies the Court neither a definition for the above-quoted concepts nor any metric for its application is unsurprising, as both the Courts and the Securities and Exchange Commission (the "SEC") have never imposed such a disclosure burden upon an issuer on the grounds it would serve only to confuse and mislead investors.

## III.    Argument

The Opposition never succeeds in identifying any "fact" the Fund purportedly misstated or omitted.  As a consequence, the Complaint fails as a matter of law.

### A.    Plaintiff Has Failed to State a Section 11 or Section 12(a)(2) Claim[6]

#### 1.    Defendants Have No Duty to Quantify Level of Risk For Investors

The securities laws, for good reason, simply do not require issuers to calibrate and publish contemporaneous internal risk assessments.  The instructions issued by the SEC on the items to be included in the registration statements or prospectuses of open-end mutual funds under Form N-1A make clear no level-of-risk assessment disclosures are required.  The SEC instructs that "[t]he prospectus should *help investors to evaluate the risks* of an investment and to decide whether to invest in a Fund . . . ."  SEC Form N-1A, General Instructions p. 6, Part C.1.b (emphasis supplied) (attached to the Declaration of Peter G. Rush ("Rush Declaration") as Exhibit A).[7]  The governing case law confirms there is no duty to disclose the purported

---

[6]    In an effort to avoid undue repetition, the Independent Trustees and the Integrity Funds have set forth the arguments in Sections III.A. through III.C. of this Reply Brief in condensed form, and cite to corresponding sections of the Trustees' Champion Reply Brief for a fuller discussion of the points and authorities made below.

[7]    *See* Trustees' Champion Reply Br. p. 6.

"aggregate risk profile," "risk magnitude" or "enormously enhanced risk" of a Fund's investments:

> The law simply does not impose a duty to disclose pejorative characterizations of a company's operations or business prospects. Whether or not a company used the adjective plaintiff chooses should not be the focus of the Court's inquiry. The focus of the securities laws is on the disclosure of facts; characterizations of or conclusions drawn from those facts are matters that are left to the judgment of investors.

*Kowal v. MCI Communications Corp.*, No. 90-2862, 1992 WL 121378, at *4 (D.D.C. May 20, 1992).[8]

### 2. Quantification of Risk is Inherently a Matter of Opinion, Not Fact, Amounting to "Soft Information," Disclosure of Which is Not Required

The securities laws require the disclosure of material facts, not opinions, projections or prognoses. *See* 15 U.S.C. §77k(a) (Section 11) (providing for liability where a registration statement, when such part became effective, "contained an untrue statement of a material *fact* or omitted to state a material *fact*") (emphasis supplied); 15 U.S.C. §77l(a)(2) (Section 12) (providing for liability where a prospectus "includes an untrue statement of a material *fact* or omits to state a material *fact*") (emphasis supplied).[9]  An assessment of the "magnitude" of risk as well as whether a risk has been "greatly" or "enormously enhanced" at bottom are subjective determinations left to each investor based on his or her own analysis of the facts, namely the performance of actual portfolio holdings in the anticipated and constantly-changing market conditions, as well as the investor's own appetite for risk.

---

[8]     *See* Trustees' Champion Reply Br. pp. 7-8 for additional case law for this proposition.

[9]     *See* Trustees' Champion Reply Br. pp. 9-10 for case law for this proposition.

**3.     Plaintiff Seeks to Hold Defendants Liable to Disclose a "Fact" Defendants Did Not Know**

The Complaint and Opposition assert the issuer failed to comprehend or "appreciate" the purported "enhanced risk" to the Fund. (*See* CCAC ¶ 90 (the "managers fail[ed] to appreciate the risks they were taking") (citing Andrew Gogerty, *Fund Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009)); (Opposition p. 10 (same)). Indeed, according to the allegations of the Complaint (CCAC ¶ 89 (citing Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008)), the Manager was confident in and comfortable with its investment strategy. Thus, Plaintiff sues because the Manager neglected to disclose as a purported "fact," *i.e.*, "enormously enhanced risk," something the Manager did not believe or know. "Defendants are not expected to know the unknow-able, nor are they expected to disclose it." *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008), *aff'd in pertinent part*, 2009 U.S. App. LEXIS 20652 (2d Cir. Sept. 17, 2009). Far from disclosing an internal sense of "extraordinary risk," had the Manager announced its internal risk prognosis, the Manager instead would have disclosed confidence in its investment position.[10] This reality proves the sensibility of the SEC policy <u>not</u> to compel issuers to disclose soft information, as the "inherent imprecision" of such information

---

[10]    That Defendants' expectations did not come to fruition in the wake of the credit crisis provides no fodder for a securities claim based on omission or misstatement. Even discounting the causation issues in this regard, Plaintiff's complaint that "the managers . . . failed to appreciate the risks they were taking" may state a mismanagement claim, but provides no fodder for a securities claim. (Opposition p. 10 (quoting Andrew Gogerty, *Fund Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009)); (Oppenheimer Def's Br. pp. 33-36); (Trustees' Motion pp. 16-19).

would make its disclosure "less beneficial to investors than current SEC policy." *In re Verifone*, 784 F. Supp. 1741, 1482 (N.D. Cal. 1992).[11]

### 4.   Plaintiff's Proposed New Disclosure Standard Proves Unworkable

Plaintiff provides the Court no legal guidance -- much less any metric, standard or roadmap -- as to how  (or when) to determine whether a disclosed risk has become so "heightened," "enhanced," "greatly enhanced," or "enormously enhanced" to merit some additional disclosure by the issuer. (Opposition pp. 2, 5, 6, 9, 13, 14, 21, 22, 27, 31 n.12 & 47 n.16). Plaintiff also supplies no guidance for other supposed disclosure triggers such as a substantial change in "the portfolio's risk profile," or "the aggregate risk exposure of the Fund," whatever those terms may mean. (Opposition pp. 13, 16). Plaintiff provides the Court with nothing -- essentially asking the Court to write on a blank slate -- to impose some sort of ongoing risk calibration disclosure duty upon issuers amidst volatile markets and changing conditions.

The Opposition begs but never answers the question of just when the Fund crossed the threshold of some asserted "enormously enhanced risk" thereby giving rise to a purported duty to disclose.   For instance, at what point did the "multiplying effect that the Fund's swap transactions had on the net leverage of the portfolio . . . [so] vastly enhance[] [the] . . . risk" (Opposition p. 21) so as to necessitate some additional disclosure?  Nothing required the Fund to

---

[11]     Plaintiff's reliance on *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99-12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) is misplaced.  There the court held the issuer was obligated "to disclose hard facts critical to appreciating the magnitude of the risks described." *Id.* at *8.  The issuer in that case failed to disclose (or misrepresented) the "hard fact" that the guaranteed investment contracts were redeemable in seven days as opposed to the disclosed 30 days, a fact which radically altered the company's ability to adjust liquidity.  Here, Plaintiff points to no such omitted "hard facts."

maintain some sort of continuous risk alert system.[12] Plaintiff cites no law that comes close to imposing a continuing duty of disclosure upon an issuer, especially with respect to internal risk assessments. Indeed, the law is to the contrary. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as the news comes into their possession. Yet that is not the way the securities laws work. We do not have a system of continuous disclosure.")[13]

Indeed, Section 11 of the Securities Act of 1933 provides for liability only where "the registration statement, *when such part became effective*, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k (emphasis added). Section 11 liability may attach only where a registration statement contains a misstatement or omission that is false or misleading at the time that the registration statement becomes effective. Events occurring

---

[12]    Plaintiff's suggestion that an additional disclosure was required when leverage risks had come to "fruition" (Opposition pp. 16-17) fares no better. Nowhere does the overall Complaint allege as a fact that some leverage risk came to fruition. Plaintiff's additional assertion that certain reference entities on the derivatives "were in severe financial crisis, such as AIG, Merrill Lynch, Washington Mutual, Lehman Brothers, Tribune, Citigroup, General Motors, and Ford, several of which were on the verge of bankruptcy" (Opposition p. 21) is of no moment. The Fund disclosed the exact amount at risk with respect to each reference entity. Under the securities law, it is up to the investor to calibrate the investment risk of those institutions. *See, e.g., Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 319185, at *2 (N.D. Ill. June 23, 1994); *see also In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 565 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993).

[13]    Indeed, the Opposition relies on Fund positions well *after* the challenged disclosures to demonstrate its points: for "leverage position" the Opposition points to "December 2008" (Opposition p. 7); for "commercial mortgage-backed securities" the Opposition focuses on "the period ending June 30, 2008" (Opposition p. 6); and for "excessive" credit default swaps the Opposition focuses on "transactions . . . during the second quarter of 2008." (Opposition p. 5).

subsequent to the effective date of the registration statement provide no basis for liability under Section 11. *See, e.g., In re Metropolitan Sec. Litig.,* 532 F. Supp. 2d 1260, 1294 (E.D. Wash. 2007) ("Section 11 imposes liability for misstatements and omissions that were false or misleading at the time the registration statement in question became effective. Transactions or events that occurred after a registration statement's effective date therefore cannot provide a basis for Section 11 liability."); *see also Albert Fadem Trust v. American Elec. Power Co., Inc.,* 334 F. Supp. 2d 985, 1019 (S.D. Ohio 2004) (to avoid dismissal of a Section 11 omission claim, plaintiff must allege that defendants were under a duty to disclose the omitted material information, and "that such information existed at the time the prospectus became effective.")[14] Moreover, "[c]laims under Sections 11 and 12 are usually evaluated in tandem, because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)(2). Plaintiffs pleading Sections 11 and 12 claims must state facts showing the 'allegedly omitted facts both existed and were known or knowable, at the time of the offering.'" *Lin v. Interactive Brokers Grp., Inc.,* 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (internal quotations omitted).

Plaintiff alleges misleading statements and omissions in the Registration Statements issued April 30, 2007 and April 29, 2008. As a consequence, to assess the adequacy of disclosure of those documents requires that a snapshot be taken at that moment in time. The Opposition, for good reason, makes no effort to do that. In fact, through its silence and its

---

[14]      Indeed, Plaintiff concedes that "[w]hen determining whether a statement is material, courts should 'adopt[] the perspective of an investor on the date the registration statement containing the prospectus at issue became effective.'" (Opposition p. 13 (citing *Yuan v. Bayard Drilling Techs., Inc.,* 96 F. Supp. 2d 1259, 1966 (W.D. Okla. 1999))).

express and adopted statements, the Opposition concedes the market conditions relevant to the Fund changed dramatically and reached an unprecedented level in the latter part of 2008. In addition, according to the Opposition, "the overall crisis in the real estate market . . . accelerated in 2008" and a "downturn in the commercial real estate market (. . . eventually materialized) . . . ." (Opposition pp. 5, 6). According to statements adopted by both the Complaint and now the Opposition:

- "As we all know by now, the market only got worse and became more illiquid during the course of the year [2008]"

- "By the end of September [2008], just before the Treasury Department's Troubled Asset Relief Program proposal and right around the time the market sailed off into uncharted mania . . . ."

- the 2008 market "appeared" to present "historically unthinkable valuation opportunities that no one expected to act in any correlated fashion."

- in 2008 historically "rare market scenarios . . . proved quaint next to the price movements that actually occurred and which represented market fear of true economic calamity"

- "A chief culprit [of the Fund's loss] was the sudden drop of prices of the fund's commercial mortgage-backed securities sparked by the Treasury's shifting priorities for the Troubled Asset Relief Program" in September 2008.

- "The market for CMBS total-return swaps, for example, seized up in the wake of September's financial-sector upheaval," and the market became "dysfunctional."

- "[T]he market for both bonds and derivatives became increasingly illiquid as the credit crisis unfolded" [15]

---

[15]    Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008 (*cited in* CCAC ¶¶ 6, 89; Opposition pp. 1, 9-10, 17, 20, 31 & 47 n. 16); Miriam Sjoblam, *We've lost confidence in Oppenheimer Core Bond Fund*, MORNINGSTAR, Dec. 17, 2008 (*cited in* CCAC ¶ 88; Opposition p. 9); Andrew Gogerty, *Fund Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009 (*cited in* CCAC ¶ 90; Opposition pp. 10, 31-32).

As seen through the lens of the aforementioned admissions, the only possible remaining securities claim would be the Fund Manager in fact anticipated the actual market calamity and its impact on its portfolio and failed to disclose that purported "fact" in early 2008. But the Opposition's adopted statements absolutely preclude any such claim. "[I]t's upsetting that [the Fund Manager] didn't anticipate the dangers of the fund's derivative positions in this dysfunctional market." (Miriam Sjoblam, *We've lost confidence in Oppenheimer Core Bond Fund*, MORNINGSTAR, Dec. 17, 2008, *cited in* CCAC ¶ 88); (Opposition p. 9). "[I]t's very disappointing that the [Fund investment] team didn't internalize just how much risk it was taking . . . ." (Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008, *cited in* CCAC ¶¶ 6, 89); (Opposition pp. 1, 9-10, 17, 20, 31 & 47 n.16). Plaintiff's complaint, essentially that the Fund Managers "focused on the trees that appeared to be incredible bargains . . . . [b]ut [c]ouldn't see that the forest was on fire" fails to state a securities claim. *Id.*

### 5. The Fund Disclosed All the Factual Information Required

According to the Opposition, "'[l]everage' refers to the utilization of 'borrowed' money." (Opposition p. 6). However, nothing in the Complaint or any of the disclosure documents indicates the Fund "borrowed" any monies. Hence, the leverage about which Plaintiff complains involves some risk other than the ability to repay borrowed money. Plaintiff expressly acknowledges, as he must, that the Fund disclosed it entered into transactions, including "swaps," that "may have off-balance sheet market risk." (Opposition p. 15 (quoting Oppenheimer Core Bond Fund April 29, 2008 Prospectus p. 6) (selected portions attached to Rush Declaration as Exhibit B)). Plaintiff further acknowledges that the April, 2008 Prospectus explained leverage exists "when an investor achieves the right to a return on a total investment amount that exceeds the cash amount the investor contributed in making the investment." (*Id.*)

Plaintiff further acknowledges that the Fund disclosed that investments in derivative instruments present the risk of leverage with the potential for unlimited loss:

> Derivatives also present the risk of leverage . . . . The Fund's use of certain economically leveraged derivatives can result in a loss substantially greater than the amount invested in the derivative itself. Certain derivatives have the potential for unlimited loss, regardless of the size of the initial investment. When the Fund uses derivatives for leverage, a shareholder's investment in the Fund will tend to be more volatile, resulting in larger gains or losses in response to the fluctuating prices of the Fund's investments . . . .

(*Id.*) (emphasis supplied).[16]

Unable to maintain a failure by the Fund to disclose that investing in swaps resulted in leverage, Plaintiff instead argues that "the Fund failed to disclose that, at the time of the offerings, the risk already had come to fruition, *i.e.*, the Fund was already heavily leveraged up to more than two times the total value of its net assets." (Opposition p. 17 (citing CCAC ¶ 68)). Yet the very paragraph of the Complaint Plaintiff cites defies his contention that the complained-of risk -- "leverage more than two times the total value of the Fund's net assets" -- had in fact come to fruition by the effective date of either the April 2007 or the April 2008 offering materials. Indeed, the chart in Paragraph 68 of the Complaint shows the Fund's net leverage as of the two quarters that collared the April 2007 offering were 1.2483 and 1.4349, respectively,

---

[16]    With respect to investments in derivatives, the Fund clearly disclosed it could "use derivative instruments," including "swaps," "for speculative purposes (to seek higher investment returns)." (April 29, 2008 Prospectus pp. 3, 16, 19-20). The Fund further disclosed the risks involved in using swaps, including liquidity risk, counterparty credit risk, risk of mistake by the Manager, risk of a credit event, interest rate risk, and stock market risk. (April 29, 2008 Prospectus pp. 6, 14, 17); (Oppenheimer Core Bond Fund April 29, 2008 Statement of Additional Information ("SAI") p. 134 (selected portions attached to Rush Declaration as Exhibit C)); (Oppenheimer Core Bond Fund, *Management Commentaries and Semiannual Report*, June 30, 2007 p. 55 (selected portions attached to Rush Declaration as Exhibit D)).

and the net leverage as of the two quarters that collared the April 2008 offering were 1.7673 and 1.6885, respectively. According to the chart in Paragraph 68, the Fund's net leverage never reached the purported risk level asserted to constitute "fruition," namely "two times the total value of its net assets," until December 31, 2008, long after the offerings complained of here.[17] (Oppenheimer Core Bond Fund, *Management Commentaries and Annual Report*, Dec. 31, 2007 pp. 24-33 (selected portions attached to Trustees' Motion at Rush Declaration Exhibit G)). And importantly, Plaintiff can point to nothing to indicate why this factor of two constitutes some threshold for disclosure rather than some other number.

The Opposition even admits the Fund disclosed the full leverage risk (the "notional amount" at risk in the event of default) for every single CDS the Fund sold.  (CCAC ¶ 64). Moreover, the Complaint never alleges a "default" with respect to any sold CDS occurred for which "the Fund would be subject to investment exposure." When the disclosures detail the very risk that allegedly led to plaintiff's losses, there can be no disclosure action under the Securities Act. *Demaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001).[18]

### 6.   The Opposition Fails to Support Any Contention the Fund Failed to Invest Its Net Assets in Investment Grade Securities

Although not entirely clear, the Opposition implies the Fund violated the securities laws by not investing enough of its net assets in "investment grade securities." (Opposition pp. 1-2,

---

[17]   With respect to mortgage-backed securities, as set forth in detail in the Trustees' Motion, the Fund disclosed the total notional amount of every single mortgage-backed security entered into by the Fund, the reference entity, the terms of the payment and due date as well as the principal amount and value of the obligation.

[18]   There is, of course, no duty for the Fund to compare itself to any peer fund from a risk perspective. *See* Trustees' Champion Reply Br. p. 16 for further discussion.

25-27).  Contrary to this implication, far from moving away from investment grade securities in this Fund, the Manager migrated toward them.   In its December 31, 2008 Management Commentaries and Annual Report, the Management stated one of the "most significant factors influencing Fund performance for this reporting period" was "the Fund's investments in the high-quality commercial mortgage-backed securities (CMBSs) sector and long-maturity fixed-income securities of highly-rated financial institutions."   (Oppenheimer Core Bond Fund, *Management Commentaries and Annual Report*, Dec. 31, 2008 p. 5 (selected portions attached to Rush Declaration as Exhibit E)).  It explained, "the volatility in the corporate debt market created a backdrop in which even the highest-rated assets were battered, including the Fund's investments in high quality CMBSs, non-agency residential mortgage-backed securities (MBSs) and longer-maturity investment grade financial bonds, which we had believed to be fundamentally sound." (*Id.* at 6); (*see also* Oppenheimer Core Bond Fund, *Management Commentaries and Semiannual Report*, June 30, 2008 pp. 6-7, *An Interview with Your Fund's Managers* (noting that Fund purchased more MBS backed by "high quality" securities, and cited an emphasis on "longer-term, high-quality financials bonds" within investment-grade exposure) (selected portions attached to Rush Declaration as Exhibit F)).   According to Plaintiff's own adoptive statements, "[b]y January 2008, the [Fund investment] team had begun packing some of that powder in . . . four key areas that they felt had become exceedingly cheap.  That included AAA rated commercial mortgage-backed securities . . . [and] AA and A rated financial-sector corporate bonds." (Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008, *cited in* CCAC pp. 6, 89); (Opposition pp. 1, 9-10, 17, 20, 31 & 47 n.16).

**B.**     **Plaintiff Has Failed to Show the Independent Trustees or the Integrity Funds Can be Liable Under Section 12(a)(2) as "Sellers"**

Plaintiff seeks to prosecute a Section 12(a)(2) claim he insists "provide[s] for absolute liability, even for innocent misstatements" but proposes his statement of those claims be "subject only to the liberal notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which requires [sic] 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" (Opposition pp. 11, 12). The governing standard, however, is not so lax so as to condone the conclusory allegations made by Plaintiff here. Controlling Supreme Court authority mandates a plaintiff seeking such absolute liability plead "facts" which establish a plausible, rather than simply possible, right to relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Various Circuit Courts of Appeals have recognized that *Iqbal* and *Twombly* significantly changed the pleading landscape. *See Moss v. U.S. Secret Service*, 572 F.3d 962, 972 (9th Cir. 2009) (requirement that facts alleged in a complaint must state a claim that is plausible on its face "is a significant change, with broad-reaching implications"); *see also Turkmen v. Ashcroft*, 589 F.3d 542, 546-47 (2d Cir. 2009) (characterizing *Iqbal* and *Twombly* as imposing a "heightened pleading standard.")

To assess the adequacy of Plaintiff's attempt to plead seller status, it is necessary to refocus on the buyer-seller relationship. A Section 12(a)(2) claim may only be asserted against the "seller" of the security. The Supreme Court interprets "seller" narrowly to mean either the "owner who passed title," or "the person who successfully solicits the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities

16

owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647, (1988).[19]  The Independent Trustees and the

Integrity Funds neither sold nor solicited for sale any of the Fund's securities, as "solicitation"

requires that a person, at a minimum, **directly communicate with and actively solicit the**

**buyer**.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003).

For example, in *In re Metropolitan Sec. Litig.*, the court rejected the type of allegations

made by Plaintiff here in holding that "neither the signing of a prospectus, nor the unsupported

assertion of solicitation is sufficient to qualify an individual as a 'seller' for the purposes of

Section 12," reasoning, "the Supreme Court's recent decision in *Twombly* emphasizes the

importance of alleging facts at the pleading stage.  Given that solicitation of a sale is a necessary

element of a claim brought under Section 12, the contention that 'the defendant solicited the sale'

must be supported by factual allegations at the pleading stage."  532 F. Supp. 2d at 1296; *see*

*also Cafaro v. HMC*, No. 07-2793, 2008 WL 4224801, at \*5 (D.N.J. Sept. 8, 2008) (plaintiff

failed to raise a right to relief above the speculative level where complaint "merely recite[d] the

elements of a cause of action under Section 12(2) in a conclusory fashion" without supporting

factual allegations) (citing *Twombly*, 127 S. Ct. at 1965).

The Opposition ignores the greater weight of case law cited by the Independent Trustees

and the Integrity Funds, instead merely cataloguing those pre-*Iqbal* district court cases which

have held that signing a registration statement is sufficient to deem one a "seller."  Defendants

contend the cases cited by Plaintiff reach the incorrect conclusion on the "seller" issue in part

---

[19]     Although *Pinter* addressed the meaning of "seller" under Section 12(a)(1), courts have
concluded that the definition applies to Section 12(a)(2).  *Allison v. Bank One-Denver*, No. 91-
1422, 1994 WL 637403, at \*3 (D. Colo. Jan. 7, 1994); (*see* Trustees' Motion p. 7 n.6).

17

because they fail to recognize the Supreme Court's edicts in *Iqbal* and *Twombly* on the necessity of pleading facts giving rise to a plausible right to relief.[20]

Moreover, none of Plaintiff's cases examine the *Pinter* court's recognition that, although Section 11 expressly applies to "collateral participants" such as persons who "sign" a registration statement, "[t]here are no similar provisions in § 12, and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions." *Id.* at 650 n.26.[21]

In the cases where the *Pinter* decision has been carefully applied, the courts have concluded that a trustee can be a "seller" based on contractual privity with the purchaser or direct involvement in the solicitation of a purchaser's investment, but not through signing a registration statement or prospectus. (Trustees' Motion pp. 9-10); (Trustees' Champion Reply Br., p. 20).

---

[20]     Those cases, including *In re Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009) and *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933 (M.D. Tenn. 1999), are cited in the Opposition at pages 37 and 38. Unlike those cases, the *In re Metropolitan* and *Cafaro* courts applied *Twombly* to find allegations of signing a registration statement insufficient. (*Sirrom Capital* long-preceded *Twombly*.) The *Schwab* court did not cite *Twombly* in concluding that such remote act provides grounds for a Section 12(a)(2) claim. Interestingly, *Schwab* was decided pre-*Iqbal*, the 2009 case in which the Supreme Court made clear the *Twombly* pleading standards applied to all cases rather than only those alleging antitrust violations. This may explain why the court in *Schwab* never mentioned *Twombly* nor applied its pleading standards.

[21]     Those cases also do not apply the directive in *Pinter* that section 12(a)(2)'s "purchase from" requirement focuses on a defendant's "***relationship***" with the plaintiff-purchaser. *Pinter*, 486 U.S. at 651. As a result, the existence (or more appropriately, the lack) of any such relationship is never examined in these cases. The Tenth Circuit appears to be in accord with this requirement, stating that a plaintiff must "at a minimum allege ***facts*** indicating that [a defendant] solicited [the] purchase." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998) (emphasis supplied); *see also In re Thornburg Mortgage, Inc. Sec. Litig.*, No. 07-0815, 2010 WL 378300 (D.N.M. Jan. 27, 2010) (citing *Maher*'s requirement to plead facts indicating solicitation to conclude that allegations directors created and signed offering documents did not rise to the level of solicitation).

The other allegation relied upon by the Opposition, that "governing" the Fund in the role of independent trustee means that the Independent Trustees solicited purchases of shares for their own financial interests, is similarly insufficient to convey Section 12(a)(2) liability. *In re Sonus Networks Sec. Litig.*, No 04-10294, 2006 U.S. Dist. LEXIS 28272, at *34-38 (D. Mass. May 10, 2006) (dismissing Section 12(a)(2) claim devoid of factual allegations pertaining to defendants' solicitation efforts). This bare allegation equating "governing" to "soliciting" does nothing to set forth facts demonstrating a plausible right to relief. *See Iqbal*, 129 S. Ct. at 1950; *see also Twombly,* 127 S. Ct. at 1965.[22] The allegation also ignores the *Pinter* court's directive to focus on the buyer-seller relationship, and is nothing more than the type of conclusory label that the most courts rejected even before *Iqbal* and *Twombly* became the governing pleading standard.

Finally, the Opposition does not attempt to address the failure to state a claim against the Integrity Funds; the only allegation is the Integrity Fund was the registrant of the Fund. (*See* Trustees' Motion p. 11-12). The factually-devoid pleading must result in dismissal against this defendant as well.

### C. The Complaint Does Not Allege Any Section 15 Claim Against the Independent Trustees or the Integrity Funds

#### 1. The Complaint Fails to Allege the Independent Trustees Controlled Any Defendant

The Section 15 claim should be dismissed for a central patent deficiency which Plaintiff ignores in the Opposition: the failure to properly allege that the Independent Trustees or the

---

[22] The *Schwab* case illustrates a deficient analysis. Not only was *Pinter* not examined in depth, the court made no separate analysis of the independent trustees' motion to dismiss the Section 12(a)(2) claim. The court instead relied on pre-*Twombly* case law articulating lenient pleading standards at the motion to dismiss stage, and found the generic allegation of "actively solicit[ing]" sales sufficient.

Integrity Funds controlled any of the named defendants. The Complaint alleges that the Independent Trustees controlled the Fund (CCAC ¶ 35), but the Fund is not named as a defendant.[23] The law is clear that the asserted "controlled person" must be a defendant to sustain a Section 15 claim.[24] Plaintiff's failure to address this critical deficiency constitutes an admission that the claim has not been pleaded properly. *See Brett*, 2009 WL 424546, at *5; *see also Tatum*, 2007 WL 419463, at *3.[25]

Instead, the Opposition asserts that the Independent Trustees can be liable under Section 15 for controlling the Distributor. (Opposition p. 40). Plaintiff cites paragraphs 17 and 33 for the proposition the Complaint alleges such control over the Distributor. A brief analysis of those paragraphs, however, shows that this assertion is erroneous. Paragraph 17 merely identifies the Distributor, while paragraph 33 alleges that the Distributor controlled the Fund. Indeed, as the Fund's SAI makes clear, the Board of Trustees governs the *Fund*, not the Distributor. (April 29, 2008 SAI p. 38) (selected portions attached to Rush Declaration as Exhibit C).

---

[23] Plaintiff names the Integrity Funds as a defendant, but not the Core Bond Fund, which is the "Fund" referred to throughout the Complaint. The Core Bond Fund is a series within the Integrity Funds. (*See* Trustees' Motion p. 4).

[24] *See* Trustees' Motion p. 14 n.9 and Trustees' Champion Reply Br. pp. 21-22 for cases supporting this proposition. Although this legal rule was cited in the Trustees' Motion, Plaintiff avoided the issue in the Opposition. Thus, Plaintiff relies upon the allegations of control over the Fund for the sufficiency of the claim without addressing the fundamental issue that the Fund is not named as a defendant. (*See* Opposition pp. 39-40).

[25] Similarly, Plaintiff has waived any argument against its failure to set forth a claim against the Integrity Funds, as the Opposition did not attempt to rebut the insufficiency of the sole allegation against defendant, that it was the registrant of the Fund. (*See* Trustees' Motion pp. 15-16).

Also, the amorphous allegations that the Independent Trustees somehow controlled the Manager and other Defendants fall well short of what is needed to set forth a Section 15 claim after *Iqbal* and *Twombly*. A Section 15 claim may not be based on "control person allegations [which] are limited to legal conclusions and therefore are not entitled to the presumption of truth." *Graham v. Barriger*, No. 08-9357, 2009 WL 3852461, at *19 (S.D.N.Y. Nov. 17, 2009) (citing *Iqbal*, 129 S. Ct. 1949-50);[26] *see also Maher*, 144 F.3d at 1306 (dismissal is appropriate where "a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person.").[27]

As set forth more fully in the Trustees' Motion, the Section 15 Count is impossible to decipher, failing to define which Defendants are included in the Count and failing to specify which Defendants purportedly controlled other Defendants. With regard to the Independent Trustees, the Complaint states merely they attained control by unspecified "direct and/or indirect business and/or personal relationships" with other (unidentified) parties. (CCAC ¶ 117). The Complaint has no control allegations pertaining to the Integrity Funds; this defendant is merely identified as the registrant. (CCAC ¶ 34). Such factually devoid pleading cannot support a

---

[26]     *Graham* dealt with control person allegations under Section 20(a) of the Securities Exchange Act of 1934. The control person provisions of Section 15 and Section 20(a) are interpreted the same. *Maher*, 144 F.3d at 1305 n.7.

[27]     Plaintiff contends the Complaint demonstrates the requisite control by the Independent Trustees because they signed registration statements, but in *Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 U.S. Dist. LEXIS 52365, at *25 (C.D. Cal. July 1, 2008), , cited by Plaintiff on the control issue, the court dismissed Section 15 and 20(a) claims because allegations that certain directors signed SEC filings and served on the audit committee "do not present a basis for control liability against these defendants." Moreover, Plaintiff does not, and cannot, point to any defendant over which the Independent Trustees allegedly exercised control by virtue of the signing registration statements.

Section 15 claim. *See Maher*, 144 F.3d at 1306;[28] *see also Iqbal*, 129 S. Ct. at 1949 (mere conclusory allegations without factual support are insufficient to establish a claim for relief).[29]

### 2. The Complaint Does Not Allege an Underlying Securities Act Violation

Control person liability cannot be established without proper allegations of a primary violation under Section 11 or 12. *See Maher*, 144 F.3d at 1305; *Cooperman v. Individual, Inc.*, 171 F.3d 43, 52 (1st Cir. 1999) (control person claim dismissed where plaintiffs failed to properly allege underlying violation). The Opposition fails to demonstrate the proper allegation of an underlying violation.

## IV. Conclusion

For all the foregoing reasons, defendants William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone and F. William Marshall and the Oppenheimer Integrity Funds respectfully request that this Court dismiss the Complaint with prejudice.

---

[28]   The Opposition attempts to distinguish *Maher* by asserting that the Complaint's general allegations of control show more than the "tenuous connection" between purported control and controlled persons in *Maher*. The instant Complaint and the facts in *Maher* are more similar than Plaintiff admits. The Independent Trustees serve in that capacity, but only with respect the non-defendant Fund. The Independent Trustees are not, and are not alleged in the Complaint to be, trustees, officers or employees of either the Manager or the Distributor.

[29]   Furthermore, it should be undisputed that the Independent Trustees did not control the Manager or Distributor. As set forth in the Trustees' Motion and again, unrebutted by the Opposition, the ICA prohibits conferring independent trustee status on an "interested person," which is defined to include any "affiliated person" of the investment adviser or principal underwriter. 15 U.S.C. §80a-2(a)(19). Any suggestion this is somehow a factual matter misses the point: because Plaintiff has failed to allege any facts underlying his conclusory allegations, there is no factual matter, only improper allegations subject to dismissal.

Dated:   February 17, 2010                   Respectfully submitted,

                                             **K&L GATES LLP**

                                 By:   */s/ Peter G. Rush*
                                       _____

                                       Peter G. Rush
                                       Jeffrey T. Petersen
                                       Sara E. Fletcher
                                       70 West Madison Street, Suite 3100
                                       Chicago, IL  60602
                                       Telephone:  (312) 372-1121
                                       Facsimile:   (312) 827-8000
                                       E-Mail:  peter.rush@klgates.com
                                                jeffrey.petersen@klgates.com
                                                sara.fletcher@klgates.com


                                       **DAVIS GRAHAM & STUBBS LLP**

                                       Dale R. Harris
                                       1550 Seventeenth Street, Suite 500
                                       Denver, CO  80202
                                       Telephone:  (303) 892-9400
                                       Facsimile:   (303) 893-1379
                                       E-Mail:  dale.harris@dgslaw.com

                                       *Attorneys for Defendants William L.
                                       Armstrong, Robert G. Avis, George C.
                                       Bowen, Edward L. Cameron, Jon S. Fossel,
                                       Sam Freedman, Beverly L. Hamilton, Robert
                                       J. Malone and F. William Marshall and the
                                       Oppenheimer Integrity Funds*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February, 2010, I electronically filed a true and correct copy of the foregoing **DEFENDANTS INDEPENDENT TRUSTEES' AND THE OPPENHEIMER INTEGRITY FUNDS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net

- **Robert Bruce Carey**
  rcarey@hbsslaw.com,agostnell@careylaw.com,rob.carey@att.net,
  cindyj@hbsslaw.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,sf_filings@hbsslaw.com

- **Peter George Koclanes**
  pkoclanes@shermanhoward.com

- **Aaron Michael Sheanin**
  amv@girardgibbs.com

- **Christina H.C. Sharp**
  chc@girardgibbs.com

- **Gordon W. Netzorg**
  gnetzorg@shermanhoward.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com

- **Regina Ames Sandler**
  ras@girardgibbs.com

- **Stephen D. Bunch**
  dbunch@cohenmilstein.com

- **Steven J. Toll**
  stoll@cohenmilstein.com

- **Charles Walter Lilley**
  clilley@lilleylaw.com

- **Karen Jean Cody-Hopkins**
  kjch@lilleylaw.com

- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com

- **Robert J. Dyer, III**
  bob@dyerberens.com

- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com

- **Daniel Charles Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **Dale R. Harris**
  dale.harris@dgslaw.com,patricia.henson@dgslaw.com

- **Christopher J. Keller**
  ckeller@labaton.com,ejo@labaton.com,aellman@labaton.com,electroniccasefiling@labaton.com

- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com

- **Robert Nolen Miller**
  rmiller@perkinscoie.com

- **Stephanie E. Dunn**
  sdunn@perkinscoie.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com,lisa@shumanlawfirm.com

/s/ Peter G. Rush
Peter G. Rush
K&L GATES LLP
70 W. Madison Street
Suite 3100
Chicago, IL  60602
312.372.1121
peter.rush@klgates.com